# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------------------x
TIMOTHY KARCHER, et al.,                   :
                                           :        Case No. 16-cv-232 (CKK)
                        Plaintiffs,        :
                                           :
             -against-                     :
                                           :
ISLAMIC REPUBLIC OF IRAN,                  :
                                           :
                        Defendant.         :
-----------------------------------------------------x
```

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ............................................................................................ v

I.   BACKGROUND ...................................................................................................... 4

  A.  Overview of the Action .......................................................................................... 4

  B.  Plaintiffs' Burden of Proof under 28 U.S.C. § 1608(e) ........................................ 5

  C.  The Court's Evidentiary Standards under 28 U.S.C. § 1608(e) ............................ 6

  D.  Plaintiffs' Proffered Experts and Expert Testimony Were Properly Qualified and Admitted ................................................................................................................. 7

  E.  Overview of Plaintiffs' Evidence .......................................................................... 7

    1.  Plaintiffs' Liability Expert Witnesses ............................................................ 7

    2.  Plaintiffs' Medical Expert Witnesses ........................................................... 10

    3.  Plaintiffs' Exhibits ........................................................................................ 11

  F.  This Court Properly Took Judicial Notice of Specified Findings in *Fritz v. Islamic Republic of Iran* ................................................................................................... 14

II.  PROPOSED FINDINGS OF FACT ...................................................................... 15

  A.  Iran's History of Orchestrating Acts of International Terrorism as an Instrument of Regime Policy ...................................................................................................... 16

    1.  Formation and Development of Lebanese Hezbollah ................................... 18

    2.  Hezbollah's History of Launching Terrorist Attacks at Iran's Behest ......... 19

    3.  Hezbollah's Development of Advanced Tactics ........................................... 21

  B.  Iran's Strategic Goals in Iraq After the 2003 U.S.-Led Invasion ....................... 25

    1.  The IRGC-QF's role in Iraq ......................................................................... 27

    2.  Hezbollah and the IRGC-QF Introduced EFPs into Iraq ............................. 29

    3.  Indicators of Hezbollah Training in the "TTP" Used by IRGC/Hezbollah Proxy Groups ................................................................................................ 30

    4.  Hezbollah's Central Role in Training Iranian Terror Cells in Iraq .............. 32

    5.  The U.S. Military's Response ....................................................................... 35

  C.  Hezbollah's Development of Explosively Formed Penetrators ("EFPs") ........... 42

    1.  Metallic Properties and Structural Design ................................................... 43

    2.  Chemical and Metallurgical Composition of EFPs ...................................... 44

    3.  EFP Trigger Mechanisms .............................................................................. 48

  D.  The IRGC-QF and Hezbollah's Initial Proxies in Iraq ...................................... 50

1.   The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") and
     the Badr Corps.................................................................................. 50

2.   Muqtada al-Sadr and Jaysh al-Mahdi ("JAM")............................................ 51

3.   The Emergence of IRGC and Hezbollah Proxy Groups 2004 – 2011 .................... 55

III.  The Bellwether EFP Attacks ................................................................... 68

A.   The May 3, 2005 Attack – Baghdad .......................................................... 68

B.   The October 22, 2006 Attack – Baghdad..................................................... 72

C.   The March 17, 2008 Attack – New Baghdad ................................................ 76

D.   The March 23, 2008 Attack – Baghdad ...................................................... 81

E.   The May 9, 2008 Attack – Baghdad .......................................................... 88

F.   The May 17, 2009 Attack – Baghdad ......................................................... 92

G.   The January 20, 2007 Attack On The Karbala PJCC ...................................... 99

IV.   The Framework For Damages Awarded In FSIA Cases Warrants Adjustment
      In Cases Involving Injuries Sustained From EFPs ......................................... 109

A.   The Unique Effects of EFPs .................................................................. 112

1.   EFPs Produce "The Most Devastating And Catastrophic Injuries In
     Modern Combat"............................................................................... 113

2.   The EFP's Blast Waves Result in Exceptionally Devastating TBIs ..................... 116

3.   The Medical Community Has Recently Dispelled Previous Medical
     Misconceptions Regarding TBI ............................................................... 117

4.   The Medical Community Has Recently Dispelled Beliefs That "Mild" TBI Is,
     in Fact, Mild ..................................................................................... 119

5.   The Medical Community Now Better Understands the Poor Prognosis for
     Mild TBI.......................................................................................... 122

6.   EFPs Cause Particularly Devastating TBIs ................................................. 123

B.   EFPs Cause Exceptionally Devastating Traumatic Amputations and
     Orthopedic Injuries ........................................................................... 126

1.   Physics and Engineering Design of an EFP Cause it to Impart Especially
     Deadly Force ..................................................................................... 127

2.   Resulting Traumatic Amputations and Orthopedic Injuries are Unprecedented ........ 128

3.   Traumatic Amputations Caused By EFPs are More Devastating Than When
     Caused By Other Blasts......................................................................... 129

4.   The Force of EFPs Often Result in Uniquely Severe Fractures Which Require
     Painful, Often Unsuccessful, Treatment ................................................... 132

5.   Traumatic Amputations and Orthopedic Injuries Caused by EFPs are Often
     Accompanied by Uniquely Severe Complications........................................... 133

C.  EFPs Frequently Cause Unprecedented Polytraumatic Injuries ...................................... 137

  1.  Polytraumatic Patients Are Frequently Denied Initial Pain Medication, Leading to Chronic Pain That Is Difficult to Manage.................................................. 138

  2.  The Root of Polytraumatic Patients' Pain Is Often Difficult to Identify, Frequently Resulting in Ineffective Pain Management................................................ 140

  3.  EFP Victims Often Require Extensive and Long-Term Treatment, Causing Further Pain and Adverse Effects.................................................................................. 141

  4.  Chronic Pain and Its Treatment Causes Adverse Effects on the Polytraumatic Patient ............................................................................................... 142

D.  EFP Victims Are at Unique Risk for Psychological Injuries........................................... 143

  1.  EFP Victims Are Separated from Their Units Against Standard Military Recommendations ...................................................................................................... 147

  2.  TBIs Contribute to EFP Victims' Psychological Injuries ........................................... 151

  3.  Chronic Pain Contributes to EFP Victims' Psychological Injuries ............................ 151

  4.  EFPs' Traumatic Injuries Contribute to EFP Victims' Psychological Injuries............ 152

E.  The Medical Evidence Presented Concerning Injuries Caused by EFPs Warrants the Application of a Distinct Baseline for Damages.............................................................. 153

F.  The Baseline Awarded for Psychological Injuries Should be Increased Based on EFPs' Unique Effects....................................................................................................... 154

G.  Previous Damages Awarded for Mild TBI Should Be Increased Based on New Medical Understanding of EFPs' More Lethal Effects .......................................... 155

  1.  The Baseline for Mild TBI With Psychological Injuries Only Should Be Set at $5 Million.................................................................................................................... 157

  2.  The Baseline for Mild TBI With Psychological Injuries and Other Serious Physical Injuries Should Be Set at $7 Million ............................................................ 159

  3.  The Baseline for Mild TBI With Psychological Injuries and Polytrauma/Traumatic Amputations Should Be Set at $20 Million ................................................................. 160

  4.  The Baseline for Moderate/Severe TBI Should Be Set at $20 Million........................ 162

  5.  The Baseline for Moderate/Severe TBI With Other Physical Injuries Should Be Set at $30 Million...................................................................................................... 163

V.  CONCLUSIONS OF LAW ................................................................................................ 163

A.  Basis of Jurisdiction Under FSIA ................................................................................... 163

  1.  Jurisdiction over Iran and the IRGC is premised on 28 U.S.C. §§ 1330(a), 1331 and 1605A ................................................................................................................. 163

  2.  Service of Process/Personal Jurisdiction.................................................................... 164

  3.  Subject Matter Jurisdiction......................................................................................... 165

    4.    Iran Designated as a State Sponsor of Terrorism ........................................................ 166

    5.    The FSIA Applies to Conduct Occurring Prior to Act's Enactment ........................... 166

  B.    Extrajudicial Killing, Torture, Hostage Taking and Provision of Material Support ....... 167

    1.    Extrajudicial Killing ................................................................................................ 167

    2.    Torture ..................................................................................................................... 168

    3.    Hostage Taking ........................................................................................................ 169

    4.    Provision of Material Support .................................................................................. 169

  C.    Federal Cause of Action ............................................................................................ 170

CONCLUSION ................................................................................................................ 171

# **TABLE OF AUTHORITIES**

**Cases**

*Akins v. Islamic Republic of Iran*,
    332 F. Supp. 3d 1 (D.D.C. 2018) ................................................................... 156

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ................................................................................... 163

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) ..................................................................................... 12

*Blais v. Islamic Republic of Iran*,
    459 F. Supp. 2d 40 (D.D.C. 2006) ........................................... 110, 155, 162

*Brewer v. Islamic Republic of Iran*,
    664 F. Supp. 2d 43 (D.D.C. 2009) .......................................... 14, 157, 158

*Campuzano v. Islamic Republic of Iran*,
    281 F. Supp. 2d 258 (D.D.C. 2003) ......................................... 5, 110, 154

*Cohen v. Islamic Republic of Iran*,
    238 F. Supp. 3d 71 (D.D.C. 2017) ................................................................ 4

*Colvin v. Syrian Arab Republic*,
    No. 16-cv-1423 (ABJ), 2019 WL 416462 (D.D.C. Feb. 1, 2019) ........................ 166

*Estate of Doe v. Islamic Republic of Iran*,
    943 F. Supp. 2d 180 (D.D.C. 2013) ............................................................ 160

*Flanagan v. Islamic Republic of Iran*,
    190 F. Supp. 3d 138 (D.D.C. 2016) ............................................ 166, 167, 169, 170

*Flanagan v. Islamic Republic of Iran*,
    87 F. Supp. 3d 93 (D.D.C. 2015) ................................................................. 13

*Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*,
    313 F. Supp. 3d 50 (D.D.C. May 1, 2018) ..................................................... 2

*Fritz v. Islamic Republic of Iran*,
    320 F. Supp. 3d 48 (D.D.C. 2018) .................................................... *passim*

*Gates v. Syrian Arab Republic*,
    580 F. Supp. 2d 53 (D.D.C. 2008) ............................................................. 110

*Gill v. Islamic Republic of Iran,*
  249 F. Supp. 3d 88 (D.D.C. 2017) ..................................................... 168

*Haim v. Islamic Republic of Iran,*
  425 F. Supp. 2d 56 (D.D.C. 2006) ..................................................... 155

*Han Kim v. Democratic People's Republic of Korea,*
  774 F.3d 1044 (D.C. Cir. 2014) ........................................................ 167

*Harrison v. Republic of Sudan,*
  882 F. Supp. 2d 23, 31 (D.D.C. 2012) ................................................ 14

*Heiser v. Islamic Republic of Iran,*
  466 F. Supp. 2d 229 (D.D.C. 2006) .................................................... 110

*Holliday v. J S Exp., Inc.,*
  No. 12-cv-1732 (ERW), 2013 WL 2395333 (E.D. Mo. May 30, 2013) ............ 12, 13

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
  376 F.3d 1123 (D.C. Cir. 2004) ........................................................ 170

*Kirschenbaum v. Islamic Republic of Iran,*
  572 F. Supp. 2d 200 (D.D.C. 2008) .................................................... 159

*Mohammadi v. Islamic Republic of Iran,*
  782 F.3d 9 (D.C. Cir. 2015) ............................................................. 169

*Moss v. Ole S. Real Estate, Inc.,*
  933 F.2d 1300 (5th Cir. 1991) ........................................................... 12

*Mousa v. Islamic Republic of Iran,*
  238 F. Supp. 2d 1 (D.D.C. 2001) ...................................................... 155

*Murphy v. Islamic Republic of Iran,*
  740 F. Supp. 2d 51 (D.D.C. 2010) ...................................................... 15

*Oveissi v. Islamic Republic of Iran,*
  768 F. Supp. 2d 16 (D.D.C. 2011) ..................................................... 111

*Owens v. Republic of Sudan,*
  71 F. Supp. 3d 252 (D.D.C. 2014) ..................................................... 110

*Owens v. Republic of Sudan,*
  826 F. Supp. 2d 128 (D.D.C. 2011) ........................................ 6, 163, 165, 170

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017) ...................................................................... *passim*

*Peterson v. Islamic Republic of Iran,*
    264 F. Supp. 2d 46 (D.D.C. 2003) ...................................................................... 2, 19

*Peterson v. Islamic Republic of Iran,*
    515 F. Supp. 2d 25 (D.D.C. 2007) ("*Peterson II*")................................... 109, 110, 159

*Reed v. Islamic Republic of Iran,*
    845 F. Supp. 2d 204 (D.D.C. 2012) ...................................................................... 4

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) ...................................................................... 166

*Rimkus v. Islamic Republic of Iran,*
    750 F. Supp. 2d 163 (D.D.C. 2010) ...................................................................... 15

*S.E.C. v. Pentagon Capital Management PLC,*
    722 F. Supp. 2d 440 (S.D.N.Y. 2010) ...................................................................... 12

*Stern v. Islamic Republic of Iran,*
    271 F. Supp. 2d 286 (D.D.C. 2003) ...................................................................... 2

*Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss.,*
    296 F.3d 671 (8th Cir. 2002)...................................................................... 13

*United States v. Midwest Fireworks Mfg. Co., Inc.,*
    248 F.3d 563 (2d Cir. 2001) ...................................................................... 14

*Valore v. Islamic Republic of Iran,*
    700 F. Supp. 2d 52 (D.D.C. 2010) ...................................................................... *passim*

*Weinstein v. Islamic Republic of Iran,*
    184 F. Supp. 2d 13 (D.D.C. 2002) ...................................................................... 161

*Wultz v. Islamic Republic of Iran,*
    864 F. Supp. 2d 24 (D.D.C. 2012) ...................................................................... 159

## Statutes

18 U.S.C. § 2339A ...................................................................... 169, 170

28 U.S.C. § 1330 ...................................................................... 164, 165

28 U.S.C. § 1331 ...................................................................... 163

28 U.S.C. § 1350 .......................................................................................... 167, 168

28 U.S.C. § 1604 .......................................................................................... 164, 165

28 U.S.C. § 1605A ............................................................................................. *passim*

28 U.S.C. § 1608 ................................................................................... 5, 6, 164, 169

50 U.S.C. § 2405 ...................................................................................................... 3

**Rules**

Fed. R. Evid. 201 ................................................................................................. 14

Fed. R. Evid. 702 ................................................................................................... 7

Fed. R. Evid. 703 ................................................................................................. 12

Fed. R. Evid. 801 ................................................................................................. 13

Fed. R. Evid. 803 ........................................................................................... 12, 13

Fed. R. Evid. 804 ................................................................................................. 13

Fed. R. Evid. 901 ................................................................................................. 12

This case arises from the deaths of, and grievous injuries sustained by, significant numbers of American service members[1] in Iraq between 2004 and 2011 as a result of a multifaceted terrorist campaign sponsored and perpetrated by Defendant Islamic Republic of Iran ("Iran"). The 369 Plaintiffs, which include estates and/or family members of the deceased, and injured soldiers and their family members, allege that they were killed or injured by Iraqi Shi'a terrorist cells established, funded and jointly directed by Iran's chief foreign proxy, Lebanese Hezbollah; Iran's terror apparatus, the Islamic Revolutionary Guard Corps ("IRGC"); and the IRGC's external operations directorate, the IRGC-Qods Force ("IRGC-QF"). Proceeding under the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs allege that Iran, through Lebanese Hezbollah and the IRGC, provided massive material support, resources and training to these Iraqi terrorist cells, including supplying them with specific lethal aid in the form of Explosively Formed Penetrators ("EFPs") – a particularly deadly type of anti-armor weapon often confused with roadside Improvised Explosive Devices ("IEDs") – and other weapons. Iran provided these resources specifically intending that its proxies would attack U.S. service members on its behalf. Accordingly, Iran should be held liable for these deaths and injuries.

Defendant has not answered or otherwise participated in this litigation. The case is accordingly proceeding in a default setting.

This case presents several unique issues that are likely to materially impact several other pending actions.[2] To begin with, unlike the vast majority of cases brought under the FSIA's

---

[1]     Two of the decedents were military contractors and a third was journalist.

[2]     Several cases have been filed in this District subsequent to this case that also seek to hold Iran liable for EFP attacks in Iraq. *See, e.g.*, *Burks v. Islamic Republic of Iran* (16-cv-1102) (CRC); *Donaldson v. Islamic Republic of Iran* (17-cv-1206) (JEB); *Martinez v. Islamic Republic of Iran* (16-cv-2193) (EGS); *Holladay v. Islamic Republic of Iran* (17-cv-915) (RDM); *Estate of Robert*

1

Terrorism Exception, this case does not involve a single act of terrorism or even a small subset of terrorist attacks. Instead, it encompasses 92 distinct attacks that Iran committed through Lebanese Hezbollah[3] and the IRGC and their Iraqi proxies. The majority of these attacks were perpetrated using EFPs, an Iranian signature weapon in Iraq, designed and perfected by Hezbollah and then mass produced and supplied by Hezbollah and the IRGC to their Iraqi terrorist agents. The case also presents questions of first impression as to whether traumatic brain injuries ("TBIs") should be evaluated as a separate category of injury in FSIA cases, and whether EFPs, because of their particularly devastating physical and psychological impact, warrant the application of a modified set of baselines for injuries that departs from the generally accepted baselines set forth in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) and *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010).

Recognizing that this case presented numerous separate attacks that caused the deaths of over 90, including dozens of Plaintiffs and injured 20 more, the Court elected to hear evidence concerning Iran's liability for six bellwether attacks involving EFPs and the attack involving the January 20, 2007 raid on the Provincial Joint Coordination Center in Karbala, Iraq (together, the "bellwether attacks"). *See* Transcript of Nov. 5, 2018 Conf., ECF No. 60. Following the trial, the Court directed Plaintiffs to propose findings of fact and conclusions of law as to:

(1) Iran's role as a State Sponsor of Terrorism;

(2) Whether Iran developed, directed, and provided material support to certain specific groups or cells operating in Iraq as its proxies during the relevant period;

---

*P. Hartwick v. Islamic Republic of Iran* (18-cv-1612) (CKK); *Tollefson v. Islamic Republic of Iran* (17-cv-1726) (RCL).

[3]     Numerous other decisions from this Court have found that Hezbollah is an Iranian proxy. *See, e.g.*, *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53-55, (D.D.C. May 1, 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

(3) Whether Iran provided EFPs and other specific munitions deployed in Iraq during the relevant period to its terror proxies;

(4) The unique forensic and engineering qualities of EFPs and their effect on targeted vehicles;

(5) The unique injuries and medical challenges caused by EFPs;

(6) Iran's liability for the six EFP bellwether attacks and the Karbala attack; and

(7) The types of evidence that would be sufficient for a special master appointed by the Court to determine Iran's liability for the other 85 attacks alleged in the Amended Complaint.

*See* Transcript of Dec. 18, 2018 Conf. at 3-5, ECF No. 76.

Plaintiffs in the bellwether attacks are American service members and family members of American service members who were killed or injured in seven separate terrorist attacks while serving in Iraq. Each of these attacks was committed by Iran through terrorist agents and proxies that Iran trained, funded, and otherwise supported. Iran – a political and ideological enemy of the United States since the 1979 Iranian Revolution – viewed the U.S. presence in neighboring Iraq as a threat to its regime and its strategic aims. The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)), and Iran has remained so designated from that time through the present. Plaintiffs filed this civil action pursuant to 28 U.S.C. § 1605A, the FSIA's Terrorism Exception, seeking to hold Iran civilly liable for their injuries arising from the aforementioned 92 separate terrorist attacks set forth in the Amended Complaint.

The Court held a bench trial on December 3, 4 and 6, 2018. Upon consideration of the pleadings, the relevant legal authorities, the trial testimony, the expert reports and the 109 other exhibits admitted into evidence, Plaintiffs respectfully request that the Court find that they have established their claims by evidence satisfactory to the Court and:

(1) grant default judgment against Defendant as to the 7 bellwether attacks;

3

(2) make certain factual findings that will aid the special master(s) reviewing the evidence regarding non-bellwether attacks – these findings concern Iran's material support to certain specific terrorist groups or cells operating in Iraq during the relevant period, including supplying them with certain lethal munitions such as EFPs; and

(3) make certain factual findings concerning the nature of the injuries caused by EFPs that will provide a separate set of baselines for EFP-related injuries and aid the special master(s) reviewing the damages evidence concerning survivors of those attacks.

For the reasons set forth below, the evidence admitted before and at trial amply substantiates the conclusion that Iran is civilly liable for the bellwether Plaintiffs' injuries under Section 1605A and should be found liable for the remaining attacks in this case to the extent that Plaintiffs establish that each specific attack was (1) perpetrated by an Iranian proxy group or cell and/or (2) caused by Iranian-supplied ordnance such as an IRGC-manufactured EFP or Improvised Rocket Assisted Munition ("IRAM").

I.      **BACKGROUND**

A.      **Overview of the Action**

Plaintiffs brought their claims pursuant to the private right of action created by subsection (c) of the FSIA's Terrorism Exception, 28 U.S.C. § 1605A. The bellwether Plaintiffs comprise three groups: (1) the estates of U.S. soldiers killed in Iraq by acts of terrorism that Iran materially supported; (2) U.S. soldiers injured in Iraq as a result of those acts; and (3) the immediate family members (or the estates of now-deceased immediate family members) of those deceased and injured U.S. soldiers (the remaining Plaintiffs also include several civilians working in Iraq). This Court has consistently "looked to the Restatement (Second) of Torts to define the contours of liability under the FSIA." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 82 (D.D.C. 2017); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("a plaintiff proceeding

under the FSIA must show that the defendants' acts would give [rise] to liability if viewed through the lens of tort law").[4]

In order to establish Iran's liability, Plaintiffs were required to demonstrate, through the use of "evidence satisfactory to the court," 28 U.S.C. § 1608(e), that (i) Iran was a State Sponsor of Terrorism at all times relevant to the acts alleged in the Amended Complaint; (ii) Plaintiffs are or were U.S. nationals, members of the armed forces, individuals performing a contract awarded by the United States Government acting within the scope of their employment, or the legal representatives of such persons; and (iii) that Iran provided material support and resources to the terrorists responsible for the extrajudicial killing, torture and hostage taking that caused Plaintiffs' injuries and/or deaths. 28 U.S.C. § 1605A(c).

### B.      Plaintiffs' Burden of Proof under 28 U.S.C. § 1608(e)

To award the bellwether Plaintiffs relief, this Court must determine that those Plaintiffs have established their claims "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), a standard which may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore*, 700 F. Supp. 2d at 59 (internal quotation marks omitted). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citations omitted). "In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit."

---

[4]      Plaintiffs also seek punitive damages as authorized by 28 U.S.C. § 1605A(c), to the extent permissible by Circuit law. *See Owens v. Republic of Sudan*, 864 F.3d 751, 818 (D.C. Cir. 2017). Because punitive damages can in some cases relate to compensatory damages awards, Plaintiffs propose briefing punitive damages after the special master(s) recommends compensatory awards, if any.

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). The D.C. Circuit recently affirmed this decision and emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

*Owens*, 864 F.3d at 785 (internal citations and quotations omitted).

In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Id.* (internal citations and quotations omitted). The D.C. Court of Appeals in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.*

### C.    The Court's Evidentiary Standards under 28 U.S.C. § 1608(e)

In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Id.* (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "courts have the authority— indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding) (internal alterations and quotation marks removed)). A district court's "broad discretion" in such cases "extends to the admission of expert testimony, which, even in the ordinary case, does not constitute an abuse of discretion merely

because the factual bases for an expert's opinion are weak." *Id*. (internal citations omitted). In sum, "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." *Id*. at 785-86.

**D.    Plaintiffs' Proffered Experts and Expert Testimony Were Properly Qualified and Admitted**

The three-day bench trial included live testimony from eight fact witnesses and ten expert witnesses. Having considered the requirements set forth in Fed. R. Evid. 702 for the admission of expert testimony, the Court qualified each proffered expert. Courts in this District "[r]ecogniz[e] that expert testimony is not only entirely proper, but often sufficient, and even indispensable in 'terrorism cases ... because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787).

In order of appearance, below is a brief summary of the qualifications of each of the expert witnesses who provided sworn testimony in this matter and the areas the Court qualified them in to provide expert testimony.

**E.    Overview of Plaintiffs' Evidence**

**1.    Plaintiffs' Liability Expert Witnesses**

**Dr. Matthew Levitt**, the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy, worked as a counterterrorism intelligence analyst at the Federal Bureau of Investigation, and was a Deputy Assistant Secretary for Intelligence and Analysis at the U.S. Treasury Department, where he served as both a senior official within the department's terrorism and financial intelligence branch and as deputy chief of

the Office of Intelligence and Analysis. Dr. Levitt also served as a State Department counterterrorism advisor to the special envoy for Middle East regional security. He authored a leading scholarly book on Hezbollah and has been qualified as an expert on numerous occasions in both civil and criminal terrorism cases. T1-15-20; PX-154 (Expert Report of Dr. Matthew Levitt) at Exhibit A. Dr. Levitt was qualified as an expert on Iran's role as a State Sponsor of Terrorism; the IRGC; IRGC-QF; Hezbollah; and those entities' support and training of the Iraqi terrorist groups in Iraq known as the Special Groups. Levitt T1-26.

**Lieutenant General (Ret.) Michael Oates** served in the United States Army for 32 years, most recently as Director of the Joint Improvised Explosive Device Defeat Organization ("JIEDDO"), the Defense Department's lead agency for providing counter-IED ("C-IED") capabilities in support of combat forces in Iraq and Afghanistan. Between 2003 and 2009, he served in several capacities in Iraq, including as Chief of Staff to the Deputy Administrator and Chief Operating Officer, Coalition Provisional Authority, Deputy Commanding General of the 101st Airborne Division, Commanding General of the 10th Mountain Division, and Commanding General, Multi-National Division Center/South. PX-153 (Expert Report of Lieutenant General (Ret.) Michael L. Oates) at 2. Mr. Oates was qualified as an expert on the tactical and strategic threats faced by U.S. and Coalition Forces in Iraq from 2003 to 2008, including the specific threat to U.S. military forces from IEDs and other ordnance, including EFPs. Oates T1-86.

**Colonel (Ret.) Leo Bradley** served in the United States Army for 29 years, including as the commander of the 184th Ordnance Battalion EOD (explosive ordnance disposal), which at the time was the main U.S. Army EOD component in Iraq. He also served as commander of the 71st Ordnance Group EOD, and Commander of the Combined Joint Task Force Paladin, the C-IED task force in Afghanistan. T2-7-9; PX-156 (Expert Report of Colonel (Ret.) Leo E. Bradley III) at

Exhibit A. Mr. Bradley was qualified as an expert on U.S. military EOD operations and IED investigations. Bradley T2-12.

**Captain (Ret.) Donald Wade Barker** served in the United States Army in various capacities, including as the Officer in Charge of the 101st AASLT (air assault) Asymmetric Warfare unit developing and implementing C-IED and counter insurgency strategies. He was selected to stand up and command the first C-IED Company in the Army, the 101st AASLT, which developed training plans for deployments into Iraq and Afghanistan. Captain Barker subsequently served as a research scientist at the Georgia Tech Research Institute at the Georgia Institute of Technology, where he assessed IED and C-IED technology. T3-60-62; Exhibit 1 to PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker). Mr. Barker was qualified as an expert on IEDs, EFPs and C-IED technology. Barker T3-10.

**Colonel (Ret.) Kevin Lutz** served in the United States Army in various capacities, and was selected to establish and command Combined Joint Task Force-Troy ("CJTF-Troy"), which was responsible for all EOD and C-IED efforts in Iraq. Colonel Lutz also commanded the Army's 52nd EOD Group. PX-159 (Expert Report of Colonel (Ret.) Kevin Lutz) at Exhibit A. Mr. Lutz was qualified as an expert on the use of explosive devices, including IEDs and other ordnance, by transnational terrorist organizations, and specifically the tactics, techniques and procedures used by terrorist groups in Iraq between 2003 and 2011. Lutz T5-15.

**Russell McIntyre** served in the United States Army for 26 years before joining the Office of the Secretary of Defense as a program manager and analyst focusing on Hezbollah, its activities, and its weapons technological capability and development. He also served as a senior intelligence officer with the Multi-National Corp Iraq C-IED cell, as a senior intelligence officer supporting JIEDDO, and as Chief of the Defense Intelligence Agency's Office of Forensic Intelligence. T5-

59-62; PX-157 (Expert Report of Russell L. McIntyre) at Exhibit A. Mr. McIntyre was qualified as an expert on IED threats to U.S. forces, specifically in Iraq between 2003 and 2011, and with an additional focus on EFPs. McIntyre T5-64:16-22.

**Michael Pregent**, a Senior Fellow at the Hudson Institute and retired intelligence officer with over 28 years of experience, served in the United States Army for 20 years as an intelligence officer with a focus on the Middle East. He subsequently served as the Senior Lead Middle East Analyst at the Defense Intelligence Agency and as a subject matter expert on Islamic terrorist groups with the United States Central Command ("CENTCOM") Intelligence Directorate. PX-155 (Expert Report of Michael Pregent) at 1-2. Mr. Pregent was qualified as an expert on intelligence matters, including attribution of terror attacks, evidence collection and analysis in the intelligence field. Pregent T5 - 173.

### 2.   Plaintiffs' Medical Expert Witnesses

**Dr. Romney Andersen**, Chief of Orthopedic Surgery of Riverside Health System in Newport News, Virginia and the chair of the Orthopedic Research Program, a Congressionally-mandated program geared toward funding research projects that help improve the care of wounded warfighters, was the former Chief of Orthopedic Surgery for the 10th Combat Support Hospital in Iraq's Green Zone, the main casualty evacuating hospital for combat casualties in Iraq. He was also the former Chairman of Orthopedic Surgery at Walter Reed National Military Medical Center, the primary receiving facility for all of the severely injured combat casualties from Iraq. Andersen T2-87; PX-162 (Expert Report of Dr. Romney Andersen) at Exhibit A. Dr. Andersen was qualified as an expert on the treatment and prognosis for orthopedic blast injuries, including injuries from EFP attacks. Andersen T2-84-85, 92.

**Dr. Charles Marmar**, the Chairman of the Department of Psychiatry at New York University School of Medicine, was a member of the American Psychiatric Association committee that developed the diagnostic criteria for Posttraumatic Stress Disorder ("PTSD"), co-edited the definitive textbook on PTSD, and started one of America's first PTSD clinics for veterans, which has been replicated around the nation. Marmar T3-72, 76; PX-163 (Expert Report of Dr. Charles Marmar) at Exhibit A. Dr. Marmar was qualified as an expert regarding PTSD, Major Depressive Disorder ("MDD"), neurocognitive disorder following TBI, PTSD in veterans surviving EFP attacks, and the impact of war zone service on military family members. Marmar T3-68, 77.

**Dr. Russell Gore** is a former flight surgeon who now directs the Complex Concussion Clinic and the SHARE Military Initiative for veterans at the preeminent Shepard Center in Atlanta, Georgia. PX-161 (Expert Report of Dr. Russell Gore) at Exhibit A. Dr. Gore was qualified as an expert in TBI and its consequences, diagnosis and treatment. Gore T4-5-8.

**Dr. Shean Phelps**, is a former member of the Army's Special Forces, as well as the Senior Flight Surgeon for the Army's Special Forces in Iraq, PX-160 (Expert Report of Dr. Shean Phelps) at Exhibit A. Dr. Phelps was qualified as an expert on the treatment of combat injuries, including polytrauma and blast injuries, particularly with respect to Iraq. Phelps T5-119-127.

### 3.    Plaintiffs' Exhibits

The Court also received 120 exhibits into evidence before and during trial, which included documentary evidence, encompassing documents, photographs, videos, and diagrams. *See* Nov. 17, 2018 Order pre-admitting certain exhibits, ECF No. 64 ("Pre-Admission Order"). Plaintiffs' exhibits admitted before trial consisted of official U.S. government designations, reports, records, and statements regarding Iran's, the IRGC's, the IRGC-QF's, Hezbollah's and the Special Groups' support for terrorism and their involvement in and responsibility for the specific attacks alleged in

the Amended Complaint. These exhibits were authenticated under Rule 901 through evidence showing that the exhibits were obtained from the U.S. government and other sources either directly or from the public domain. *See id. See also* Pls. Nov. 27, 2018 Motion to Pre-Admit Evidence, ECF No. 61, and accompanying declarations.

As the Court properly found, the government records at issue are admissible to prove facts in dispute under Fed. R. Evid. 803(8). *See* Pre-Admission Order. Admission is proper under Rule 803(8) if a document is "[a] record or statement of a public office" that "sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report . . . ; or (iii) in a civil case . . . , factual findings from a legally authorized investigation[.]" Fed. R. Evid. 803(8)(A). As the D.C. Court of Appeals stated in *Owens v. Republic of Sudan,* "[p]ursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record." 864 F.3d at 792 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). *See also Beech Aircraft,* 488 U.S. at 170 ("[a]s long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report."); *S.E.C. v. Pentagon Capital Management PLC*, 722 F. Supp. 2d 440, 442 (S.D.N.Y. 2010) ("The legal authority giving rise to the investigation *need only permit the investigation, not require it*.") (citations omitted and emphasis added).

Further, a government report is admissible even if it contains a layer of hearsay from unidentified witnesses. *See Holliday v. J S Exp., Inc.,* No. 12-cv-1732 (ERW), 2013 WL 2395333, at *5 (E.D. Mo. May 30, 2013). *See also Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1309-10 (5th Cir. 1991) ("Many government reports, as with many expert witnesses, have to rely in part on hearsay evidence, and the reports are not generally excluded for this reason."). This conclusion is guided by Fed. R. Evid. 703, which allows experts to rely on otherwise inadmissible facts to reach

their opinions if experts in that field would reasonably rely on those facts in forming an opinion on that subject. Accordingly, "[t]here is no reason that government officials preparing reports do not have the same latitude." *Holliday*, 2013 WL 2395333, at *5 (*citing Moss*, 933 F.2d at 1310). Additionally, some statements included in the exhibits are admissible under Fed. R. Evid. 801(d)(2) as made by agents or co-conspirators of opposing party Iran and under Fed. R. Evid. 804(b)(3) as admissions of illegal conduct performed on Iran's behalf.

Exhibits admitted by the Court include types of items specifically accepted pursuant to Rule 803(8) in other cases. Examples include government designations of terrorists and terrorist organizations, investigative reports following a terrorist attack, interrogation reports of detainees, and State Department Country Reports on Terrorism. *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d at 59 n.3. *See also Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) (relying on both agency press releases and State Department reports in a 28 U.S.C. § 1605A case); *Owens*, 864 F.3d at 792 (holding that the State Department Country Reports "fit squarely within the public records exception" and were therefore admissible under Rule 803(8)).

Rule 803(8) requires the party opposing admission to demonstrate that "the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Not only have Plaintiffs demonstrated that their proffered evidence is trustworthy, Defendant Iran has also not appeared in this action to argue otherwise. *See, e.g.*, *Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 679 (8th Cir. 2002) (burden of showing untrustworthiness is on party opposing admission); *Owens*, 864 F.3d at 793 (same). That presumption of trustworthiness was further supported and strengthened by the testimony presented by multiple witnesses appearing at the trial. *See United States v. Midwest Fireworks Mfg. Co., Inc.,*

248 F.3d 563, 566 (2d Cir. 2001) (noting that the presumption of admissibility for Rule 803(8) reports was "further bolstered by testimony" presented to the trial court).

Finally, the Court admitted additional exhibits at trial, including several videos and video animations, a website capture of a terrorist group's claim of responsibility for one of the bellwether attacks, photographs produced by some of the bellwether Plaintiffs, an additional government report, and each of the expert's reports. The witnesses laid the proper foundation for the admission of these exhibits during their testimony.

### F.    This Court Properly Took Judicial Notice of Specified Findings in *Fritz v. Islamic Republic of Iran*

Finally, in its subsequent Order dated November 28, 2018, ECF No. 66, this Court took judicial notice of three specific paragraphs of Judge Randolph Moss's opinion in *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018) pursuant to Federal Rule of Evidence 201. Rule 201 provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) ("Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings."); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("[r]elying on the pleadings and the . . . findings of other judges in this jurisdiction").

"At the same time, taking *notice* of another court's finding of fact does not necessarily denote *adoption* or *finding* of that fact." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012). Instead, "courts in subsequent related cases [may] rely upon the evidence presented in earlier litigation," but must still "reach their own, independent findings of fact in the cases before

14

them." *Rimkus*, 750 F. Supp. 2d at 172; *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) ("The taking of judicial notice of the *Peterson* opinion, therefore, does not conclusively establish the facts found in *Peterson* for, or the liability of the defendants in, this case. . . . In rendering default judgment against defendants, the Court was . . . required to, and did, find facts and make legal conclusions anew."). This Court determined that the specified *Fritz* findings were relevant to this FSIA case and has had the opportunity to independently confirm those findings in this case.

## II.    PROPOSED FINDINGS OF FACT

The evidence presented in this case points to three intersecting issues that implicate Iran's liability for the 92 attacks at issue. The first is Iran's extensive material support to a variety of violent actors in Iraq and the IRGC-QF's orchestration – in concert with Lebanese Hezbollah – of a multifaceted campaign of terror against U.S. and Coalition Forces in Iraq between 2003 and 2011. The second is the evidence of Iran's use of Lebanese Hezbollah and the IRGC-QF to develop, supply and deploy EFPs (alleged to be responsible for 83 of the 92 attacks at issue) against American service members in Iraq and to train and direct their Iraqi proxies to emplace them. The third is the forensic (and other) evidence that confirms that a particular attack (in this case – six bellwether attacks) was in fact caused by Iranian-supplied EFPs.

Given the strong record of testimonial and documentary evidence, including the public findings and conclusions of offices and officials of the U.S. government, that Plaintiffs presented and to which the Court applied the Federal Rules of Evidence, Plaintiffs respectfully request that the Court make the following findings of fact.

A.      **Iran's History of Orchestrating Acts of International Terrorism as an
Instrument of Regime Policy**

Iran was designated a State Sponsor of Terrorism ("SST") on January 19, 1984. PX-1 (U.S.

Dep't of State list of State Sponsors of Terrorism),[5] Levitt T1-27, 29. It has remained a designated

SST from that date through the present, *id.*, including throughout the period during which the

attacks at issue took place. Since the establishment of the Islamic Republic of Iran in 1979, the

Iranian regime has supported acts of international terrorism, first through its IRGC[6] and later,

through the IRGC's special directorate known as the IRGC-QF.[7] "On May 5, 1979, Ayatollah

Ruhollah Khomeini, the first Supreme Leader of the Islamic Republic of Iran, promulgated a

decree establishing the Pasdaran e-Enqelab (literally the 'Guardians of the Revolution,' also

referred to in English as the 'Revolutionary Guard' and later as the 'Islamic Revolutionary Guard

Corps') three months after the fall of the Shah and his government." PX-157 (Expert Report of

Russell L. McIntyre) at 4.

Dr. Levitt testified that the IRGC is not synonymous with Iran's armed forces. Levitt T1-

28. ("[W]hat's important to understand about the IRGC is that it is something that runs parallel to

the actual Armed Forces of Iran. They have an army and a navy and an air force. The IRGC also

---

[5]      Iran was designated pursuant to section 6(j) of the Export Administration Act, section 40
of the Arms Export Control Act, and section 620A of the Foreign Assistance Act.

[6]      The IRGC was designated on October 25, 2007 under Executive Order 13382 as a
proliferator of weapons of mass destruction. PX-5 ("U.S. Dep't of the Treasury, Fact Sheet:
Designation of Iranian Entities and Individuals for Proliferation Entities and Support for
Terrorism"). It was again designated on October 13, 2017 under Executive Order 13224 as a
Specially Designated Global Terrorist. PX-6 ("U.S. Dep't of the Treasury, Fact Sheet: Treasury
Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under
Counter-Proliferation Authority").

[7]      *See*, Levitt T1-27 ("The US government has designated Iran as a state sponsor of terrorism
since we started that list in 1984. And the primary tools that Iran uses to engage in terrorism abroad
and to protect the revolution are the Islamic Revolutionary Guard Corps and its subsidiary for its
operations abroad, the Qods Force."). *See also* PX-5.

has the same, because one is intended to protect the borders of Iran and the other, the IRGC and

the Qods Force, is there to protect the revolution."). The IRGC-QF was formed as a sub-directorate

of the IRGC dedicated to advancing the Iranian revolution's ambitions to create, cultivate and

support terrorist groups around the world to further the regime's policies and punish its enemies.

As Dr. Levitt testified:

> [T]he Qods Force is the sharp end of the spear for Iran's extraterritorial activities,
> almost like its version of a special operations unit for the IRGC engaged in activities
> abroad. And it has different branches or corps for operations and activities in
> different countries around in the region. It's been designated as a terrorist group.
> It's led by Major General Qasem Soleimani…[who] has himself been designated
> as a specially designated global terrorist. Actually, he's been designated under three
> different authorities.

*Id.* at 33.

Just as Iran employs the IRGC-QF to project force outside its borders, the Lebanese

terrorist organization Hezbollah is, in turn, the IRGC-QF's most reliable foreign terror proxy. Iran

has used Hezbollah for decades to strike targets all over the world. Describing Hezbollah's

relationship with the Iranian regime, Dr. Levitt testified:

> [T]hese groups have been both ideologically and operationally connected at the hip
> with weapons and funds and intelligence and training as a constant between them.
> The ide[o]logical affinity, this shared subscription to the idea of *wilayat al-faqih*,
> the rule of the jurisprudent, explains how this is something that is much more than
> just transactional. And they both get something out of this. Hezbollah obviously
> gets all of this tremendous support without which it wouldn't be a fraction of what
> it has become. And Iran gets an incredibly capable proxy that is deeply committed
> to it and is willing to do things on its behalf abroad in ways that it, Iran, can claim
> reasonable deniability and that it can call upon to go to other places to help train
> and build up new militants that will be shaped in the image of Hezbollah in different
> places.

Levitt T1-49.

Since 1998, the IRGC-QF has been commanded by General Qasem Soleimani, who reports

directly to Supreme Leader Ayatollah Ali Khamenei. *See* PX-154 (Expert Report of Dr. Matthew

Levitt) at 7. The United States has designated Soleimani three times for his roles in the IRGC. *See* Levitt T1-33-34. *See also* PX-23 (Treasury designation of Soleimani and describing his prior designations). The IRGC-QF set up different regional commands for its worldwide activities. The First Corps, also referred to as the "Ramazan Headquarters," "Ramazan Corps," or "Department 9000," headquartered in Tehran, was (and is) focused on implementing Iranian government policy in Iraq. PX-154 at 6-7. Parallel to the Ramazan Corps, Lebanese Hezbollah established Unit 3800 to assist and coordinate with the IRGC-QF to implement Iranian policy in Iraq. *Id.* at 9. *See* Levitt T1-57-58 (describing Unit 3800 as created at Iran's behest to train Iraqi Shi'a terrorists to attack U.S. forces and to itself engage in attacks on U.S. forces). These two "sub-agencies" of the IRGC-QF and Hezbollah, respectively, were responsible for directing and orchestrating a sophisticated terror campaign against U.S. service members in Iraq. *Id.* As Dr. Levitt testified, "the Qods Force operates exceptionally closely with Lebanese Hezbollah, sometimes so much so that they will work with Hezbollah to build up and train other proxy groups in an effort to build them in the image of Lebanese Hezbollah." *Id.* at 33.

### 1. Formation and Development of Lebanese Hezbollah

To understand how Iran carefully and methodically built up its terrorism capabilities in Iraq after 2003, it is important to consider its successful effort to transform fractious Shi'a militia in southern Lebanon into what later became the formidable fighting force and most reliable IRGC proxy now known as Lebanese Hezbollah. "In 1982, despite being heavily engaged in combat with Iraqi forces, the Iranian government sent IRGC members to assist the Lebanese Shi'a community build a political movement and military capable of driving the Israeli army out of Southern Lebanon (following the Israeli army's 1982 incursion known as 'Operation Peace for Galilee' to evict the Palestine Liberation Organization from Lebanon)." PX-157 at 7. "From Hezbollah's

inception, the IRGC funded, armed, and supported it and provided it with the ability to attack Israeli forces in southern Lebanon." *Id.* at 9. "[The] relationship [between the IRGC and Hezbollah] is especially close because the IRGC played such a critical role in the founding of Hezbollah and the molding of Hezbollah and, from its inception through today, supplies material support, money, weapons, training and intelligence to Hezbollah. And Hezbollah carries out many operations on Iran's behalf in part so that Iran can have those done with reasonable deniability." Levitt T1-30.[8] "Over time, Hezbollah became increasingly adept at inflicting casualties on the Israeli military, and it eventually forced the IDF in 1985 to withdraw into what Israel called a 'Security Zone' in Southern Lebanon…. For 15 years, the IDF [Israel Defense Forces] maintained this buffer zone until increasing numbers of IDF casualties precipitated an Israeli withdrawal in 2000 to its current border with Lebanon." PX-157 at 9.

### 2. Hezbollah's History of Launching Terrorist Attacks at Iran's Behest

Although Hezbollah is a complex organization with many components, including a highly successful political party apparatus, its ideological core is most embodied by its terror apparatus.[9] Dr. Levitt described Hezbollah's terrorist apparatus as follows: "there are many constituent parts to an organization as large as Hezbollah, including one that engages in terrorist activities abroad. They call that their Islamic Jihad Organization, or IJO." Levitt T1-54. As Mr. McIntyre testified, the IJO, also known as its External Security Organization, "conducted terrorist operations outside of Lebanon in collaboration very often with the IRGC and then later with the IRGC-Qods Force.

---

[8]    This Court *in Peterson*, 264 F. Supp. 2d at 53 found: "It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities."

[9]    Hezbollah Deputy Secretary General Naim Qassem underscored that Hezbollah was, nonetheless, one holistic entity: "Hezbollah has one single leadership . . . ." PX-154 at 14.

And then also they conducted combat operations against Israeli Defense Forces while they were deployed in southern Lebanon and also outside of the Middle East…" McIntyre T5-68.

Hezbollah was designated a Specially Designated Terrorist ("SDT") on January 23, 1995, PX-2 at 4, a Foreign Terrorist Organization ("FTO") on October 8, 1997, PX-3, and a Specially Designated Global Terrorist ("SDGT") on October 31, 2001, PX-4 at 4. Mr. McIntyre testified regarding the central role senior Hezbollah leader Imad Mughniyah played in overseeing Hezbollah's IJO. McIntyre T5-66-68. *See also* PX-154 at 16 ("Until he was assassinated in February 2008, Imad Mughniyeh was Hezbollah's 'top militant commander' and reportedly led the Jihad Council himself."). *See also* Levitt T1-54.

As Plaintiffs' experts explained, Hezbollah's most prominent attacks perpetrated at Iran's behest include:

- "The October 23, 1983 bombing of the U.S. Marine Corps barracks in Beirut, Lebanon (that resulted in the death of 220 Marines, 18 Sailors and 3 Soldiers) was a coordinated attack sponsored and planned by the IRGC and carried out by Hezbollah operatives." PX-157 at 8. *See also* PX-154 at 13.

- In 1983, Hezbollah joined with operatives of Iraq's Da'wa Party (discussed *infra* at 26, 64) to plan the bombings of the U.S. and French embassies in Kuwait City, and the 1985 assassination attempt on the Kuwaiti Emir. PX-153 at 33; PX-154 at 17; Levitt T1-46-47.

- "In 1985, Hezbollah operatives hijacked TWA Flight 847 from Cairo to Athens, torturing and then murdering one hostage, Robert Stethem a U.S. Navy Steel Worker 2nd Class (SW2), dumping his body on the tarmac of Beirut International Airport, and holding the rest of the hostages for weeks." PX-157 at 8.

- "In March 1992, Hezbollah operatives carried out a truck bombing of the Israeli Embassy in Buenos Aires, killing twenty-nine people and then helped the IRGC bomb the Argentine-Israeli Mutual Association, also in Buenos Aires." PX-157 at 8. *See also* Levitt T1-47.

- "In June 1996, Hezbollah also bombed the American Khobar Towers housing complex in Saudi Arabia, killing 19." PX-157 at 8. *See also* Levitt T1-47.

### 3.      Hezbollah's Development of Advanced Tactics

The 15-year period (1985-2000) that Hezbollah fought an insurgency against the IDF in southern Lebanon provided a battle laboratory for Hezbollah to hone its tactical war fighting skills and weapons development. Hezbollah studied and improved its insurgent tactics against the IDF, including: (1) effectively ambushing Israeli patrols, (2) deploying IEDs, (3) kidnapping Israeli soldiers,[10] and (4) developing and deploying EFPs in the 1990s against Israeli armored vehicles. PX-157 at 9. As McIntyre explained:

> The relatively rapid evolution of Hezbollah TTP [Tactics, Techniques and Procedures] was a product of at least three related factors. First, Hezbollah's operatives were highly motivated and willing to risk heavy losses in their confrontations with Israel. Second, they benefited enormously from Iranian financial support and IRGC training and technology transfers. Finally, Hezbollah took advantage of the first two factors and perfected its TTP through trial and error against the SLA [Southern Lebanese Army, a Christian-dominated militia aligned with Israel] and IDF. These combined factors allowed Hezbollah to inflict significant casualty levels on the IDF.

*Id.* at 12.

#### a.      Hezbollah's TTP for Emplacing IEDs

One of Hezbollah's signature tactics was to develop effective camouflage for its IEDs and EFPs. As Mr. Lutz, Plaintiffs' expert on explosive devices and other ordnance used by transnational terrorist organizations testified, the camouflaging techniques Hezbollah developed in Lebanon resurfaced in Iraq:

> You could have a three- to five-inch; you could have an eight- to ten-inch; you could have a 10- to 12-inch explosively formed penetrator. They were purposely designed against different weapons systems…once the foam is overlaid, then they get dirt, something that's similar to where they're going to place that EFP.

---

[10]      *See* PX-61 (Video released by Hezbollah-affiliated *Al-Mayadeen* showing Hezbollah operatives practicing a kidnapping extraction from a vehicle, under the tutelage of Imad Mughniyah, at the time the Commander of Hezbollah's IJO.). McIntyre T5-75-76 ("And also, they developed the training, tactics and procedures for battlefield abduction of enemy combatants, the Israeli soldiers, which in one instance in July 2006 they abducted two Israeli soldiers. They ambushed a patrol. And it led to over a month-long conflict between Hezbollah and Israel.").

Hezbollah mastered that in the Bekaa Valley to make it look like it was in the surroundings....

Lutz T5-44. Dr. Levitt similarly testified that:

Hezbollah perfected…the art of building and deploying, often camouflaged as rocks or other things that just fit into the roadside, these exceptionally powerful shaped charges, EFPs, which proved to be able, through this kind of molten, hot projectile of a bullet, to penetrate even armored vehicles and proved to be the single most devastating weapon deployed against Coalition -- American and other Coalition, including Iraqi, forces in Iraq, leading to the majority of deaths and injuries."

Levitt T1-59.

Beginning in August 1991, Hezbollah began regularly detonating bombs in Lebanon by remote radio control, eliminating the need for detectable command wire. The IDF attempted to counter the remote-control detonations by sweeping a wide spectrum of radio frequencies from its listening bases on the peak of Mount Hermon to explode the bombs prematurely. Hezbollah adjusted to Israeli tactics, first returning to the use of command-wire and victim-initiated pressure plates and mat detonations, before introducing a new coded remote-control system in mid-1993 that fitted its bombs with two receivers and scramblers. PX-157 at 11. By 1995, Hezbollah was equipping its IEDs with cellular phone receivers to trigger firing switches. In turn, Israel jammed cell phone frequencies from aircraft flying high above southern Lebanon. Hezbollah responded by using passive infrared devices ("PIRs"). *Id.*

In addition, Hezbollah developed methods to arm their IEDs with a simplified process that made it faster and simpler to emplace the explosives "on target" (i.e. the targeted location for placing the device). Mr. Lutz testified that Hezbollah developed a set of connecting switches for their IEDs:

What Hezbollah had done – and when I looked at them in the late 1990s, they created these – they were connect-and-disconnect switches which allowed you to quickly insert like a male-female connecter. And you could just quickly push those together. They did that for a couple reasons: One was, it limited the time on target.

> So they could quickly place the IED there, put these male-female connecters
> together, and then they could be off target. They wouldn't be exposed. The second
> part was, it was a safe mechanism where you didn't have an emplacer trying to wire
> up, you know, and get their wires wrong. It was a simple plug that goes into this
> connect. That facilitated the efficiency of the system so that they didn't fail and
> they were successful in executing their operations.

Lutz T5-38-39. He also provided an example of these signature Hezbollah switches. *Id.*

> Mr. Lutz went on to testify that:

> [F]or Lebanese Hezbollah, they had taken the time based on the battlefield training
> and conditioning and learning experiences in the Bekaa Valley and realized that if
> they were going to be successful and their emplacers were going to be successful,
> they would have to create a mechanism that allowed the quick connect of the
> components together that prevented it from detonating as well as making sure that
> it operated when they needed it to operate.

Lutz T5-40.

> Mr. Lutz also testified concerning a February 2007 presentation made by the U.S. military

using photographs provided by CJTF-Troy. Lutz T5-40-43. *See also* PX-65 (MNF-I Report on

EFPs). Mr. Lutz described one of the photographs featured in the presentation:

> [Y]ou would typically as you were driving by, fully up-armored, you've got your
> gear on, to try and pick this out of trash that was alongside the road. Then you see
> that lens that was mentioned. They had scoped that down to more like a pencil, so
> you narrowed the view of the lens. So it wasn't wide and it prematurely detonated.
> It was narrowed so that it would hit the target as intended.

Lutz T5-44. Mr. Lutz confirmed that "this [was] a hallmark of Lebanese Hezbollah TTP[.]" *Id.*

> Discussing the evolution of Hezbollah's sophisticated tactics, Mr. McIntyre testified:

> There was a series of counter-countermeasures at the beginning of the use of
> Hezbollah employment of IEDs [in Lebanon]. They didn't start with EFPs. That
> was a later development. They started with IEDs, very simple IEDs, using
> command wire as a trigger…The Israelis became very adept at using native trackers
> and sweeping along or patrolling along the sides of the road to discover those
> command wires. Hezbollah noted that. Then they moved on to the use of electronic
> devices to trigger the IED. Then the IDF, of course, noticed that; and then they
> developed the ability to first identify the radio frequencies that Hezbollah was using
> and then developing a jamming capability, a steady stream of RF energy, to protect
> their vehicle … convoys and dismounted patrols. Hezbollah noted that. They

moved to the passive infrared receiver, which the Israelis could not jam, and of course very difficult to detect. Then they later used the PIR, combined it with the EFP, again encasing it within foam, foam insulation, a spray can…and then cleverly camouflaging it and placing it by the side of the road.

McIntyre T5-79-80.

### b.      Hezbollah's TTP for Indirect Fire

During the 1980s and 1990s, Hezbollah also frequently deployed 107mm and 122mm artillery rockets (frequently referred to as "Katyusha rockets") against IDF positions in southern Lebanon and against Israeli border towns in northern Israel. Iran supplied these weapons to both Hezbollah and (later) Iran's Iraqi Shi'a proxies,[11] and Hezbollah also transferred its experience with these indirect fire weapons to the Iraqi landscape. PX-157 at 59. As Mr. McIntyre testified:

> [Hezbollah tactics] included use of 107-millimeter and 122-millimeter rockets and fairly precise targeting of Israeli Defense Forces', IDF's, forward operating base that were in southern Lebanon. It also included developing the tactics, techniques and procedures for incorporating IEDs in ambushes, some of them complex ambushes, against Israeli Defense Forces. It also included learning through experience and engaging in a very active counter-countermeasure, electronic warfare struggle or challenge with the Israeli Defense Forces...

McIntyre T5-75.

Mr. Lutz testified that "Lebanese Hezbollah used … 107-millimeter rockets, as well as other indirect weapons, and battle-tested those against the Israeli Defense Force to improve their capabilities and effectiveness, particularly along the employment of tactics, techniques and procedures." Lutz T5-15-16. The 107 mm and 122 mm rockets were later supplied by the IRGC-QF to its proxies in Iraq between 2003 and 2011. McIntyre T5-109.[12]

---

[11]     Hezbollah proxies in Iraq used these same types of artillery rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and Multi-National Force – Iraq ("MNF-I") Headquarters in the Green Zone. PX-157 at 59.

[12]     The 2010 NDAA Conference Report issued by the Office of the Secretary of Defense confirmed that "Iran continues to provide money, weapons and training to select Iraqi Shia

### B.      Iran's Strategic Goals in Iraq After the 2003 U.S.-Led Invasion

Iran's primary strategic goal in Iraq after the 2003 U.S.-led invasion was to incorporate Iraq into its sphere of influence while degrading American power and influence in the region. In order to do so, it needed to drive the United States and its allies out of Iraq without provoking a full-scale conflict with the U.S. military. PX-154 at 8.[13] To that end, it directed a sophisticated and carefully calibrated campaign of terrorism directed against Coalition Forces in Iraq. *See, e.g.*, McIntyre T5-112. ("[The goal] was to bleed American forces and make our presence there as difficult as possible and hurry us out of Iraq, because obviously they did not want US forces in their immediate neighborhood. They wanted us out."). To implement its policy objectives in Iraq, Iran embarked on a multi-pronged strategy[14] spearheaded by the IRGC-QF's Ramazan Corps.[15]

---

militants and terrorists despite pledges by senior Iranian officials to stop such support. The weapons include: Explosively Formed Penetrators (EFPs) with radio-controlled, remote arming and passive infrared detonators, Improvised Explosive Devices (IED), Anti-aircraft weapons, mortars, 107 and 122 millimeter rockets ...." PX-39 at 2.

[13]      *See also* PX-16 (Annual Threat Assessment of the Director of National Intelligence for the Senate Select Committee on Intelligence, February 2, 2006) at 12 ("Iranian policy toward Iraq and its activities there represent a particular concern. Iran seeks a Shia-dominated and unified Iraq but also wants the US to experience continued setbacks in our efforts to promote democracy and stability. Accordingly, Iran provides guidance and training to select Iraqi Shia political groups and weapons and training to Shia militant groups to enable anti-Coalition attacks.").

[14]      *See also* PX-153 at 21 ("The Islamic Republic gained regional influence through the Shi'a-dominated political parties that relied upon Iran for money, weapons and training. Iran had diversified its 'investments' in Iraq through a dual-track approach of: (a) cultivating ties with and supporting Iraqi Shi'a politicians and their parties, and (b) training, financing, arming and directing Iraqi Shi'a militias to threaten, coerce, and murder Iraqis, and U.S. and Coalition Forces to advance Iran's strategic objectives.").

[15]      Dr. Levitt explained: "[T]he Ramazan Corps was the Qods Force entity most responsible for coordinating attacks by Shi'a militants against Coalition Forces and against the Iraqi government based on the Iranian side of the border in Iran, training people, smuggling operatives back into Iraq, smuggling weapons systems of all kinds from the IEDs and the EFPs to small arms, et cetera, into Iraq to be able to carry out attacks. And they functioned as a...very effective command structure for these groups and operations happening across the border in Iraq from the

The first part of that strategy was to support Shi'a political parties that would ultimately dominate Iraq's nascent democratic political process. Of the three main Shi'a factions that emerged after 2003, one answered directly to Iran and was financed by it (the Supreme Council for the Islamic Revolution in Iraq ("SCIRI")), the second was sympathetic to Iran and had historically received support from it (Da'wa Party), and the third was ambivalent toward Iran but was partially financed by the IRGC (the faction led by Muqtada al-Sadr, discussed *infra*). PX-153 at 14-17. Oates T1-109.

The second part of the strategy – interconnected with the first – was to infiltrate IRGC-QF proxies into the Iraqi police and security forces (while simultaneously using those forces to assassinate former Saddam Hussein regime elements). Oates T1-89, 112; Pregent T5-170. PX-157 at 19-21. PX-81 (44th Tactical Interrogation Report of Qais Khazali).

The third part of Iran's strategy was to use Hezbollah and the IRGC-QF to establish a multitude of terror cells that could be directed to target American and Coalition Forces in Iraq. Levitt T1-68-69. *See also* Lutz T5-16.[16] Moreover, to ensure that it could calibrate the violence directed against Coalition personnel, Iran directed Hezbollah and IRGC-QF to supply their Iraqi proxies with EFPs but to control the flow and use of these and other weapons. McIntyre T5-111-

---

safety of their headquarters in Iran." Levitt T1-68-69. Mr. McIntyre testified that "[General Shahlai] was a brigadier general. He was in charge of what was known as Department 9000 within the IRGC. And Department 9000 was responsible for external lethal support to Shi'a resistance groups." McIntyre T5-84.

[16]     According to an August 2007 National Intelligence Estimate, "Iran has been intensifying aspects of its lethal support for select groups of Iraqi Shia militants, particularly the JAM [Jaysh al-Mahdi], since at least the beginning of 2006. Explosively formed penetrator (EFP) attacks have risen dramatically." PX-20 (National Intelligence Estimate: *Prospects for Iraq's Stability: Some Security Progress but Political Reconciliation Elusive*) at 4.

12.[17] This had two benefits from the Iranian perspective. First, by controlling the flow of EFPs into Iraq and selecting the specific terrorists who would receive training in emplacing them, Iran was able to keep its Iraqi proxies extremely dependent on Hezbollah and the IRGC-QF and therefore obedient. McIntyre T5-96. Second, Iran sought to inflict significant casualties on American personnel in Iraq but not to a point that would provoke a devastating response from the American military. EFPs (and later IRAMs and other weapons) provided Iran with a highly-lethal but controlled weapon system that matched its objective of inflicting calibrated but lethal force against American and Coalition Forces. *See id.* at 109 (testifying that the IRGC-QF provided 240mm rockets only to the "proxy militias that they directly established and fielded and supported in Iraq. And they would directly control their operations, to include weapons-use targets as well as the tempo of combat operation against US forces as well.").

## 1. The IRGC-QF's role in Iraq

As explained above, Iran used the IRGC-QF to direct its deadly terror campaign in Iraq. On October 25, 2007, the IRGC-QF was designated an SDGT by the U.S. Department of the Treasury. The press release announcing the designation described the U.S. government's finding that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

---

[17]     Hezbollah and the IRGC-QF's role in training their Iraqi proxies is attested to in many U.S. government designations. *See, e.g.*, PX-18 (State Dep't "Country Reports on Terrorism" 2006-2012), 2011 Report, at 172 ("Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF, in concert with Lebanese Hizballah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.").

> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

PX-5 at 3.

A few months later in early 2008, IRGC-QF Brig. General Ahmed Foruzandeh was designated by the U.S. Treasury Department, which identified him as the Commanding Officer of the Ramazan Corps, and noted that he "leads terrorist operations against Coalition Forces and Iraqi Security Forces, and directs assassinations of Iraqi figures …."  PX-8 at 1. The 2010 National Defense Authorization Act ("NDAA") Conference Report issued by the Office of the Secretary of Defense also confirmed that the "IRGC-QF Ramazan Corps is responsible for carrying out Iran's policy in Iraq." PX-39 at 2.[18]

On September 16, 2008 the U.S. Treasury Department designated Abdul Reza Shahlai, an IRGC-QF deputy commander, noting that he was responsible for:

> [P]lanning Jaysh al-Mahdi (JAM) Special Groups attacks against Coalition Forces in Iraq.  Shahlai has also provided material and logistical support to Shia extremist groups—to include JAM Special Groups—that conduct attacks against U.S. and Coalition Forces.  In one instance, Shahlai planned the January 20, 2007 attack by JAM Special Groups against U.S. soldiers stationed at the Provincial Joint Coordination Center in Karbala, Iraq.  Five U.S. soldiers were killed and three were wounded during the attack.
>
> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.
>
> Shahlai also approved and coordinated the training of JAM Special Groups.  As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition

---

[18]    It also noted that "the IRGC-QF posts its officers in Iran's diplomatic missions throughout Iraq, including Iran's outgoing Ambassador to Iraq, Hassan Kazemi-Qomi. The incoming Ambassador to Iraq, Hassan Danafar, is also a Qods Force officer." *Id.*

Forces in Iraq.  In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.

PX-9 at 1 ("RPGs" are rocket-propelled grenades).

General Shahlai was a key lieutenant of IRGC-QF commander Qasem Soleimani and was responsible for training, arming, funding and directing what would later be known as the "Special Groups" in Iraq.[19]

### 2.       Hezbollah and the IRGC-QF Introduced EFPs into Iraq

Hezbollah and the IRGC-QF first introduced EFPs into Iraq in 2004. Lutz T5-20. ("[T]he intelligence will tell you that EFPs were seen in 2004 starting in Basra, which is in southern Iraq, and then they moved up into Baghdad and the east area of Baghdad in 2004.") The IRGC-QF used long-established supply lines that the IRGC had developed during the Iran-Iraq war in the 1980s. Mr. McIntyre testified that:

> This was a very well-developed network that had actually been established relatively soon after the 1980 to 1988 Iran-Iraq War began to enable Iranian forces to support clandestine activity behind Iraqi lines. They . . . identified and then they developed a network of supply bases, cache sites, to hide and conceal the weapons for temporary periods of time, areas on the border where they could – between Iran and Iraq where they could move undetected. And then there were a series of safe houses that would move from Maysan Province, which was right here, up into Baghdad.

McIntyre T5-96-97. *See also* Lutz T5-47-48. ("They would run these through what we would call logistic rat lines. And so somebody that was not of my background or an ammunition background would easily just pass these and discard these as US ammunition or in this case C4 being moved from one location inside the theater to the next and completely dismiss it.").

---

[19]      Soleimani was directly responsible for Iranian policy in Iraq. *See, e.g.*, PX-75 at 56 (MNF-I Weekly Update to the Secretary of Defense, August 5-11, 2007) ("Soleimani told Waeli that he (Soleimani) is the sole decision-maker on Iranian activities in Iraq and he offered to make a deal involving our release of Qais Khazali in exchange for decreased JAM Special Group activity.").

Mr. Lutz testified that Hezbollah's EFP manufacturing process was of a high quality. Lutz T5-18. Mr. Lutz's assessment was consistent with the Department of Defense's view set forth in a March 2007 report to Congress: "EFPs require advanced manufacturing processes and training for employment that clearly place them outside the category of 'improvised explosive devices.'" PX-35 at 17. The steel casings in many EFPs found in Iraq were traced back to Iran. Lutz T5-48. ("[I]intelligence reports did identify large shipments of steel going into Iran to a specific manufacturing plant that had the capability to cut and mill the casings themselves."). Likewise, the U.S. military was able to determine that the explosives often used to detonate EFPs in Iraq were in fact Iranian-sourced C4 well-disguised to look like a close approximation of American C4 explosives, as explained *infra* at 38-39, 47.

The Department of Defense also agreed that those weapons included EFPs:

> Consistent with the National Intelligence Estimate, Iranian support to Shi'a militias, such as JAM and the Badr Organization, includes providing lethal weapons, training, financing, and technical support. This includes supplying some Shi'a extremist groups with explosively formed projectiles (EFPs), the most effective of the roadside bombs. Shi'a extremist groups have been implicated in direct attacks against Coalition forces, including with EFP technology.

PX-35 at 17. Mr. Lutz testified that the "overwhelming majority" of EFPs deployed in Iraq were "conducted by or facilitated by the IRGC or Lebanese Hezbollah," but he acknowledged that not 100 percent of them were. Lutz T5-52.

### 3. Indicators of Hezbollah Training in the "TTP" Used by IRGC/Hezbollah Proxy Groups

Mr. Bradley testified that successfully emplacing EFPs required considerable experience and training. Bradley T2-27. ("[T]hink of the EFP as a rifle bullet. You had to make sure that the scope was aiming towards where the bullet was going to go. And then you had to figure out how far were you going to be from the vehicle. And there's a certain amount of trigonometry involved in how fast is the vehicle going and where you're going to aim the EFP so that…it would trigger

and then the EFPs would arrive at the right place at the right time. So there was a lot of trial and error you would have to do to be able to develop that.")

Mr. Lutz also testified that the successful emplacement of EFPs in Iraq required that the terrorists involved understand the likely speed of the vehicle being targeted, the general range of the jamming devices carried by American armored vehicles (the so-called ECM bubble that protects the vehicle) and deploy technological measures to arm the passive infrared devices that would initiate the EFP. Lutz T5-36-37. (The terrorists "were masters at judging our speed and knowing when we were coming in. So they had the time to facilitate arming the passive infrared within the time frame that it requires to activate." Lutz T5-31). Mr. Lutz further testified that victim-initiated passive infrared triggers were a hallmark or a signature of Hezbollah. Lutz T5-36. Mr. Oates testified that "as we watched the rapid capability development of the Shi'a militia in Iraq from a weapons training and tactics procedure, the speed with which they achieved this capability and their ability to adapt led me to believe that there was external assistance provided." Oates T1-98. Mr. Barker testified that EFP emplacers quickly learned how to defeat U.S. counter-measures such as "Rhinos" (metal and electronic appendages attached to the front of American vehicles intended to trigger EFPs prematurely). *See* Barker T3-30 ("So our enemy is very adaptive. A lot of training. And it's easy to see this very large device sticking out front. So what they did is they started to offset the PIR. They also angled it. So if my EFPs were oriented forward, I can turn my PIR, say, 25 degrees to the right. Now, when the Rhino comes in front of it, by the time the Rhino sets off the PIR, the warheads are aimed at the crew cabin and punch the warheads through the vehicle.").

### 4.   Hezbollah's Central Role in Training Iranian Terror Cells in Iraq

As discussed herein, Hezbollah was instrumental in establishing and organizing the IRGC-

QF's terror proxy groups in Iraq. A Department of Defense report on Hezbollah detainees

explained:

> Additional detainee reporting further highlights the significant role that L[ebanese]
> H[ezbollah] plays in the training of Shi'a extremist groups in Iraq. Senior Shi'a
> extremist leaders obtain administrative, logistics, financial, religious and small-unit
> tactics, leadership training in Lebanon. Multiple detainees have claimed that the
> training received from LH instructors in Iran is of notably higher quality than those
> from Iranian instructors, also noting the difficulty overcoming language obstacles.

PX-107 at 1-2.

> Likewise, Mr. McIntyre testified that:

> Lebanese Hezbollah spent an extended period of time, again, from 1982 to 2000,
> including engagements up until 2006, with Israeli Defense Forces. They went to
> school, again, on one of the best armies in the region. The Iraqi students knew that.
> And of course, Hezbollah was very careful to make sure that their exploits were
> propagandized throughout the region as well. The IRGC-Qods Force members, not
> only could they not speak Arabic; often, they were not familiar with Iraqi Shi'a
> Arabic culture, which was different than Persian. For example, Persian culture was
> much more cosmopolitan. Iraqi Shi'a culture still had large vestiges of tribal, clanal
> [sic], familial networks and relationships that were not that omnipresent in Iran
> itself. So it was very, very understandable. As one detainee put it when commenting
> on the capability of Hezbollah instructors, he simply said, "They did it. They are
> the real article, the real deal."

McIntrye T5-108. *See also* PX-154 at 22.

And as the 2010 NDAA Conference Report issued by the Office of the Secretary of

Defense noted:

> In addition to providing arms and support, IRGC-QF is responsible for training
> Iraqi insurgents in Iran, sometimes using Lebanese Hizballah instructors. Lebanese
> Hizballah provides insurgents with the training, tactics and technology to conduct
> kidnappings, small unit tactical operations and employ sophisticated IEDs. In
> addition to weapons and support, Iran continues training Shia militants in the use
> of IEDs, EFPs, and the counter-measures designed to defeat these weapons and the
> networks that design, build, emplace and fund them draw persistent counter-
> responses. The flow of new IED technologies and highly creative emplacement and

employment methods underscore the enemy's ability to adapt and react quickly and efficiently to CF countermeasures.

PX-39 at 3.

### a.    Hezbollah's Role in Training EFP cells

Hezbollah trained Iran's proxy Special Groups on the use of EFPs specifically. The State

Department's Country Reports on Terrorism 2006 noted that:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

PX-18, 2006 Report, at 147.

> It went on to observe that:

> Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

*Id*. at 251.

> The State Department's Country Reports on Terrorism 2008 noted that Iran was:

> Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

*Id.*, 2008 Report, at 183.

Dr. Levitt testified that his research and findings was consistent with the language set forth in these and similar Country Reports related to the relevant period. Levitt T1-60-64. Mr. Lutz testified that "the Iran IRGC-QF and Hezbollah also facilitated the training of the JAM Special Forces Groups as well as the Badr Corps in the employment of explosively formed penetrators against US forces in Iraq." Lutz T5-16. Similarly, the Treasury Department announcement of former Badr Corps leader and Special Group Kata'ib Hezbollah ("KH") (discussed *infra*) founder Abu Mahdi al-Muhandis's designation noted that "[a]s of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran." PX-11 at 2.

### b.     Hezbollah's Role in Training Iranian Terror Cells on Indirect Fire

Hezbollah's role in training its proxies and developing and implementing sophisticated methods to overcome American military counter-measures relating to EFPs is discussed *infra*. But Hezbollah also contributed significantly in other ways to the training and effectiveness of the terror cells that were tasked with attacking American and Coalition Forces. For example, during a July 2, 2007 press briefing, Brigadier General Kevin J. Bergner noted that the Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery." According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets." PX-106 (MNF-I July 2, 2007 Press Briefing). The use of this training was clear—U.S. and Coalition Forces raids regularly uncovered cache sites that contained Iranian-supplied artillery rockets, along with other weaponry. "[W]e continue to seize significant caches.

Finds this week include one in south Baghdad that contained 105 mortar rounds and another in [Baghdad neighborhood] Sadr City that had 28 Iranian 107mm rockets, 63 Iranian mortar rounds, 7 Soviet 122mm rockets, and a large assortment of other weapons and ammunition, all in very good condition." PX-78 at 61 (MNF-I Weekly Update to the Secretary of Defense, August 4-10, 2008).

### 5.   The U.S. Military's Response

Following the U.S.-led invasion of Iraq in 2003, the United States military did not have enough explosive ordnance disposal assets in Iraq to deal with the growing IED threat because it did not anticipate the use of IEDs employed against Coalition Forces and the significant number of resulting casualties. Oates T1-94. *See also* Bradley T2-16-17 ("we were unprepared for the IED threat. We didn't believe that they would be there. And it wasn't widely known."); *id.* at 46 (describing improvement in EOD capacities in Iraq). To deal with the ballooning IED problem, the Department of Defense established CJTF-Troy in 2005 as an operational force in Iraq that fused intelligence, explosive ordnance expertise and engineering expertise to help the U.S. military better understand which weapons were being used against Coalition Forces and what terrorist and smuggling networks were involved in using them. In assessing EFPs, for instance, CJTF-Troy concluded that the "principal source of the materials and the completed munition, the EFP, was being provided from Iran." Oates T1-95.

### a.   Technological and Material Counter-Measures

As the IED threat became more apparent in Iraq, the U.S. Army added up-armored versions of palette loaders, flatbeds, wreckers and other utility vehicles, and increased the number and use of Bradley Fighting Vehicles ("Bradleys") and up-armored HMMWVs (High-Mobility Multipurpose Wheeled Vehicles) in theater. *See, e.g.*, Bradley T2-20-22 (describing the U.S.

military's improvement in vehicular armor in Iraq); PX-156 (Expert Report of Col. (Ret.) Leo E. Bradley) at 9-11 (same). As the proliferation of armored vehicles by the U.S. military caused terrorists in Iraq to turn to more powerful IEDs, U.S. forces eventually developed and deployed Mine-Resistant Ambush Protected vehicles ("MRAPs"). *Id.* at 22.

In addition to increasing the armor on the vehicles used by American forces, the U.S. military began to deploy tactical countermeasures, designed to disrupt EFPs at either the arming or the triggering phase of their deployment, because the terrorists usually camouflaged the devices too well to be spotted by passing vehicles before detonation. EFP countermeasures developed and deployed included CREW (Counter-Remote Controlled Improvised Explosive Device Electronic Warfare) systems (jammers) to prevent the arming of RF transmitters such as cell phones, long-range cordless phones and key fobs. The introduction of more heavily armored vehicles and the addition of Rolled Homogenous Armor ("RHA") to vehicles like HMMWVs proved helpful against conventional IEDs but wholly ineffectual against EFPs. Barker T3-14 ("It's the hardest steel that we can make. We use it in layers on the vehicles to prevent penetration. It's graded against armor-piercing bullets, RPGs, large artillery shells, things like that. It has no defense against EFPs.").

Similarly, by deploying PIR, victim-operated triggers to initiate the EFPs, Hezbollah was able to help Iran's proxies defeat U.S. military electronic countermeasures.[20] As explained *supra*

---

[20]     As Mr. Lutz explained, Shi'a terror cells' ability to overcome U.S. CREW systems can be linked directly to the IRGC. PX-159 at 21. ("CREW systems cost hundreds of millions of dollars to design, maintain and deploy and were well beyond the capacity of a local terror cell—limited by education, experience and access to technology—to overcome. In my professional opinion, the Special Groups and other local Shi'a terror cells could not have deployed and implemented throughout southern Iraq the sophisticated radio-frequency technology necessary to defeat our next-gen CREW systems without the IRGC's active involvement, training, equipment and support.")

at 30-31, Hezbollah-trained cells learned to overcome U.S. countermeasures such as the Rhino. *See also* PX-159 at 21-22.

### b.       Tracing Materials and Technology Back to Iran

In addition to adding armor, U.S. Forces also added manpower in the form of increased forensics and analysis of IED attacks. Starting in 2004, MNF-I stood up the Combined Explosives Exploitation Cell ("CEXC"), an in-theater laboratory dedicated to performing strategic analysis on materials collected by members of the Army's EOD units during their post-blast analyses. In 2005, the Army approved doubling the size of its EOD force, although it took three years to build the approved strength level. *See* Bradley T2-35-36 (describing process of increasing EOD forces in Iraq); PX-156 at 25 (same). By September 2005, Multi-National Corps Iraq ("MNC-I") had established Task Force Troy (under the command of then-Colonel Kevin Lutz) as the first operational C-IED task force in U.S. military history. Task Force Troy was subsequently partnered with the FBI's Terrorist Explosive Device Analytical Center ("TEDAC"), and CEXC was placed under CJTF-Troy's authority. In 2006, the Department of Defense established JIEDDO to lead and coordinate all Department of Defense efforts to counteract IEDs as weapons of "strategic influence." PX-159 at 10-11. Mr. Oates explained:

> The JIEDDO organization was created by the Department of Defense once we realized there was a significant IED threat to our soldiers, the principal killer of our soldiers in Iraq, to coordinate all of the defense activities to understand this explosive, how we might mitigate the effects from a material solution or from training and furthermore to understand the intelligence components associated with the networks that are being used against Coalition Forces with these devices. And it was the entire range of improvised explosive devices.

Oates T1-85-86.

Mr. Lutz described the process by which his task force worked to exploit the IEDs recovered in Iraq:

> When you came across an IED event or a cache, you would do exploitation so that you would recover that material. You would bring it back. It would be exploited. You would exploit what you could on site. You'd bring it back and it would get exploited there at the different labs. And we would look at the components and look for the technology that was being used, capture the radio frequencies. You could identify signatures by bomb makers. Literally, we had codes for them. You could identify where they were on the -- in the Iraqi theater.

Lutz T5-27.

Once evidence was analyzed in theater, it was sent back to the U.S. for further analysis.

Mr. Bradley described part of the process by which the FBI's TEDAC and its UK equivalent, the

Defence Science and Technology Laboratory, set about to learn the origin of IED components, the

tradecraft of the bomb-makers and the identity of IED cells:

> TEDAC actually maintains all of the material that we collected overseas as the U.S. main hub for terrorist explosive devices. So every IED that we recovered, everything that we got from a cache, everything that we rendered safe was exploited in theater and then was sent back to the FBI where they would conduct additional exploitation. They would double check our work and then provide some things like trace evidence fibers and some other things that we were not doing forward; they would do that level of exploitation back here in the United States.

Bradley T2-44.

Mr. Oates testified that the United States military was able to trace the actual metal used in

these EFPs, as well as the actual manufacture of the weapons, back to Iran. Oates T1-95. He further

testified that:

> The devices, some that were actually exploded and some that we captured in caches, we were able to use a significant amount of forensic examination to determine that the components, the detonating devices themselves, came from Iran… the exact milling requirements on the copper have to be precise or it doesn't work. That machine tooling was tied back to Iran.

*Id.* at 96.

Mr. Lutz testified that "intelligence reports did identify large shipments of steel going into

Iran to a specific manufacturing plant that had the capability to cut and mill the casings

themselves." Lutz T5-48. He also described the process of confirming that the large quantities of

C4 explosives being used to detonate EFPs in Iraq were counterfeit. "[W]e went through our chemical analyzers and analyzed that this was not the same property, nor did it have the taggant inside it. So we were able to say that this came from a source outside the US and most likely from Iran through the IRGC." *Id.* at 47.

Mr. Lutz also described how high-end components found in EFPs were linked to Iran:

[CJTF-Troy] came across a device…that was acquired in the US, tens of thousands of them that wreaked havoc on our CREW systems that were imported through the UAE into Iran. And then they started to appear, like most of the EFP threat did, starting in the south and Basra. And it moved its way up into Baghdad until we were able to recover an EFP with this technology. We assessed it…Several of our vehicles were hit because the CREW systems weren't effective because their technology circumvented the capability that the technology provided.

*Id.* at 48-49.

The U.S. military also developed systems for tracking IED data, in order to develop patterns and test hypotheses relating to discovering the provenance of IEDs. Bradley T2-38-39 (describing the importance of standardized reporting); PX-156 at 35-37 (describing the standardized reporting system). This included standardized reporting, using forms such as:

- **SIGACT Reports.** Reports created by units responding to the scene of militarily significant activity, such as a terrorist attack, the discovery of a weapons cache or the detention of a suspected terrorist. These reports are often updated as intelligence and other units add more information following further investigation.

- **IED Reports.** Similar to SIGACT reports, IED reports set forth findings of a unit responding to an IED discovery or attack.

- **CEXC Records**. Reports, photographs, and images prepared by CEXC as a part of the IED exploitation process.

*See id.* The military relied on other reporting tools as well, such as each service branch's line of duty reports prepared following the death of a service member. Most common in this case are **AR 15-6 Reports**, which are prepared by a U.S. Army investigator following the injury or death of

Army personnel.[21] Many of these documents were stored on the Combined Information Data Network Exchange ("CIDNE"), an electronic database adopted by MNF-I and later CENTCOM, which allowed document sharing across the U.S. military's (and some allied militaries') C-IED landscape. For instance, the U.S. Army's Operations Research/Systems Analysis personnel applied advanced mathematical modeling to the data, to help determine, *inter alia*, the provenance of EFPs and other IEDs. *See id.* at 32-34.

In sum, Mr. Bradley explained that the U.S. military partnered with the foremost law enforcement experts in the world to build the capability for IED site exploitation. "[W]e built a superb system of systems to be able to . . . provide evidentiary tools. Those links are very strong and well proven." Bradley T2-47. As a result of that system, "[t]he U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and PIR devices deployed in Iraq to Iran and its illicit supply chain." PX-153 at 25.

### c. Military and Intelligence Efforts to Combat Malign Iranian Influence

The gradual recognition of the Iranian threat in Iraq did not immediately translate into a U.S. strategic plan to counter it. However, an important first step occurred in late 2006 when General George Casey directed the Combined Joint Special Operations Command Task Force ("CJSOTF") to create a new subordinate command or task force focused exclusively on Shi'a terror cells with the goal of taking direct action against major EFP networks.

---

[21]     Mr. Barker explained that an AR 15-6 investigation is "an internal military investigation within a unit. An officer from outside the brigade is brought in. It could be something stateside, where maybe two soldiers got in a fight, something was stolen, or it could be something as devastating as a major vehicle and several soldiers being killed." Barker T3-54; *see also* PX-158 at 3. Mr. Barker testified that, as an officer in the U.S. Army, he himself was the investigating officer for multiple AR 15-6 reports. Barker T3-55.

This effort began to bear fruit in late 2006 when U.S. special forces apprehended IRGC-QF General Mohsen Chirazi in the SCIRI compound. Oates T1-116. ("[We] [f]ound with him…a significant amount of documentation and materiel that clearly identified their direct involvement with militia in Iraq."). However, while the raid yielded a substantial amount of intelligence[22] on the IRGC-QF and its work with the Badr Corps and Special Groups (discussed *infra*), Chirazi and his IRGC-QF team were quickly released. PX-153 at 26.

In January 2007, a special operations task force captured five mid-level IRGC officers posing as Iranian diplomats in Erbil, in Kurdish northern Iraq. Thereafter known as the "Erbil Five," they were held until 2009. Oates T1-116-17. *See also* PX-65; PX-8 (Treasury Designation of Sheibani and others) at 1 ("Qods Force officers often use various cover mechanisms – including diplomatic, non-governmental organization, humanitarian, and media – for conducting operational activity, belying their military affiliation."). In March 2007, as noted *infra,* Coalition Forces arrested the senior leaders of the IRGC-QF-directed Special Group network known as Asa'ib Ahl al-Haq ("AAH"), brothers Qais and Laith Khazali, and a senior Hezbollah commander, Ali Musa Daqduq. Commenting on these arrests, Brigadier Gen. Bergner, spokesman for the MNF-I, noted during a July 2, 2007 press briefing that Iranian-backed Special Groups operated across Iraq and:

> [P]lanned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms – including explosively formed penetrators, the most deadly form of improvised explosive device – and funding from Iran. They also have received planning help and orders from Iran …. They also moved money into and around Iraq to fund their operations.

PX-154 at 29. U.S. Forces also regularly detained Iraqis who had spent time training with Hezbollah and the IRGC in Iran. *See* PX-63 (SIGACT reports describing, *inter alia*, detentions);

---

[22]    The safe house contained a military operations center with maps, computers, videotapes, and receipts confirming weapons shipments from Iran. PX-153 at 26.

PX-66-70 (summaries of detainee interrogations and investigations into smuggling operations) at 3, 10, 14-15, 17, 28, 40, 63, 72, 74-76, 79, 82, 84, 85, 88, 95). Ultimately, despite the deployment of a dedicated CJSOTF task force to counter malign Iranian activity, the IRGC-QF was never held responsible in a meaningful way by the U.S. government for its conduct. Oates T1-129. *See* McIntyre T5-113.

### C.    Hezbollah's Development of Explosively Formed Penetrators ("EFPs")

Hezbollah developed and refined its design, manufacturing and emplacement of EFPs in the Bekaa Valley and southern Lebanon several years before the U.S.-led invasion of Iraq in 2003. Lutz T5-19. Mr. Lutz testified that "Lebanese Hezbollah was the first that developed the explosively formed penetrator as well as the associated tactics, techniques and procedures that were eventually used by the Special Groups inside of Iraq against US forces." Lutz T5-15. Mr. McIntyre testified that the first EFP deployed by Hezbollah that was identified by the U.S. intelligence community was fielded in July 1998. McIntyre T5-79.

During the trial, Mr. Lutz presented a Lebanese Hezbollah EFP training video (PX-60) that was confiscated from a fishing boat seized by an Israeli special operations force in 2003. Lutz T5-17. As Mr. Lutz testified:

> The video really shows you … the advanced machining and processing of explosively formed penetrators. It's not a weapons system that you simply can just hack up some metal, put in some copper, add some explosives and you get an effective result. So it's more of a propaganda film that they built. This is in 2003, before we started to see the EFP threat evolve in Iraq….
>
> As you see the video, again, they're showing you the advanced technical machine that's required to mill to the precise angle and thickness of an explosively formed liner…. Just to reiterate, this is not something that you just cut a piece of copper and insert into a pipe. And you'll see at the end -- and I'll illustrate the machine -- the quality…. As you can see here, the liner perfectly is seated into the casing. If there were gaps or the welding was incorrect, then you would not get the … effectiveness that you've seen or heard about from EFP initiations, looking at the door on the model there.

And what they're aiming at is a sheet of metal, just showing in a propaganda film how this weapons system is effective against steel and armored vehicles and, as identified, that M113 vehicle that they described in the video at the beginning. Again, the hole looks very similar to the hole that's inside – that's shown there on the Humvee inside the courtroom.

Lutz T5-17-18. Mr. Lutz testified that PX-60 was filmed before the conflict in Iraq and was not intended for the benefit of Hezbollah's proxies in Iraq, but rather reflected the EFPs deployed in the Bekaa Valley and southern Lebanon against Israeli forces. T5-19.

### 1.    Metallic Properties and Structural Design

Plaintiffs' explosives expert, Mr. Wade Barker, testified that the EFP is a "purpose-built weapon designed to penetrate armor. It has no other purpose." Barker T3-13. Unlike a shaped charge, which has a conical metal liner that projects a hypervelocity jet of metal capable of penetrating armor to great depths (like an RPG or anti-tank missile), the EFP liner is shaped like an inverted metal dish or platter. PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker) at 5.

As Mr. Barker explained, "[w]hile shaped charges have been employed on battlefields since the 19th century, EFPs are a more recent innovation, first appearing on modern battlefields in the 1990s as a weapon deployed in Lebanon by Hezbollah against Israeli armored vehicles." PX-158 at 6. "The first recorded use of an EFP occurred in Southern Lebanon, on October 5, 1998 when Hezbollah attacked Israeli HMMWVs and armored vehicles resulting in the deaths of two Israeli soldiers and wounding of six more." *Id.*

"The EFP derives its armor-defeating power by focusing the energy of an explosive blast behind its metal liner, utilizing what is sometimes referred to as the Misznay-Schardin effect."[23]

---

[23]    According to Mr. Barker, the Misznay-Schardin effect occurs when an explosive charge is directed toward a particular target, as opposed to exploding in all directions at the same time, "i.e.,

*Id.* The warhead itself is normally constructed with a 3- to 12-inch diameter, steel pipe, approximately one quarter to one half inch thick, with one end sealed with a welded steel plate and a priming hole for the insertion of a detonator. Barker T3-13, PX-158 at 6. "The open end of the pipe is then packed with high-energy ("HE") explosive and closed with a copper plate." *Id.*

Once the explosive is detonated, the copper line inverts and turns into a slug, easily penetrating through rolled homogenous armor. "The EFP's destructive capabilities were not limited solely to penetrating a vehicle's armor, however. The contained explosion created a massive blast overpressure, capable of blowing the doors and turrets from vehicles close to the device." PX-158 at 7. Moreover, the heat and force of the penetrator would shatter the vehicle's armor and materials inward, sending hundreds or even thousands of razor-sharp shards of Teflon and steel ripping through the interior compartment. *Id. See also* Barker T3-20; PX-58 (video of EFP test fire). The heat from the penetrator could ignite engine fuel and set vehicles ablaze. PX-158 at 7.

### 2.      Chemical and Metallurgical Composition of EFPs

HE explosives are chemical compounds or mixtures that are capable of supporting or sustaining a detonation wave. HE explosives do not require confinement as they combust instantaneously producing heat, gas, a rapid expansion of matter, and a detonation shock wave. HE explosives detonate with explosive velocity ranging from 3 to 9 km/s. For instance, TNT has a detonation (burn) rate of approximately 5.8 km/s (19,000 feet per second), detonating cord of 6.7 km/s (22,000 feet per second), and C4 about 8.5 km/s (29,000 feet per second). Low energy explosives, by contrast, are compounds where the rate of decomposition proceeds through the material at less than the speed of sound. The decomposition is propagated by a flame front

---

an antitank mine can punch through the bottom of a tank, or in [the] case [of] an EFP . . . I direct that copper slug at the armor and it pierces the armor." Barker T3-15-16.

(deflagration) which travels much more slowly through the explosive material than a shock wave of an HE explosive. Under normal conditions, low explosives undergo deflagration at rates that vary from a few centimeters per second to approximately 400 meters per second. A low explosive is usually a mixture of a combustible substance and an oxidant that decomposes rapidly. PX-158 at 6 n.13.

The use of an HE explosive is key to generating enough heat and force to melt the liner, invert it, and propel it forward with sufficient speed so as to penetrate several inches of steel armor. Barker T3-16; PX-158 at 8. Mr. Barker explained that HE explosives are rated by their "relative effectiveness" or "RE" in which a baseline value of 1 is assigned to the explosive force created by trinitrotoluene (i.e., TNT, commonly referred to as "dynamite"). Barker T3-16. Homemade explosives ("HME"), Mr. Barker testified, would have an RE of ".75 or .8, so about 28 percent less effective than dynamite." *Id.* HE explosives, on the other hand, "go far past 1. C4, Semtex, RDX: These explosives can reach a relative effectiveness of a 1.7, so 70 percent stronger than TNT." *Id.*

Mr. Barker testified that an HE explosive such as C4 will detonate at "about 26,000 feet per second and 2,000 degrees Fahrenheit . . . .  So during the blast, the copper . . . inverts [and] turns into a slug; and as it passes through [the] atmosphere, it turns into kind of a teardrop shape, which is very aerodynamically sound, flies upon the target, producing about 460 kilojoules of energy, which is enough to penetrate half its diameter of rolled homogenous armor." Barker T3-13-14.

Even a fairly powerful industrial bulk explosive like ammonium nitrate fuel oil ("ANFO") is not sufficient to reliably defeat U.S. armor.[24] For instance, ANFO has a maximum detonation temperature below the melting point of copper (1,984 degrees Fahrenheit) and an explosive speed of approximately 3,200 meters per second. *Id.* at 8. Accordingly, even if an EFP packed with ANFO could generate enough heat at detonation to melt the copper liner, it would lack the explosive speed to invert the liner into a fully formed slug and propel it through several inches of armor. *Id.*

Mr. Barker also testified as to the importance of the use of a copper liner, as pure copper has an ideal melting point for use with HE explosives, just below the maximum detonation temperature of C4. Barker T3-13; PX-158 at 9. Copper, Mr. Barker explained, "is just malleable enough that it will begin to shape properly, but not so malleable that it'll fly apart" upon detonation of the HE explosive. Barker T3-17. This allows the copper liner to invert and form into the penetrating slug. Barker T3-13-14. Steel liners, by contrast, will not "begin to melt until north of 2,500 degrees Fahrenheit," causing the liner to turn into "a big chunk of steel" that "destabilizes and then strikes the vehicle, denting the vehicle as opposed to penetrating" its armor. Barker T3-17 An aluminum liner will simply melt and shatter when employed with HE explosives. PX-158 at 9.

Mr. Barker further testified that the liner of an EFP *must* be precisely milled to an exact thickness and a 140-degree angle to ensure that the liner inverts and properly forms into the penetrating slug:

---

[24]     ANFO is classified as a blasting agent, meaning that it decomposes through detonation rather than deflagration at a velocity higher than the speed of sound in the material but has a moderate velocity compared to other explosives, such as C4, a military-grade plastic explosive, which has a maximum detonation temperature of 2,060F and an explosive speed of 8,092 m/s. PX-158 at 8 n. 19.

> So what we found through experimentation is that, deeper than 140 degrees, the cone actually collapses on itself. So the slug again destabilized in flight, comes apart. [If i]t's too shallow[, t]he blast tears the copper apart, becomes multiple slugs that are again destabilized in flight and don't hit the target.

Barker T3-17-18. Accordingly, "[i]f a liner is milled too thin, the explosive blast will shatter it; too thick and it will fail to invert and gain enough heat and speed to penetrate armor." PX-158 at 9. "Likewise, liners milled with improper or imprecise angles will fail to invert and/or lose structural integrity before striking the target." *Id.*

In Iraq, the Coalition Forces recovered large caches of explosives together with EFP component parts. PX-44 (Dep't of Defense Images); PX-65 at 8. These supplies often closely resembled C4, the HE explosive mostly widely used by the U.S. military. Mr. Lutz testified concerning a photograph of one weapons cache in Iraq showing counterfeit (American) C4 explosives:

> What you're seeing here is what looks like US C4 high-energy explosives. It's how we package our C4. In our laboratories, we had the capability to chemically analyze explosives. So we had a sample of our own C4. It has its own chemical properties.

> We also use a tag called taggant . . . . Taggant is basically a chemical that's inserted so when our explosives are found, we know where they came from. We know what manufacturing plant manufactured them and potentially when they were manufactured.

> [T]he explosives that are shown in this picture – they looked like ours; but unless you understood how we stamp-marked our production line with the lot number, the date, you would just assume that this was US C4. But in fact, if you look closely at the lot markings, there was a difference.

> Further, to confirm that, we went through our chemical analyzers and analyzed that this was not the same property, nor did it have the taggant inside it. So we were able to say that this came from a source outside the US and most likely from Iran through the IRGC.

Lutz T5-46-47. PX-44 at 24, 28.

### 3.     EFP Trigger Mechanisms

As with many explosive devices, EFPs must first be armed then triggered. "Arming" an EFP can best be described as transitioning the weapon from a passive or standby mode into an active, or ready mode. PX-158 at 10. Once armed, an EFP is primed to detonate only upon the occurrence of a given event. That event is known as the "trigger." *Id.* In Iraq, EFPs were usually armed either by remote frequency ("RF") or by the use of a command wire capable of carrying a low-level electric charge with a maximum range of around 100 meters, and usually triggered with a passive infrared device ("PIR"). *Id.* RF arming could be achieved using something as simple as a key-fob or as complex as the dual-tone multi-function ("DTMF") reference board found inside a cell phone. Barker T3-27; PX-158 at 10.

Mr. Barker testified that EFPs in Iraq could be armed by placing a call to a cell phone wired into the device and keying in "anywhere from a four-digit to a ten-digit PIN," which would allow a bombmaker to arm the device from "1,000 miles away." Barker T3-25, 28. Mr. Barker further testified that the emplacers of EFPs in Iraq preferred operating at a distance for "safety, because when the emplacers placed the device, if it didn't have a safety system, it could go off. So they would wire in the safety system with a PIN code. So then [the terrorist] calls, dials in the PIN code. The PIR comes on. And there's nobody there when the device goes off." Barker T3-33.

"Given that the individual arming the EFP was often at a considerable distance from the target, successful attacks often required the tactical use of a fixed geographic features to create an aiming point, such as a lamp post or solitary tree." PX-158 at 10. "As a military convoy passed the aiming point, the terrorist operator would remotely arm the EFP to explode from hundreds of feet away." *Id.* "Once remotely armed, the EFP would be triggered using a passive infra-red device ("PIR") attached to the EFP." *Id.* According to Mr. Barker, "once the PIR is on, there's no turning

it off." Barker T3-28. Mr. Barker explained that this two-step method of arming and triggering EFPs is referred to as a "dual-phase initiation system." *Id.* at 25.

After arming, the PIR detected the heat signature of a passing vehicle and, as that event occurred, the PIR sent an electrical current that set off the explosion within the EFP's casing. PX-158 at 10. Mr. Barker explained the process in the following terms when describing a five-array EFP:

> And so when something with enough heat and movement passes in front of [the PIR], it collapses another circuit and sends one and a half volts to each one of the blasting caps [in the EFP array] . . . and sets them off all at once, sending anywhere from 10 to 20 warheads . . . passing through the vehicle.

Barker T3-25. As Mr. Barker explained, the process was simple—and deadly:

> Q.    And now that we have this turned on, this PIR sensor is now active?
>
> A.    Yes. If you walk in front of it, it'll light up again, which would set the device off. That's all it takes.
>
> Q.    Just heat and motion?
>
> A.    And everybody's dead.

Barker T3-32.

"In essence, the passing vehicle itself would trigger the EFP. In military parlance, this is a Victim Operated IED ('VOIED')." PX-158 at 10. "A VOIED is just what it sounds like: The intended target or victim triggers the detonation, eliminating the need for human intervention once the device was armed." *Id.* Barker T3-11, 28. Mr. Barker testified that constructing and implementing these types of dual-phase initiation systems was beyond the abilities of the average Iraqi insurgent, stating unequivocally that "you need to be a classically trained engineer to build one of these." *Id.* at 33.

"When emplacing and detonating EFPs, this two-step arming and triggering process provided the operative activating the weapon with the ability to selectively target U.S. military

vehicles, and thus avoid civilian casualties (unless that was the specific intended target)." PX-158 at 12. Unfortunately, at times, the U.S. military unintentionally developed predictable travel patterns that allowed terrorist spotters to arm a device when a specific target entered the area before a military vehicles' electronic counter measures (discussed *supra* at 36-37) could jam the RF signal that allowed the terrorist to arm the EFP. PX-158 at 12; Barker T3-64.

### D.     The IRGC-QF and Hezbollah's Initial Proxies in Iraq

#### 1.     The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") and the Badr Corps

The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") was founded by Muhammad Baqr Hakim in Iran in 1982 during the Iran-Iraq War. The IRGC cultivated SCIRI and bankrolled it as a Shi'a political party in exile. PX-153 at 14. SCIRI played an important role in the post-2003 period as Iran's most reliable proxy within the electoral process overseen by the U.S. and its Coalition partners. Oates T1-109.

From its inception, however, the IRGC had also established and cultivated SCIRI's armed wing, the Badr Corps, as an IRGC proxy that was used to conduct sabotage operations, intelligence gathering, and weapons smuggling across the border into Iraq. *Id.* Before 2003, the Badr Corps served as the IRGC's most important anti-Ba'athist surrogate inside Iraq, acting as a de facto arm of the IRGC-QF. *Id.* As Dr. Levitt testified:

> The Badr Corps was the military wing of the Supreme Council for Islamic Revolution in Iraq, or SCIRI, both of which were forged in the early 1980s in the context of the Iran-Iraq war. These are Iraqi Shi'a entities, partnering not with Iraq, but with Iran, against the regime of Saddam Hussein in the context of the Iran-Iraq war…Until 2003, Badr was Iran's most important surrogate inside Iraq. And it, too, was very intimate with the IRGC Qods Force.

Levitt T1-64.

In the months following the U.S.-led invasion, the Badr Corps devoted most of its energies to targeting (and eliminating) former members of Saddam Hussein's regime and methodically

infiltrating the new Iraqi police and security services. *See* PX-153 at 15-16; PX-157 at 15; PX-81 at Bates no. 01439 (49th  Tactical Interrogation Report of Qais Khazali). At the same time (in 2003), the IRGC-QF also developed certain cells within the Badr Corps for the express purpose of attacking Coalition Forces. Oates T1-110. As Mr. Oates testified, "[The Badr Corps] was formed by [the IRGC-QF] early, probably the first of the Special Groups, because they had such a longstanding relationship with the Iranians." *Id.* at 125. Mr. McIntyre confirmed a Badr Corps element called the Sheibani Network was the first Iranian proxy to deploy EFPs in Iraq in 2004. McIntyre T5-97, 98. Mr. Lutz testified that the IRGC-QF and Hezbollah also facilitated the training of "the Badr Corps in the employment of explosively formed penetrators against US forces in Iraq." Lutz T5-16.

According to Qais Khazali, a high-value detainee (discussed *infra*), the Badr Corps terror cells under Abu Mustafa al-Sheibani, an Iranian national and Badr Corps commander, enjoyed a privileged status among the Special Groups sponsored by Iran:

> The Khamenei groups in Iraq are led by Abu Mustafa al Shaibani [sic] and although there are many groups under him, detainee does not know the names of the groups, the number of groups, or any of the leaders of the groups. This is due to the secretiveness of the Khameini groups… All of the provinces that border Iran are controlled by Badr Corps and this causes some troubles with other groups in the area. Badr Corps is more militarily oriented than the other groups and generally target U.S. forces. They are better equipped than the other groups and have superior weapons such as SAM and RPG-29s. In general, the Badr Corps are fewer in numbers but more effective than other groups.

PX-81 at Bates No. 01221 (10th Tactical Interrogation Report of Qais Khazali).

## 2. Muqtada al-Sadr and Jaysh al-Mahdi ("JAM")

During Saddam Hussein's rule in Iraq, a prominent Iraqi Shi'a cleric known as Ayatollah Sadiq al-Sadr developed a cohesive network of mosques and social welfare organizations under his guidance and control. He was particularly popular in the Shi'a slums of Baghdad and Basra,

and his network of mosques and social institutions attempted to mirror Hezbollah's model in Lebanon. Eventually, the Hussein regime came to regard Sadr as a political threat and assassinated him and his two eldest sons. Muqtada al-Sadr, the Ayatollah's surviving son, then became the de facto successor to what became known as the Sadrist Movement.[25]

The Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement. The overthrow of the Hussein regime in 2003, however, freed Muqtada al-Sadr and his followers from the constraints previously placed on them, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community. Hezbollah, having long-standing ties to the Sadrist Movement, made sure to cultivate Sadr and establish high-level lines of communication with him and his senior deputies almost immediately.

That cultivation was managed by Muhammad Kawtharani, a member of Hezbollah's Political Council. Kawtharani was tasked with overall responsibilities for the terrorist organization's Iraq portfolio. As the U.S. Treasury Department noted when it designated him an SDGT on August 22, 2013, Kawtharani was "the individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to

---

[25]    *See also* McIntyre T5-81-82 ("[al-Sadr] established what was called the Sadrist movement in Iraq. The Sadrist movement was based upon the Hezbollah social services network that was established in Lebanon. And this is where the mosque serves as a focal point or conduit for…the distribution of money, food, aid for the poor Shi'a population in order to assist them. So…he adopted a Lebanese model. In 1999, he and his two older sons were assassinated by Saddam Hussein's police. He's also the father of Muqtada al-Sadr…"); PX-153 at 16 ("Because Mohammad Sadeq al-Sadr's two eldest sons were assassinated in 1999 with their father, Muqtada al-Sadr essentially inherited a network of schools and charities built by his family and perpetuated by the elder Sadr's former students and deputies, most of whom (like Mustafa al-Yacoubi and Qais Khazali) would later play larger roles in post-2003 Iraq.").

Iraqi Shi'a insurgent groups." PX-76 (August 22, 2013 Treasury Designation of Hizballah Leadership) at 1.

According to declassified detainee interrogation reports, Kawtharani made contact with Sadr's deputy soon after (and possibly before) the overthrow of the Hussein regime in 2003:

> Mustafa al-Yaqubi has frequent contact with Lebanese Hezbollah. He speaks often by phone with al-Kawtharani, who is Lebanese Hezbollah's political spokesperson on Iraq issues. Al-Kawtharani has served in that position since shortly after Saddam Hussein's regime fell. Al-Kawtharani is a former student of the Najaf al-Hawza. But he is Lebanese-one of two Lebanese students who attended. He and Mustafa discuss major events that take place in Iraq.

PX-81 at Bates no. 01311-12 (28th Tactical Interrogation Report of Qais Khazali). At the invitation of Iran's Supreme Leader, Ayatollah Khamenei, Mr. Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion. PX-81 at Bates no. 01207 (9th Tactical Interrogation Report of Qais Khazali).

General Abdul Reza Shahlai – a deputy IRGC-QF commander – served as the "chief of protocol" for the visit, and IRGC-QF commander Qasem Soleimani served as host to the Sadr delegation. *Id.* Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC–QF wanted to financially support the Sadrist movement. *Id. See also* McIntyre T5-87 ("They made three principal offers: first, the offer of funding, amounts of three-quarters of a million to a million dollars and, under special circumstances, $2 million per month; they offered arms; and they also offered training.").

Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives to Iraq, Imad Mughniyah, then commander of Hezbollah's IJO and his brother-in-law, cousin and successor in that role, Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction which Sadr called "Jaysh al-Mahdi" or the Mahdi Army. *See* McIntyre T5-71 ("They worked together in 2003, specifically, early 2003, in establishing the early

beginnings of the…Iranian Shi'a proxy militia groups in Iraq."). As a later U.S. intelligence report dated August 5, 2007, noted, Sadr's movement received approximately a third of its funding (or more) from Iran. PX-84 at 1. *See also* Oates T1-105-06.

As former Badr Corps leader and Special Group Kata'ib Hezbollah founder Abu Mahdi al-Muhandis (discussed *infra*) later explained to the Hezbollah-affiliated channel *Al-Mayadeen*:

| | |
|---|---|
| Al-Muhandis: | Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq. |
| Host: | Training Iraqis here, to fight the Americans? |
| Al-Muhandis: | Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003. |
| Host: | After 2003… |
| Al-Muhandis: | They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role. |

PX-122.[26]

With the substantial loyalty of the Shi'a slums, the financial support of the IRGC-QF, and the advice and training provided by Hezbollah under the tutelage of Imad Mughniyah and Mustafa Badr al-Din, the Sadrist trend and its paramilitary arm, JAM, rapidly expanded their territorial control in predominantly Shi'a neighborhoods in Baghdad (like Sadr City, a 20km area comprising

---

[26]     Muhandis masterminded the 1983 Kuwait bombings, and later became a senior advisor to IRGC-QF commander Qasem Soleimani. Mustafa Badr al-Din, one of Hezbollah's leading bomb-makers at the time, was arrested by Kuwaiti authorities after the attacks and convicted for his role in the bombings. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison.

tenements and inhabited by over 2 million Shi'a in East Baghdad, (re)named for Sadiq al-Sadr), as well as over time, in religiously mixed areas, displacing or killing local Sunnis. PX-153 at 17.

Yet, despite Hezbollah's training and assistance and the IRGC-QF's financial backing, from its inception in June 2003 through the first half of 2004, JAM had limited capacity to challenge Coalition Forces. McIntyre T5-92. ("They were more like a street gang. And they had a modicum of local leadership, someone whom they trusted or respected, that was very much neighborhood-based."). Nonetheless, Sadr and JAM received significant financial support from Iran during this period. An American intelligence analysis from August 2007 estimated that: "Using estimates of various sources of funding, DIA [the Defense Intelligence Agency] assessed that current Sadrist income from domestic sources is at least approximately $17 million per year, compared to $8 million to $12 million per year from Iran." PX-84 at 1.

### 3.   The Emergence of IRGC and Hezbollah Proxy Groups 2004 – 2011

#### a.   JAM Special Groups

On March 28, 2004, Coalition Forces shut down the main Sadrist newspaper, *al-Hawza*, for inciting violence. A few days later, Coalition Forces arrested a senior cleric close to Sadr. JAM responded within a few days with major uprisings in Baghdad, Karbala, Najaf and other southern Iraqi cities. The initial uprising showcased JAM's capabilities by demonstrating Sadr's ability to coordinate violence across southern and central Iraq. In Najaf, Sadr agreed to a ceasefire with Coalition Forces in June 2004 that was largely favorable to JAM, securing certain no-go zones for Coalition Forces.

The ceasefire was, however, short lived: in early August 2004, JAM attacked a U.S. patrol in Najaf. This engagement was followed by another, in which JAM mounted several attacks in one day against an Iraqi Police station, leading to a large-scale response by U.S. and Iraqi forces. The

resulting battle was devastating for JAM, which suffered more than 1,000 fatalities and lost much of its prestige as a fighting force. Oates T1-103-104 ("within his organization, many people were – some of his subordinate leaders were unhappy with the outcome").

According to later interrogation reports, IRGC-QF personnel were present during the battle. See PX-81 (45th Tactical Interrogation Report of Qais Khazali) at Bates no. 01412 ("Sheikh Ansari was in Najaf, so he could personally assess the need for mortars and RPG's. During the fighting in Najaf, a small number of weapons did arrive from the Iran [sic]."). And although the results were disastrous for JAM, some of its commanders gained valuable experience from it and burnished their reputations. *Id.* at Bates no. 01413 ("Akram [Kaabi] was given the position of Commander in Chief of all of Jaysh al-Mahdi. Akram was allotted this position because he demonstrated deft control over the Sadr trend forces in the Battle of Najaf.").

Although the precise timing remains somewhat uncertain, sometime after the 2004 JAM-sponsored uprising in Najaf, Muqtada al-Sadr authorized his deputies to create what became known as the Special Groups. Though it is unclear whether Sadr was primarily acceding to pressure from his disgruntled subordinates, saw a genuine need to rethink his strategy, or was lured by the promise of Iranian financial and logistical support, what was clear after the August 2004 uprising was that ordinary JAM operatives were little more than street criminals who were largely ineffective in confronting U.S. and British military units.[27] Accordingly, Sadr wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" militia concentrated on murdering and kidnapping Sunnis and engaging in

---

[27]     There were several notable exceptions to this rule, but they fall outside the scope of the present case.

traditional criminal enterprises.[28] From that point forward, "regular" JAM forces primarily focused on ethnic cleansing of Sunni neighborhoods, revenge killings, kidnapping and extortion, and Sadr relied on the newly-formed JAM "Special Groups" to execute the fight against the U.S. and Coalition Forces.

From September 2004 to late 2005, these newly-formed Special Groups conducted low-intensity operations against the British and U.S. military. Mostly, they trained in Iran and Lebanon with Hezbollah and the IRGC-QF and developed their TTP, preparing for the next round of conflict. PX-153 at 23. Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi). PX-57 at Bates no. 000324 (MNF-I Magistrate Review). As the U.S. military later noted:

> When Special Groups were formed, Qais [sic] and Akram al Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

PX-57 at 2. Kaabi was designated by the U.S. Treasury Department in 2008, for threatening the peace and stability of Iraq and the Government of Iraq. PX-9 at 2.

From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used JAM and its Special Groups to target Coalition Forces, gradually providing them with EFPs and advanced training on how best to emplace them. Mr. Oates testified that after the formation of the JAM Special Groups, Lebanese Hezbollah and the IRGC-QF assumed a greater

---

[28]     *See* PX-83 at 1 (MNF-I Intelligence Information Paper) ("The Special Groups were to function separate from JAM and focus on conducting attacks against Americans (likely CF) and Wahabis (presumably Sunnis). Sadr's initial letter regarding the groups' formation indicated they would be formed in several cities divided into three regions: Baghdad, the South (Basrah, Nasiriyah, Amarah, Kut, and possibly Samawah and Diwaniyah), and the Central (Hilla, Karbala, and Najaf).").

role in training the Special Groups "and then their level of direction to these teams grew over time to where it became almost exclusively directed by Lebanese Hezbollah and the IRGC." T1-104.

In June 2007, the Commanding General of Multi-National Forces in Iraq, General David Petraeus, reported to Secretary of Defense Robert Gates:

> This past week we briefed DPM Barham Saleh and NSA Mowafak al-Rubaie on what we have learned about Iranian and Lebanese Hezbollah activity in Iraq from those we've detained. They were properly taken aback and left for Iran on Sunday determined to take a strong message to Tehran. The evidence is impressive. The five-page Qais Khazali sworn statement, made last week and marked with his inked fingerprints, is an unequivocal indictment of Iranian interference. His statement, along with those of his brother and other detainees, provides incontrovertible evidence that Iran is arming, funding, training, equipping, and advising Shi'a extremists operating in Iraq. Iranian interference began shortly after the Coalition began operations, but advanced significantly after the Najaf operation in 2004. The statements of those interrogated are buttressed by dozens of documents taken from the captured laptops. As Qais asserted, without Iranian funding, JAM special groups would not be able to function. We will brief the Prime Minister this Tuesday on the same material.

PX-75 at 25 (MNF-I Weekly Update to the Secretary of Defense, June 3-9, 2007).

### b.    Asa'ib Ahl al-Haq ("AAH")

### 1.    Establishment of AAH

In 2006, Qais Khazali, one of Muqtada al-Sadr's senior deputies and a commander of one or more of the Special Groups, began calling the terror cells under his command "Asa'ib Ahl al-Haq." PX-153 at 32. Mr. Oates testified that: "In . . . late 2005-early 2006, Qais Khazali was ostensibly subordinate to Mr. Sadr. But he was much more interested in conducting direct attacks against the Americans; and he was supported and encouraged by the Qods Force to do so, and they took more direct control of him at that point." Oates T1-120.

According to a report by the U.S. military:

> In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, Ali Khomeini (Sayyid Ali Hosseini Khamenei was then and is still now

the Supreme Leader of Iran) met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb al-Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March, 2007 in Basra, served as the Operations Chief for Asayb al-Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled frequently between Iraq, Iran and Syria.

PX-57 at Bates no. 000324.

Mr. McIntyre testified that the August 2006 recruitment of Khazali began with a summons from Tehran directed at Muqtada al-Sadr, who declined to attend and sent the Khazali brothers in his stead. "There," according to Mr. McIntyre's assessment, the Khazali brothers "met again with General Shahlai; they met Qasem Soleimani. But more specifically, they met with again the Supreme Leader of Iran, who asked Qais Khazali, would he form a special militia initially called K2, but later known as the League of the Righteous? And this was the first instance where the IRGC-Qods Force, the Supreme Leader of Iran, directed a specific entity militia to be formed, to include naming it." McIntyre T5-104.

In March 2007, the Khazali brothers were captured by Coalition Forces. Yet, despite the capture and detention of the Khazali brothers, AAH continued to function operationally because of the significant funding, training and weapons it received from the IRGC, and from the training it received from, and close cooperation it maintained with, Hezbollah. AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of U.S. forces at the end of 2011. Qais Khazali emerged from U.S. detention in early 2010 and went on to become one of Iraq's most important political leaders. In sum, from 2006 to 2011, AAH operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF. Iran harbored elements of AAH's leadership (and their families), trained and supplied its operatives, funded the AAH cells, and directed them to commit attacks on Americans in Iraq. PX-153 at 33. *See also* Pregent

T5-223 (testifying that AAH was "funded, directed, trained and equipped by the IRGC-Qods Force and Lebanese Hezbollah.").

## 2.      Ali Musa Daqduq's Role in Directing AAH

The Khazali brothers not only received instructions from Iran's Supreme Leader to establish AAH, they also received guidance and direction from Ali Musa Daqduq, the longtime Hezbollah commander who had served in numerous leadership positions with Hezbollah before being dispatched to Iraq. PX-155 at 14; Pregent T5-221-22. Notably, Daqduq joined Hezbollah back in the early 1980s and spent two years "in charge of external protection" for Hezbollah's General Secretary. PX-106 at Bates no. 001150.  By the early 2000s, Daqduq had become one of Hezbollah's senior IJO leaders. In mid-2005, senior Hezbollah leadership tasked Daqduq with combating "the occupying force" (i.e., the Coalition Forces) in Iraq. *Id.* at Bates No. 01151.

At the IRGC-QF's direction, Daqduq made trips in and out of Iraq and reported on the training and arming of AAH operatives in mortars and rockets, deployment of EFPs and kidnapping operations. Specifically, he was tasked with organizing AAH and other Special Groups in ways that mirrored the way Iran had organized Hezbollah in Lebanon. PX-155 at 14; PX-106 at Bates no. 001156. Daqduq and the Khazali brothers reported directly to General Shahlai, the deputy commander of the IRGC-QF, Department of External Special Operations. PX-155 at 14-15; Pregent T5-222.

On March 20, 2007, the Khazali brothers and Daqduq were captured by Coalition Forces in Basra. PX-155 at 31; Pregent T5-180-81. The British and American special operators also seized computers and documents during the raid, including a 22-page memorandum that "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," as well as Daqduq's role in overseeing other AAH and Special Groups operations. PX-155 at 31. See PX-

103 (translated Daqduq memorandum); PX-71 (MNF-I Report on Captured Special Groups in Iraq).

After extensive, closely monitored interrogations[29] of Daqduq, the Khazali brothers and the other detainees captured in the Basra raid, Daqduq revealed himself (as explained below, he initially pretended to be a mute named Hamid). As noted in a May 31, 2007 MNF-I memorandum:

> [Daqduq] has knowledge of Iranian surrogate networks operating in Iraq and has admitted to meeting Iranian Revolutionary Guard Corps-Quds Force (IRGC-QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander.

PX-56.

According to U.S. military officials, both Daqduq and Qais Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack. PX-81 at Bates Nos. 01189-93, 01257-61 and 01343-47 (6th, 18th, and 34th Tactical Interrogation Reports of Qais Khazali). General Bergner also stated that the IRGC-QF and Hezbollah were jointly operating camps near Tehran in which they trained Iraqi fighters before sending them back to Iraq to conduct attacks. PX-155 at 32; PX-71. According to General Bergner, Daqduq was the liaison between the IRGC-QF, Hezbollah and AAH, and Daqduq confirmed that AAH operatives had carried out the Karbala attack. Daqduq also told his interrogators that the Karbala attackers "could not have conducted this complex operation without the support and direction of the [IRGC-QF]." PX-155 at 32.

In April 2007, General Petraeus, then Commander of MNF-I, gave a press briefing:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members – the heads of the Qazali [sic] network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the

---

[29] Mr. McIntyre testified that the interrogations were conducted by "what was called the strategic interrogation unit. And this was a special, highly experienced elite interrogation team that . . . worked on high-value detainees." McIntyre T5-88.

extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction.

When we captured these individuals – the initial capture, and then there have been a number of others since then – we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala.

It also detailed – there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

PX-155 at 32-33.

### c.    Sheibani Network (Badr)

As discussed above, even before it helped establish the JAM Special Groups, the IRGC-QF deployed the Sheibani Network, named for Abu Mustafa al-Sheibani, an Iranian national and Badr Corps commander, to smuggle weapons, money and Special Groups operatives into Iraq and exfiltrate select operatives from Iraq to Iran (and sometimes Lebanon) for additional training.[30] The Sheibani Network was a hybrid Special Group that received training from Hezbollah, and weapons, financing, and training from the IRGC-QF. Sheibani was effectively an IRGC-QF operative who ran Badr Corps smuggling operations into Iraq before 2003 and was dispatched after the U.S.-led invasion to cement his arms-trafficking network and infiltrate Badr Corps operatives back into Iraq. Sheibani's network extensively supplied JAM Special Groups after 2004 and was a key supplier of EFPs to them. In addition to supplying weapons to the Badr Corps and

---

[30]    In subsequent interrogations, Qais Khazali described Sheibani as "an Iranian Republican Guard Force (IRGC) Intelligence Officer and [] one of the Badr Corps Leaders." *See* PX-81 at 1244 (15th TIR of Qais Khazali).

JAM Special Groups, Sheibani developed and commanded his own terror cells, responsible for numerous attacks against Coalition and Iraqi forces. PX 153 at 36.

The network's center of operations was in southern Iraq, with nodes extending into central Iraq, including Baghdad. The Sheibani Network was able to conduct its smuggling activities with relative ease across a relatively porous Iraqi border with Iran that was loosely guarded by Iraqi border guards who were frequently favorably disposed toward the group and did not interfere with the weapons smuggling. PX 157 at 26. The network also conducted attacks against U.S. and Coalition Forces, killed Iraqi government officials, Levitt T1-68 ("And so Iran had groups like Sheibani's network specifically carry out assassinations of Iraqi politicians, including Iraqi Shi'a politicians who stood in their way[]"), engaged in criminal activity and employed death squads engaged in sectarian based murder directed against the Sunni population. Notably, EFPs were one of the most important weapons that the network smuggled from Iran into Iraq. *See also supra* at 50-51 (Khazali's  description of the Badr Corps' effectiveness).

On January 9, 2008 the U.S. Department of the Treasury designated Abu Mustafa Al Sheibani under Executive Order 13438 for threatening the peace and stability of Iraq and the Government of Iraq for committing, directing, supporting or posing a significant risk of committing acts of violence against Iraqi citizens, Iraqi government officials, and Coalition Forces. The Treasury Department announcement stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network. Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for

attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

PX-8 at 1-2.

### d.      Kata'ib Hezbollah ("KH")

Encouraged by their success establishing AAH as an IRGC-QF-directed Special Group, in early 2007 Hezbollah and the IRGC-QF tapped former Da'wa Party and Badr Corps veteran Abu Mahdi al Muhandis to form a new Special Group called Kata'ib Hezbollah ("KH" or "Hezbollah Brigades") that they even more tightly controlled. PX-153 at 33. Levitt T1-71. ("Kata'ib Hezbollah, in large part because it's led by people like Muhandis, who had been a senior advisor to Qods Force's General Qasem Soleimani, is intimately close and operating closely with both Iran's Qods Force and its primary proxy, Lebanese Hezbollah.").

Mr. Oates explained that KH was an IRGC creation: "Kata'ib Hezbollah was founded, we believe, in early 2007. It was a whole-cloth creation of the IRGC. Mr. Abu Mahdi al-Muhandis was placed in charge. He was a very senior advisor to Qasem Soleimani, a former Badr Corps member as well. And he began operations exclusively against Coalition force." Oates T1-123-24. Its overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Treasury Department as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." PX-13 at 5. According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC-QF and Lebanese Hizballah. Ghanimi has sent money provided by the IRGC-QF to KH leaders in Iraq." *Id.*

KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout southeastern Iraq, conducting attacks on U.S. and Coalition Forces with (1) RPGs;[31] (2) 107mm and 240mm rockets;[32] (3) IRAMs;[33] and (4) EFPs. KH was also supplied by Iran with their production model of the RPG-29 anti-tank rocket launcher. It was first used against U.S. forces during operations in Sadr City, Baghdad. PX-157 at 41.

On June 26, 2009 the U.S. Department of State designated Kata'ib Hezbollah an FTO, noting that "KH has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks and sniper operations." PX-10. On July 2, 2009 the U.S. Department of the Treasury designated KH an SDGT, finding:

---

[31]     "[The RPG-29 is] an antitank weapon with a tandem warhead. And it was the only rocket-propelled grenade that appeared in Iraq that had a tandem warhead… It's absolutely lethal. This first element, the first warhead, would strip away any kind of reactive armor on the vehicle itself and soften the metal. And then it would be followed by the main portion of the shell, which would be another high-explosive antitank warhead. And that would follow in behind almost immediately the initial contact made by the first element here." McIntyre T5-111 (noting the RPG-29s were only supplied by the IRGC-QF to KH).

[32]     The IRGC-QF supplied 107and 122 mm rockets. McIntyre T5-109:1-10. ("[A 240 mm rocket] was only going to be employed by [the IRGC-QF's] proxy militias that they directly established and fielded and supported in Iraq. And they would directly control their operations, to include weapons-use targets as well as the tempo of combat operation against US forces as well." McIntyre T5-109.

[33]     As Mr. McIntyre explained, "IRAM is an improvised weapon which was used exclusively by Hezbollah Brigades. And it was a 107-millimeter rocket motor that was removed from the rocket itself. And then they would take a propane gas tank, of course, that was empty. They would cut it open. They would fill it with C4 explosives. Then they would attach a nose cone that was a detonator for the system, as well as usually a grazing fuse on the side, so if it didn't hit directly, the grazing fuse would initiate the device. They could include up to 75 pounds of plastic explosive. They also would put in there, nails, pieces of chain, for a shrapnel effect which would be truly horrific." McIntyre T5-110. In a designation announcement, the U.S. Treasury Department described Sayyid Salah Mandi Hantush al-Maksusi as "a senior KH operations officer who personally oversaw and executed improvised rocket assisted mortar (IRAM) attacks against Coalition forces in Iraq." PX-13. The U.S. Treasury Department also noted that "Maksusi has received training from the IRGC-QF and from Lebanese Hizballah." *Id.*

Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG-29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

PX-11 at 2-3.

As Mr. Oates testified, "[The IRGC-QF] were…the exclusive director of [Kata'ib Hezbollah's] operations. They were, in fact, their proxy organization operating in Iraq." Oates T1-124.

### e.    Promised Day Brigades ("PDB")

After Sadr's rift with Qais Khazali became final and the IRGC's formation of AAH was solidified, the Special Groups largely fell under the direct control of Hezbollah and the IRGC-QF.

Over the next 20-24 months, JAM retained its role as a criminal organization soliciting kickbacks, protection money and other illicit revenue streams, and it remained active in fostering death squads targeting Sunnis and systematically driving them from mixed ethnic neighborhoods in Baghdad. In June 2008, Sadr announced that JAM would transition its efforts to non-military social service activities focusing on assisting Shi'a communities under the name "Mumahidun" that would promote Islamic heritage and ideology. PX-157 at 46. Nonetheless, later in 2008, Sadr, still seeking to maintain his nationalist bona fides and with Iranian support, formed a new JAM Special Group called the Promised Day Brigades, established to carry out attacks against Coalition Forces. *Id.* The PDB was a mere shadow of the JAM forces that Sadr commanded in 2004-2006, but, like other Special Groups, it received funding, training and weapons from the IRGC-QF and Hezbollah. The PDB also made extensive use of EFPs. PX-153 at 38.

According to a May 2009 report from MNF-I commander General Ray Odierno to the Secretary of Defense:

> Reporting indicates that Iran continues its support of Iraqi militants, including Kata'ib Hizballah, (KH), Promised Day Brigade, and Asaib Ahl al-Haqq (AAH), and that AAH, and these groups intend to leverage these activities in June. The training, including the use of explosively formed projectiles and global positioning systems, reveals no new tactics or weapons, but indicates that Iranian facilitated attacks may increase next month.

PX-79 at 58 (MNF-I Weekly Update to the Secretary of Defense, May 11-17, 2009).

Similarly, in an August 2009 report to the Secretary of Defense, General Odierno reported that the PDB was responsible for the 15 EFP attacks that were perpetrated that month in Baghdad, as "many of their fighters are now returning from Iran, following extensive training, in time to influence elections." PX-79 at 90 (MNF-I Weekly Update to the Secretary of Defense, August 24-30, 2009). Despite the fact that the U.S. military moved aggressively to neutralize PDB, it nonetheless survived and continued to attack Coalition Forces, in part because Sadr's movement

was too large and entrenched to disappear altogether, but primarily because the IRGC-QF and Hezbollah sustained it – in keeping with the IRGC's long-time policy of investing in all Shi'a factions. PX-153 at 38.

## III.   The Bellwether EFP Attacks

Messrs. Barker and Lutz were tasked with assessing the six bellwether attacks presented at trial involving EFPs; i.e., the attacks that occurred on May 5, 2005, October 22, 2006, March 17, 2008, March 23, 2008, May 9, 2009 and May 17, 2009. Mr. Barker, having reviewed the available evidence, concluded that "each of [these] attacks [involved] an EFP, engineered and specifically designed to penetrate armor." Barker T3-6. Mr. Lutz (agreeing with Mr. Barker's assessment, Lutz T5-49:20-23), concluded that "the six attacks that have been presented, all involved explosively formed penetrators that were provided by the IRGC." Lutz T5-16. *See also id.* at 52 ("So through those sources, my own experience, I concluded those are all EFPs that were provided by the IRGC and probably facilitated in some way through the Lebanese Hezbollah, if not jointly.").

### A.   The May 3, 2005 Attack – Baghdad

On the morning of May 3, 2005, Plaintiff Robert Bartlett was working as a scout and a sniper in a reconnaissance team from 1st Battalion, 64th Armor Regiment. Bartlett T2-51. Mr. Bartlett testified at trial that he had a "dual role" in his unit. *Id.* Mr. Bartlett and his unit would "clear sectors and clear areas" as well as "check on the Sheikhs . . . trying to win the hearts and minds . . . try[ing] to stand up the local governments and help, you know, the poor people." *Id.*

Mr. Bartlett was the driver of the team's up-armored M1141 HMMWV. He testified that "[t]hat day I was doing a scouting mission, so we had cleared a couple of sectors. We did some presence patrols in a few sectors just south of Sadr City… When we got on [Route] Pluto, we were on our way to clear the third sector for the day and we would have been done for the day." Bartlett

T2-57. Mr. Bartlett was driving the lead vehicle in a three-vehicle convoy. *Id.* As they were crossing on Route Pluto on an overpass, Mr. Bartlett's vehicle was struck by a roadside bomb as he was negotiating a Jersey barrier (concrete traffic obstacles that were often used in Iraq to slow down traffic) installed on the overpass. Bartlett T2-57; Barker T3-39-40; PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker) at 18-20.

Mr. Bartlett testified that his vehicle was struck by an EFP, and an EFP slug "cut me from the left corner of my temple down through my jaw. And then it took my truck commander's head — well, it took my gunner's legs and then took the top of my truck commander's head off." Bartlett T2-51-52. The fourth occupant, riding in the backseat behind Mr. Bartlett, was blown out of the HMMWV's back door by the strength of the EFP's blast overpressure and rendered unconscious. *Id.* at 54-55. Mr. Bartlett recalled smelling "burning flesh and burning hair and diesel fuel," and recalled that his "truck was still running." *Id.* at 55.

Mr. Bartlett suffered severe facial trauma that has required him to undergo numerous facial reconstructive surgeries. *Id.* at 62-63. He suffers from permanent nerve pain in his face, lips and hands, a traumatic brain injury, post-traumatic stress disorder, and short-term memory loss. *Id.* at 63-65.

Mr. Bartlett's former Battalion Commander, U.S. Army Colonel (Ret.) Kevin Farrell, also provided eyewitness testimony regarding the May 3, 2005 attack. Mr. Farrell testified that Mr. Bartlett's unit was providing overwatch for other soldiers in his Company who were, at the time, largely engaged in operations against JAM personnel in the areas just south of Sadr City, Baghdad. Farrell T2-72-73. Mr. Farrell explained that Sadr City is "obviously affiliated with Muqtada al-Sadr. And I'd say there were, we guessed, about 1.5 million inhabitants in a teeming slum . . . . And we inferred, I think quite rightly, that this was a sanctuary. The connection between Sadr City

and Iran or Iranian agents was clear, and that many of the attacks that we were subjected to, the planning and the stockpiling of munitions we believed were done in Sadr City." *Id*. at 73.

Mr. Farrell testified that on the day of the attack, he was on a routine patrol outside the forward operating base ("FOB") when "we heard the explosion, and . . . heard the call over the radio, and we traveled to the location where Robert Bartlett's vehicle had been struck…. And we — as I recall, we were the first element on the scene after the attack." *Id.* at 78-79. He described Mr. Bartlett's injury as "ghastly." *Id.* at 80.

Mr. Farrell concluded his testimony by stating:

> By my experience in theater, I have no doubt that this EFP attack — it was an EFP attack, and it was consistent with all of the signs of the Iranian supplied munitions, the targeting. Everything had the hallmarks[.] I'm convinced beyond a doubt that this was an Iranian-sponsored attack.

*Id.* at 83.

Mr. Barker testified that the May 3, 2005, attack that injured Robert Bartlett was caused by an EFP array, based upon his review of PX-123 (SIGACT Report titled "IED ATTK ON 1-64AR IN BAGHDAD (ZONE 30): 1 CF KIA, 3CF WIA/M114 DAMAGE"); (Barker T3-34); PX-124: Casualty Report (*Id.*).[34] He also reviewed 26 photographs Mr. Bartlett obtained of his vehicle that were taken in the immediate aftermath of the attack, which the Court received into evidence. PX-126 (Post-attack photographs provided by Robert Bartlett); Bartlett T2-65-66.

The May 3, 2005 attack was a relatively early EFP attack against U.S. armor in Iraq. PX-158 at 19. As a result, the SIGACT provided little information beyond the fact that SSG Bartlett's HMMWV "struck an IED…." *Id.* Because Mr. Bartlett's fellow soldiers opted to self-evacuate their wounded back to the nearest Forward Operating Base (in this case, FOB Rustamiyah), it

---

[34]     Mr. Barker also relied upon a sworn declaration provided by Mr. Farrell, PX-125, which was not received into evidence because Mr. Farrell provided testimony during the trial.

appears from the record that no EOD detachment was dispatched to the attack site to perform a post-blast analysis or sensitive site exploitation at the site of the attack. *Id.*

The Casualty Report indicates that Mr. Bartlett was the driver "on [a] route securing mission when an IED exploded from the right of the vehicle. [Mr. Bartlett] arrived at 86th C[ombat] S[upport] H[ospital] with an emergency placement of a tracheostomy… [diagnosed with] massive facial trauma [and] dental injuries." *Id.* at 19-20; PX-124 at 5.

Mr. Barker testified that the photographs of the wreckage of Mr. Bartlett's HMMWV confirm that the blast was caused by a sophisticated EFP that sent multiple penetrating slugs approximately 3-5 inches in size through the vehicle along its left side, with the blast seat located roughly at Mr. Bartlett's 11 o'clock. Barker T3-35-37; *see also* PX-158 at 20. The weapon launched multiple slugs directly into the crew compartment along a diagonal path, with one slug exiting via the rear right passenger window. Barker T3-38. Another partial EFP slug exited through the roof of the up-armored vehicle, which Mr. Barker testified was covered with approximately two inches of RHA. *Id.* at 36.

Mr. Barker also testified that the holes visible in the photos of the hardened steel suspension of the HMMWV were "telltale signs of smaller pieces of copper penetrating the steel. If it had been anything else . . . [it] would have broken off large chunks of [the suspension]. The EFP pierces the steel. You can even see little pieces of copper residue left behind." Barker T3-37; PX-126. Mr. Barker explained that the discovery of copper residue on a vehicle further supports his conclusion that this attack involved a copper-lined EFP. Mr. Barker confirmed that copper is ideal for EFPs ("the next best thing" after tantalum), and that there is no copper in the vehicle or in any other weapons that would have been fired at the vehicle. Barker T3-38-39.

Mr. Lutz's assessment was similar: "The penetrations to the armor and ballistic glass bear all the characteristics of strike points made by a copper-lined EFP array, and the photos below show copper residue (1) embedded by an EFP fragment in the driver's side ballistic glass and (2) present on an entry hole in the left front wheel." PX-159 (Expert Report of Col. (Ret.) Kevin Lutz) at 29.

Mr. Barker testified that he assessed the attack to have involved a multi-warhead EFP array that was RF-armed and PIR-triggered. Barker T3 at 39-40; PX-158 at 22-23. Mr. Barker reached his conclusion as to the arming and triggering of the device based upon the lack of enemy presence both before and after the attack, the fact that no command wire was discovered at the scene, the accuracy of the EFP warhead impact points, and his experience that "99 times out of 100, the EFP is set off with a PIR." Barker T3-40. He also concluded that the EFP was packed with HE explosives, as home-made explosives lack "the brisance . . . the cutting or sheering force of the explosives [required] to penetrate the armor." *Id.* at 40-41. Mr. Lutz concluded that the EFP was made of high-quality components linkable to Hezbollah and the IRGC. He found that the attack "involved an early example of the use of an EFP of original Hezbollah and IRGC design that was supplied by the IRGC…. [T]he weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." PX-159 at 25.

Based upon the foregoing evidence, the Court should find Iran liable for the May 3, 2005 attack that injured Robert Bartlett because it was caused by a well-designed and professionally manufactured EFP array of original Hezbollah and IRGC design that was supplied by the IRGC.

### B.  The October 22, 2006 Attack – Baghdad

On the afternoon of October 22, 2006, a personal security detachment of 2nd Platoon, 6th Infantry division, consisting of four up-armored M1114 HMMWVs equipped with Level 5 Interim

Fragmentary Armor Kits ("Frag 5 Kits"), was traveling northwest on Route Jackson in central Baghdad. PX-158 at 23. Seated in the left back seat of the lead vehicle was bellwether Plaintiff (and then-U.S. Army Major) David Haines. Haines T4-163. Mr. Haines was participating at that time "in what the Army calls a RIPTOA, a relief in place [/] transfer of authority. I was the incoming unit, 2[-]6 Infantry. Major Dave Taylor and his crew were the outgoing unit . . . . And on this specific patrol here, we were rehearsing the route between FOB Falcon and the Baghdad hospital." *Id.* at 162.

According to Mr. Haines, his vehicle was struck by a multi-array EFP. *Id.* at 164-66. The EFP's warheads struck the passenger front door, killing a Major Taylor who was riding in the front seat. *Id.* at 164. Mr. Haines testified that as a result of the EFP strike, the vehicle's driver lost his right leg below the knee, the passenger seated behind Major Taylor lost his left leg below the knee, and the vehicle's gunner lost both of his legs below the knees. *Id.* at 165. Mr. Haines was "struck by EFP shrapnel in my right hand, my left arm, my right leg about mid shaft on my femur and in my side." *Id*. Mr. Haines also provided seven photographs of the damaged vehicle taken shortly after the attack, which the Court received into evidence. PX-135; Haines T4-161.

Mr. Haines testified that the "metacarpals in my right hand were shattered, and it looked like somebody had taken a bite out of the side of my hand. I had shrapnel lodged in my left arm. It segmented my ulna and ulnar nerve, and it locked my hand back so it was not functional. . . . The shrapnel in my right femur broke my leg, and there had been some metal and probably part of my rifle that somehow jammed my feet into the Humvee." Haines T4-168.

Mr. Haines testified that his arm required multiple skin grafts and his body was "compared to Swiss cheese" due to the number of holes created by the shrapnel. *Id.* at 167, 171-73. Mr. Haines further testified that he still carries shrapnel in his body from the attack, and that as recently as

June 2018, Army doctors removed a foreign body from his right forearm that was tested and determined to be copper. *Id*. at 167.

Mr. Barker testified that that the October 22, 2006 attack that injured Mr. Haines involved the use of an EFP array, based upon his review of PX-132 (SIGACT, CEXC, and other records relating to the attack and Mr. Haines's injuries) and PX-135. Barker T3-41. According to Mr. Barker's expert report, the SIGACT report noted that an IED detonated on the right side of the lead vehicle as it was traveling northbound on Route Jackson. PX-158 at 24. Mr. Barker's expert report also notes that "EOD was dispatched to the attack site" and that a Weapons Intelligence Team ("WIT")[35] was "spun up," meaning that the WIT members received orders to investigate the attack. *Id*.

Mr. Barker testified that the CEXC laboratory performed a chemical analysis on the copper slugs recovered from Mr. Haines's HMMWV that detected the presence of RDX and TNT. Barker T3-42-43. Mr. Barker further testified that RDX is a high energy explosive that was often employed in EFPs. *Id*. at 43. The CEXC reports concluded that Mr. Haines's HMMWV was struck by an array consisting of multiple EFP warheads and a shaped charge, but Mr. Barker reached a different conclusion. Barker T3-43. According to Mr. Barker, shaped charges, such as High-Energy Anti-Tank ("HEAT") rounds, require a delivery method, such as a rocket or mortar. *Id*. at 43. Mr. Barker explained that HEAT rounds "[have] a core of tungsten. So when its fired at a tank, it impacts the tank. Then there's a second explosion that forces the tungsten through the tank." *Id*. EFPs, by contrast, use the HE explosive packed behind the liner to transform the liner into a warhead and deliver it. *Id*. at 44. Accordingly, Mr. Barker concluded that the EFP employed against Mr. Haines's up-armored HMMWV contained "somewhere between an eight- and ten-

---

[35]     WITs are described in greater detail *infra*.

inch warhead with two or three smaller warheads stacked around them." *Id.* Mr. Lutz testified that he agreed with Mr. Barker's assessment that the blast involved an EFP array without an accompanying shaped charge, stating that a shaped charge "would have [left] a much smaller hole. What it looked like to me was an EFP that was probably 10 to 12 inches if you look at the hole. And there [were] multiple [EFP warheads], because there was also three other holes on that door." Lutz T5-51.

Mr. Barker testified that the EFP array made four penetrations in the armored front-passenger door of the HMMWV, which was equipped with "standard RHA, but…also had the Rhino…. So they angled the PIR, the warheads, and then the warheads struck the vehicle as designed." Barker T3-45-46. Mr. Barker further testified that "the armor was completely overwhelmed…. The steel is still flat. It's not deformed. It just has a puncture in it. [RHA] is so hard that you can't cut it with a cutting torch. But yet something passed through it like a hot knife through butter." *Id.* at 46.

PX-132 includes the CEXC report admitted into evidence that indicated: "The array [was] positioned on the curb running parallel to RTE JACKSON in order to provide the optimum angle of attack and camouflaged with dead foliage to prevent visual detection by passing C[oalition] F[orces]. The vehicle was engaged at a distance of approximately 16 ft." PX-132 at 29. The report's analysis section is partially redacted but notes that a "copper slug created an internal hole approximately 12" in length and 9 1/2" wide" inside the vehicle. And that there was "minimal copper splattering around [the] points of penetration." *Id.*; *see also* PX-158 at 25-26.

Regarding the EFP's initiation systems, the CEXC report concluded that it was "highly likely that the array was remotely armed and PIR initiated." PX-132 at 30. The report contains an assessment that the attackers "would have identified the average speed of M1114 convoys" and

the length of their Rhino anti-PIR devices and concludes that the "EFP array would then be angled accordingly to target the passenger areas of the HMMWV when the [Rhino] activated the PIR[']s passive infrared sensor." *Id.* Mr. Barker testified that "[t]his was a sophisticated EFP array. They used a dual-initiation system. The accuracy of it is [due to] nothing but a PIR with an RF setup. CEXC . . . found the high-energy explosives. Even without the RDX present, the damage to the vehicle could be nothing but HE." Barker T3-47.

Mr. Lutz reviewed the same evidence and concluded that "the October 22, 2006 attack that injured then-Major ("MAJ") David Haines involved the use of an EFP array of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 31. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." *Id*. Mr. Lutz also concluded that "that the attack that injured MAJ Haines was a well-planned and coordinated attack that was part of the EFP campaign orchestrated by the IRGC and Hezbollah and conducted by one of the IRGC's Special Group proxies, involving the use of a uniquely concealed, copper-lined EFP array …." *Id.* at 38.

Based upon the foregoing evidence, the Court should find Iran liable for the October 22, 2006 attack that injured David Haines because it was caused by a well-planned and coordinated attack involving a well-designed and professionally manufactured EFP array of original Hezbollah and IRGC design that was supplied by the IRGC.

### C.       The March 17, 2008 Attack – New Baghdad

During the afternoon of March 17, 2008, a convoy of five up-armored HMMWVs from D Company, 2nd Battalion, 30th Infantry Regiment was traveling west on Route Predators, en route to FOB Rustamiyah. PX-158 at 29-30. As the convoy passed through the intersection of Routes Predators and Gold, a roadside bomb that had been placed between two small Jersey barriers

detonated on the right side of an up-armored HMMWV commanded by bellwether Plaintiff (and then-U.S. Army Specialist) Christopher Levi. *Id.*; Levi T4-181-82.

Mr. Levi testified that he was riding in the middle vehicle when it was "struck from the right side by an EFP." *Id.* at 182. Mr. Levi recalled maintaining consciousness for a few moments after the blast, after which he blacked out. *Id.* at 183. He recalled awakening still in the vehicle, but unable to see because of the smoke from the blast that obscured his vision. *Id.* at 183-84. Mr. Levi testified that he then performed a "self-assessment," at which point he discovered that the "EFP . . . went directly through my thighs, a transfemoral amputation, catastrophic at site. Double transfemoral amputation. And a piece of shrapnel that if I had my hands in my lap would have hit me in my throat . . . [b]ut it entered my forearm, bounced off my ulnar, hit my radius, took five of my wrist bones out and two-thirds of my second metacarpal and just deflected away from my face saving my life." *Id.* at 184-85.

Mr. Levi testified that he was eventually medivaced to Germany and then to Walter Reed Medical Center in the United States for treatment. *Id.* at 188-89. He remained at Walter Reed for three months and had more than 100 surgeries performed to correct his injuries. *Id.* at 189. After his legs healed, he was fitted for leg prosthetics, and he now has "an 8-inch plate from the tip of my knuckle to the middle of my forearm with six to eight screws holding the separate parts together" in his hand. *Id.* Mr. Levi could not ambulate well with his prosthetic legs until more than a year after his discharge. *Id.* at 190-91. Mr. Levi testified that prior to his medical discharge from the Army, he was moved into the barracks at the Walter Reed complex, where he developed pulmonary embolisms, bed sores and infections. *Id.* at 192-93.

Mr. Levi testified that he experiences nerve pain on a continuous basis, for which he takes prescription medication. *Id.* at 194. During the years following the attack, he has found and removed shrapnel from his body. *Id.*

Mr. Barker opined that the March 17, 2008 attack that injured Mr. Levi involved the use of a multi-array EFP that was RF-armed and PIR-triggered based upon his review of PX-131 (a SIGACT Report; an IED Report; a WIT 3 Report; an Event Storyboard; CEXC Report 18530-08, and the Casualty Report for then-Specialist Christopher Levi). Barker T3-47-48; PX-158 at 23.

The SIGACT report categorized the mode of attack as "Directional IED," describing the "IED Type" as "EFP" and noting an "IED Description" as a "4 array copper EFP." PX-131 at 8. The SIGACT report also contains an assessment by the EOD team that the weapon employed against Mr. Levi's vehicle was a "4 array copper EFP." *Id.* at 9. CENTCOM redacted a portion of the "Vehicle Status" field, which would have indicated what (if any) C-IED equipment was installed on the vehicle. *Id.* at 8. However, based upon the unredacted portions of the documents and the photographs provided by CENTCOM, Mr. Barker concluded that the vehicle was equipped with a Rhino. PX-158 at 30; Barker T3-51. The Battalion's intelligence staff officer (referred to as the "S2") noted that this was the third IED attack at "this particular section of RTE Predators since 6FEB08," and assessed that the attack was "conducted by S[pecial] G[roup] elements possibly operating out of Mashtal." PX-131 at 9.

The IED report describes the Main Charge Configuration of the IED as "EFP," and notes that the "EFP was placed between two small jersey barriers used to create a mandatory turn lane to filter traffic in [the] right lane onto Route Gold." The EOD team "recovered pieces of a D cell battery…. Small pieces of copper slugs were [also] recovered from the vehicle, soldiers [sic] eye protection, and the blast site." *Id.*

The report notes that an Iraqi Police ("IP") station was located "on the northeast corner off Route[s] Predators and Gold," and that the "IPs should have been able to see the device or suspicious persons placing the device." *Id.* According to Mr. Barker's report, these comments "indicate that the site investigators were suspicious of the local IPs' failure to observe the installation of the EFP or to warn Coalition Forces of the danger." PX-158 at 31.

The IED report also contains comments from WIT 3, which noted that "[f]our strike points were identified on the right side of the vehicle. Two strike points were located on the engine compartment and two strike points where [sic] on the [front passenger] door. EOD assessed that the device was a 4-array [copper] lined EFP." PX-131 at 4. Again, the IED report notes that the EOD/WIT investigators recovered pieces of a D cell battery and a "copper slug embedded in one of the soldiers [sic] eye protection," but that "[n]o other initiation system or components [were] found . . . ." *Id.*

At the trial, Mr. Barker explained that the WITs "were trained to go out and collect evidence. As you can imagine, it's difficult to be on an active battlefield when people are shooting at you and calmly collect evidence. So we trained up teams that can both defend themselves and collect data." Barker T3-49. Mr. Barker further testified that the WITs were trained by the Asymmetric Warfare Group. *Id.*

Mr. Barker also explained at the trial that the discovery of pieces of a D cell battery was significant because these types of batteries were often used "to power the PIR as well as provide backup power to the cell phone if [the EFP] sits for too long." *Id.* at 49-50. Mr. Barker explained that "[s]ome of these devices sat for weeks before they detonated them. It got us into a sense of complacency before they detonated on us." *Id.* at 50.

Mr. Barker testified the CEXC laboratories performed a chemical analysis on the recovered fragments and detected the presence of RDX, a high-energy explosive. *Id.* at 50-51.

In reviewing the images of Mr. Levi's HMMWV that were provided as part of the CEXC and WIT 3 reports, Mr. Barker testified that "this [was] a devastating EFP. Again, [the vehicle] had a Rhino in an effort to defeat the PIR. The enemy had taken measures to aim the warheads properly towards the armor. So it took out both the engine and the cab." *Id.* at 51. He also confirmed that the WIT identified the presence of copper residue on the vehicle. *Id.*

Mr. Barker testified that this attack involved a "precision-built and -manufactured, purposely built EFP for penetrating armor. Multiple warheads: Anywhere from three to five of these warheads did the damage it did. The CEXC identified HE; but again, the overwhelming damage to the vehicle even without the chemical analysis was high-energy explosives. It was a dual-trigger system. Again, [the HMMWV] had the Rhino, which set off the PIR. The PIR was turned on by [an] RF device." *Id.* at 52.

Mr. Lutz reviewed the same evidence and concluded that "the March 17, 2008 attack that injured Specialist ("SPC") Christopher Levi involved the use of a copper-lined EFP array of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 38. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." *Id.* Elsewhere, Mr. Lutz concluded that "the attack that seriously injured SPC Levi was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies. The attack involved a 4-array copper-lined EFP concealed between two jersey barriers that was likely RF remotely armed and PIR triggered." *Id.* at 47.

Based upon the foregoing evidence, the Court should find Iran liable for the March 17, 2008 attack that injured Christopher Levi because it was caused by a well-planned and coordinated attack involving a well-designed and professionally manufactured EFP array of original Hezbollah and IRGC design that was supplied by the IRGC.

### D. The March 23, 2008 Attack – Baghdad

On March 23, 2008, at approximately 4:00 p.m., a patrol consisting of two armored M2 Bradleys, between six and eight Iraqi National Police vehicles, and an M1151 HMMWV carrying a U.S. Army Tactical Psychological Operations ("PSYOP") team departed FOB Falcon, located a short distance outside Baghdad. PX-158 at 37. The patrol from A Company, 4th Battalion, 64th Armored Regiment had several mission objectives, including searching a house suspected of containing a weapons cache, and escorting the PSYOP team as it conducted loudspeaker broadcasts and placed signs discouraging the local Iraqi nationals from attacking Coalition Forces. PX-158 n. 66; Mason T4-55. At approximately 10:30 p.m., the lead Bradley was struck by a roadside bomb. PX-158 at 38. The weapon caused the lead Bradley to catch fire, killing bellwether Plaintiffs' decedents Christopher Hake, Andrew Habsieger and George Delgado. Sergeant Steve McCoy, the Bradley's commander, escaped the vehicle but was badly burned and succumbed to his wounds approximately three months later in a military hospital. *Id.*

At the trial, the Court heard testimony from Russell Mason, who was decedents' Platoon Leader and was commanding the other Bradley in the patrol that evening. Mason T4-52-53, 58-59. According to Mr. Mason, the "patrol consisted of a lead Bradley Fighting Vehicle . . .; about three or four Iraqi National Police vehicles; the PSYOPs[' HMMWV] . . . in the middle; an additional three to four Iraqi National Police; and then followed by my [Bradley] vehicle in the rear. . . ." *Id.* at 58-59.

Mr. Mason testified that he was manning the independent operating turret in his Bradley, and that his turret was facing the rear position when he heard "a loud pop" through his headset, and that he "immediately knew that something was not right." *Id.* at 62. He positioned his turret forward and "saw that our lead Bradley had stopped." *Id.* Mr. Mason ordered his driver to approach the lead vehicle, but maintained an initial distance of approximately 100 meters, because he was taught that the insurgents "would do multiple IEDs. So they would try to engage and disable the first vehicle, and then they would have a secondary IED waiting for an additional vehicle when they come up to try to provide aid to the first vehicle." *Id.* at 64.

Mr. Mason testified that he knew that the lead vehicle had been attacked "probably within 20 seconds of getting a little closer. . . ." *Id.* at 65. Mr. Mason further testified that "this whole time I'm trying to call [the lead Bradley crew] on the radio with no response. So it was pretty clear when I got closer that something was not right and that it was an IED attack." *Id.* Roughly one or two minutes later, Mr. Mason saw "a person running back to our vehicle, and they were completely engulfed in flames." *Id.* At first, Mr. Mason believed this person to be the "trigger man" for the IED who, he assumed, had been too close to the bomb when it detonated. But, "half a second later" he "realized it was Sergeant Steve McCoy. . . . [D]ue to his running style, [he] knew it was him." *Id.* at 64-66. At this time, Mr. Mason also noted that "the rest of the [Bradley] was starting to become engulfed in flames." *Id.* at 69.

Mr. Mason testified that between two and five minutes elapsed between the moment he heard the "loud pop" and when he saw Sergeant McCoy on fire and running toward his vehicle. *Id.* at 67. Mr. Mason further testified that after Sergeant McCoy was placed in the undamaged Bradley, the dismounted soldiers began "to receive small arms fire from a nearby building." *Id.* at

66-67. Shortly thereafter, Mr. Mason's platoon "started to get more support from [the] battalion and some tanks rolled in and the small arms fire dissipated." *Id.* at 67-68.

While this engagement was ongoing, other members of Mr. Mason's platoon "tried and attempted to gain access to the now burning Bradley fighting vehicle." *Id.* at 69. Mr. Mason testified that his fellow soldiers "could not gain [access] — while they could open some of the hatches, when they opened them up, flames would come shooting out and they could not gain access." *Id.* Due to the lack of firefighting services available in Baghdad at the time, it took "about three or four hours" to assemble sufficient local resources and extinguish the burning Bradley. *Id.* at 69-70. Mr. Mason testified that, accordingly, "the Bradley fighting vehicle didn't get back to the FOB where we were at until we returned [from accompanying Sergeant McCoy to the Green Zone hospital]. And then that's when the doctors were able to go in and . . . see that there was [the remains of] four service members inside still." *Id.* at 70.

Mr. Barker opined that the March 23, 2008 attack that killed bellwether Plaintiffs' decedents Christopher Hake, Andrew Habsieger and George Delgado involved the use of an EFP array that was command wire-armed and PIR-triggered, based upon his review of PX-94 (U.S. Army AR 15-6 Report); PX-129 (SIGACT Report; an IED Report; an Event Storyboard; a CJTF-Troy Report; CEXC Reports, and the Casualty Reports for Christopher Hake, Andrew Habsieger and George Delgado); PX-136 (Post-attack photographs of the destroyed Bradley (not offered into evidence)); and PX-95 (Video of the attack made by the PSYOP team (not published or offered into evidence)). PX-158 at 37; *see also* Barker T3-54, 58-61.

According to the AR 15-6 report's Table of Exhibits, the investigating officer interviewed the soldiers that took part in the patrol, those who responded to the attack as part of a "Quick Reaction Force," and the soldiers responsible for conducting the recovery of the damaged Bradley.

PX-94. The investigating officer also interviewed the Battalion Intelligence Officer, Electronic Warfare Officer, the EOD detachment and the WIT that examined the Bradley after it was returned to FOB Falcon. *Id.* The sworn statements of 13 of the soldiers are annexed to the officer's final AR 15-6 report, and the PSYOP team also used their onboard video recorder to capture a video of the attack immediately following the EFP strike. *Id.* In addition to these interviews, the investigating officer also personally examined the damaged Bradley vehicle hours after it was returned to FOB Falcon. *Id.* Mr. Barker testified that, in his opinion, the investigating officer "did a good job doing what he had to do. . . . [T]o kill a Bradley is a significant event." Barker T3-55. Because, Mr. Barker explained, a Bradley Fighting Vehicle is "almost 13 feet tall. It's . . . 25 to 28 feet long." *Id.* at 58. "[A] Bradley has far more armor than a Humvee. It has twice the armor." *Id.* at 61.

> The investigating officer concluded that the lead Bradley vehicle was struck by a:

> Command [Wire]-Initiated Explosively Formed Penetrator; a portion of which defeated the armor on the right-hand side of the Bradley Fighting Vehicle, passed through the fuel tank of the vehicle, and exited the vehicle through the armor of the left-hand side of the vehicle. The resulting blast energy ignited the fuel within the fuel tank immediately.

PX-94 at 125.

> The investigating officer also found that, immediately after the EFP strike, the patrol came under small arms fire from "ground level and second-floor window positions to the south." *Id.* According to the investigating officer:

> The intense fire [within the Bradley] incapacitated [] Hake…[] Habsieger and [] Delgado, resulting in their inability to extricate themselves from the vehicle. Their state ultimately resulted in their deaths. [] McCoy, who exited [via] the vehicle commander's hatch completely engulfed in flames, was the sole survivor.

*Id.*

Mr. Barker agreed with these conclusions except as to the manner in which the EFP was triggered. According to Mr. Barker, the investigating officer believed that "the enemy soldier was sitting at the battery. And as the Bradley drove by, he set it off. That's not what happened. It was too accurate. So it's the middle of the night. Our enemy has no night vision. The Bradley may be big, but it's a long way away. It's a lot of things going on. So what they did was they . . . powered the PIR on [via command wire]; and when the Bradley drove in front of it, it was a very accurate shot. It was just off center, just above the road wheel through the armor." Barker T3-56-57.

Mr. Barker concurred with the AR 15-6 report's conclusion that the EFP slug passed through the Bradley's armor on its right side, passed through the vehicle's fuel tank, and exited out the armor on its left side, setting the vehicle ablaze. *Id.* at 57.

The AR 15-6 report accords with Mr. Mason's testimony that, notwithstanding the efforts of the soldiers from the Quick Reaction Force, which arrived at the scene approximately 15 to 20 minutes after the attack, the intense heat from the fire, and the subsequent "cooking off"[36] of the ammunition within the Bradley, made extraction of the soldiers within the vehicle impossible. PX-94 at 126. After the fire was finally extinguished, and the damaged Bradley returned to FOB Falcon, the bodies of Messrs. Hake, Habsieger, and Delgado were finally removed. According to the medical examiner's notes annexed to the AR 15-6, the bodies of all three men were "burned beyond visual recognition." PX-94, Exhibits R-1, R-3 and R-4. Indeed, the fire within the Bradley was so severe that, over four hours later, when the investigating officer personally examined the vehicle, he "could still feel excessive amounts of heat emanating from the metal." *Id.*, Exhibit O.

The SIGACT sets forth the timeline of the attack and also contains an assessment from the S2 that the "EFP was command wire detonated. It was likely a defensive emplacement by SGC

---

[36]     "Cooking off" is military slang for ammunition exploding prematurely due to heat in the surrounding environment.

[Special Group Criminals] intended to deter [Coalition Forces] from conducting raids in the area." PX-129 at 16. As noted *supra*, Mr. Barker disagrees that this weapon was *detonated* via command wire. Rather, his expert report and his trial testimony were unequivocal that the command wire was used to initiate the EFP's PIR trigger, and that the head and motion of the lead Bradley as it crossed the PIR detonated the EFP. PX-158 at 43; Barker T3-56-57.

Mr. Barker's expert report also cites the investigation performed by CJTF-Troy, which concluded that the Bradley was struck by a "2 array, 6 to 8 inch, EFP . . . in between the fourth and fifth road wheel breaching the Armor [and] causing a fire from the ammunition storage compartment. Personnel reported command wire was found at blast seat." PX-129 at 3; PX-158 at 41. Mr. Barker testified that he assessed the attack to involve a single EFP warhead, rather than dual array, since "[i]f there had been more than one warhead, [it] would have struck the vehicle. It's just too large of a target to miss. . . . They think there were two [warheads]. I say there was one of them. . . . [T]he PIR, when it set[s] [an EFP array] off, it sets them all off together. The Bradley is just so large that the warhead would not have missed. [The warhead] moves so fast, moves at 26,000 feet per second. It would not have missed if there had been two." Barker T3-58-59.

Mr. Barker's report notes that the Storyboard prepared by the responsible division's operations section contains the assessment that the "attack was most likely an EFP attack conducted by S[pecial] G[roup] C[riminals] in West Rashid . . . . SGC most likely conducted this attack in response to the recent detention of SGCs from the West Rashid Area." PX-129 at 1; PX-158 at 42. The Storyboard's battle damage assessment notes that the Bradley was destroyed, and that "10X suspected JAM S[pecial] G[roup] members [were] detained." PX-129 at 1.

The CEXC report notes that a "bundle of wire" was recovered from the attack cite, which supports the conclusion of the AR 15-6 and the CJTF-Troy reports that the EFP was armed via command wire. *Id.* at 31. Mr. Barker explained at trial that, unlike a command-detonated IED, here, the command wire was used to activate the PIR sensor, which triggered the EFP when the Bradley passed through the passive infrared footprint. Barker T3-60.

Mr. Barker concluded that this attack involved "a precision-made, very effective EFP" that was "powered on by the command wire and then detonated in a victim-operated sense with the PIR." *Id.* at 61. Mr. Barker further testified that this attack "absolutely" involved the use of HE explosives. *Id.*

Mr. Lutz reviewed the same evidence and concluded that "the March 23, 2008 attack that killed Staff Sergeant ("SSG") Christopher Hake, Private First Class ("PFC") Andrew Habsieger and Private ("PV2") George Delgado involved the use of an EFP array of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 47. He further concluded that "the weapon was likely deployed by an IRGC-sponsored Special Group." *Id.* Mr. Lutz also concluded that "the attack that killed SSG Hake . . . PFC Habsieger, and PV2 Delgado was part of the EFP campaign orchestrated by the IRGC and Hezbollah, and that the attack was likely conducted by one of the IRGC's Special Group proxies." *Id.* at 55-56. He further concluded "that this attack involved the use of an Iranian-manufactured, military-grade EFP." *Id.*

Based upon the foregoing evidence, the Court should find Iran liable for the March 23, 2008 attack that killed Christopher Hake, Andrew Habsieger and George Delgado, because it was caused by a well-planned and coordinated attack involving a well-designed and professionally manufactured EFP of original Hezbollah and IRGC design that was supplied by the IRGC.

E.      **The May 9, 2008 Attack – Baghdad**

During the late evening of May 9, 2008, a convoy of three up-armored M1151 HMMWVs and one MRAP from C Company, 2nd Battalion, 30th Infantry Regiment was traveling west on Route Buzz when the second vehicle in the order of march was struck on the passenger side by a roadside bomb. PX-158 at 44. The vehicle sustained major damage to its passenger side above the front door. *Id.* The attack severely wounded the vehicle's gunner, bellwether Plaintiff Wesley Williamson, severely injured two other occupants, and destroyed the HMMWV. *Id.*

Mr. Williamson testified that his unit was conducting a "blocking position" outside Sadr City, Baghdad, to control the flow of arms and munitions in and out of the notorious slum. Williamson T4-141-42. Mr. Williamson described Sadr City as "the worst place in Baghdad you could be. It's the hotbed of the insurgency." *Id.* at 142.

Mr. Williamson testified that, prior to the attack, he had received extensive military briefings on EFPs in Iraq. *Id.* at 138-140. Mr. Williamson testified that he was aware that the EFP employed "a copper disk with high explosives to send a molten copper slug that will penetrate any armored vehicle we have." *Id.* at 140. He further testified that, while in Kuwait, he personally viewed "a graveyard full of vehicles that had been hit in Iraq" by EFPs. *Id.* Mr. Williamson recalled how each vehicle "had a hole punched in it. . . ." *Id.*

Mr. Williamson explained that, on the day of the attack, his platoon had completed their mission, been relieved, and were on their way back to their FOB. *Id.* at 142. Shortly after passing through an Iraqi National Police checkpoint, Mr. Williamson's vehicle, an up-armored M1151 HMMWV second in the order of movement, was struck by an EFP. *Id.* at 143-44.

According to Mr. Williamson, the EFP entered the vehicle after passing through the ballistic glass of the front passenger window. *Id.* at 145. One piece of the slug struck the driver of

the vehicle in the face, and the other struck Mr. Williamson in his right arm. *Id*. The slug shattered Mr. Williamson's ulna and radius, and severed his post interosseous nerve, which Mr. Williamson explained is the nerve that controls the use of one's digits. *Id.* at 146.

Mr. Williamson recalled seeing his wounded arm "dangling like a dead fish" and "pouring blood all over the place." *Id*. at 147. He attempted to apply a tourniquet to the wound, but was unable to tighten it with only the use of his left arm, so he asked his fellow soldiers to assist him. *Id.* at 147-48. Mr. Williamson testified that he now always carries a tourniquet with him, just in case the need should ever arise that one is needed. *Id.* at 148-49. He described this compulsion as "irrational." *Id.* at 149.

Mr. Williamson provided further details of the immediate aftermath of the attack. He recalled being placed in his Platoon Sergeant's HMMWV and driven to his FOB, after which he was injected with morphine and his arm was packed with gauze. *Id.* His next memory is of waking up on a stretcher being loaded into the back of a Blackhawk helicopter. *Id.* at 150. His stretcher was anchored to the helicopter below the stretcher of the HMMWV driver from the same attack, whose "bodily fluids pour[ed] down onto" Mr. Williamson, who was strapped down and unable to move. *Id*. Mr. Williamson testified that he had nightmares of this incident for years following the attack. *Id.*

Mr. Williamson testified that he was medevaced to a military hospital in the Green Zone, where his arm was fitted in an external fixation device. *Id.* at 151. When he was assigned to Brooke Army Hospital in San Antonio Texas, the external fixation device was removed and two metal plates and 16 screws were surgically implanted in Mr. Williamson's right arm. *Id*. Mr. Williamson testified that these implanted devices cause him "general discomfort" at all times, with increased discomfort if he applies any pressure to his right arm. *Id*. at 151-52.

Mr. Williamson further testified that it took him over seven years after his discharge from the U.S. Army to "regain [his] sanity and try to be a regular civilian. . . ." *Id*. at 152-53. He explained that being a "regular civilian" is a daily struggle, and that he isolated himself and slept with a rifle by the side of his bed for years. *Id.* at 153.  He also testified that he takes anti-anxiety medications in order to attend his college classes. *Id.*

Mr. Barker opined that the May 9, 2008 attack that injured bellwether Plaintiff Wesley Williamson involved the use of a command wire armed, PIR triggered EFP, based upon his review of PX-130 (SIGACT Report; an IED Report; a CJTF-Troy Report; an Event Storyboard; a CJTF-Troy "Quick Look" report; and the Casualty Report for then-PFC Wesley Williamson). Barker T3-61; PX-158 at 44.

The SIGACT report categorizes the attack as one involving a "Directional IED," and describes the "IED Type" as "EFP." PX-130 at 17. The report also contains an assessment by the EOD team that "the IED was a[n] 8-10 in[ch] copper EFP with a command wire detonation device." *Id.* at 18. The S2 assessed that the attack was "from a S[pecial] G[roup] cell that lives in the Muh[alla] 732 area. The cell would leave the Muh[alla], conduct their operation, then return to that Muh[alla]."[37] *Id.*

The IED report describes the Main Charge Configuration of the IED as "EFP," and notes that the "[d]evice was placed at the end of an alley on the north side of RTE Buzz." *Id.* at 13-14. The investigating EOD team concluded that that "the IED was a command wire initiated[,] single[,] copper lined EFP," and noted that "[o]ne hundred meters of command wire was recovered from the blast seat which led north down an alley." *Id.*

---

[37]     Russell Mason testified that "muhalla" or "mahalla" is an Iraqi term for neighborhood, to which the U.S. military had assigned individual numbers. Mason T4-61.

The CJTF-Troy Report concludes that Mr. Williamson's vehicle "sustained major damage to the [right] side above the [front] door," and that the EOD Team "determined that the damage [to the HMMWV] was consistent with a single copper lined EFP." *Id.* at 3. The CJTF-Troy Report contained two images of the vehicle, one redacted and one unredacted, both of which Mr. Barker discussed at the trial. Barker T3-61-62.

According to Mr. Barker, the images depict where an EFP slug penetrated Mr. Williamson's HMMWV, just above the right passenger door. *Id.* at 61. The EFP warhead left "a very large bore hole. An eight- to ten-inch warhead went through that." *Id.* at 62.

The Event Storyboard, prepared by the responsible battalion operations section contains an assessment that the "attack was likely conducted by S[pecial] G[roup] C[riminals] operating out of Muhalla 732 in New Baghdad…. This attack was likely conducted to limit C[oalition] F[orces] freedom of movement within New Baghdad and draw attention away from Sadr City. SGC will continue to move away from traditional attack locations in an attempt to distract CF\I[raqi] S[ecurity] F[orces] as SGC perceive an impending assault into Sadr City." PX-130 at 1. Mr. Barker's expert report describes the CJTF-Troy "Quick Look" report as a one-page synopsis of eight IED attacks reported within one kilometer of the attack on Mr. Williamson's convoy. PX-158 at 48. According to the "Quick Look" report, "[r]ecent IEDs in this area have included EFPs (8-12 inch) and conventional IEDs . . . packed with various amounts of U[nidentified] B[ulk] E[xplosive]. The most common switch has been command wire." PX-130 at 22.

Mr. Barker testified that, based upon his review of the evidence, this attack involved "a sophisticated, manufactured warhead designed to penetrate armor." Barker T3-62. Mr. Barker concluded that the EFP "struck the vehicle exactly the way it was supposed to and penetrated the

armor." *Id*. at 63. He further concluded that the EFP "absolutely" had a copper liner and was packed with HE explosives. *Id.*

Mr. Lutz reviewed the same evidence and concluded that "the May 9, 2008 attack that injured Private First Class ("PFC") Wesley Williamson involved the use of an EFP of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 56. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." *Id*. Mr. Lutz also concluded that "the attack that injured PFC Williamson was part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies. The attack involved a concealed, copper-lined EFP likely command wire initiated. The EFP copper liner forming into a slug, moving in an upward trajectory, defeated the vehicle's one-inch thick RHA, penetrated and destroyed the vehicle frame and struck PFC Williamson." *Id.* at 63. Mr. Lutz further concluded that an "IRGC-sponsored Special Group was likely involved in the assembly and emplacement of the EFP." *Id*.

Based upon the foregoing evidence, the Court should find Iran liable for the May 9, 2008 attack that injured Wesley Williamson, because it was caused by a well-planned and coordinated attack involving a well-designed and professionally manufactured EFP of original Hezbollah and IRGC design that was supplied by the IRGC.

**F.     The May 17, 2009 Attack – Baghdad**

During the late evening of May 17, 2009, a convoy of four up-armored M1151 HMMWVs from B Company, 1st Battalion, 18th Infantry Regiment was traveling northeast on Alternate Supply Route ("ASR") Mets conducting a counter IRAM patrol, *see supra* and PX-158 at 51 n.88, when its lead vehicle was struck on the passenger side by a roadside bomb emplaced adjacent to a solar-powered light pole. PX-158 at 50-51. Immediately thereafter, the patrol came under small

arms fire from both north and south of its position. *Id.* at 51. The attack severely wounded the vehicle's commander, bellwether Plaintiff Robert Canine, who would require below-the-knee amputations of both of his legs.

Mr. Canine testified that at the time of the attack, he was a Staff Sergeant in the U.S. Army and an Infantry Squad Leader. Canine T4-107. On the day of the attack, his unit was on a routine patrol in Baghdad that consisted of four up-armored HMMWVs. *Id.* Mr. Canine testified that as the Truck Commander for the lead HMMWV, he was riding in the front passenger seat when the attack occurred. *Id.* According to Mr. Canine, his HMMWV was equipped with "two EFP countermeasures . . . . It had a Duke electronic jammer . . . [t]hat blocks electronic signals from initiating EFPs or IEDs. [It] also had a Rhino early initiation device . . . to simulate engine heat so it will trigger an EFP early." *Id.* at 108.

Mr. Canine testified that his squad had concluded their patrol and was returning to base, traveling east on ASR Mets when his vehicle "triggered an EFP." *Id.* at 109. Mr. Canine partly based his belief that his vehicle was struck by an EFP upon a five page report prepared by his unit, which the Court admitted into evidence. *Id.* at 110; PX-134 (Post-attack photographs and report).

Mr. Canine also testified that:

> [W]e were trained in Iraq that EFP was the number one threat. So we were trained by the signatures. And when I was initially hit, I has assumed it was an EFP. And then when my soldiers got on the ground, we had also thought it was an EFP. And then we had engineers come and do some blast site analysis, and they confirmed it was an EFP.

Canine T4-111.

According to Mr. Canine, after the EFP entered the vehicle, "it splattered and did a considerable amount of damage to the inside of the Humvee." *Id.* at 113. Mr. Canine testified that he believes that the EFP "was triggered early by the Rhino. So it entered early — instead of cutting

me in half, it entered the vehicle early and hit me in the feet. And it also did a considerable amount of damage to the engine and transmission and disabled the Humvee." *Id.*

Mr. Canine testified that he "heard the initial blast which could have been the precursor to the main charge." *Id.* at 114. He further testified that he blinked, and when he opened his eyes he "saw golden sparks flying from right to left" and then lost consciousness. *Id.* When he regained consciousness, Mr. Canine was still seated in the HMMWV. *Id.* He could not see, but he recalled smelling and tasting the explosives in the air. *Id.*

Mr. Canine further testified that, upon opening his eyes, regaining his vision and conducting a self-assessment, he realized that his "right leg was pretty much blown off." *Id.* at 115. He tried to use the vehicle's radio to call for help, but it was destroyed. He then realized that his weapon had been blown in half, that he was unable to use either of his feet and that his vehicle had "skidded to a halt on the curb" and his "door was pinned up against the curb," preventing him from exiting the vehicle and leaving him trapped. *Id.*

Eventually, two soldiers from the medevac truck dismounted and came to extract Mr. Canine from his HMMWV, but as they pulled him from the vehicle, his right leg began to rip off, causing him severe agony. *Id.* at 116. Mr. Canine was eventually removed from the vehicle and evacuated to the 28th Combat Support Hospital in Balad, Iraq, where his right leg and left toes were amputated. *Id.* at 117. He testified that, by this point, he had lost so much blood that he almost died. *Id.*

Mr. Canine would eventually spend approximately 18 months at the Walter Reed Medical Center, where he was fitted with an external fixation device for his left leg, his leg wound was treated for multiple infections, and he suffered from phantom limb and severe nerve pain. *Id.* at 119-21. While at Walter Reed, Mr. Canine was advised that, due to the extensive damage caused

by the EFP, his left leg would likely eventually also need to be amputated. *Id.* at 121. Mr. Canine opted to have the amputation performed at that time, rather than wait for his remaining leg to deteriorate further. *Id.* at 121-22.

Mr. Canine testified that he was ultimately fitted with leg prosthetics, which took him approximately two years to learn how to use consistently. *Id.* at 124. Mr. Canine described the process of learning to use his prosthetic legs as "painful" and "grueling." *Id.* at 123-25. He testified that, at discharge, he was still suffering from nerve pain, depression and sleep disorders. *Id.* at 124-25. Mr. Canine also testified that he suffers from PTSD, which at one point he self-treated by over-consuming alcohol. *Id.* at 126.

Mr. Canine testified that he can wear his prosthetic legs for approximately 12 hours per day, after which he "start[s] to have some . . . skin breakdown" that can lead to "hot spots where the residual limb contacts the socket and becomes extremely painful." *Id.* at 128. He also will experience pain in his hips, back and neck from overuse of his prosthetics. *Id.*

Mr. Barker opined that the May 17, 2009 attack that injured bellwether Plaintiff Robert Canine involved the use of an RF armed and PIR triggered EFP array, based upon his review of PX-133 (SIGACT Report; an IED Report; a CJTF-Troy Report; an Event Storyboard; and CEXC Reports) and PX-134 (five-page report with photographs prepared by Mr. Canine's unit). Barker T3-63, 65-66; PX-158 at 50.

The SIGACT report categorizes the attack as one involving a "Directional IED," and notes that Mr. Canine's unit reported that "one of their vehicles got hit with an EFP and received S[mall] A[rms] F[ire] from the north." PX-133 at 25. The report also contains an assessment by the EOD team that "the [lead] vehicle was struck by multiple EFPs." *Id.* at 27. The Battalion S2 likewise assessed that the attack involved an EFP, and that the suspected spotter "most likely used an

associates'[sic] home with line of sight to the incident, line of sight being required both for receiving payment from Iran, as well as triggering the incident, being able to determine the composition of the convoy, and triggering a possible PIR sensor." *Id.* at 28.

The IED report notes that the EOD "Team Leader [believes] that the vehicle was struck by multiple EFPs due to the damage [to] the vehicle." *Id.* at 18. The WIT comments within the report note that this route was patrolled "between 4-8 times each day." *Id.* at 19. Based upon this report, Mr. Barker opined that the frequency with which the soldiers were patrolling this route made the location a target of opportunity for the IRGC's local Special Group proxies. PX-158 at 52.

According to the WIT, "the copper slug [from an EFP] traveled into the center portion of the engine block and through a large portion of the armor ahead of the [SSG Canine's] legs, sending several large fragments into [SSG Canine]." PX-133 at 19. The WIT noted that the EFPs were angled upwards from ground level, "indicating an aiming point of the occupant level of an [up-armored] HMMWV or MRAP travelling westbound on RTE [Mets]." *Id.*

The WIT further noted that "portions of the copper slug and several secondary fragments" were recovered from the struck HMMWV. *Id.* The WIT conducted a "forensic site exploitation" of the blast crater left by the EFP, but "was unable to locate fragmentation of the device." Accordingly, "[n]o method of initiation was recovered." *Id.* Regardless, the WIT concluded that the device was possibly "cell phone armed and PIR fired due to three previous EFP attacks within 3 miles and 25 days of this event…. It is likely [that] the initiation system was small and compact, and possibly placed directly in front of the EFP, which consumed all evidence." *Id.* at 20. The WIT also estimated that the EFPs were packed with approximately 10-15 lbs. of explosives. *Id.*

The WIT also recovered a piece of black cloth that was believed to have been tied around one of the light poles, likely used by the attackers as a way of timing the arming of the device as

the convoy approached from the east. *Id.*; PX-158 at 53. Mr. Barker testified that "bomb makers will hire locals to scout an area where — for what we call a choke point, maybe a hard turn or something that narrows, where it's hard for us to defend ourselves. And so what they'll do is they'll mark it with something; in this case, a black cloth. . . . [S]omething so that the insurgent knows where to place the device." Barker T3-64.

CJTF-Troy assessed that the vehicle was struck by a single EFP due to the damage to the vehicle (and not multiple EFPs, as EOD initially assessed), and that the initiation system was likely a PIR trigger placed in front of the EFP "due to the lack of components found and the direct hit on the engine." PX-133 at 6.

The CJTF-Troy report contains a few largely redacted images. However, the accompanying text for these images includes language such as "[p]enetrated armor plate from right front side of truck," and "armor plate penetrated." *Id.* at 9-10. There is also an image of "[r]ecovered copper slugs," which was not redacted. *Id.* at 16. Based on these images and the accompanying text, Mr. Barker opined that it was likely that the attack on Mr. Canine's patrol involved the use of a copper-lined EFP array, remotely armed and PIR triggered. PX-158 at 54.

According to Mr. Barker's expert report and trial testimony, the CEXC reports produced by CENTCOM contain, *inter alia*, chemical analysis that was conducted on the fragmentation and copper samples recovered by the WIT from Mr. Canine's vehicle. *Id.* at 55; PX-133 at 35. According to the analysis, CEXC detected the presence of RDX and TNT based explosives, both of which are consistent with the use of HE explosives. *Id.*; Barker T3-64.

Mr. Barker also testified regarding his review of the photographs included in the report prepared by Mr. Canine's unit. Specifically, Mr. Barker observed that "the warhead went into the engine bay [of Mr. Canine's HMMWV]. It also separated the armor from the firewall, allowing

penetration into the cab[in]." Barker T3-65. Mr. Barker explained that the firewall is "the organic part of the vehicle that separates the engine from the crew compartment. It's just made of stamped sheet metal, much like in [a] civilian vehicle." *Id.*

According to Mr. Barker, "the extreme overpressure — it's the blast, the movement of the air as it passes through — it shears the bolts and pushes the armor out of the way, allowing steel and more copper to pass through the very thin sheet metal and then into [Mr. Canine]." *Id.* Mr. Barker observed that the "passenger side [of the cabin was] completely decimated" by the EFP strike. *Id.*

Mr. Barker concluded this attack involved "a manufactured, purposed-built EFP for defeating armor, copper liners. CEXC did a great job identifying the HE; but again, with the devastation of the vehicle, it had to be an EFP with HE. And it was RF armed and PIR initiated." *Id.* at 66.

Mr. Lutz reviewed the same evidence and concluded "that the May 17, 2009 attack that injured Staff Sergeant ("SSG") Robert Canine involved the use of an EFP of original Hezbollah and IRGC design that was likely supplied by the IRGC." PX-159 at 63. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group" *Id.* Elsewhere, Mr. Lutz concluded that "the attack that injured SSG Canine was part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies. The attack involved the use of a concealed, copper-lined EFP that was likely remotely armed and PIR triggered. The copper slug from the weapon penetrated the HMMWV's engine block and defeated the armor protecting SSG Canine's legs, which were severely wounded by the EFP's copper liner (ultimately forming into a slug) and associated fragmentation created by the penetration of the vehicle." *Id.* at 71. Mr. Lutz further concluded that

an "IRGC-sponsored Special Group was likely involved in the assembly and emplacement of the EFP." *Id.*

Based upon the foregoing evidence, the Court should find Iran liable for the May 17, 2009 attack that injured Robert Canine, because it was caused by a well-planned and coordinated attack involving a well-designed and professionally manufactured EFP of original Hezbollah and IRGC design that was supplied by the IRGC.

### G.      The January 20, 2007 Attack On The Karbala PJCC

The January 20, 2007 raid on the Provincial Joint Coordination Center ("PJCC") in Karbala claimed the lives of five American service members, including Private Johnathon Millican and Captain Brian Freeman, whose estates and family members are Plaintiffs in this Action, and injured more than a half dozen American service members, including bellwether Plaintiffs Billy Wallace, Johnny Washburn, Marvin Thornsberry and Evan Kirby. The PJCC was an Iraqi government facility situated near the center of Karbala, a city in central Iraq located approximately 60 miles southwest of Baghdad that is home to two shrines considered holy by Shi'a Muslims. PX-155 at 15.  At the time of the attack, the PJCC was a mixed civilian and military compound that served as the nexus of the local provincial governmental authority, housing Karbala's provincial Governor, Council and Police Directorate, and U.S. soldiers, U.S. military police, and their interpreters (referred to as the "Karbala Provincial Team"). *Id.* On the day of the attack, January 20, 2007, the Karbala Provincial Team was assisting the Karbala provincial government with security planning for the upcoming Shi'a religious observation of Ashura. Saddam Hussein's regime had banned Shi'a Muslims from celebrating Ashura, and, in the years that followed the 2003 invasion by Coalition Forces, the holiday was targeted by Sunni Muslim extremists seeking to create sectarian strife. PX-155 at 16; Pregent T5-191.

Mr. Pregent testified, based on his professional experience and the substantial evidentiary record, that the January 20, 2007 terrorist operation was conducted by an AAH strike team which was trained and directed by the IRGC-QF and Hezbollah. Pregent T5-233. These conclusions are consistent with the Court's findings in *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 71-73 (D.D.C. 2018).

The assault on the PJCC began around 6 p.m. on January 20, 2007. *Id*. Between seven and nine American model SUVs vehicles approached from the south, driving up to the first of two gated checkpoints. PX-96 at 4; Pregent T5-187. The attackers had outfitted themselves and their vehicles (predominantly black Chevrolet Suburban SUVs) to appear as though they were American soldiers or security contractors: the SUVs were rigged with false antennae on their front bumpers and carried placards directing others to stay back a hundred meters (indicia of American vehicles in Iraq), and the attackers spoke English, wore U.S. Army Combat Uniforms, and had helmets and weapons resembling those of U.S. soldiers. PX-96 (Karbala AR 15-6 investigative report) at 4-5; PX-155 (Expert Report of Michael P. Pregent) at 17; Pregent T5-187. Most of the vehicles then continued on to a second security checkpoint, located due north of the first checkpoint. PX-96 at 4-5.

At both gates, the attackers pretended that they were Americans, and demanded – in English – that the Iraqi police turn over their weapons. *Id*. at 5. One vehicle stayed behind at each checkpoint. *Id*.; PX-155 at 17; PX-87 (Karbala Animation); Pregent T5-198-99. The passengers got out, one member of the AAH assault team held the Iraqi police at gunpoint at each checkpoint, and the remaining members of the AAH assault team fanned out to take positions from which they could fire on the PJCC building once the operation began. PX-155 at 17-18; Pregent T5-198. A third vehicle positioned itself between the two checkpoints. *Id*. The remaining SUVs continued

north toward the PJCC's main building and entered the parking lot. PX-96 at 5; PX-155 at 17. An unknown subset of the AAH assault team disembarked and immediately subdued the Iraqi police stationed around the gated entrance to the courtyard. *Id.*

Five members of the AAH assault team then crossed through the gated entrance into the courtyard and approached the front door of the PJCC's main building. PX-96 at 5. At this time, Freeman and First Lieutenant Jacob Fritz were in their room at the front of the building, *see id.* at 4, while Specialist Johnathan Bryan Chism and Private First Class Shawn Falter occupied an armored HMMWV in the courtyard next to the building's entrance, *id.* at 5. Chism manned the machine gun mounted on top of the turret; Falter sat in the HMMWV's driver's seat. *Id.*; Pregent T5-196, 202. The five members of the AAH assault team, who wore the uniforms of American troops and spoke English, greeted Chism and Falter and walked toward the PJCC as though they were arriving for a meeting. PX-96 at 5; Pregent T5-187-88. Falter exited the HMMWV and started to approach the SUVs near the front gate, presumably to determine the reason for their arrival. PX-96 at 5; Pregent T5-201. About five seconds later, three more AAH assault team members entered the courtyard, greeted Chism and Falter, and followed the initial group of five to the front entrance of the PJCC. PX-96 at 5; Pregent T5-201-02. Like the others, these AAH assault team were dressed in American uniforms and greeted Chism and Falter in English. PX-96 at 5.

Each of the last three insurgents to enter the courtyard had specific tactical roles, and they executed their assignments more or less simultaneously. The last of the three walked past Falter, turned around, and shot him in the neck from behind. PX-96 at 5 and Ex. A (Autopsy Report). The second climbed on the back of the HMMWV and shot Chism, who was facing the courtyard gate and "had no chance to react." PX-96 at 5. Despite the seriousness of their injuries, neither Chism

nor Falter was killed by these initial gunshot wounds. *Id.*, Ex. A (Autopsy Reports); Pregent T5-202.

Seconds after the sound of gunfire erupted in the courtyard, "a well-coordinated and synchronized attack occurred in the building, in the back, and against the barracks area." PX-96 at 5; PX-87. The AAH assault team who were staged outside the building began to fire at the building, which had the effect of diverting the U.S. military personnel on the second floor of the PJCC to the roof of the building, where they responded to what they believed to be a small arms assault on the complex. PX-96 at 7-8. At the same time, other members of the AAH assault team launched an attack on the PJCC command and control room, which was located next to the room where Fritz and Freeman were working. PX-96 at 6-7; Pregent T5-202-03.

The command and control room housed five U.S. soldiers – the only soldiers other than Fritz and Freeman located on the first floor of the main PJCC building – as well as radios for communicating between the PJCC and coalition forces. PX-96 at 6; PX-155 at 20; Pregent T5-202-03. By attacking that room, the AAH assault team was able to aid its exfiltration by delaying communications regarding the attack, and members of the AAH assault team were able to subdue the soldiers that "posed the largest threat," to the AAH assault team. PX-96 at 6. The fact that the assailants "knew the layout of the building ahead of time" evidences that they had inside information and that the attack was a highly sophisticated one. *Id.*

The U.S. soldiers working in the command and control room were able to prevent the attackers from taking control of their room, but the AAH assault team was able to direct gunfire and a grenade into the room. *Id.* at 6-7; Pregent T5-203; PX-155 at 20; PX-87 (Karbala Animation). Three of these five soldiers were injured, and one, Private First Class Millican, was killed. PX-96

at 6; Pregent T5-203. PFC Millican thwarted the AAH assault team's effort to take the command

and control room when he threw himself on the grenade. *Id.*

As the soldiers in the command and control room continued to fight back, they heard

gunshots in the hallway and heard a grenade explode in or near Fritz and Freeman's room next

door. PX-96 at 6-7; PX-155 at 22. During this period of time, the AAH assault team forced Fritz

and Freeman from the officer's room and led them out of the building. PX-96 at 7; Pregent T5-

209; PX-155 at 22-23; PX-87. While exiting the PJCC, the AAH assault team threw a grenade into

the hallway near the two rooms. PX-96 at 7; PX-155 at 23. That grenade blast, along with increased

gunfire, prevented the surviving soldiers in the command and control room from exiting the room.

PX-96 at 7. Both Fritz and Freeman were alive at this time, although it appears that Fritz was

injured and bleeding. *Id.* Significantly, the AAH assault team did not attack the soldiers on the

second floor of the PJCC, providing further evidence that their mission was to abduct U.S. soldiers.

*Id.* at 6. Upon returning to the courtyard, the AAH assault team destroyed the HMMWV that Chism

and Falter had manned, as a well as a second (unmanned) HMMWV, *id.* at 7; Pregent T5-207-08,

and they used "smoke grenades" to obscure their exfiltration. PX-96 at 8.[38] They then handcuffed

Freeman and Chism and put them in one SUV and handcuffed Fritz and Falter together and put

them in a second SUV. *Id.* at 7. Up to this point, the entire attack had taken only between ten to

fifteen minutes. *Id.* at 8-9.

The assailants fled, splitting up into at least two separate convoys. *Id.* at 10; Pregent T5-

209-10; PX-155 at 27; PX-87. The AAH assault team with the hostages drove toward the city of

Hillah in the general direction of Iran. PX-155 at 25. But instead of taking the road that directly

---

[38]     Daqduq's journal does not mention the use of smoke grenades, but it does reference barrels
filled with fuel and "burning oil," *see* PX-103 at 6, which may be what created the obscuring
smoke described by the witnesses in the Karbala AR 15-6.

connected Karbala with Hillah, they took a long detour through Musayib. *Id*. Their route tracked

a well-known "ratline," a path along which Iran smuggled weapons and ammunition into Iraq.

Pregent T5-210-11; PX-155 at 25-26. Iraqis who were sympathetic to Iran controlled the

checkpoints along the ratline and facilitated the passage of smuggled goods. *Id*.  According to the

Investigating Officer:

> [The convoy] followed the known ratlines through the Albu Alwan area where
> [AAH] could actually control the passage. In order to do that, they would have to
> coordinate with the OMS, the Office of the Martyr Sadr, and the JAM folks we
> spoke of earlier, Jaysh al-Mahdi….. The only way someone coming from outside
> of a province that would have known to take these routes is if they had already pre-
> coordinated those ratlines. And because they followed that, based on the reporting
> from checkpoint to checkpoint, we [could] see that they were basically being led
> through there facilitated by the local help support which is something the IRGC
> …is known for doing ….
>
> I briefed the Multi-National Corps Commander and my Commanding General as
> well, because it just showed that connection to Iran. There's no way anybody from
> an outside province would have known to take those roads unless they were being
> helped and facilitated, and that was an Iranian — that's how Iran got their weapons
> through there. No one else from the outside would have known to take those routes.

PX-155 at 25.

Ultimately, however, this escape route failed. Approximately one hour after the AAH

assault team exfiltrated the PJCC compound, members of the Iraqi Army stationed at a checkpoint

in the town of Mahawil received word that an attack had occurred in Karbala and stopped the

convoy carrying the hostages. PX-96 at 9 ("1930: Five of the enemy SUVs traveling at a high rate

of speed passed through . . . Checkpoint 21J, "Karib," . . . north of Mahawil."); Pregent T5-211;

PX-96 at 9. Earlier that day, three men had approached the Iraqi Army soldiers stationed at the

checkpoint and told them that a convoy would be coming through and that they needed to let the

convoy proceed.[39] In doing so, they provoked suspicion, asserting at times that those in the convoy were Americans, and at other times saying that they were Israelis. PX-96, Ex. FF. Later, the three men came back to make sure that the Iraqi soldiers would facilitate the passage of the convoy, and, as the convoy approached, they yelled out to the guards not to fire on the approaching convoy. *Id.* The Iraqi soldiers figured out what was happening and, accordingly, detained the three men and pursued the convoy. *Id.*; PX-155 at 26; PX-96 at 2-3. It was later determined that one of the three men who had visited the checkpoint was a high ranking official from a Shi'a-affiliated militia. *Id.*

With the guard posts now on alert, the AAH assault team knew that its escape route was compromised. PX-155 at 26. As a result, they "took a back road, changed out of" the U.S. Army Combat Uniforms that they wore, "abandoned most of [their] equipment," and shot Fritz, Chism, Falter, and Freeman. PX-96 at 3; PX-155 at 26-27; PX-87. Pregent T5-216-218. By the time the Iraqi Army arrived, only Freeman was still alive, and he died a short time later. PX-96 at 7; PX-155 at 26-27; Pregent T5-215-18.

Mr. Pregent testified that the attack on the Karbala PJCC was a seminal event during the Iraqi conflict that ultimately led Coalition forces to re-evaluate their threat priorities: "[W]e knew we had a bigger problem than Al-Qaeda. We were now dealing with a level of sophistication from an enemy that we weren't fighting that was targeting us. And that ended up being Lebanese Hezbollah and IRGC-Qods Force." Pregent T5-215:2-11.

On March 20, 2007, Coalition Forces raided a house in the southern port city of Basra, Iraq. The operation was intended to capture and detain Laith Khazali but resulted in the detention

---

[39]     The individuals were later identified as including one Iraqi Policemen and the number two ranking Office of the Martyr Sadr (OMS) official for the area. The latter individual identified himself to the soldiers as "in charge of my tribe's office of JAMs [Jaysh al-Mahdi]" and stated that he "belong[ed] to JAM." Members of JAM later came to the checkpoint and asked the soldiers to release the three detainees. PX-96, Ex. FF.

of seven men, including Qais Khazali and an Arab male who "claimed to be a deaf mute," PX-106 (MNF-I July 2, 2007 Press Briefing), thus earning him at the time the moniker "Hamid the Mute" from his interrogators. "Hamid" later confessed that he was, in fact, Hezbollah senior commander Ali Musa Daqduq. *Id.* See also PX-155 at 31; Pregent T5-180-81.

As noted *supra* at 60-61, the British and American special operators also seized computers and documents during the raid, including a 22-page memorandum that "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," as well as Daqduq's role in overseeing other Special Groups operations. PX-103. According to MNF-I spokesman Brig. Gen. Kevin Bergner, the captured documents also showed that the IRGC-QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers." PX-155 at 31; PX-71 (MNF-I Report on Captured Special Groups in Iraq); Pregent T5-206.

According to U.S. military officials, both Daqduq and Qais Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack. PX-81 at Bates Nos. 01189-93, 01257-61 and 01343-47 (6th, 18th and 34th Tactical Interrogation Reports of Qais Khazali). As noted in an MNF-I memorandum dated May 31, 2007:

> [Daqduq] has knowledge of Iranian surrogate networks operating in Iraq and has admitted to meeting Iranian Revolutionary Guard Corps-Quds Force (IRGC-QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander.

PX-56. General Bergner also stated that the IRGC-QF and Hezbollah were jointly operating camps near Tehran in which they trained Iraqi fighters before sending them back to Iraq to conduct attacks. PX-155 at 32; PX-71. According to General Bergner, Daqduq was the liaison between the IRGC-QF, Hezbollah and AAH, and Daqduq confirmed that AAH operatives carried out the Karbala attack. Daqduq also told his interrogators that the Karbala attackers "could not have

conducted this complex operation without the support and direction of the [IRGC-QF]." PX-155 at 32.

As noted *supra* at 60-61, in April 2007, General Petraeus gave a briefing in which he described the "22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala" and stated that the Khazali network (AAH) received Iranian financing that was "taking place through the Quds force of the Iranian Republican Guards Corps." PX-155 at 32-33.

Coalition Forces also learned that the AAH assault team that conducted the raid was led by Azhar al-Dulaimi, an AAH commander who was killed by Coalition Forces on May 19, 2007. PX-155 at 33. Subsequent forensic investigations of the Karbala assailants' SUVs resulted in the recovery of fingerprints, some of which were identified as belonging to Dulaimi. *Id.* Indeed, AAH's official website credited Dulaimi with the Karbala attack:

> He was especially known for his sophisticated operations, like setting up ambushes to kidnap enemies and attacking their sites in order to kill or kidnap them. He achieved unrivalled successes. One of the sophisticated operations that he participated in took place in the provincial council of Karbala. Resistance fighters from Asa'ib Ahl al-Haq entered the provincial council, as they passed through U.S. checkpoints while driving U.S. GMC vehicles, dressed as U.S. officers, carrying American weapons and identity cards and speaking in a perfect American accent. The goal of the operation was to kidnap U.S. soldiers and officers. They had indeed successfully kidnapped a group of them [and headed with them] towards Hillah, where they were surrounded and had to kill the Americans.

PX-118 (AAH Website Claim of Responsibility).

The documents collected and the statements made by Daqduq and Qais Khazali all corroborated the evidence that AAH operatives were responsible for the Karbala attack under the direction of the IRGC-QF and Hezbollah, which planned, funded, and directed the attack. Pregent T5-179, 180-81, 222-23. For example, a May 22, 2009 memorandum summarizing the interrogations of Ali Musa Daqduq noted:

> Detainee is a Lebanese Hizballah Commander and was an advisor to AAH leadership. Detainee was involved in the planning of the Karbala PJCC attack in January 2007 and the reconnaissance of various CF bases and ports. Detainee took his direction from IRGC-QF Officer Hajji Yusif [alias of General Shahlai] and LH [Lebanese Hezbollah] Unit 2800 Commander Yusif Hashim.

PX-107 at Bates no. 000328 (May 22, 2009 Memorandum on Ali Musa Daqduq).

An August 13, 2007 Memorandum recounted the data retrieved from the Basra location

of the March raid:

> Of note, photographs were also found of items from the wallet of ███ a U.S. soldier killed in a complex attack on the Provincial Joint Coordination Cell in Karbala on 20 Jan 07—including his SSA card, credit cards, identification cards, and family photographs. Documents seized include: spreadsheets detailing weapons and targets; step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks.

PX-57 at Bates no. 000324 (Department of Defense Memorandum dated August 13, 2007).

An October 5, 2008 Memorandum further noted:

> [Daqduq] admitted to being Lebanese Hezbollah and admitted to an active role in Iraq as an agent of Iranian state-sponsored terrorism. [Daqduq] admitted that Abdul Reza Shahlai, Iranian Revolutionary Guard Corps - Quds Force (IRGC-QF) Department 9000 (Lethal Aid) Deputy Chief facilitated [Daqduq]'s illegal entry into Iraq on four separate occasions. IRGC-QF is one of the primary agents of Iranian state sponsored terrorism. [Daqduq] admitted that his role was to arrange for training of Shi'a extremist groups, facilitating training and weapons procurement for Special Groups. Special Groups have conducted numerous AIF and ACF attacks throughout Iraq. [Daqduq] admitted to a significant operational planning role in the abduction and murder of 5 U.S. Service Members.

PX-107 at Bates No. 000330.

On September 16, 2008, the U.S. Department of the Treasury designated several

individuals under Executive Order 13438 for fueling violence in Iraq. Among them was General

Abdul Reza Shahlai – a deputy commander in the IRGC-QF who was designated for, among other

things, having "planned the January 20, 2007 attack by JAM Special Groups against U.S. soldiers

stationed at the Provincial Joint Coordination Center in Karbala, Iraq. Five U.S. soldiers were

killed and three were wounded during the attack." PX-9 at 1.

On November 19, 2012, the U.S. Department of the Treasury designated Ali Musa Daqduq

pursuant to Executive Order 13224:

> Daqduq is a senior Hizballah commander responsible for numerous attacks against
> Coalition Forces in Iraq, including planning an attack on the Karbala Joint
> Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the
> deaths of five U.S. soldiers.
>
> On March 20, 2007, Coalition Forces in southern Iraq captured Daqduq, who
> falsely claimed to be a deaf mute at the time and produced a number of false identity
> cards using a variety of aliases. From January 2009 until December 2011, U.S.
> military forces held Daqduq in Iraq under the terms of the 2008 "Agreement
> Between the United States of America and the Republic of Iraq on the Withdrawal
> of United States Forces from Iraq and the Organization of Their Activities during
> Their Temporary Presence in Iraq" (the Security Agreement). PX-102.

Based upon the foregoing evidence, the Court should find Iran liable for the January 20,

2007 attack on the PJCC, a well-planned and coordinated attack perpetrated by an AAH assault

team that was planned, funded and directed by Lebanese Hezbollah and the IRGC-QF.

## IV.    The Framework For Damages Awarded In FSIA Cases Warrants Adjustment In Cases Involving Injuries Sustained From EFPs

Damages available under the FSIA "may include economic damages, solatium, pain and

suffering, and punitive damages." 28 U.S.C. § 1605A(c).[40] Courts in this District have developed

a framework for awarding these damages based upon the deaths and grievous injuries in three

different bombing attacks: (i) the 1983 truck bombing of the U.S. Marine Corps barracks in Beirut,

Lebanon (*see, e.g.*, *Peterson v. Islamic Republic of Iran (Peterson II)*, 515 F. Supp. 2d 25 (D.D.C.

2007); *Valore, supra*; (D.D.C. 2010)); (ii) the 1996 truck bombing of Khobar Towers, a housing

complex for members of the U.S. Air Force in Khobar, Saudi Arabia (*see, e.g.*, *Heiser v. Islamic*

---

[40]    The damages discussed herein do not encompass the specific damages requested by individual Plaintiffs injured in the bellwether attacks, nor do Plaintiffs address damages for solatium or economic losses, which they do not believe warrant any new analysis by this Court.

*Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006)); and (iii) the simultaneous 1998 truck bombings of U.S. embassies in Tanzania and Kenya (*see, e.g., Owens v. Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014)). FSIA cases arising out of subsequent terror attacks have awarded damages based on the framework developed in these cases (the "*Valore* framework").

The *Valore* framework developed by these cases is premised on establishing instructive baseline damages amounts for categories of injuries, and then departing upward or downward as necessitated by details of a particular injury or set of injuries. For example, "individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as 'lasting and severe psychological pain'" are typically "granted a baseline award of $5 million." *Valore*, 700 F. Supp. 2d at 84 (quoting *Peterson II*, 515 F. Supp. 2d at 54). Upward departures to $7.5–$12 million are merited "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Id.* Courts will grant downward departures "to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Id*. Courts have granted extraordinary awards in more extraordinary cases. *See, e.g.*, *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 74 (D.D.C. 2008) (awarding $50 million in pain and suffering to estates of victims who were beheaded). When victims suffer psychological (but no physical) injuries as a result of a terrorist attack, Courts have typically awarded baseline awards of $1.5 million, *Peterson II*, 515 F. Supp. 2d at 56, and have also departed from that figure when warranted. *See, e.g., Campuzano*, 281 F. Supp. 2d at 275 (awarding $7 million in damages to plaintiff who suffered severe psychological injuries, but no physical injuries, as a result of a terror attack).

The *Valore* framework "constitutes useful guidance for FSIA courts" and "provides a starting point for a court;" however, "it is simply that—a starting point." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011). Plaintiffs respectfully submit that, due to unique medical issues raised by injuries caused by EFPs, as well as advances in medicine since the *Valore* framework was established, the *Valore* baselines do not entirely capture the scope of injuries at issue here. Thus, while each Plaintiff's injuries should be assessed individually because particular circumstances invariably impact individual victims differently, Plaintiffs recommend establishing a more nuanced set of baselines that takes into account the role that Traumatic Brain Injuries play in EFP attacks, along with other unique physical injuries caused by this weapon. Specifically, Plaintiffs suggest the following adjustment of the existing framework's baseline for determining certain damages in cases involving injuries caused by EFPs, which would serve as a guide to the Special Masters making recommendations for specific Plaintiffs.

| | |
|---|---|
| Psychological injuries (<u>without</u> TBI diagnosis/severe shrapnel/ fractures/orthopedic injuries/polytrauma) | Baseline: $2 million Range: $1.5 - $8 million |
| Mild TBI with psychological injuries (<u>without</u> severe shrapnel/fractures/ orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million Range: $3 - $7 million |
| Mild TBI with psychological injuries (<u>with</u> severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million Range: $4 - $10 million |
| Mild TBI with psychological injuries (<u>with</u> polytrauma/traumatic amputations) | Baseline: $15 million Range: $10 - $20 million |
| Moderate/severe TBI (<u>without</u> severe shrapnel/fractures/orthopedic injuries/ polytrauma/traumatic amputations) | Baseline: $20 million Range: $15 - $25 million |
| Moderate/severe TBI (<u>with</u> severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million Range: $25 - $50 million |

This framework is warranted in order to account for the following factors:

(1)    Plaintiffs in prior cases did not present diagnostic evidence as to certain types of injuries, such as TBIs, or presented expert opinions based on medical knowledge that has since substantially advanced in the intervening years (such as recent discoveries as to the lifelong effects of even seemingly mild TBIs);

(2)    Intervening improvements in battlefield post-blast medical care over the past 15 years have increased the survivability of attacks. Consequently, certain blast victims who once would have died at the scene now live with devastating injuries and excruciating treatments—often for decades—that would have been fatal had they occurred even a few years earlier; and

(3)    This case is the first to assess the unique confluence of injuries caused by EFPs, a devastating, focused-energy weapon, which penetrates all levels of U.S. military vehicular armor and inflicts unprecedented polytrauma on vehicle occupants.

The first two factors are discussed further in the review of the medical testimony and evidence below. The unique physical effects of EFPs, however, merit additional discussion here.

## A.    The Unique Effects of EFPs

The physics and engineering of EFPs, which were deployed in 83 of the 92 attacks in this case, caused unprecedented injuries, qualitatively different than any previously seen by the U.S. military – including in the three attacks addressed (*i.e.*, *Peterson*, *Heiser*, and *Owens*) above that were caused by explosions characterized as IEDs.[41] These differences will be discussed in greater detail below in Section A (1) and (2), but a summary of the differences between EFPs and IEDs is warranted upfront:

*First*, an EFP travels at an extremely high velocity, which causes it to transfer more kinetic energy into its ultimate target than a typical IED, resulting in a higher-energy blast and more tissue

---

[41]    The range of types of IED weapons is wide, encompassing pipe bombs to the explosive devices responsible for the massive casualties in the attacks described *supra* at 109-110. Their common feature, as described by Mr. Barker, is that the blast they produce originates "from a rounded explosive charge which expands in all directions." PX-158 at 6. As described *infra*, the blast from an EFP is focused, and "will be sent in the direction away from the mass." *Id.*

destruction. PX-161 (Expert Report of Dr. Russell Gore) at 5, 8, 10-13; PX-160 (Expert Report of Dr. Shean Phelps) at 11-13; Phelps T5-137.

*Second*, whereas an IED disperses, rather than concentrates, the force of the blast waves it generates, an EFP directs all of its energy in a uniquely focused blast wave against its target. PX-161 at 13; Phelps T5-137.

*Third*, service members riding in vehicles attacked by an EFP are much closer to the EFP's blast waves than *surviving* victims of blast waves in more common bombings caused by an IED. PX-161 at 13.

*Fourth*, an EFP's blast wave is significantly more intense than an explosion caused by an IED in an open space because the EFP is confined to the (steel reinforced) walls of the military vehicle. These waves, which are forceful enough to shatter metal before it can bend, Barker T3-20, will in many instances reflect off of the solid surfaces of the vehicle, including the walls, floors, and ceilings, creating multiple wave reflections. PX-161 at 13-14; Gore T4-29-30.

## 1. EFPs Produce "The Most Devastating And Catastrophic Injuries In Modern Combat"

Plaintiffs' medical experts testified that EFPs were engineered to produce "the most devastating and catastrophic injuries in modern combat." PX-160 at 7. *See also* Marmar T3-104 (characterizing EFPs as "weapons of mass destruction because of the brutal nature of the wounds they inflict."); Andersen T2-91 (confirming that "EFP injuries were significantly more damaging to patients … [than] other sorts of blast injuries."); PX-161 at 5 (stating that EFPs "result in particularly devastating cases of TBI."). The U.S. Army and its medical personnel had never before witnessed the types and extent of injuries as those produced by EFPs, which became "the most casualty-producing weapon possible" in the Iraq conflict. Phelps T5-147. Dr. Shean Phelps, a

former senior U.S. Army and U.S. Navy Flight Surgeon with over 22 years of medical experience and over 30 years of military experience, testified:

> I trained as a Green Beret medic for years, saw all kinds of combat, took care of hundreds and hundreds of individuals on the field. I never saw anything like these EFP injuries. I was – we were all – wholly unprepared for them.

Phelps T5-159.

Part of what made the EFP's injuries unprecedented was that its victims typically suffered "polytraumatic injuries," or multiple traumatic injuries to a wide range of body organs and systems. Phelps T5-116-17. *See also* PX-163 (Expert Report of Dr. Charles Marmar) at 15; Marmar T3-105 (describing how EFP victims "may experience multitrauma in the form of loss of limbs, disfigurement, burns, damage to internal organs."). These types of injury patterns significantly complicated the assessment, treatment, recovery, rehabilitation, and reintegration into society of EFP victims. PX-160 at 24-25. Plaintiffs' experts also underscored that an EFP victim suffering just *one* category of injury will experience unprecedented nuances and complications relating to that category of injury due to the physics and engineering of an EFP. Plaintiffs' medical experts focused specifically on the categories of (i) TBI, (ii) orthopedic injuries and traumatic amputations, and (iii) psychological injuries, to illustrate how these injuries, when caused by EFPs, are even more devastating than when caused by other weapons such as IEDs.

Extracting a victim from an EFP attack itself presented unprecedented challenges. The "golden hour" denotes the period of time service members have to treat someone who has been severely traumatized and deliver them to an advanced medical care facility in order to increase their rate of survival. A subset of that time period is called the "platinum ten," which is the first ten minutes after wounding, during which effective medical care further increases a victim's rate of survival. Phelps T5-140-141. This essential period of time was often obstructed by the complexities attendant to gaining access to the occupants of a vehicle struck by an EFP. As an

initial matter, EFP attacks were frequently accompanied by small-arms fire, preventing the immediate extrication and treatment of the EFP's victims. Phelps T5-147. After the enemy fire was suppressed, the EFP strike was often so severe that it buckled the frame of the vehicle. That, combined with doors often weighing 300 pounds or more, often made it impossible to access the victims: "We would often have to take a chain and push it through the cleat here and then yank it off with another vehicle just to get the doors open." Phelps T5-148-149.

Plaintiffs Robert Bartlett and Robert Canine each described how difficult it was for them to be extracted from their struck vehicles. Mr. Bartlett testified that "it took him three yanks to get this door open, and then held me to the backseat." Bartlett T2-55. Mr. Canine testified that:

> I couldn't get out of the truck because the – when the EFP entered, it had hit the bottom hatch on the door, and the 500-pound steel door was hanging down. When the Humvee was destroyed, it skidded to a halt on the curb. And I was pinned – the door was pinned up against the curb and I could not exit the vehicle.

Canine T4-115.

The door was not the only feature of the up-armored HMMWV working against its occupants in an EFP attack. Mr. Barker described how up-armored HMMWVs wore panels of RHA, the "hardest steel that we can make." Barker T3-14. RHA is graded against armor-piercing bullets, RPGs, and large artillery shells, but was "useless" against EFPs. Barker T3-14-15. In fact, the heat and force of the EFP "would shatter the vehicle's armor and materials inward, sending hundreds or even thousands of razor-sharp shards of Teflon and steel ripping through the interior compartment." PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker) at 7. *See also* PX-58 (Video of Test Fire of EFP). Dr. Phelps analogized the inside of an up-armored HMMWV struck by an EFP to a "Cuisinart inside: pieces of metal splicing through everyone and everything, human, equipment." Phelps T5-150-151. Dr. Romney Andersen similarly compared the EFP's penetration into the vehicle as a "pool ball hitting a rack of pool balls," describing how "it rattles

all around and it can take radios and flashlights and everything inside the vehicle and throw those around." Andersen T2-100. Many times, Dr. Phelps had to extract someone "and their body parts were in effect impaled inside the vehicle and I had to figure ways to get them out." Phelps T5-150. Robert Canine illustrated this point when he testified how his foot was impaled by metal after his vehicle was struck by an EFP:

> So [another soldier] grabbed me by my body armor with both hands and he jerked me out. And when he did, my right foot was still kind of entangled in the debris of the vehicle, the metal, so it started to rip my right leg off. I started screaming to get my foot. And then the other soldier that was there grabbed -- it was still attached by the fabric of my pants and stuff. And he grabbed the fabric and lifted it up and swung it out and put me on the ground.

Canine T4-116-117.

Fire, smoke, and blood mixed with dirt and metal often made the situation even more confusing for victims and rescuers alike. Phelps T5-151.

## 2.      The EFP's Blast Waves Result in Exceptionally Devastating TBIs

When an EFP is detonated, it produces a blast wave that can cause injuries even if the victim is not touched by the EFP or its fragmentation. The organs most susceptible to an EFP's blast waves are the middle ear, the lungs, the brain, and the bowel. PX-161 at 15. These injuries are referred to as "primary blast injuries." *Id*. *See also* PX-160 at 8 ("The primary blast wave of an explosion…is responsible for injuries typified by non-penetrating traumatic brain injury, tympanic membrane rupture, and lung or hollow organ injury.").[42]

Dr. Gore testified that "EFPs are a particular form of IED designed so that their blast waves are even stronger and more focused than those caused by other types of IEDs." PX-161 at 5.

---

[42]      "Secondary effect" injuries are caused by the EFP slug or its secondary fragmentation impacting the human body. "Tertiary effects" denote harm caused when a person, propelled by the force of the EFP blast, impacts with stationary objects such as the ground. "Quaternary effects" are caused by interaction with or inhalation of the heated gases of the explosion or with by-products of combustion of secondary flammable materials. *Id*.

Specifically, Dr. Gore testified that the velocity of an EFP's blast wave is 8 kilometers per second, and the energy release rate is the same output as generated by a large electrical plant but compressed in time of a few microseconds. *Id*. at 8. The wave lasts a fraction of a second, exerts pressure of up to 700 tons per square inch, and can travel at initial velocities of 1,600 feet per second and beyond. *Id*. The wave dwindles back to regular atmospheric pressure and is then followed by subsequent negative pressure, which creates a vacuum that sucks in the displaced air. *Id.* "This wave front can propagate at velocities up to 185 mph into the body's underlying tissue." *Id.* at 10. In fact, the EFP's blast waves are so strong they can even result in amputation alone, although rare (whereas amputation from the shrapnel or slug is more common). PX-160 at 7, 14, 20. Much more commonly, they "result in particularly devastating cases of TBI." PX-161 at 5.

### 3. The Medical Community Has Recently Dispelled Previous Medical Misconceptions Regarding TBI

According to Dr. Gore, "[u]ntil the 21st century, TBI caused by bullets and shrapnel received more attention than [TBI caused by] non-penetrating blast wave exposure, likely because penetrating trauma is physically obvious." PX-161 at 7. Medical professionals did not identify many instances of TBI during the Vietnam War, ostensibly because "we didn't look carefully enough." Marmar T3-117. Dr. Gore described how, even when it was identified "[i]n the not so distant medical past, TBI was lumped together with psychological and emotional injuries, presumed to have little physiological effect on the human body." PX-161 at 63.

However, the proliferation of IEDs and EFPs during the conflicts in Iraq and Afghanistan forced the medical community to face the burgeoning issue of TBIs, which has been diagnosed among service members over 350,000 times since 2000 (a figure which the medical community believes underestimates the true incidence of TBI). Gore T4-10. In fact, TBI incurred from blasts has been termed the "signature injury" of the Iraq and Afghanistan conflicts. PX-161 at 64. *See*

*also* PX-163 at 12. In recent years, military and medical professionals have become more cognizant of TBI caused by blasts, "even when the victim appears physically unscathed and initial radiologic tests are unrevealing." PX-161 at 7.

The medical community has started to dispel misconceptions regarding TBI. Medical professionals now understand that they cannot rely on imaging alone to determine whether a patient has a brain injury. Gore T4-16. The only wholly reliable method of directly examining the biological effects of blast force on the human brain is an autopsy, since magnetic resonance imaging (MRI) of the brain of a living patient has a resolution of a thousand times less than what can be seen when a brain is examined under a microscope. PX-161 at 62.

The medical community has also acknowledged that previous brain models used to inform its understanding of primary blast injury were flawed and provided misleading results regarding the effects of primary blast injury on the brain. The previous models had assumed that the brain was similar to a block of gelatin, in that brain tissue was thought to be a uniform material. The brain is now understood to be a complex collection of different material components including grey matter (neuron cell bodies), white matter (bundled axons sending signals), blood vessels, and spaces filled with cerebrospinal fluid (CSF), among others. Gore T4-35; PX-161 at 16.

Another limitation of prior experimental models was head fixation during blast exposure. In most previous experimental animal and cadaver studies, the head was secured to prevent movement of the neck and body relative to the head. This technique did not replicate the way an actual human body experiences exposure to a blast wave. In more recent studies, in which animal models were exposed to blast waves with the subject's head free to move around (similar to actual blast exposures), experimental data demonstrate an inflammatory response to blast injury and microscopic changes not previously seen in head-fixed experiments. *Id.* at 18-19; Gore T4-36-37.

4.      **The Medical Community Has Recently Dispelled Beliefs That "Mild" TBI Is, in Fact, Mild**

The current benchmark to assign a TBI category of mild, moderate, or severe, is based on the Glasgow Coma Scale ("GCS"), which is conducted at the time of the injury and measures a patient's functioning in three areas: (1) verbal response, (2) eye opening, and (3) motor response. PX-161 at 39. The GCS is designed for the "very acute phase," and is used to "make immediate decisions about evacuation, about your surgical needs, potential surgical needs; do they need to get you to somewhere where they have more advanced conventional imaging." Gore T4-12. It is not, however, designed to assess functional disability after a TBI. In his work as the founding director of the Complex Concussion Clinic at the Shepard Center in Atlanta, Georgia, which is focused on TBIs that have been classified as "mild" but often have debilitating symptoms and disabilities, Dr. Gore explained that he frequently treats service members who received mild GCS scores but are exhibiting functional deficits in physical, emotional, and community participation in the moderate and severe range. Gore T4-6-7; PX-161 at 42-43 (Internal data from the Shepherd Center with pre- and post-treatment results assessing functional abilities).

Service members who received moderate and severe GCS scores, which are often caused by penetrating injuries, generally reflect TBI that is "evident immediately after blast exposure due to severe symptoms, instability of the victim requiring advanced care, and clear physical and imaging findings consistent with TBI." PX-161 at 23; Gore T4-15. This category of injuries has a mortality rate of over 90%. *See* PX-161 at 23; Gore T4-14. These injuries typically result from damage to the grey matter in the brain, which comprises neuron cell bodies forming specific areas of function within the brain. PX-161 at 27. This damage presents as "loss of tissue, a dramatic amount of blood in the brain, swelling that's shifting structures around," which is "very evident and visible on conventional imaging." Gore T4-15. Dr. Gore characterized these victims as "very

sick," and "at high risk of death." *Id.* Depending on the areas of grey matter that were injured, the victim will suffer functional losses including loss of movement, sensation, language function, and neuro-sensory ability such as vision or hearing deficits, as well as loss of higher-level functions such as balance, coordination, memory, emotional deficits, and personality changes. Injury to the brainstem, where most of the automatic body functions are regulated, may result in unresponsiveness or coma and potentially the inability to wake. Control of heart rate, breathing, and swallowing are some other activities controlled through the brainstem at risk after a moderate to severe brain injury. PX-161 at 45-46.

The vast majority of U.S. troops with TBI, however – about 80% – have been diagnosed with GCS scores indicating mild TBI. Gore T4-10. The medical community has recently started to focus on how the prognosis for mild TBI is not dissimilar to that for moderate to severe TBIs. Whereas moderate to severe TBI encompasses injuries to the brain's grey matter, mild TBI typically encompasses injuries to the brain's white matter, which carries messages between the grey matter's neuron cell bodies. PX-161 at 26-27. Dr. Gore analogized white matter injuries to a "perfectly good computer with a slow internet connection. . . . So the computer may be just fine, but you're going to have a lot of dysfunction because of slowing." This dysfunction is termed "cortical hypoconnectivity." Gore T4-17. Dr. Gore described recent studies evaluating high level cognitive and memory function, known as executive function, which found that the severity of executive dysfunction correlated best with the degree of white matter injury. Veterans suffering the most significant white matter injuries performed more poorly on tasks of executive function than their control group, as compared to the veterans suffering more grey matter injuries when compared to their own control group. PX-161 at 46; Gore T4-18-19. Dr. Gore explained how this frequently translates into a "well-appearing, well-dressed, in society you may not notice that they

have a problem client" suffering from dizziness, headache, and nausea in busy environments such as their children's classrooms or grocery stores, *Id.* at 20, and drops in performance in a work setting. *Id.* These injuries are termed "invisible injuries" because they are generally not diagnosable even using state-of-the-art imaging, and because the victims are often functioning relatively highly in society. *Id.* at 10-11. Yet, their symptoms are causing emotional and family problems with relationships, as well as decreasing their productivity. "It's tremendously disabling," explained Dr. Gore. *Id.* at 48.

Plaintiffs' medical experts further described that white matter injuries have specific effects on the particular white matter pathway that has been injured. For example, an injury affecting the brain's frontal lobe leads to impulsivity and poor decision making, Gore T4-26, which may manifest itself in the associations between even a single mild TBI and an increased risk of substance abuse, risk-taking, gambling, and other behaviors which have long-term effects on quality of life, vocational productivity, and family functioning. Gore T4-25; PX-161 at 47-48. Cerebellar white matter injuries result in chronic vestibular and balance deficits. *Id.* at 38. Exposure to even one single mild TBI can also increase the risk of PTSD, clinical depression, and other cognitive and psychiatric disorders due to injury to specific brain networks. *Id.* at 51; Gore T4-23-24; *See also* Marmar T3-119. "In fact, individuals with mild TBI are more likely to develop a persisting psychiatric disorder than patients without TBI and those with severe TBI." PX-161 at 6. Dr. Gore termed this phenomenon a "typical chicken and [] egg conundrum," asking: "Is it traumatic brain injury that is a cause of PTSD or do traumatic combat experiences increase the risk of persistent symptoms after a blast exposure?" The medical community is still trying to understand the answer, but "there's no question that these networks are overlapping and these conditions are linked." Gore T4-23.

5.      **The Medical Community Now Better Understands the Poor Prognosis for Mild TBI**

The previously-held assumption that the brain cures itself has also been dispelled. Even in cases where mild TBI symptoms appear to subside over time, an individual's prognosis does not necessarily improve. Unlike tissues such as bone or muscle, the neurons in the brain do not mend themselves. The nervous system does not heal in ways that lead to full recovery. "Certain areas of the brain may remain damaged, and the functions that were controlled by those areas may emerge as challenges throughout the individual's lifespan." PX-161 at 7; Gore T4-43-44. "About 29% of patients with mild TBI continue to suffer cognitive, physical, and emotional symptoms after one year with profound results on quality of life, productivity, and family relationships." PX-161 at 5-6. *See also* Gore T4-48. Indeed, Robert Bartlett, whose EFP attack took place on May 3, 2005, described his cognitive problems, caused by the attack, which have persisted for 13 years:

> I have to -- you know, it's little tricks I do to remember somebody's name or sometimes I repeat the same question because it hasn't made it to the point where I know that I've said it yet. Also, then there's losing train of thought or it's like a record skipping in your head. It's playing a song and you're saying everything you want to say, and then all of sudden it's like it hits a bump and it's got to start over. Things like that.

Bartlett T2-64.

Mr. Bartlett testified that "I've made great recovery, but I'll have it the rest of my life." *Id*.

Years may pass before a victim of a blast bombing starts to notice TBI symptoms. *See* Gore T4-25 ("[W]hat we see is that there is a constellation of problems…that develop over time."). *See also* PX-161 at 65. Victims of blasts will sometimes have no documented history of brain injury and can even function at a high level for a number of years before exhibiting symptoms. Dr. Gore described a case study involving a patient who was in a blast but not diagnosed with TBI, went on to finish his career in the Army and achieve the rank of Senior Master Sergeant, and complete a

Master's degree in theology, before noticing a number of years later "an indolent decline in terms of his memory and cognitive function," as well as emotional problems. Gore T4-40-41.

The long-term prognosis of individuals with even single mild TBI is disturbing. Recent studies have associated these injuries with a 17% greater risk of neurodegeneration and dementia later in life as well as a 56% greater risk of developing Parkinson's disease. PX-161 at 5-6, 29-35, 47-48, 55-59. *See also* PX-163 at 13. As a possible correlation to these statistics, Dr. Gore presented studies identifying the accumulation of tau protein in animal and postmortem human brains affected by blasts. Gore T4-42-47; PX-161 at 29-35; PX-191 (PowerPoint Demonstrative of Dr. Gore) at 25-28. In an uninjured brain cell, tau protein aids the transmission of information along the axons. When the brain is injured, tau protein becomes sticky through a chemical process called "phosphorylation" and eventually accumulates into pathological clumps known as neurofibrillary tangles. The presence of accumulated tau and neurofibrillary tangles is implicated in a variety of neurodegenerative diseases, including Alzheimer's disease and Chronic Traumatic Encephalopathy (CTE). Gore T4-43-44. Furthermore, epidemiological studies show increased mortality rates even after mild TBI from these disorders and suicide. Gore T4-25-26; PX-161 at 54-55.

Recovery from brain injury, following initial life saving measures, is currently limited to rehabilitation based on mechanisms that remain uncertain. In most cases, rehabilitation focuses on adaptation to disability, using exercises to encourage functional brain areas to compensate for injured areas, and compensation for injury by teaching strategies to lessen the impact of disabilities. Gore T4-49-50; PX-161 at 43.

### 6.      EFPs Cause Particularly Devastating TBIs

Plaintiffs' medical experts testified as to the various reasons listed *supra* at 112-13 why the "characteristic of EFPs, along with the proximity of the service members in the vehicle struck by

an EFP to those blast waves, result in particularly devastating cases of TBI." PX-161 at 5. *See also* Phelps T5-159 ("You see traumatic brain injury, which is not solely the purview of an IED blast or, say, an RPG strike. They seem to be as prevalent and potentially even worse in these individuals."). These reasons include (i) the EFP's ability to travel at an extremely high velocity, causing it to deposit more kinetic energy into its ultimate target than typical IEDs, resulting in a higher-energy blast and more destruction to tissue; (ii) the EFP's direction of all its energy in a uniquely focused blast wave against its target, unlike an IED which disperses the force of the blast waves it generates; (iii) the proximity of an EFP and its blast wave to its target; and (iv) the confinement of the EFP's blast wave to the walls of the military vehicle, creating more intense waves which reflect off of the solid surfaces of the vehicle and create multiple wave reflections. PX-161 at 13-14. Dr. Gore analogized an EFP's blast wave reflecting within a military vehicle to shooting "a ping pong ball into a box at a high velocity, you would see that the ping pong ball is going to bounce around off of all the different surfaces within the box." Gore T4-29-30.

Dr. Gore illustrated this last point with a study in which an explosive was detonated through a blast tube welded to a HMMWV (thereby mimicking the focused effects of an EFP attack) with three different sensors mounted in the HMMWV to measure resulting blast waves:



PX-191 (Dr. Gore PowerPoint Demonstrative) at 15.

The green wave represents readings from sensors in the vehicle, and the blue and red waves represent readings from sensors that were situated in the vicinity of a pig's head that was placed inside the vehicle for the study. Gore T4-30. The sensors recorded a very high initial peak at the entry point after detonation, and then multiple peaks within the vehicle occurring within less than half a second later, depicted by black arrows. Significantly, these multiple waves originated from multiple directions at different peak overpressures (like multiple ping pong balls bouncing around a box). *Id.* at 31. The middle of the blue wave, which represents a reflected wave (as opposed to the original wave), represents the highest peak experienced by the swine. *Id.* at 32.

For service members in a HMMWV, "every occupant is at risk. Depending on the entry point, even those who are survivors and have less catastrophic external and visible injuries were exposed to this complex blast wave." *Id.* at 34. If an EFP enters a HMMWV to the right of a driver, that driver may experience a TBI-causing blast wave reflected on the left side of his head. *Id.* at

32. Dr. Gore illustrated the exposure of every occupant in a vehicle to an EFP's complex blast wave by overlaying the results of the swine study on the positions of occupants within a HMMWV:



PX-191 at 16.

### B.   EFPs Cause Exceptionally Devastating Traumatic Amputations and Orthopedic Injuries

Plaintiffs' medical experts testified that the most common cause of EFP-related injury and death results from secondary blast effects. These are exceptionally devastating because the EFP transfers much higher levels of explosive energy into the victim than typical IEDs that disperse, rather than concentrate, the force of the blast wave. PX-160 at 8. *See also* Andersen T2-99 ("So the energy imparted from an EFP going off here into that vehicle right there would be much, much higher than if a bomb of the same caliber went off that wasn't focused and spread its energy radially throughout this room."). The EFP also has higher "brisance" ability, meaning it produces particularly deadly shattering and fragmentation that can destroy tissue and traumatically amputate limbs. PX-160 at 15-16.

1.      **Physics and Engineering Design of an EFP Cause it to Impart Especially Deadly Force**

Dr. Phelps testified as to the physics behind the EFP's massive kinetic energy using the calculation K.E. = $1/2mv^2$. "K.E." denotes the kinetic energy imparted to a target by a projectile. The term "m" denotes the mass of the projectile, and "v" denotes the projectile's velocity. The calculation reflects how the amount of kinetic energy imparted to a target increases geometrically with larger mass but increases exponentially with increases in velocity. While an object's mass is important, it is comparably less significant (in its contribution to potential deposition of energy) than its imparted velocity. Phelps T5-135-136; PX-160 at 9-10. Using this calculation, Dr. Phelps testified how being struck by a 2+ pound EFP slug "is roughly the equivalent of being hit by a 12,100 lb. armored vehicle traveling at highway speed," albeit even more lethally because the EFP slug has a cross-sectional area of only about 40 to 60 millimeters. PX-160 at 12. Accordingly, when the EFP strikes its target, it concentrates all of that energy into one spot, whereas the armored vehicle would spread that energy out over the much larger surface area of the object it strikes. Phelps T5-137; PX-160 at 11-12.

Another engineering consideration in the EFP's design that contributes to its lethal secondary effects is its detonation velocity, density, and brisance. "Detonation velocity is an overall indicator of the power of detonation…while density denotes the mass of an explosive per unit volume." PX-160 at 14. These both contribute to the detonation pressure of an explosive. Generally speaking, the higher the detonation pressure of an explosive, the higher the brisance (or "shattering") of the object. High-order explosives used in EFPs have very high detonation pressures, density of loading, and brisance. *Id.* at 15. A higher brisance results in more efficient and higher quality fragmentation. *Id.* at 15-16. "Both the EFP slug itself and the effects of the

weapon's inherent brisance can, when detonated in close proximity to a victim, crush soft-tissue and bone… and propel debris at ballistic speeds." *Id.* at 16.

### 2. Resulting Traumatic Amputations and Orthopedic Injuries are Unprecedented

These physics and engineering considerations translate into unprecedented traumatic amputations (in which a limb is ripped from the body by the force of an injury, rather than removed as a surgical procedure after the injury is sustained) and orthopedic injuries (i.e., injuries to the musculoskeletal system). The EFP's post-detonation molten slug penetrated and sheared through plated vehicle armor and soft tissue alike – analogous to a superheated, hyper-velocity guillotine blade – very often completely separating or tearing the limb from the service member while temporarily cauterizing the wound due to intense thermal radiation imparted by the liquefied, missile-like slug projectile. As the slug passed through the vehicle's metal structure and armor plating, it turned the up-armored HMMWV's armor, walls, and equipment themselves into fragmentation or "spall," the secondary propulsion of hot metal fragments, which often struck occupants or bystanders with such force as to also cause traumatic amputation. Phelps T5-133-134; PX-160 at 13, 19-20; Andersen T2-94 ("When that blast wave hits or if a fragment hits…it can cause immediate traumatic amputation at the site. We frequently see mangled extremities with injuries to the bones, soft tissue, muscle, fractures, and spinal cord injuries.").

Dr. Phelps described such a scene:

Seeing an individual who's wide wake and talking to you and they're missing three limbs and they're at the time – this happened over and over – were not bleeding heavily. But the moment you move them and get them out of the vehicle, they just start bleeding like a fire hose. And it becomes a mad rush to try and keep them alive.

Phelps T5-162.

The victims would be in shock, if they were awake, and peppered with holes from fragmentation shrapnel. They would "look like they walked into a thresher machine. And the limbs have been just – parts of their body are just gone. Oftentimes, we'd find them outside the vehicle or somewhere inside the vehicle, if they were there at all." *Id.* at 162-163. Dr. Phelps stated that "[t[here's really nothing to describe it from a medical perspective, especially when it's someone that you know closely, that you've been with for a long time. It's very difficult." *Id.* at 163.

The ensuing injuries caused by EFPs were worse than those caused by other types of blasts, requiring more surgical procedures and resulting in lifelong disability and chronic pain. Victims of EFPs "never got back to their pre-injury level of health." Andersen T2-92-93.

### 3.      Traumatic Amputations Caused By EFPs are More Devastating Than When Caused By Other Blasts

The conflict in Iraq presented the unprecedented phenomenon of soldiers with three- and four-limb extremity amputations surviving. PX-162 (Expert Report of Dr. Andersen) at 5; Andersen T2-101. This phenomenon was a result of better medical care, Andersen T2-101, and the EFP's engineering design as a "direct energy weapon." Phelps T5-157. Dr. Phelps explained that while mortars or artillery fire typically cause victims to be "blown apart," EFPs "act in a different way … penetrat[ing] armor, causing guillotine-like injuries where they literally sever – cut people in half, tear off limbs." Phelps T5-158. The Court heard a first-hand account of such injury from Christopher Levi, whose legs were both traumatically amputated on March 17, 2008, when an EFP "came across went directly through my thighs, a transfemoral amputation, catastrophic at site. … I tried to wiggle my toes and I couldn't move them…and I knew I had lost my legs." Levi T4-184-185.

Traumatic amputations by an EFP itself and later amputations resulting from an EFP attack differ markedly from planned surgical amputations involving fresh, clean tissue and nerves which

can be sharply transected with a scalpel. EFP attacks often inflict such severe damage to the victim's limb by destroying tissue, muscle, nerves, and arteries, that they render the extremity unsalvageable in the operating room suite. PX-160 at 14; Andersen T2-107-109. In creating a skin flap to cover the end of the residual limb so as to maximize blood supply and healing, surgeons find that they must essentially fashion pieces of skin into "mosaic flaps to cover the end of the residual limb" of a blast-injured soldier, since there are no clean flaps to do so. Andersen T2-107. The tissue transferred from other parts of the body never has the same level of function as the lost tissue. PX-160 at 34-35. When muscle tissue around the extremity, which is valuable for covering the wound and movement, is lost or damaged, there is no way to replace it. Andersen T2-108. Nerve grafts from another part of a patient's body or a cadaver may be attempted when a victim's nerves are transected as a result of the blast, but the segment of injury is often so long that reconstructive efforts with nerve grafts and conduits are unsuccessful. Patients with significant nerve injuries from a blast injury are left with chronic pain that is extremely difficult to manage. PX-160 at 34-35; Andersen T2-107; PX-162 at 9. Similarly, the overpressure wave can either transect an artery primarily or cause intimal damage which can lead to a thrombus (blood clot) and eventual loss of perfusion (passage of fluid) to the limb. "These injuries need to be addressed urgently in theater as the tissues of a poorly perfused limb will become hypoxic [inadequately oxygenated] and thereafter would not be salvageable." PX-160 at 34-35. *See also* PX-162 at 9; Andersen T2-108-109.

Initial attempts to reconstruct the potentially salvageable limb that was injured in an EFP attack are not typically completely successful, and more surgical procedures are generally required. Andersen T2-92-93. Even numerous procedures attempted to save or reconstruct a limb are commonly deemed unsuccessful, resulting in "late amputations." PX-162 at 7. Plaintiff Robert

Canine described how, surveying his legs after an EFP struck his HMMWV on May 17, 2009, "I thought they would be able to save my left leg, but at that point I kind of assessed that my right leg would probably need to be amputated." Canine T4-117. Mr. Canine was air evacuated to a combat support hospital where his right leg was amputated. *Id.* At Walter Reed, after being told that he could need as many as 50 surgeries to attempt to salvage his left leg with the distinct possibility that it would still need to be amputated, Mr. Canine had that leg amputated as well. *Id.* at 121-122.

Amputations also cause significant pain. Amputees experience residual limb pain and phantom limb pain, both of which can be debilitating. Andersen T2-106-107; PX-162 at 7. In addition, limited blood flow to the limb, accompanied by related nerve damage to the area, causes pain. In those circumstances, amputation of the limb may be the only treatment. Andersen T2-108-109; PX-162 at 9.

Rehabilitation of a blast injury amputation is significantly more complex than standard elective amputation, because the whole limb affected is typically injured, as opposed to just the portion that was amputated, as well as other limbs. The victim usually will not have full use of his or her other limbs on which to rely. Andersen T2-104. Victims will also typically require multiple subsequent surgeries, and if they had a skin graft performed to cover their residual limb, the prosthesis may wear on it, necessitating another skin graft or the need for a subsequent amputation further up the limb. *Id.* at 105. The function in an amputated limb in a prosthetic is never as good as the limb prior to their injury. The victim is required to expend more work and effort to achieve the functions he or she can no longer perform perfectly, if they can perform them at all. *Id.* at 105-106. Responding to the question of whether there are activities he can no longer perform as a double amputee, Mr. Levi listed the following:

131

> Jump, scoot. You can't scoot without thighs and ankles and calves. Balance. I can't balance without knees and ankles. Lift my foot up straight in the air which I could easily do standing on one foot before. I can't stand still on two feet now. Those are basic things. If you want to extrapolate from there, you can say everything.

Levi T4-195.

As described *supra* at 95, Mr. Canine explained that he cannot wear his prosthetics for longer than 12 hours, or he will experience skin breakdown and pain in his back and neck. He will have to stay home the next day or use his wheelchair. Having formerly been very physically active and fit, Mr. Canine can only walk for about a quarter to a half mile at one time without taking a break. He needs to plan his day to include breaks and avoid obstacles such as stairs, uneven terrains or inclines. Mr. Canine used to spend time with his son outdoors hunting and fishing, jumping on a trampoline, and playing sports. He can no longer do any of those activities. Canine T4-128-129.

### 4. The Force of EFPs Often Result in Uniquely Severe Fractures Which Require Painful, Often Unsuccessful, Treatment

EFPs were also largely associated with fractures, both in victims' spines and bones in their limbs. Andersen T2-114. Dr. Andersen testified that the blast waves caused injuries to the spine by either blasting foreign material straight into the spine or, more frequently, by launching occupants of the vehicle against inanimate objects. *Id*. Dr. Andersen characterized "lumbosacral dissociation" as another one of the "signature injuries we saw with EFPs" as a result of the "violent movement of the vehicle" from the EFP blast, resulting in the dissociation, or split, of the spine and pelvis so that they were no longer attached to each other. *Id.* at 114. The "violent up blowing explosion" of EFPs also caused low lumbar burst fractures, where the lower end of the lumbar region was blown out. *Id*. These fractures often required victims to undergo reconstructive spine surgery which oftentimes necessitated fusing the injured segment of the spine, resulting in impaired motion. *Id.* at 115. Post-traumatic arthritis and degeneration of the spine frequently occur just above or just below the fusion level because they are exposed to higher levels of stress. *Id*.

EFP blasts also often result in severe, and sometimes multiple, fractures to bones in victims' limbs. *Id.* at 108. Fractures caused by EFPs were uniquely severe in that they were accompanied by segmental bone loss, where a whole area of bone was missing. Dr. Andersen T2-110. Often, the EFP's force caused bony avulsions to present along the shaft of long bones, where fragments of bone are torn off the larger bone mass. PX-160 at 14. These fractures frequently required more extensive surgery to regenerate bone, which necessitated the use of a "circular multiplanar external fixation device." PX-162 at 8. This device is attached directly to the bone and adjusted in order to lengthen the bone and regenerate it. Andersen T2-112-113; PX-162 at 8. It must remain on the bone for several months, leaving "some tracks running down their leg from where the pins had moved down the limb." Andersen T2-113. The process is extremely painful; so much so that patients undergoing it will sometimes elect for an amputation instead. *Id.* at 113. Use of these devices have nearly "100% complication rates that included pin site infections, tissue death, and failure of adequate healing." PX-162 at 8. Plaintiffs Robert Canine, Christopher Levi, and Wesley Williamson each testified about how their treatment included external fixation devices. Messrs. Levi and Williamson now have permanent plates and screws holding the bones that were reconstructed by the external fixator, while Mr. Canine's leg was amputated. Canine T4-119; Levi T4-189; Williamson T4-151.

### 5. Traumatic Amputations and Orthopedic Injuries Caused by EFPs are Often Accompanied by Uniquely Severe Complications

Devastating traumatic amputations and orthopedic injuries caused by EFPs are accompanied by equally devastating complications unique to EFPs. *See* PX-160 at 50-54 (listing heterotopic ossification, myofascial tissue and nerve damage, spasticity, post-traumatic arthritis, and long-term scarring as some of the orthopedic complications associated with EFPs). Heterotopic ossification – a condition where the trauma to the body is so great that the victim's

very DNA and RNA wrongly starts producing bone where it once produced muscle – occurs frequently in EFP victims suffering musculoskeletal polytrauma. Infections abound in both amputees and non-amputees as a result of all kinds of shrapnel – copper, teeth, and skin, to name a few – becoming lodged into the flesh of the EFP victims by the EFP's sheer force.

### a.    Heterotopic ossification

When a muscle is severely damaged by an overpressure wave, the traumatic impact has the potential to change the DNA and RNA which produces muscle tissue into DNA and RNA which produces bone tissue. PX-162 at 10-11; Andersen T2-94-95; PX-160 at 50-52. This phenomenon of painful abnormal bone growth is known as "heterotopic ossification" and frequently develops as a result of combat-related blast injuries. The condition can occur in blast-injured amputees and non-amputees. PX-160 at 50-51; PX-162 at 10. It is 40 times more common in blast combat casualties than non-blast combat casualties, Andersen T2-95, and was more frequently observed in Operation Iraqi Freedom and Operation Enduring Freedom than in previous conflicts and wars. PX-162 at 12.

Dr. Phelps described heterotopic ossification as "the single most significant obstacle to independence, functional mobility, and/or return to normal function for combat-injured veterans of Operation Enduring Freedom and Operation Iraqi Freedom." PX-160 at 50. It causes limited range of motion and loss of the ability to flex or extend, and can also cause a complete loss of mobility. Andersen T2-98; PX-162 at 11; PX-160 at 51. Significant pain, especially when the bone growth impinges upon a nerve resulting in nerve pain, can become chronic.

Heterotopic ossification can interfere with brace and prosthetic fittings when bone growth erodes through skin at the amputation site. PX-162 at 11; Andersen T2-98; PX-160 at 52. Resection and shortening of the limb may be required, but often prove ineffective because bone continues to

134

grow at the site. Andersen T2-97-99; PX-162 at 11. The effects of this condition can be long-lasting. *Id.* at 12.

### b.     Shrapnel and risk of infection

While high-energy blast wounds caused by typical IEDs often include shrapnel injuries, Plaintiffs' medical experts testified that EFPs were specifically designed with high brisance producing "more efficient and higher quality fragmentation." PX-160 at 15. As described above, both the EFP slug itself and the effects of the weapon's inherent brisance can, when detonated in close proximity to a victim, crush soft-tissue and bone and propel debris at ballistic speeds. *Id.* at 16. In addition, the spall created when the EFP slug passed through the up-armored HMMWV can also cause traumatic amputation. Phelps T5-133-34; PX-160 at 13, 19-20.

Plaintiff David Haines' injuries reflect the extreme lethality of the EFP's shrapnel:

But I had my hands – the metacarpals in my right hand were shattered, and it looked like somebody had taken a bite out of the side of my hand. I had shrapnel lodged in my left arm. It segmented my ulna and ulnar nerve, and it locked my hand back so it was not functional. The shattered metacarpals caused a lot of my fingers to be just dangling on my hand. The shrapnel in my right femur broke my leg, and there had been some metal and probably part of my rifle that had somehow jammed my feet into the Humvee. And I was not – because I couldn't unlatch the door and couldn't move my feet, I was unable to move in the initial aftermath of the attack.

Haines T4-168.

Mr. Haines' testimony further underscored the unprecedented nature of the EFP-caused shrapnel injuries when he described how he "had a couple of mentors while I was at Walter Reed, both were severely wounded Vietnam veterans. And one of them commented one time that he'd never seen anybody with more holes in him than me. And he actually compared me to Swiss cheese one time." *Id.* at 167.

Christopher Levi also testified how EFP shrapnel is particularly painful:

But those heated metal globules when they enter your skin are liquid. And when they come in contact with your skin and cool down, then they become hard

> sometimes in the shape of teardrops where the teardrop is hooked like a fish hook. So when those pieces are pulling themselves out and you go to try to assist it along, it just winds up cutting all the muscle inside your arm.

Levi T4-194.

Messrs. Haines and Levi, as well as Robert Canine, continued to endure shrapnel injuries years after their respective attacks. *See id.* ("Actually I had been peppered with a lot of shrapnel as well. And for I would say maybe four or five years I was pulling a significant amount of pieces out, you know, slowly less and less. I still had like a few random pieces after that."); Haines T4-167 (describing how he continued to have copper shrapnel removed from his body over twelve years since his EFP attack on October 22, 2006: "I had a small piece of a foreign body in my right forearm that I carried until this June. I was thinking it was just a pebble probably from the street in Baghdad. And the Army actually took it out and got it tested, and it was also copper."); Canine T4-127 (describing how, four years after his attack, "I had shrapnel that was damaging the bursae sacks in my right knee, and it was swollen up so big I could hardly walk, I could hardly move my legs.").

As attested to by Mr. Haines' copper shrapnel test results, EFP shrapnel will often include complex, multi-component metallic compounds or relatively rare chemical/biologic/radiologic components not present in other blast exposures. In addition, EFP blasts in particular are so powerful that victims may sometimes experience the phenomena of "organic" shrapnel – teeth, skin, and bones from another person – becoming retained as foreign material within their own bodies. The presence of iron, copper, or aluminum with traces of antimony, titanium, uranium, and lead and/or human shrapnel each present a particular set of complications with regard to infection, and biological and chemical contamination. PX-160 at 17-18; Andersen T2-110; PX-162 at 13. Treatment for infections requires close and frequent attention for a long period of time, and involves a great deal of intravenous antibiotics. Andersen T2-118. Multiple attempts at removing

the foreign matter are typically made via irrigation and debridement of tissue necrosis (the removal

of the existing dead and nonviable tissue). *Id.* at 103-104. Mr. Canine recalled how his amputated

right leg became infected, and was subject to five rounds of irrigation:

> When I got to Walter Reed, my right leg was infected and I had to go through a
> procedure called a washout. I went through five washouts where they tried to
> remove the infection. They cut off extra tissue and bone to try to remove that to get
> rid of the infection. I went through that five times. On the fifth one, they said if they
> didn't get the infection they was going to take it off at the knee. But they got all the
> infection on the fifth washout.

Canine T4-119-120.

## C.     EFPs Frequently Cause Unprecedented Polytraumatic Injuries

As stated *supra*, part of what has made the injuries caused by EFPs unprecedented is that

their victims typically suffered polytraumatic injuries – multiple traumatic injuries (including the

above-described TBI and orthopedic injuries) to a wide range of body organs and systems. To

illustrate polytrauma, Plaintiffs' medical experts testified that an EFP victim might suffer both

massive blood loss and catastrophic tissue destruction as a result of being struck by the EFP or its

fragmentation. This would lead to severe hypotension (abnormally low blood pressure), which

would further lead to profound under perfusion (poor blood delivery) of the vital organs (especially

the brain), reduced initial levels of consciousness, and increased likelihood of cardiorespiratory

collapse. PX-160 at 20. The same EFP victim, having experienced the "exaggerated overpressure

phenomenon" caused by the EFP striking, penetrating, and depositing its massive kinetic energy

into a closed, heavily up-armored HMMWV, would also be suffering from resulting blast injuries,

including tympanic membrane injury, lung injuries, GI tract injuries, and TBI. *Id.*; Phelps T5-159.

These types of injury patterns were "fairly unprecedented," Phelps T5-117, and

significantly complicated the assessment, treatment, recovery, and rehabilitation of the EFP victim.

PX-160 at 24-25. EFP victims tend to have longer length of hospital stays to manage complex

wound care protocols, medication regimens (which often include multiple antibiotics, cardiovascular and renal system support, and complex pain control regimens), and prolonged mechanical ventilatory support. They suffer more severe and longer-term complications and increased overall mortality rates. *Id.* at 23-24.

A principal reason for the complications presented by polytrauma is the attendant pain, which is difficult to manage and often becomes chronic. Phelps T5-153, 160-161; PX-160 at 26 ("[V]eterans who have suffered from polytraumatic injuries face additional risks for developing chronic, unremitting pain."). Chronic pain, in turn, causes a host of adverse physical and psychological effects on the body. PX-160 at 26-27, 55-57. The victim's polytraumatic injuries also require extensive treatment, which results in still further pain and adverse effects. PX-160 at 23-28, 57-58. Indeed, a victim of an EFP attack suffers the effects of the attack for a lifetime.

### 1. Polytraumatic Patients Are Frequently Denied Initial Pain Medication, Leading to Chronic Pain That Is Difficult to Manage

Because it is often dangerous to provide pain medication to a polytraumatic patient as it may further exacerbate their respiratory or brain injuries, service members injured by EFPs often do not receive pain management until well after they are injured. Phelps T5-153, 160-61. Later administered pain management in severe polytrauma is not as effective as if it were provided earlier on, and consequently, "veterans who have suffered from polytraumatic injuries face additional risks for developing chronic, unremitting pain…." PX-160 at 26; Phelps T5-161 ("We were behind the eight ball the entire time trying to get ahead of their pain management. Oftentimes, they end up suffering with chronic, debilitating pain for the rest of their lives.").

Plaintiffs remembered their horrific suffering unmitigated by pain medication all too well. Mr. Bartlett recalled how the EFP "came through the vehicle, cut me from the left corner of my temple down through my jaw," and the ensuing pain:

> When I got hit, it was like a molten hot sledgehammer that hit me in the face. It was like I was standing in front of -- the best way I can describe it, like a cannon, like my head was on the front of a cannon and the cannon went off and what hit me was molten hot.
>
> . . .
>
> You know, I don't want to ever go through that pain again. But I -- words could never express the amount of pain veterans go through when they get injured, especially from a blast injury where it's traumatic, legs are lost or an injury like myself or burn patients. It's just indescribable.

Bartlett T2-51, 61.

Mr. Bartlett did not receive pain medication at the scene of his attack, *id.* at 60, and described the pain he continues to endure even 13 years after his EFP attack:

> I'll be in pain the rest of my life. I have nerve damage to my face. My face and my lips especially feel like they're on fire. They're burning right now. It's like a tingly burning feeling all the time. I have the same on parts of my hands and then my side here too as well where they put a chest tube in to drain off the blood from when my lung collapsed.

*Id.* at T2-65.

Mr. Williamson also recalled the pain he felt at the scene of his EFP attack. Mr. Williamson testified that despite the fact that his "arm was just kind of dangling like a dead fish over here just kind of pouring blood all over the place," he "was very calm surprisingly," until his truck commander "turned around and screwed on the tourniquet windlass and stopped my bleeding. And actually I didn't feel any pain until the tourniquet finally got cranked down, and then I started feeling pain." Williamson T4-147-148. Dr. Phelps, the recipient of multiple blast injuries and gunshot wounds himself, also testified that the most extreme pain he ever experienced was having a tourniquet applied to him, which was during a training session, not even an attack. Phelps T5-154. Unfortunately, medics must engage in what Dr. Phelps characterized as the "liberal application of tourniquets," as the number-one killer on the battlefield after initial wounding if the victim survives the initial strike is blood loss, claiming the lives of about 85% of service members

who die on the battlefield. Phelps T5-152. *See* Canine T4-117-118 ("I lost so much blood I almost died. My team leader who was helping me when I was on the ground, he said it looked like somebody dumped a 5-gallon bucket of paint on the ground.").

**2.      The Root of Polytraumatic Patients' Pain Is Often Difficult to Identify, Frequently Resulting in Ineffective Pain Management**

Apart from a polytraumatic EFP victim's chronic pain because of the medical decision not to manage that pain at the scene of the attack, polytrauma victims of EFPs frequently suffer from constant and severe debilitating residual pain because their injuries involve both the generation of nociceptive pain – pain which arises from the direct stimulation of nerve cells – and neuropathic pain – pain which arises from damage to or disease in the nerves themselves. Each of these types of pain requires different treatment approaches. When medical providers are able to provide pain management to these victims, they often have difficulty isolating the root cause of pain when dealing with the complexities of blast-related polytraumatic injuries. PX-160 at 25. Amputees specifically experience two categories of significant, often extreme, pain: residual limb pain ("pain at the amputation site where there's cut limbs and damaged tissue") and phantom limb pain (a "debilitating, burning type of pain" that results from the transection of larger nerves which would normally provide sensory input and motor function to the limb that are still being stimulated). Andersen T2-106; PX-162 at 7. These categories of pain require lifelong medical treatment and sometimes surgical intervention. PX-162 at 7.

Robert Canine described the devastating nerve and phantom pain he experienced even with pain management attempts:

> I started experiencing physical pain to the point where I started having respiratory issues and my heart was beating very, very rapidly. They increased my medication and managed that. And then the next day I started experiencing severe phantom pain or nerve pain to the point where I actually thought I was on fire. And I was yelling in the hospital for everyone to get out because the hospital was on fire. …
> They first put me on medication for nerve pain, and then increased it to the max

140

dose which had no effect. And then they put me on the second nerve medication that they offer and increased it to the max as well.

Canine T4-120-21.

This was not the last time Mr. Canine would experience unbearable pain: "To have to use prosthetics with open wounds is just a new level of pain that I'd never experienced before." *Id.* at 123.

### 3.      EFP Victims Often Require Extensive and Long-Term Treatment, Causing Further Pain and Adverse Effects

The pain suffered by EFP victims is not only a result of the initial wounding. When EFP victims survive their initial injuries and life-saving surgical procedures, they are almost always subject to many years of painful corrective repeat surgeries (skin grafting, burn repair, amputation stump revision, heterotopic ossification resection, contamination removal, etc.) and grueling, sometimes multiple years-long stints in various modes of in- and out-patient rehabilitation. PX-160 at 24. Mr. Bartlett testified how he believed he had undergone "over 40 procedures, and then 12 times under anesthesia." Bartlett T2-63. In order to mitigate the need to subject Mr. Bartlett to anesthesia, "they'd team up, so hand surgeons would work on my hands while facial plastic surgeons were working on my face." *Id*. Mr. Levi estimated that he had been in "over a hundred surgeries," with his "life … at stake" in approximately 30 of them. *See* Levi T4-189.

Patients undergoing these repeat surgeries suffer additional pain and accompanying ill effects. PX-160 at 25-26. These patients are also subject to the anesthesia risks referenced by Mr. Bartlett, and it is not unusual for a patient who sustained massive blood loss and required repeated blood transfusions or multiple surgeries to develop Hepatitis C. *Id.* at 57.

### 4.     Chronic Pain and Its Treatment Causes Adverse Effects on the Polytraumatic Patient

The pain endured by polytraumatic patients at every phase, from initial wounding to multiple surgeries, itself generates a host of adverse effects, including, but not limited to:

- sleep-related breathing issues;

- gastrointestinal disorders;

- musculoskeletal complications;

- increased sensitivity to pain;

- untoward sedation;

- hormonal imbalance;

- psychosocial/emotional disorders;

- immune, cardiovascular, endocrine and central nervous system dysfunction;

- triggering of the patient's pituitary-adrenal axis which may suppress the body's immune system, leading to an increased risk for postsurgical infection and poor wound healing, which is particularly hazardous for an EFP polytrauma victim; and

- reduced patient mobility, resulting in complications such as deep vein thrombosis, pulmonary embolus, and pneumonia.

PX-160 at 26-27, 55-57.

The treatment of pain also presents its own set of adverse effects. Polypharmacy, or the administration of many different drugs, is frequently unavoidable for an EFP victim, and can induce dependence, allergic reactions and bowel conditions and infections. *Id.* at 27-28, 58. Opioids in particular pose problems for the polytrauma patient, and veterans are twice as likely as non-veterans to die from accidental overdoses of opioids. *Id.* at 26. Veterans with PTSD are approximately three times as likely to be prescribed opioids as those without that disorder. Opioids are particularly dangerous for veterans with PTSD, as studies have demonstrated that prescription

opioids have been associated with an increased risk of overdose and death for all veterans, but most pronounced in veterans with PTSD. PX-160 at 54-55.

### D.    EFP Victims Are at Unique Risk for Psychological Injuries

Dr. Marmar described EFPs as "weapons of mass destruction because of the brutal nature of the wounds they inflict." Marmar T3-104. Those wounds are both visible, such as amputations, burns and disfigurement, and invisible: PTSD, TBI, depression, alcohol and drug use disorders. Marmar T3-105.

Dr. Marmar, who worked on the diagnostic criteria and subsequent revision for PTSD in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM"), Marmar T3-76, described PTSD as a mental disorder which occurs in a minority of individuals exposed to extreme stress. PX-163 at 3; Marmar T3-78. An individual with PTSD will experience a combination of four clusters of symptoms: reliving the traumatic event in the form of thoughts, images and memories; avoiding reminders of the event; experiencing negative emotions of self and the world; and suffering chronic anxious arousal. In cases of diagnosable PTSD, these symptoms will last at least a month, cause the person significant clinical distress, interfere with their ability to work and engage in relationships and other meaningful activities, and are not better explained by another cause such as a medical illness or a medication. PX-163 at 3-4; Marmar T3-78-79.

Major depressive disorder, as explained by Dr. Marmar, is a disorder of mood, characterized fundamentally by persistent feelings of depressed mood and persistent loss of interest in normally enjoyable activities. PX-163 at 9; Marmar T3-110. These feelings are accompanied by a combination of other symptoms such as gaining or losing weight; difficulty sleeping or sleeping too much; feeling restless and agitated; feeling exhausted and unable to move;

feeling a sense of worthlessness or inappropriate guilt; difficulty thinking and concentrating; not being able to make decisions; and recurrent thoughts of death. PX-163 at 9-10; Marmar T3-114.

Dr. Marmar explained how psychological injuries also extend to a soldier's family. Currently the Chairman of the Department of Psychiatry at New York University School of Medicine, Dr. Marmar started a clinic in 2012 for the psychological treatment of veterans and their family members that has screened 2,500 veterans and family members. Marmar T3-73, 75. Dr. Marmar cited his own published research finding that one in three spouses of service members who served in Iraq and Afghanistan reported one or more psychiatric difficulties. PX-163 at 16; Marmar T3-126. Dr. Marmar also testified as to studies that demonstrated how spouses and children of Vietnam veterans with PTSD suffered more problems compared to spouses and children of veterans without PTSD. Family members of veterans who "came back with chronic PTSD were having more anxiety and depression themselves. They were having more marital conflict. There was more domestic violence. And the children were having more problems in friendships and at school." Marmar T3-125.

Plaintiff David Haines, who served in the military for almost 30 years, illustrated this point. Mr. Haines, who had never lived apart from his wife and two children aside from active deployments, described the "emotional and psychological tailspin" he experienced about nine years after his EFP attack, after he left the military:

> I did a lot of damage to my marriage. My daughter was out of the house at the time, but she's a smart enough woman I'm sure she knew what was going on. It wasn't anything physically abusive, but I was emotionally abusive to my wife just because of my anger and my depression and taking it out on her. My son was with us, and he was going through a hard time as a young teenager. And I think I was very, very hard on him to the point where he was probably questioning whether I loved him or not.

Haines T4-173-74, 157-58.

Robert Canine also described how his EFP attack destroyed his family, leaving him at "rock bottom" when his wife left him:

> I started experiencing a lot of issues, post-traumatic stress type symptoms where I had alienated myself from the majority of my friends and family as well. Most people didn't like me at that point -- which I don't blame them because I didn't really like myself either.

Canine T4-126.

Dr. Marmar testified that there are few treatments that have been validated as safe and effective for PTSD. Marmar T3-106. Worse, studies of the effects of treatment on veterans with PTSD have demonstrated that both medications and behavioral therapy treatments are less effective on veterans than civilians. *Id.* at 109-10.

Veterans who have been diagnosed with PTSD are likely to suffer from it for many years afterward. *Id.* at 94. A study of Vietnam veterans conducted by Dr. Marmar revealed that about 50% of Vietnam veterans who developed PTSD at some point after the war had it 15 years later. Of that number, 50% continued to have symptoms 40 years later. *Id.* at 94. Among the Vietnam veterans who developed chronic PTSD, 50% developed Major Depressive Disorder at some time. Of the 50% of veterans who continued to have PTSD symptoms 40 years later, a third had major depression. *Id.* at 112. Dr. Marmar cautioned that these statistics likely underestimate the number of veterans truly suffering from psychological disorders, noting that soldiers hold "lifelong values of independence, self-reliance and loyalty" to each other, causing them to be reluctant to disclose their suffering. Soldiers do not want to reveal personal weakness, they do not want to "let their team down," and they want to go back to the battlefield "to even the score for losses they've experienced." *Id.* at 96-99.

Dr. Marmar illustrated the unwillingness of soldiers to reveal their suffering with a case study of a World War II veteran who sought treatment 40 years after killing a Japanese soldier.

The veteran had noticed a photograph in the dead soldier's uniform, and, curious, picked it up. The photograph was of the dead soldier's wife and two children. The veteran noted that the children were about the same age as his own. *Id.* at 83-85. Dr. Marmar continued:

> And at that moment, he became flooded with the terrible thought that he had created a widow and orphans and that that could have been his family, abandoned.

*Id.* at 85.

The veteran immediately developed "terrible repeated thoughts, images and memories of that event," along with nightmares two to three times a week. *Id*. Hot, humid days reminiscent of a Southeast Asian jungle would trigger the veteran, as would hearing people speaking Japanese. *Id.* at 86-87. After four decades, the veteran finally sought care. *Id*. at 85-86.

Plaintiffs testified regarding some of the psychological injuries they continue to suffer even years after their attacks. Mr. Williamson, who was injured by an EFP on May 9, 2008, described the seven years in between retiring from the Army and starting college during which he isolated himself and slept with a rifle by the side of his bed. He continues to sleep with a pistol close by, and takes anxiety medicines before going to classes. *See* Williamson T4-152-153.

Mr. Bartlett, who was injured by an EFP on May 3, 2005, testified how he still experiences triggering events:

> Here in D.C., here's a common one is people tailgating you. So to get the speed of a vehicle down to know what the timing is for setting that bomb off, they'll tailgate you or send a car to tailgate you so they know what the speed of the vehicles are so then they know when to command detonate it with a trigger at whatever point that vehicle crosses a certain fire line.
>
> Also crowds, I hate crowds. So I force myself into -- to go to hockey games and things like that because I don't want it to control me. Crowds are unsafe, I don't have my guys with me watching my back with guns in their hands, and there's a million people standing behind me. So that's very difficult for me. There's also sleep and things like that. I don't watch a lot of war movies and things like that. I lived it.

Bartlett T2-63-64.

Mr. Canine, injured by an EFP on May 17, 2009, also continues to suffer its psychological effects:

> I still have some issues with PTSD and pain, sleep. I have a lot of problems with sleep. And I hope some day that I will be fully recovered at some point.

Canine T4-131.

Plaintiffs' medical experts offered a number of different reasons why EFP victims are at unique risk for psychological injuries. Chief among them is the unprecedented practice of evacuating EFP victims from their units because of the severity of their injuries; standard military protocol urges medical personnel to keep wounded soldiers with their units in order to help maintain their already precarious emotional states. Phelps T5-155-157. Also contributing to EFP victims' psychological injuries are the devastating TBIs caused by EFPs, PX-161 at 51, which can cause psychological injuries, PX-161 at 50-54; Marmar T3-118-119, as well as the chronic pain and traumatic injuries imparted by EFPs, PX-160 at 56-57, Marmar T3-106. Survivors of EFP attacks suffering from PTSD do not benefit greatly from treatment, as evidenced in studies monitoring the effects of medication and behavioral therapy on veterans with PTSD. Marmar T3-109-110

### 1.      EFP Victims Are Separated from Their Units Against Standard Military Recommendations

The unprecedented injuries caused by EFPs necessitated unprecedented life-saving measures. Despite military protocol urging medical personnel to keep wounded soldiers with their units in order not to exacerbate the victims' emotional states, the EFPs' catastrophic injuries forced their victims to be evacuated immediately. Phelps T5-155-57 ("But in these cases, especially with EFPs, there was pretty much no choice because of the gravity of their wounds and the complexity."). Dr. Phelps explained how this unprecedented evacuation feels:

> Well, one of the main factors that -- things they lose is that connection back to your unit. Having been medically evacuated several times, it is – you're already in a bad way, in a bad psychological state. You feel like you've let down your unit. You are probably -- have not completely processed the loss of people that are very close to you. And then to be taken out of that and not have that support system is very difficult. You could say the units are family. And when you're taken from your family, if you've ever spent any time away from your family for reasons you couldn't control, you kind of have an idea of how bad it would be. And then you add on top of that the traumatic event.

*Id.* at 156-57.

Illustrating this point, Mr. Bartlett described the last intense moment he had with the gunner in his HMMWV before they were evacuated after being injured by an EFP: "So when he fell down on top of me, then I helped straighten out his legs. We put his back towards the front windshield, I straightened out his legs the best I could with my damaged hands. He just threw his arms around me, and I threw my arms around him and we were going to die together." Bartlett T2-59.

The evacuation process itself is also intensely emotional and stressful to the EFP victim. Mr. Williamson recalled being strapped into the back of a Blackhawk helicopter underneath a stream of bodily fluids pouring down on him from the driver of his HMMWV, who was strapped above him. Mr. Williamson suffered from this memory for years. Williamson T4-150. Mr. Haines remembered getting sick from the pain medication he requested on the C-17 military transport aircraft and vomiting on everyone in the four or five bunks below him. Haines T4-170-171.

While being transported, the service member, if conscious, may not know if they will live, or, typically the most stress-inducing fear of all, if their comrades survived the attack. PX-160 at 42. Mr. Haines recalled asking about the other passengers in his HMMWV upon arriving at the hospital in Baghdad:

> I knew that Sergeant Recendez, Specialist Taylor and Specialist Alabsawi were alive. I did not -- after the attack, I could not see Major Taylor, I did not see him. But I did ask -- as I came out, I asked my Battalion Commander two questions that I can remember. One was, "Is Major Dave Taylor okay?" And he lied to me and said, "Yeah, he's okay. Don't worry about it." And the other one was did I keep my

> left hand, because I really thought in the initial attack just the way my hand looked
> with the shrapnel that I was going to lose my left hand.

Haines T4-170.

Mr. Haines was then moved to Balad Air Base for transport to Landstuhl Regional Medical Center in Germany, and recalled how, again, "I tried to get up and look for some of the guys from the crew to see if they were there, and then I went back out." *Id.* at 170.

Dr. Phelps was adamant that "it is nearly – if not completely – beyond the ability of a lay person to fully comprehend and/or understand the depth of despair and despondency a highly committed professional soldier feels, even when wounded, 'knowing' that they've let their teammates down, or fearing for their fellow soldiers' safety and well-being, even if/when that wounded soldier is facing the loss of a limb." PX-160 at 42. Dr. Marmar characterized this despair and despondency as "survivor's guilt," defining it as "a sense of guilt about the fact that I am alive or I am alive and not injured when the people that I deeply cared about on the battlefield died or were badly injured." Marmar T3-124. Dr. Marmar explained the perspective of the soldier suffering from survivor's guilt, testifying that "when I ask war fighters why they served, particularly in a volunteer army, they often say to me:  I went to war to serve my country. But I fought in war to bring my teammates back." The soldier's new goal once in battle is defeated if they leave their teammates injured or dead on the battlefield, and "they can often have searing guilt for being the ones that walked away." Marmar T3-124.

Mr. Bartlett elucidated on this point:

> It's called survivor's guilt. My buddy was killed next to me. He had a wife and two
> kids, and I was single. So you go through that. And then I also lost friends
> afterwards. And I was an older guy, I joined at the age of 30. A lot of these young
> men I cared about deeply like little brothers and wanted to make sure they get home
> safe to their family. And I lost a few more after I was gone. I felt guilty because I
> wasn't there to bring them home safe.

Bartlett T2-67.

Dr. Marmar cautioned that veterans suffering from survivor's guilt present with a specifically high risk for depression, suicide and alcohol use. Marmar T3-124.

Dr. Phelps continued to describe the "horror and pain" experienced by wounded service members who woke up in foreign locations after evacuation to missing extremities, inability to communicate, or the loss of function of one or more of their body parts. PX-160 at 42. Unlike a civilian who suffers a terrible accident in his or her own hometown, these service members were further traumatized by having to move themselves and their families closer to major military medical centers and subsequent rehabilitation facilities, restarting their medical and psychological healing with new medical teams, while simultaneously undergoing the stressors of moving to a new community. *Id.* at 43-44. Christopher Levi testified how his parents took turns flying from New York to Washington D.C. to stay with him for a year while he was outpatient at Walter Reed: "So my mother would stay with me for 15 days and then fly back. And then my dad would stay with me 15 days and then fly back. And then that continued for a year." Levi T4-190.

At some point, the wounded service member ultimately faces the enormity of their situation: the injuries, the loss of function, the violent termination of a career, and quite possibly the end of their life as they knew it before. PX-160 at 42. Mr. Levi described what it felt like to live in Walter Reed housing where working soldiers were stationed: "First of all, watching them get to go to work every day wasn't always great. … So for six months I just used my residual limbs to rotate in a circle on my mattress and just hope to go back to sleep, because being awake sucked." Levi T4-193. Mr. Haines, who served in the military for almost 30 years, testified regarding the "emotional and psychological tailspin" he experienced about nine years after his attack, after he left the military. Haines T4-173-74. Mr. Williamson also described the struggle he continues to endure upon transitioning to civilian life after his attack:

Yeah, basically I took about seven years to regain my sanity and try to be a regular civilian afterwards. … That was probably the most difficult thing I've ever dealt with aside from the physical injuries were the mental stuff. So it's still a daily struggle for me.

Williamson T4-152-153.

## 2.     TBIs Contribute to EFP Victims' Psychological Injuries

As discussed *supra* at 117-18, TBI from blasts has been termed the "signature injury" of the Iraq and Afghanistan conflicts, PX-161 at 4; PX-163 at 12, and EFPs "result in particularly devastating cases of TBI." PX-161 at 5. Also as previously discussed, exposure to a single mild TBI can cause PTSD, clinical depression, and other cognitive and psychiatric disorders due to injury to specific brain networks. PX-161 at 50-54; Marmar T3-118-119. In fact, Dr. Gore specifically confirmed that "there's no question that these networks are overlapping and these conditions are linked," Gore T4-23, which Dr. Marmar corroborated by testifying that TBI commonly co-occurs with PTSD and clinical depression "because of injury during TBIs to emotion control centers in the brain, which are mostly in the front of the brain, and then variable other side effects of what we call post-concussive syndrome." Marmar T3-118; PX-163 at 14.

## 3.     Chronic Pain Contributes to EFP Victims' Psychological Injuries

The chronic pain suffered by an EFP victim described above also contributes to his or her psychological injuries. Dr. Phelps testified that common psychological responses to chronic pain include anxiety and depression. PX-160 at 56-57. On this point, Plaintiffs described the pain they continue to endure years after their attacks.

Mr. Bartlett, injured by an EFP on May 3, 2005, testified:

I'll be in pain the rest of my life. I have nerve damage to my face. My face and my lips especially feel like they're on fire. They're burning right now. It's like a tingly burning feeling all the time. I have the same on parts of my hands and then my side here too as well where they put a chest tube in to drain off the blood from when my lung collapsed.

Bartlett T2-65.

Mr. Levi, injured by an EFP on March 17, 2008, rated his pain on a typical day "[a]s much as five is the average of 10 and one, five. Because sometimes it's 10, sometimes it's one. About half though each side. So about average five." Levi T4-194.

Mr. Williamson, injured by an EFP on May 9, 2008, described how he still avoids putting pressure on his injured arm:

> Basically just general discomfort is always going on in my arm. But if I were to set my arm on say like a table or something like that, I basically have the screws pushing into my bone still. And the plate kind of overlaps my elbow, so it's basically like – I don't put a lot of pressure on my right arm basically.

Williamson T4-151-152.

Mr. Canine, injured by an EFP on May 17, 2009 described the pain he endures from wearing his prosthetics:

> But if I wear [prosthetics] longer than 12 hours, I start to have some breakdown, skin breakdown where I get a rash where the liners are.  I start to get hot spots where the residual limb contacts the socket which becomes extremely painful. And my hips and my back start to tighten up, and I start getting pain in my back and my neck. If I overdo it, I won't be able to walk the next day.

Canine T4-128.

### 4. EFPs' Traumatic Injuries Contribute to EFP Victims' Psychological Injuries

As discussed above, Plaintiffs' medical experts testified that EFPs were engineered to produce "the most devastating and catastrophic injuries in modern combat." PX-160 at 7. The U.S. Army and its medical personnel had never before witnessed the types and extent of injuries as those produced by EFPs. Dr. Phelps T5-157-159.

Dr. Marmar described how these particularly traumatic visible injuries caused by EFPs can result in traumatic invisible injuries:

> If a person has been attacked, a war fighter is attacked by an EFP, and it has damaged their face and hands, they literally cannot escape the triggers because the trauma is imprinted on their disfigured body. So every morning when they shave or every morning when they get up or every time they shake hands with another person can be a triggering reminder of their trauma, because the trauma is imprinted on the body.

Marmar T3-106.

Mr. Canine confirmed how his prosthetics trigger reminders of his attack on a daily basis:

> Wearing the legs every day is just a constant reminder of the attack, the things that I went through and the constant struggles that I'm going to be facing that day and in the future. It's just a painful reminder that I have to put on every day.

Canine T4-130-131.

Mr. Williamson also described how he feels the two plates and 16 screws every time he rests his right arm on a table, and how he takes anxiety medications to go to school. Williamson T4-151-153.

### E.     The Medical Evidence Presented Concerning Injuries Caused by EFPs Warrants the Application of a Distinct Baseline for Damages

Based on the testimony by Plaintiffs and their medical experts, Plaintiffs respectfully request that this Court award baseline amounts for certain injuries sustained as a result of EFP attacks as follows:[43]

| | |
|---|---|
| Psychological injuries (<u>without</u> TBI diagnosis/severe shrapnel/ fractures/orthopedic injuries/polytrauma) | Baseline: $2 million Range: $1.5 - $8 million |
| Mild TBI with psychological injuries (<u>without</u> severe shrapnel/fractures/ orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million Range: $3 - $7 million |
| Mild TBI with psychological injuries (<u>with</u> severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million Range: $4 - $10 million |

---

[43]     For those injuries that are not included or encompassed in the proposed framework, Plaintiffs respectfully submit that the existing framework developed by the Court should continue to be used for guidance.

| Mild TBI with psychological injuries (with polytrauma/traumatic amputations) | Baseline: $15 million<br>Range: $10 - $20 million |
| Moderate/severe TBI (without severe shrapnel/fractures/orthopedic injuries/ polytrauma/traumatic amputations) | Baseline: $20 million<br>Range: $15 - $25 million |
| Moderate/severe TBI (with severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million<br>Range: $25 - $50 million |

These baselines would serve as a guide to Special Masters appointed by this and other courts which must assess the specific injuries of individual service members injured by EFPs.

### F.     The Baseline Awarded for Psychological Injuries Should be Increased Based on EFPs' Unique Effects

| Psychological injuries (without TBI diagnosis/severe shrapnel/ fractures/orthopedic injuries/polytrauma) | Baseline: $2 million<br>Range: $1.5 - $8 million |

While the baseline award for psychological injuries without physical injuries is $1.5 million, *see Peterson II*, 515 F. Supp. 2d at 56, courts may grant upward departure awards to plaintiffs whose psychological injuries are significantly severe and lasting. *See, e.g., Campuzano*, 281 F. Supp. 2d at 275 (awarding $7 million in damages to plaintiff who suffered severe psychological injuries, but no physical injuries, as a result of a terror attack). Plaintiffs propose that the Court increase the baseline for psychological injuries to $2 million. As described *supra* at 147, EFP victims are at unique risk for psychological injuries for a number of different reasons, including the medical necessity of evacuating EFP victims from their units in contravention of standard military protocol, Phelps T5-155-157, the devastating TBIs caused by EFPs, PX-161 at 5, which, in turn, can cause psychological injuries, PX-161 at 50-54; Marmar T3-118-119, and the particular chronic pain and traumatic injuries imparted by EFPs which trigger psychological responses and injuries. PX-160 at 56-57, Marmar T3-106. Also as described *supra*, survivors of EFP attacks suffering from PTSD do not benefit greatly from treatment, as evidenced in studies

monitoring the effects of medication and behavioral therapy on veterans with PTSD. Marmar T3-109-110.

Plaintiffs further respectfully request that this Court deem increased awards for certain psychological injuries warranted and expand the upward departure range from the $7 million awarded in *Campuzano* to $8 million for the most severe cases where no major physical injuries have been diagnosed but the victim's psychological injuries are severe.

### G.   Previous Damages Awarded for Mild TBI Should Be Increased Based on New Medical Understanding of EFPs' More Lethal Effects

Courts have, in certain cases, awarded upward departures to victims with readily diagnosable brain injuries characterized by such indicia as skull fractures. *See, e.g.*, *Blais*, 459 F. Supp. 2d at 49-51, 59 (awarding pilot in the U.S. Air Force with diagnosis of severe axonal brain injury, anoxic brain injury, and organic encephalopathy $20 million); *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 62, 75 (D.D.C. 2006) (awarding plaintiff in terrorist bombing whose brain was "crushed" by broken bones and shrapnel and who suffered large right occipital lobe brain hematoma $11 million); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 12-13 (D.D.C. 2001) (awarding plaintiff with cranial fracture from terrorist bus bombing $12 million). In determining compensation in these cases, the courts had the benefit of medical expert testimony describing the severity of the plaintiffs' brain injuries and their implications. *See Blais*, 459 F. Supp. 2d at 50; Plaintiffs' Proposed Findings of Fact and Conclusions of Law, *Haim*, 02-cv-01811 (D.D.C. Jan. 3, 2006), ECF No. 23 at 43, 55, 59; *Mousa*, 238 F. Supp. 2d at 7.

However, in cases with allegations describing or suggesting TBI but lacking in these more severe TBI indicia, awards do not appear to reflect the serious, life-long consequences of mild TBI. For instance, in one case, two plaintiffs with severe back and leg injuries and diagnosed—but unsupported by expert testimony—TBIs were awarded the baseline $5 million. *Akins v. Islamic*

*Republic of Iran*, 332 F. Supp. 3d 1, 21, 24, 41 (D.D.C. 2018). Where evidence suggests TBIs likely sustained but plaintiffs failed to allege them, courts have (understandably) granted awards that evidently did not consider the likely TBIs. Thus, in *Peterson II*, two plaintiffs with head injuries—but who also suffered symptoms of TBI including chronic headaches and severe emotional issues—received, respectively, a downward departure of $3 million for less serious physical injuries and the baseline $1.5 million for no physical injuries. *See, e.g.*, *Peterson II*, 515 F. Supp. 2d at 55, 56.[44]

Several factors have contributed to the variations in ways the courts have assessed TBI victims. The first is that courts can only consider what has been presented to them in the record and – as noted *supra* – the medical record presented has varied significantly from case to case. The second factor is that even in cases where medical testimony has been presented concerning TBI, it has generally not been comprehensive. The final factor is that courts have not been presented with the most up-to-date scientific and medical studies and findings over the past decade discussed *supra*, which have improved the medical community's understanding of mild TBI and its long-term consequences. The law has not caught up yet with scientific developments in this field.

Dr. Gore specifically demonstrated that "[m]ild TBI is now widely considered a misnomer of medical parlance because it not only affects a person's cognitive and physical abilities for longer than previously thought; it has also been linked to increased risk of neurodegenerative disease, including Parkinson's disease, Alzheimer's, and CTE, and increased rates of mortality and

---

[44]     *See* Special Master Reports, No. 01-cv-02094, ECF No. 158 at 4, 8 (awarding $3 million to plaintiff who "was knocked unconscious" and "dazed because of a head wound that was bleeding profusely" from the blast, and who continued to suffer chronic, "excruciating" headaches); and ECF No. 195 at 5, 7-8 (awarding baseline $1.5 million for emotional damages, despite allegations that plaintiff suffered from nightmares, alcoholism, and violent temper and outbursts, while concluding that he "suffered no physical injuries").

suicide." PX-161 at 64. Furthermore, epidemiological studies show increased mortality rates even after mild TBI from these disorders and suicide. Gore T4-26; PX-161 at 54-55. As noted *supra* at 123, in most cases, rehabilitation from even mild TBIs focuses on *adaptation* to disability, using exercises to encourage functional brain areas to compensate for injured areas, and compensation for injury by teaching strategies to lessen the impact of disabilities. Gore T4-49-50; PX-161 at 43.

Accordingly, Plaintiffs respectfully request that this Court increase the baseline damages for mild TBI caused by EFPs to reflect both the previously underestimated effects of mild TBI, as well as the unprecedented severity of mild TBIs imparted by EFPs.

### 1. The Baseline for Mild TBI With Psychological Injuries Only Should Be Set at $5 Million

| Mild TBI with psychological injuries (underline severe shrapnel/fractures/ orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million Range: $3 - $7 million |
|---|---|

There is no current baseline for mild TBI (where no other serious physical injuries have been sustained) and Plaintiffs respectfully request the establishment of a $5 million baseline for such injuries. *Brewer* provides a useful illustration for Plaintiffs' request. There, plaintiff Richard Paul Brewer (a U.S. Marine) was standing on the balcony of the second floor when a bomb was detonated outside of the U.S. Embassy Annex building in Lebanon in 1984. *See Brewer*, 664 F. Supp. 2d at 47. Mr. Brewer was physically injured – he lost consciousness twice and sustained numerous cuts, contusions, and lacerations, *see id.* at 48 – but the Court focused primarily on his psychological injuries. A year after Mr. Brewer returned home, he felt anxious, depressed, and jittery. Like Mr. Canine, Mr. Brewer isolated himself, became dependent on alcohol, and divorced his wife. Canine T4-126. Like Mr. Bartlett, Mr. Brewer could not stop thinking about the friends he lost in the terrorist attack. Bartlett T2-67. He found work as a detective, but was forced to resign from his job because of his inability to control his "dangerous or inappropriate" impulses. He

continued to drink heavily and struggled to resist impulses to use his firearm inappropriately. *See id*. at 48.

Mr. Brewer ultimately found new work as a high school history teacher, remarried and had two children, but still suffered from depression, excessive drinking, nightmares, lack of impulse control, inability to concentrate, headaches, and ringing in his ears. *See id.* at 49. He was diagnosed with PTSD approximately ten years after his attack; he sought serious treatment for PTSD over twenty years after his attack. *See id.* Mr. Brewer also displayed symptoms of TBI, which, as Plaintiffs' medical experts testified, can cause PTSD. PX-161 at 51; Marmar T3-118-19. Just as the Plaintiffs testified that they struggle with their psychological injuries even years after their attacks, Williamson T4-153; Bartlett T2-63-64; Canine T4-131, the court noted that Mr. Brewer's psychological injuries would continue to persist. *See id*. at 49. Mr. Brewer was awarded $7 million in damages. *See id*. at 57. Using Mr. Brewer's case as a benchmark, both his symptoms and his persistent suffering are a common result of mild TBI, despite the emphasis on Mr. Brewer's PTSD over his TBI. *See id*. at 49 ("He suffers from constant back pain and migraine headaches although these physical ailments are secondary to the psychological stress he continues to endure."); Expert Witness Report of Edgar Garcia-Rill, Ph.D., Case 1:08-cv-00534 (D.D.C. Aug. 6, 2009), ECF No. 19-6 at 5 ("While PTSD is the primary disorder present in this case, repeated diagnoses of dysthymic disorder (similar to depression), depression, tinnitus, and TBI are made in the medical record."). Of course, symptoms in some cases are milder and in others prove even more severe than those reported by Mr. Brewer, However, his case is closer to the statistical mean for EFP survivors with mild TBI. Accordingly, Plaintiffs respectfully request that this Court accordingly establish a baseline of $5 million for mild TBI caused by EFPs, with a range of $3 million to $7

million, depending on the persisting effects each Plaintiff's TBI and psychological injuries have on their lives.

### 2. The Baseline for Mild TBI With Psychological Injuries and Other Serious Physical Injuries Should Be Set at $7 Million

| | |
|---|---|
| Mild TBI with psychological injuries (<u>with</u> severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million<br>Range: $4 - $10 million |

Plaintiffs respectfully request a $7 million baseline for those Plaintiffs who suffer from mild TBI with psychological injuries in conjunction with other serious physical injuries, for two reasons.

*First*, Courts have awarded at least $5 million in cases of severe physical injuries (as are often present with EFP victims), *not* including TBI. For example, a suicide bombing victim in *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200 (D.D.C. 2008) was awarded $5 million for his shrapnel injuries and a fracture which left him with a slightly misshapen arm. *See id*. at 207, 212-13. "Nuts, bolts, and other objects penetrated his body in various places creating wounds that were ultimately left open to allow the objects to surface. The metal objects often surfaced in a different location than where they penetrated, thus creating multiple entrance and exit wounds over time." *Id*. at 212-13. *See also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (awarding $5 million to victim in a suicide bombing attack who suffered shrapnel wounds in his legs, forehead, face, and scalp, a fractured left tibia, and ruptured eardrums); *Peterson II*, 515 F. Supp. 2d at 54 (awarding serviceman who suffered compound fracture of his right leg, injuries to the toes on his left foot, and shrapnel wounds $5 million). More serious physical injuries (again, *not* including any discussion of TBI diagnoses) of these types have merited increased awards. *See, e.g.*, *Harrison*, 882 F. Supp. 2d at 37, 49 (awarding $7.5 million to

U.S. Navy member who suffered fractures to both knees, hearing loss, and severe lower back trauma and who could no longer lift over 100 pounds).

*Second*, Plaintiffs submit that the severe shrapnel and orthopedic injuries caused by EFPs alone merit increased baseline awards of greater than $5 million, pointing to the Plaintiffs' and experts' testimony describing the particular lethality of shrapnel produced by EFPs' engineering design, PX-160 at 16; Haines T4-166-68; Levi T4-194; Canine T4-127, the unprecedented phenomenon of EFP blasts injecting human and potentially toxic alloy shrapnel into their victims, PX-160 at 17-18; Andersen T2-110; PX-162 at 13, and the frequent complications faced by EFP victims suffering from orthopedic injuries, including heterotopic ossification. PX-162 at 10-12; Andersen T2-94-98; PX-160 at 50-52. Plaintiffs respectfully request that the Court establish a $7 million baseline for these types of serious physical injuries when accompanied by mild TBI, with a range of $4 million to $10 million that will provide flexibility to the Special Masters depending on the particular circumstances of each case.

### 3. The Baseline for Mild TBI With Psychological Injuries and Polytrauma/Traumatic Amputations Should Be Set at $20 Million

| Mild TBI with psychological injuries (with polytrauma/traumatic amputations) | Baseline: $15 million Range: $10 - $20 million |
|---|---|

Plaintiffs respectfully request that the Court establish a baseline of $15 million for Plaintiffs who sustained mild TBI and polytrauma or traumatic amputations, such that the Special Masters can adjust each award as necessary. Setting a higher baseline is consistent with the upward departure awards granted by courts to victims who suffered amputations as a result of blast injuries, which can serve as a guide when awarding damages to those who suffered from amputations caused by EFPs. *See, e.g.*, *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 187 (D.D.C. 2013) (awarding $7 million to U.S. service member who "suffered particularly horrific injuries" during the bombing of the U.S. Embassy in Beirut when his arm and leg were crushed by

debris and ultimately had his leg amputated); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 22-23 (D.D.C. 2002) (awarding $10 million to victim of terrorist bus bombing whose legs had to be amputated after bus bombing).

In the attacks implicated here, issues of mild TBI and physical injuries unique to EFPs warrant setting the baseline above these upward departure figures. For instance, Plaintiffs' medical experts testified as to how EFP attacks frequently destroy soft tissue, muscle, nerves and arteries, leaving patients with chronic pain that is extremely difficult to manage. Andersen T2-106-08; PX-160 at 34-35. EFP attacks are also more likely to cause complications of heterotopic ossification not discussed in prior cases as a condition possibly attendant to traumatic amputations, as well as the particular set of complications with regard to infection and biological and chemical contamination posed by EFP shrapnel injuries. PX-162 at 10-13; Andersen T2-94-98; PX-160 at 17-18, 50-52.

Plaintiffs believe a baseline of $15 million is warranted when the victim suffering from blast-induced amputations and/or polytrauma also has to contend with mild TBI. Polytraumatic injuries certainly fall within the category of a victim who "suffered relatively more numerous and severe injuries," previously warranting upward departure awards of $7.5 - $12 million. *Valore*, 700 F. Supp. 2d at 84. These amounts, which are comparable to the $7 and $10 million awarded to the amputee victims in *Estate of Doe* and *Weinstein*, respectively, merit increases when the victims are also suffering from mild TBI because the injuries sustained are not only lifelong in duration, but the combination of severe physical injuries (and attendant medical complications), severe and chronic pain, and brain injury makes daily functionality, let alone successful treatment, extremely challenging – at best.

### 4.      The Baseline for Moderate/Severe TBI Should Be Set at $20 Million

| Moderate/severe TBI (without severe shrapnel/fractures/orthopedic injuries/ polytrauma/traumatic amputations) | Baseline: $20 million Range: $15 - $25 million |
|---|---|

Plaintiffs respectfully request the establishment of a $20 million baseline, with a range of $15-$25 million, for Plaintiffs suffering from moderate to severe TBI without other, severe physical injuries, permitting Special Masters to adjust this figure as needed. This baseline is consistent with the upward departure granted by the Court to the plaintiff in *Blais* ($20 million amount awarded after receiving testimony from an expert neurologist on the severity and effects of Mr. Blais' brain injury). *See Blais*, 459 F. Supp. 2d at 50, 59. Ten years after the Khobar Towers bombing, Mr. Blais continued to suffer from diminished motor skills, short-term memory impairment, trouble with writing and reading, impaired vision, problems with speech, balance, coordination, and tolerance for frustration and impulse control, moderate cognitive impairment, depression, several suicide attempts in the early years after his injury, PTSD, and survivor's guilt. *See id*. at 50-51, 59. These symptoms encompass some of the functional losses noted *supra* as symptoms of moderate and severe brain injuries, depending on the areas of the brain that were injured. Other activities at risk after a moderate to severe brain injury can include control of heart rate, breathing, and swallowing. PX-161 at 45-46. Accordingly, Plaintiffs respectfully request that the Court apply a range of $15 - $25 million depending on the severity of the TBI symptoms suffered by the Plaintiffs in this case.

### 5.    The Baseline for Moderate/Severe TBI With Other Physical Injuries Should Be Set at $30 Million

| Moderate/severe TBI (<u>with</u> severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million Range: $25 - $50 million |
| --- | --- |

Plaintiffs respectfully request that the Court establish a $30 million baseline for those Plaintiffs who have suffered serious physical injuries *in addition* to moderate/severe TBI, with a range of $25-$50 million. Plaintiffs' assessment is predicated on the $20 million amount awarded for a moderate to severe TBI in *Blais*, and the $5 - $7.5 million awards granted to victims who sustained serious (non-polytraumatic) orthopedic injuries, or the $7 - $10 million amounts awarded to victims who sustained traumatic amputation victims described above. That baseline and range is appropriate because of the combination of severe physical injuries (and attendant medical complications), severe and chronic pain, and severe, debilitating brain injury, which almost certainly requires the victims to require significant long-term 24 hour, 7 days a week care and assistance.

## V.    CONCLUSIONS OF LAW

### A.    Basis of Jurisdiction Under FSIA

#### 1.    Jurisdiction over Iran and the IRGC is premised on 28 U.S.C. §§ 1330(a), 1331 and 1605A

The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions in which a federal district court can obtain personal and subject matter jurisdiction over a foreign state. *See e.g.*, *Owens*, 826 F. Supp. 2d at 135, *aff'd, Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017). Under the FSIA, a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance

with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. §§ 1330(a), 1604.

The "Terrorism Exception" to the FSIA, first enacted as part of the Mandatory Victim's Restitution Act of 1996 and substantially expanded by section 1083 of the National Defense Authorization Act for Fiscal Year 2008, authorizes causes of action against foreign state sponsors of terrorism for "personal injury or death" arising from acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support for those acts. 28 U.S.C. § 1605A(c). Here, this Court has jurisdiction because service was proper and Defendant's conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A.

### 2.        Service of Process/Personal Jurisdiction

Under the FSIA, a court may exercise personal jurisdiction over a defendant if the state is properly served in accordance with 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b); *Stern*, 271 F. Supp. 2d at 298. This Court has already found that Plaintiffs effected service on Iran pursuant to § 1608(a). *See* Apr. 19, 2017 Order, at 3, ECF No. 31 ("Iran is deemed to have been served on December 18, 2016" "pursuant to section 1608(a)(3)."). Specifically, the Court noted that Section 1608(a) provides four means of serving a foreign state that must be attempted in order until service is completed. The first two options were unavailable to Plaintiffs, as they require a relevant international agreement between the U.S. and Iran. 28 U.S.C. § 1608(a)(1), (2). The Court found that Plaintiffs satisfied the third option because the Clerk of the Court, at Plaintiffs' request, a copy of the summons, complaint, and notice of suit, each translated into Farsi, to the head of Iran's ministry of Foreign Affairs, and that the delivery was made and signed for by someone at the ministry. *Id.* at 2-3. In that same order, the Court also found that Iran failed to answer the complaint

in the 60 days provided by section 1608(e) and affirmed the Clerk of Court's entry of default

against Iran on February 27, 2017, ECF No. 30. *Id.*

### 3.        Subject Matter Jurisdiction

Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific

statutory exceptions to immunity. *See* 28 U.S.C. §§ 1330(a), 1604. Here, Defendant's conduct falls

within the "state sponsor of terrorism" exception set forth at 28 U.S.C. § 1605A:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States . . . in any case . . . in which money damages are sought against a foreign
> state for personal injury or death that was caused by an act of torture, extrajudicial
> killing, aircraft sabotage, hostage taking, or the provision of material support or
> resources for such an act if such act or provision of material support or resources is
> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). To bring a suit in such a case, the foreign state defendant must have been

designated by the U.S. Department of State as a "state sponsor of terrorism" at the time the act

complained of occurred. *Id*; *Owens*, 826 F. Supp. 2d at 148-149. Moreover, subsection 28 U.S.C.

§ 1605A(a)(2)(A)(ii) requires that the "the claimant or *the victim* was, at the time the act . . .

occurred—(I) a national of the United States; (II) a member of the armed forces; or (III) otherwise

an employee of the Government of the United States . . . acting within the scope of the employee's

employment." 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III) (emphasis added).

Plaintiffs satisfy each of the requirements for subject matter jurisdiction. First, Iran was

designated as a State Sponsor of Terrorism at the time the attacks and abductions occurred.  Second,

Plaintiffs' injuries were caused by Defendant's acts of extrajudicial killing, torture, hostage

taking, and provision of material support for such acts to their agents. Third, Plaintiffs have

presented evidence that the victims in each of the bellwether attacks are (and were at the time of

the attacks) U.S. nationals or members of the U.S. armed services at the time they were killed or injured.[45]

### 4.      Iran Designated as a State Sponsor of Terrorism

Section 1605A applies only to SSTs, which it defines as "a country the government of which the Secretary of State has determined ... is a government that has repeatedly provided support for acts of international terrorism." 28 U.S.C. § 1605A(h)(6). Iran was a designated State Sponsor of Terrorism on January 19, 1984 (before all of the attacks alleged in the Second Amended Complaint occurred) and has remained so ever since without interruption. *See* PX-1 (current list of SSTs); *see supra* at 16. *See also Colvin v. Syrian Arab Republic*, No. 16-cv-1423 (ABJ), 2019 WL 416462, at *7 (D.D.C. Feb. 1, 2019).

### 5.      The FSIA Applies to Conduct Occurring Prior to Act's Enactment

The Terrorism Exception unequivocally applies to conduct, like Defendant's wrongdoing, that occurred prior to its enactment and the enactment of amendments to the Act. *See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 692-96 (2004); *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 181 (D.D.C. 2016). The Supreme Court in *Republic of Austria v. Altmann* held that the FSIA applies to pre-enactment conduct by foreign states, explaining: "we find clear evidence that Congress intended the Act to apply to preenactment conduct." 541 U.S. at 697. Courts in this Circuit have similarly held that section 1605A applies to conduct predating its 2008 enactment. "Section 1605A's limitations provision does permit plaintiffs to maintain an action for conduct that predated the new cause of action's enactment, allowing plaintiffs to assert

---

[45] Plaintiffs will present evidence as to the citizenship of the victims of the remaining attacks to the Special Master(s). A small number of claimants are not U.S. citizens, but they are immediate family members of victims who are. *See Owens*, 864 F.3d at 807 ("In sum, by its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant [Kenyan or Tanzanian family members] who is not the legal representative of a victim physically injured by a terrorist attack.").

a claim under subsection 1605A(c) so long as the action is brought not later than '10 years after April 24, 1996' or '10 years after the date on which the cause of action arose.'" *Flanagan*, 190 F. Supp. 3d at 181.

**B.    Extrajudicial Killing, Torture, Hostage Taking and Provision of Material Support**

Section 1605A(c) creates a federal cause of action for any "national of the United States," "member of the armed forces," U.S. government employee, or their legal representative for an act of "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such act" if the "claimant or the victim" was at the time the act occurred a U.S. citizen, a member of the Armed Forces or an employee of the United States which allows such person to collect "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c) (emphasis added).

**1.    Extrajudicial Killing**

The definition of "extrajudicial killing," at Section 1605A(h) follows the definition set forth in the Torture Victims Protection Act of 1991. *See* 28 U.S.C. § 1605A(h)(7). "Extrajudicial killing" is defined as: [1] "a deliberated killing [2] not authorized by a previous judgment pronounced by a regularly constituted court [3] affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and [4] that, "under international law," is not "lawfully carried out under the authority of a foreign nation." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C. § 1605A(h)(7). *See Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1050 (D.C. Cir. 2014) ("With respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

As this Court has held, the term "extrajudicial killing" encompasses attempted extrajudicial killings. *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (holding that a terrorist group's "attempted extrajudicial killing of the plaintiff constitutes an extrajudicial killing under the terrorism exception."). Moreover, where a killing has occurred, "[i]t is not necessary . . . for one of the plaintiffs [themselves] to have died in the attack in order for the state-sponsor-of-terrorism exception to apply." *Id.* (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).

Each of the bellwether attacks involved an actual death as an act of extrajudicial killing, and each of the remaining attacks alleged in the Second Amended Complaint involved acts of extrajudicial killing or attempted extrajudicial killing. As explained at length above, EFPs are designed to kill. *See supra* at 49 ("That's all it takes . . . . And everybody's dead." (quoting Barker T3-32.)). Likewise, Iran's goal, and the goal of its proxies and agents, was to kill U.S. service members. *See supra* at 63 ("The [Sheibani] network's first objective is to fight U.S. forces, attacking convoys and killing soldiers." (quoting PX-8)).

## 2. Torture

"Torture" is defined as: "[1] any act, [2] directed against an individual in the offender's custody or physical control, [3] by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, [4] is intentionally inflicted on that individual [5] for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C.

§ 1605A(h)(7). One Plaintiff's decedent, Steven Vincent, was kidnapped, then beaten, before being killed.

### 3.     Hostage Taking

Plaintiffs' evidence shows that three of Plaintiffs' decedents were taken hostage within the meaning of the FSIA. Section 1605A(h)(2)'s "definition of 'hostage taking' incorporates the definition from Article 1 of the International Convention Against the Taking of Hostages . . . and that definition applies to a person who 'seizes or detains and threatens to kill, to injure or to continue to detain another person.'" *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 16 (D.C. Cir. 2015); 28 U.S.C. § 1605A(h)(2). The kidnapping of four U.S. service members during the January 20, 2007 attack on the Karbala PJCC, as well as the kidnapping of Steven Vincent, constitutes "hostage-taking" under the FSIA.

### 4.     Provision of Material Support

Plaintiffs have satisfied their burden under 28 U.S.C. § 1608(e) to show that Iran, through Hezbollah, the IRGC and the IRGC-QF, provided vast amounts of material support and resources to Iran's terror proxies in Iraq that carried out the attacks at issue at Iran's behest. The definition of "material support or resources" in Section 1605A is drawn from the Anti-Terrorism Act, 18 U.S.C. § 2339A, and is defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

The FSIA requires that the extrajudicial killings, torture, and hostage taking be "caused by" the provision of material support. In the FSIA context, the causation requirement is satisfied by a showing of proximate cause. *See e.g.*, *Flanagan*, 190 F. Supp. 3d at 177 (citing *Kilburn v.*

*Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-28 (D.C. Cir. 2004)). "Proximate causation normally requires only that there be 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Id.* (citing *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984); *accord Kilburn,* 376 F.3d at 1128 (citing same)). Neither specific intent nor advanced knowledge by the foreign state of a terrorist act is required for a finding that a state sponsor of terrorism provided "material support" under the FSIA's terrorist exception. In *Owens v. Republic of Sudan*, the D.C. Circuit explicitly rejected the argument that the FSIA requires a "greater showing of intent than proximate cause." *Owens*, 864 F.3d at 798.

As set forth above, Iran provided material support and resources to Hezbollah and each of its Iraqi proxies in the form of financial support, training, weapons, intelligence, and safe harbor. This qualifies as property, currency, financial services, lodging, training, expert advice and assistance, safehouses, weapons and explosives under 18 U.S.C. § 2339A.

C.      **Federal Cause of Action**

Section 1605A(c) creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person. All of the bellwether Plaintiffs are U.S. nationals, as are all but one of the remaining Plaintiffs. One Plaintiff, the widow of a U.S. citizen and service member killed in an EFP attack, is not a citizen. Her claim is cognizable under D.C. law, *see Fritz*, 320 F. Supp. 3d at 9 (applying D.C. law to non-citizen plaintiff's claim where plaintiff was related to a U.S. service member killed by Iranian-backed terrorists); *Owens*, 826 F. Supp. 2d at 155 (applying D.C. law to foreign national family members of victims of terrorist attacks). Plaintiffs will further support the application of D.C. law to her claim when presenting the relevant evidence to the Special Master(s).

**CONCLUSION**

For the foregoing reasons, the Court should enter judgment in favor of the bellwether Plaintiffs and against Defendant Iran. Plaintiffs also respectfully request that the Court (1) establish the framework for EFP-related injuries set forth above and (2) refer the bellwether Plaintiffs' damages claims and the remaining Plaintiffs' liability and damages claims to one or more special masters for preparation of reports and recommendations consistent with the Court's opinion.


Dated: February 26, 2019

Respectfully Submitted,

OSEN LLC

By:    /s/ Gary M. Osen_____

Gary M. Osen (DC Bar No. NJ009)
Ari Ungar (DC Bar No. NJ008)
Michael J. Radine (DC Bar No. NJ015)
Dina Gielchinsky (DC Bar No. NJ011)
William A. Friedman (DC Bar No. NJ012)
Naomi Weinberg (DC Bar No. NJ006)
Aaron Schlanger (DC Bar No. NJ007)
2 University Plaza, Suite 402
Hackensack, NJ 07601
Tel. (201) 265-6400

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Tel. (501) 791-2277

*Attorneys for Plaintiffs*