UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TIMOTHY KARCHER, *et al.*,
      Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN,
      Defendant.

Civil Action No. 16-00232 (CKK)

**MEMORANDUM OPINION AND ORDER**
(May 27, 2025)

**I. INTRODUCTION**

This Memorandum Opinion addresses the Special Master's [231] Sealed Report and Recommendation Regarding Damages as to injuries sustained by 43 Plaintiffs.[1] These Plaintiffs comprise estates or family members of thirteen decedents who were killed in attacks that utilized Explosively Formed Penetrators ("EFPs"), for which Defendant Islamic Republic of Iran ("Iran") and its proxies bear responsibility.[2] *See Karcher v. Islamic Republic of Iran*, Civil Action No. 16-232, 2021 WL 133507 (Jan. 14, 2021) (discussing in detail the circumstances surrounding the attacks on these thirteen decedents). That opinion is incorporated by reference herein. The Special Master's Report and Recommendation addresses the following categories of damage awards: (1)

---

[1] A redacted version of the Report and Recommendation shall be filed by Plaintiffs. This Memorandum Opinion and Order is not being filed under seal as it does not disclose any confidential information.

[2] Special Master Report, ECF No. 231, addresses claims related to decedents Clay P. Farr, Carlos H. Saenz, John Vacho, Robert H. West, Isaac Lawson, Brandon Stout, Colby J. Umbrell, Kyle Little, Raymond N. Spencer, Robert McRill, Jonathan Menke, Kenneth W. Mayne, and Tony J. Gonzales.

conscious pain and suffering damages for two estate Plaintiffs; (2) economic loss damages for seven estate Plaintiffs, including damages relating to funeral expenses for one of those estate Plaintiffs; and (3) solatium damages by multiple Plaintiffs, who are close family members of the thirteen decedents.[3] Having considered the Report and Recommendation of the Special Master – which is both detailed and supported by references to the record – as well as the Plaintiffs' [234] Notice of Non-Objections to the Special Master's Report and Recommendation, the Court ADOPTS the Special Master's recommended damages awards. A separate consolidated Order and Judgment will be issued subsequently.

## II. PROCEDURAL BACKGROUND

After holding a three-day bench trial, on August 26, 2019, the Court granted default judgment against Iran as to the claims of multiple Plaintiffs injured in bellwether attacks and the claims of Plaintiffs representing individuals killed in the bellwether attacks. *See* Orders, ECF Nos. 93 & 105; *see* Aug. 26, 2019 Mem. Op., ECF No. 94 and Sept. 11, 2019 Mem. Op., ECF No. 106 (incorporated by reference herein). The Court made no finding regarding damages for any of those bellwether Plaintiffs but instead appointed Alan Balaran, Esq. as a Special Master to prepare reports and recommendations on damages for these Plaintiffs. *See* Sept. 9, 2019 Order and Admin. Plan, ECF No. 102. Before the Special Master's reports and recommendations had been completed, the Court ordered Mr. Balaran to include his findings on non-economic damages for

---

[3] Plaintiffs claiming solatium damages are as follows: Carrol Alderete; Patrick Farr; Chad Farr; Anthony Alderete; Silver Farr; Nanette Saenz; John Vacho; Estate of Carol Vacho; Ashley Vacho Leslie; Jeanette West; Shelby West; Suzzettee Lawson; Chiara Lawson; Tracy Anderson; Jeffrey Anderson; Nancy Umbrell; Mark Umbrell; Shelley Ann Smith; Raymond Nigel Spencer, Sr.; Sylvia Johnson Spencer; Katherine McRill-Fellini; Brett Coke; Brian Coke; Daniel Menke; Paula Menke; Nichole Lohrig; Matthew Menke; Michelle Benavidez; Daniel Benavidez; Christina Biederman; Jennifer Morman; Daniel Benavidez, Jr.; Marlynn Gonzales; Tony Gonzales; Tamara Runzel; and Megan People.

eight non-bellwether Plaintiffs who were injured in EFP attacks for which the Court subsequently found Iran liable.  *See* Jan. 14, 2021 Order, ECF No. 125; *see also* Jan.14, 2021 Order granting default judgment; Jan. 14, 2021 Sealed Mem. Op. (incorporated by reference herein) (addressing 73 non-bellwether attacks).

Mr. Balaran's reports and recommendations were filed under seal, ECF Nos. 146-148, and after an objection by the Plaintiffs – regarding the methodology employed to calculate EFP damages – the Special Master revised his EFP Damages Matrix, *see* ECF No. 169 (proposed modification).  Plaintiffs filed their [170] Notice of Non-Objection, and the Court issued its [171] Memorandum Opinion and [172] Order adopting the analysis and [revised] damages calculations. Thereafter, this Court appointed four additional Special Masters "to administer damages proceedings for the Plaintiffs in this case [who were] awarded default judgment, [but] who were not part of this Court's remit to Mr. Alan L. Balaran."  Oct. 3, 2024 Order and Admin. Plan, ECF No. 179, at 1.  The four Special Masters were directed to provide their Reports and Recommendations on a rolling basis.  *Id.* at 3.  Special Master Letten's Report and Recommendation – which is the subject of this Memorandum Opinion and Order – addresses claims made "by forty-three (43) Plaintiffs implicated in the 73 attacks for which the Court found the Defendant, the Islamic Republic of Iran, Liable [.]" Report and Recommendation, ECF No. 231, at 8.

**III. DISCUSSION**

As a preliminary matter, Special Master Letten noted that this Court has jurisdiction over Plaintiffs' claims insofar as all the direct victims of the attacks were either "member[s] of the armed forces" or "employee[s] of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's

3

employment," and furthermore, "all family member Plaintiffs are United States citizens." Report and Recommendation, ECF No. 231, at 11: *see* 28 U.S.C. §1605A(a)(2)(A)(ii) (regarding subject matter jurisdiction).

As noted herein, this Court has determined previously that Iran was liable for Plaintiffs' injuries under 28 U.S.C. § 1605A(c). Pursuant to Section 1605A(c), Plaintiffs' damages "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "Under the FSIA, a 'foreign states shall be liable in the same manner and to the same extent as a private individual under like circumstances.' Therefore, plaintiffs are entitled to the typical array of compensatory damages that may be awarded against tortfeasors in the plaintiffs' respective domiciliary states." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007) (quoting 28 U.S.C. §1606). In this case, therefore, "[t]he only remaining questions, therefore, are what type of damages Plaintiffs are entitled to recover and in what amounts." *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 59 (D.D.C. 2018).

In the instant case, Plaintiffs' claims for damages may be categorized as follows: (1) conscious pain and suffering brought by the Estates of Plaintiffs Saenz and Lawson; (2) economic loss brought by the Estates of Plaintiffs Farr, Saenz, Vacho, West, Lawson, Umbrell, and Mayne; (3) solatium claims brought by family members of the thirteen deceased victims; and (4) punitive damages. The issue of punitive damages was not referred to the Special Master; rather, Plaintiffs have requested punitive damages in their [8] Amended Complaint and through their [191] Motion in Support of Punitive Damages, which was granted by this Court. *See* Memorandum Opinion, ECF No. 196 (incorporated by reference herein) (awarding punitive damages, which are to be computed by multiplying each Plaintiff's compensatory damages by three). Accordingly, punitive damages for the 43 Plaintiffs addressed in this Opinion and Order will be calculated subsequently,

in a manner consistent with this Court's Memorandum Opinion, ECF No. 196. The Court turns now to the Special Master's recommendations regarding Plaintiffs' other claims for damages.

### A. Damages for Conscious Pain and Suffering

In this case, the Estates of Plaintiffs Saenz and Lawson requested damages for conscious pain and suffering. When assessing damages for pain and suffering, there is "no recovery" where "death was instantaneous," *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000). Based on the circumstances and timing of their deaths after their injuries were incurred – as verified by eyewitness accounts – that bar is inapplicable to claims by the Estates of Plaintiffs Saenz and Lawson. Plaintiffs requested, and the Special Master recommended, that the Estates of Carlos Saenz and Isaac Lawson each be awarded $1 million for conscious pain and suffering. The Special Master noted that courts have awarded $1 million to victims who experienced conscious pain and suffering for seconds before their deaths. *See, e.g., Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 234 (S.D.N.Y. 2003) (awarding $1 million on behalf of a victim who was leaving the South Tower of the World Trade Center on September 11, 2001, when the second plane struck the building, creating the possibility that he experienced pain and suffering when it happened). Victims who survived a few minutes to a few hours after the bombing typically receive an award of $1 million. *Elahi*, 124 F. Supp. 2d at 113. Furthermore, "estates of direct victims can also recover for the pain and suffering endured" by the victim. *Fritz*, 324 F. Supp. 3d at 60. The Court agrees with the Special Master's recommended award of $1 million in damages for conscious pain and suffering for the Estates of Carlos N. Saenz and the Estate of Isaac S. Lawson.

**B. Economic Loss Damages**

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*. 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (citing 28 U.S.C. § 1605A)(c)). Plaintiffs may prove economic losses through submission of a forensic expert's report. *Id*. at 49, *see Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) ("The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case.") The Special Master first must examine the methodological soundness of the calculations, with the idea that "mathematical exactitude is often impossible," *Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *11 (D.D.C. May 31, 2020). Then, the Special Master may examine "reasonableness and foundation of the assumptions relied upon by the experts. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015), to protect against "speculation, contingency, or conjecture." *Bova*, 2020 WL 2838582, at *11.

Throughout his Special Master Report and Recommendation, Special Master Letten documented the two expert reports by Wayne Plumly, Jr., Ph.D. and Steven A. Wolf, CPA, CFE, ABV/CFF, ASA that he utilized in support of calculating Plaintiffs' economic loss claims. Both economic experts are well-qualified, and both have previously provided expert reports on economic losses in numerous terrorism cases, where such loss calculations derived therefrom have been adopted by courts, including this Court. Based on a review of the record in this case, the Court finds these calculations and assumptions made by the forensic economist experts in their reports to be reasonable. Nor have Plaintiffs objected to any of the economic loss calculations. Accordingly, the economic loss damages recommended by the Special Master in his Report and

6

Recommendation on behalf of the Estates of Plaintiffs Farr, Saenz, Vacho, West, Lawson, Umbrell, and Mayne are approved by this Court.

The Court notes that, as part of its claim for economic loss damages, the Estate of Isaac Lawson requested reimbursement of unreimbursed funeral expenses, including prejudgment interest, in the total amount of $27,312.50. Funeral expenses may be awarded as part of economic damages pursuant to Section 1605A(c), along with prejudgment interest. *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 160-61 (D.D.C. 2019); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (same). Regarding prejudgment interest, the Special Master explained that "[t]his Circuit has held that an appropriate measure of what rate to use when calculating prejudgment interest is 'the prime rate for each year, *i.e.*, the rate banks charge for short-term unsecured loans to credit-worthy customers.'" Report and Recommendation, ECF No. 231, at 54 (quoting *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C. Cir.), *cert den.*, 519 U.S. 1028 (1996)). Accordingly, considering the applicable case law, the Court adopts the Special Master's recommended calculation of funeral expenses with prejudgment interest, which is included in the claim for economic damages made by the Estate of Isaac Lawson.

### C. Solatium Damages

A claim for solatium is "a claim for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Belkin*, 667 F. Supp. 2d at 22 (citation omitted). Under the state-sponsored terrorism exception to the FSIA, "the award of solatium damages to the close relatives of terrorism victims" is expressly contemplated. *Fritz*, 324 F. Supp. 3d at 61-62 (citing 28 U.S.C. § 1605A(c)). It is presumed that "family members in direct

7

lineal relationship suffer compensable mental anguish[.]" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (internal quotation marks omitted).

Judges in this District Court have employed "a general framework for the calculation of proper damage awards in FSIA cases" based on principles articulated in the *Heiser* case. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) (citing *Heiser v. Republic of Iran*, 466 F. Supp. 2d at 269-270). Under this general framework, spouses of deceased victims receive $8 million; parents and children receive $5 million; and siblings receive $2.5 million. *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F. Supp. 2d 25, 52 (D.D.C. 2007); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006). "Spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings," and "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser*, 466 F. Supp. 2d at 269 (internal quotation marks omitted).[4]

Non-adoptive stepparents may be awarded damages equivalent to biological parents if they had a relationship with the victim that was functionally the same as biological parents such as living in the same household while the victims were minors and treating the children the same as their own, financially, emotionally, and socially. *Heiser*, 659 F. Supp. 2d at 29; *see also Valore*, 700 F. Supp. 2d at 79-80 (finding non-adoptive stepfather entitled to damages where he considered the victim to be his son and vice versa, and where the victim and stepfather acted as a natural

---

[4] "Relatives of surviving servicemen receive[ ] awards valued at half of the awards to family member of th[ose] deceased[.]" Murphy *v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010); *see also Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 14 (D.D.C. 2014) (finding that, for the immediate family members of a victim injured by terrorists, courts typically adhere to the following scale: "$4 million, $2.5 million, $1,5 million, and $1.25 million to spouses, parents, children and siblings, respectively." (quotation omitted)).

family).  The test used by courts in this District for granting solatium awards to "immediate family members of a direct victim. . . even if they are not legally or biologically related" is one of "functional equivalen[cy]."  *Cabrera v. Islamic Republic of Iran*, No. 18-cv-2065 (JDB), 2023 WL 3496303, at *5 (D.D.C. May 16, 2023) (internal citations omitted), adhered to, No. 18-cv-2065 (JDB); *see also Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ("the D.C. Circuit has recognized that 'immediate family members' may include 'members of the victim's household' who are 'viewed as the functional equivalents of immediate family members.'") (citing *Betts v. Islamic Republic of Iran,* 315 F.3d 325, 335 (D.C. Cir. 2003)).  Damages may be awarded to both a parent and a stepparent of a victim, *see, e.g., Fritz v. Islamic Republic of Iran*, 15-cv-456 (RDM), 2018 WL 5046229, at *22 (D.D.C. Aug. 13, 2018), as well as to stepchildren who still maintained relationships with their biological father, *see, e.g., In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-1570 (GBD)(SN), 2016 U.S. Dist. LEXIS 144325, at *300-302 (S.D.N.Y. Oct. 14, 2016), report and recommendation adopted sub. nom. *In re Terrorist Attacks on Sept. 11, 2001,* No. 03-mdl-1570 (GBD)(SN), 2016 U.S. Dist. LEXIS 151675 (S.D.N.Y. Oct. 31, 2016).

      The Court notes that there is some inconsistency in the amounts awarded to children of deceased victims with $3 million indicated as the amount to be awarded in cases such as *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012) (based on the same amount awarded in *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 301 (D.D.C. 2003)); *see also Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27-28 (D.D.C. 2014) (finding that '[a]wards of $3 million to the children of deceased victims are typical . . . [while] [c]hildren of a surviving victim receive $1.5 million on average.") (citation omitted).  In contrast, $5 million was awarded for children of a deceased servicemember in *Heisner*, 466 F. Supp. 2d at 318, and *Oveissi*, 768 F.

9

Supp. 2d at 26, and in *Peterson II*, 515 F. Supp. 2d at 51-52 (where $2.5 million was established as the award for children of a <u>surviving</u> servicemember).

In *Mwila*, the court recognized this inconsistency and stated that:

> Courts in this district have differed somewhat on the proper amount awarded to children of victims. *Compare Peterson II*, 515 F. Supp. 2d at 51 ($2.5 million to child of injured victim), with *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 14 (D.D.C. 2012) ($1.5 million to child of injured victim). The Court finds the *Peterson II* approach to be more appropriate: to the extent such suffering can be quantified, [insofar as] children who lose parents are likely to suffer as much as parents who lose children.

*Mwila*, 33 F. Supp. 3d at 44-45. Reviewing the case law on solatium damages, this Court finds appropriate awards of solatium damages to immediate family members of victims killed by terrorists in the amounts of $8 million, $5 million, $5 million, and $2.5 million, to spouses, parents, children, and siblings, respectively.[5]

The Special Master's recommended solatium damage awards that correspond to this formula are adopted by this Court. The Court further finds appropriate the Special Master's recommended damages of $5 million to Silver Farr (stepmother to Clay Farr), *see* Report and Recommendation, ECF No. 231, at 27 (agreeing that Silver functioned as the equivalent of Farr's biological mother as the two considered each other mother and son and shared the same household since Farr was 16) and $5 million to Jeffrey Anderson (stepfather to Brandon Stout), *see id.* at 66-67 (finding that Anderson satisfies the functional equivalent of Stout's father and considered himself as such). Furthermore, the Court finds appropriate the recommended damages of $5 million to Brett and Brian Coke (stepsons to Robert McRill, who were four and three years old,

---

[5] "Siblings of half-blood to the servicemen in this case are presumed to recover as a full-blooded sibling would - - that is, they are entitled to $2,5 million. . ." *Peterson II*, 515 F. Supp 2d at 52.

10

respectively, when their mother married McRill) based on the close nature of the familial relationships between McRill and his stepsons.

In six cases, the Special Master's recommended solatium damages deviate from this aforementioned formula, but those deviations are well-supported by the facts and circumstances in the record. The Court notes that "[t]hese [solatium] numbers . . . are not "set in stone," *Murphy*, 740 F. Supp. 2d at 79, but instead are "goalposts," and "courts should deviate depending on the circumstances." *Fritz*, 324 F. Supp. 3d at 62 (citation omitted). "A court's job in a solatium case is to account for various facts and circumstances, and to use those factors to arrive at an appropriate numerical expression of total pain and grief —encapsulated in the solatium award." *Oveissi*, 768 F. Supp. 2d at 25. Upward departures may be warranted if there is "evidence establishing a particularly close relationship between the plaintiff and the decedent, particularly in comparison to the normal interactions to be expected given the familial relationship" or with "medical proof of severe pain, grief or suffering on behalf of the claimant" or if the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26-27. Downward departures are also possible where the relationship between the victim and family members is attenuated. *Valore*, 700 F. Supp. 2d at 87. The Court turns now to the departures recommended by the Special Master.

In two cases, the Special Master's recommended solatium damages deviate downward, but these downward deviations are consistent with the Plaintiffs' requested damages. The Special Master recommended an adjusted award of $500,000 in solatium damages for Anthony Alderete, stepfather to Clay Farr, and an adjusted award of $4.5 million in solatium damages to Daniel Benavidez, stepfather to Kenneth Mayne. The Special Master recommended these downward departures based on the circumstances surrounding the relationships between these Plaintiffs and

11

the victims, and the Court agrees with those recommendations. In the case of Anthony Alderete, the Special Master noted that "Plaintiffs acknowledge[s] that Anthony knew SPC Farr for about a year as a child, when Anthony was not yet married to Carrol, and then for about three years after SPC Farr and Carrol reconnected in 2003," Report and Recommendation, ECF No. 231, at 24, and while he mourned the loss of things they might have done in the future, "Anthony describe[d] primarily how SPC Farr's death affected his wife and their marriage." *Id.* In the case of David Benavidez, the Special Master indicated that Benavidez married Mayne's mother when Mayne was thirteen and that the two had a close familial relationship insofar as they went fishing, camping, and attended sporting events together; they conversed for hours; and Benavidez attended Mayne's parent-teacher conference and theatrical performances. Report and Recommendation, ECF No. 231, at 112-113. The Special Master noted also that the final time the two saw each other was the first time Mayne called Benavidez "dad" to "his face." *Id.* at 113. Based on the circumstances of these relationships, as described by the Special Master, the Court agrees with these two downward departures (that are consistent with the damages claimed by Plaintiffs).

The Special Master recommended four adjustments that all vary upward by $500,000.00 from the damages claimed by Plaintiffs - $4 million for Paula Menke (stepmother to Jonathan Menke); $3 million for Nichole Lohrig (sister to Jonathan Menke); $3 million for Matthew Menke (stepbrother to Jonathan Menke); and $3 million for Sylvia Johnson Spencer (stepmother to Raymond Spencer). Regarding Paula Menke, the Special Master found that she became Jonathan's stepmother when he was 14 years old and considered him to be her son, as his biological mother "barely had any contact" with him. Report and Recommendation, ECF No. 231, at 97-98. Paula picked Joanathan up from school and took him to practices, watched his baseball and football games and theater performance, and they enjoyed making cookies and talking about fashion

12

together. *Id.* at 95-96. The family "ate dinner together every night, followed by family game night." *Id.* at 96. The Special Master recommended, and this Court agrees with, an upward adjustment to $4 million in solatium damages for Paula Menke based on the nature of her bond with Jonathan, the frequency of their contacts, the 8-year duration of the relationship as "virtual mother and child," and the lasting effects of Jonathan's death on Paula. *Id.* at 98-99.

Regarding Johnathan Menke's sister, Nichole Lohrig, who was four years older than him, the Special Master noted the "extraordinarily close emotional bond [between the two], including the[ir] deep emotional dependence on one another." *Id.* at 102. Nichole considered her brother to be her best friend based on "their shared childhood loss of their older half-brother, which brought the two closer together for the rest of their lives," and she indicated that they would spend hours talking, laughing, and crying together. *Id.* at 103. The Special Master also considered the magnitude of the effect of Jonathan's death on Nichole's life and well-being. *Id.* Accordingly, for these reasons, the Court agrees with the Special Master's upward adjustment to $3 million in solatium damages for Nichole Lohrig.

Regarding Matthew Menke, the 8-year younger stepbrother of Jonathan Menke, the Special Master explained that Mathew regarded Jonathan as his "big brother and best friend," and that Jonathan was "everything [Matthew] wanted to be." *Id.* at 104. Jonahan taught Matthew to ride a bicycle and play basketball; they bonded over a love of football, and Matthew sought his advice about talking to girls. *Id.* Matthew was in eighth grade when Jonathan died, and he had a hard time dealing with all the attention following his brother's death while experiencing feelings of guilt about living life when his brother was gone. *Id.* at 105. The Special Master recommends an upward departure to $3 million in solatium damages for Matthew Menke, based on the nature of

13

his relationship with Jonathan and the aftereffects of Jonathan's death, and this Court agrees with that upward departure.

Regarding Sylvia Johnson Spencer, the Special Master indicated that Sylvia dated Raymond's father when Raymond was ten, and she became Raymond's stepmother when he was thirteen, and she loved Raymond and his sister as if they "were [her own] kids." Report and Recommendation, ECF No. 231, at 81. As rationale for the recommended upward departure, the Special Master noted that:

> [Raymond] and Sylvia became very close and by all accounts, spent as much time together as in a traditional mother-child relationship. In addition to routinely going for walks, to moves, playing games, or going on day trips to the zoo — even while SPC Spencer was deployed in the army, Sylvia routinely sent him care packages which included hot chocolate, candy, and cookies. Perhaps most importantly, Slyvia considered SPC Spencer as her son, and after his death became a member of the Gold Star Program. Because of their close relationship, she was so affected by SPC Spencer's death that she indicates that despite trying to move forward from her stepson's passing, "the pain is always there."

Report and Recommendation, ECF No. 321, at 83. For these reasons, this Court finds warranted the Special Master's upward departure to $3 million in solatium damages for Sylvia Johnson Spencer. Accordingly, the Court agrees with the Special Master's recommended solatium damages for Plaintiffs Carrol Alderete; Patrick Farr; Chad Farr; Anthony Alderete; Silver Farr; Nanette Saenz; John Vacho; Estate of Carol Vacho; Ashley Vacho Leslie; Jeanette West; Shelby West; Suzzettee Lawson; Chiara Lawson; Tracy Anderson; Jeffrey Anderson; Nancy Umbrell; Mark Umbrell; Shelley Ann Smith; Raymond Nigel Spencer, Sr.; Sylvia Johnson Spencer; Katherine McRill-Fellini; Brett Coke; Brian Coke; Daniel Menke; Paula Menke; Nichole Lohrig; Matthew Menke; Michelle Benavidez; Daniel Benavidez; Christina Biederman; Jennifer Morman; Daniel Benavidez, Jr.; Marlynn Gonzales; Tony Gonzales; Tamara Runzel; and Megan People.

## IV. CONCLUSION

The Court acknowledges Plaintiffs' efforts to hold Iran responsible for the acts of terror that resulted in injury and/or death to persons serving in the military and/or working for the Government and appreciates that there is no amount of money that can truly compensate the servicemembers/civilians and members of their family. Based on the explanation set forth herein, the Court finds Defendant responsible for the injuries sustained by Plaintiffs and liable under the FSIA's state-sponsored terrorism exception for damages based on economic loss, conscious pain and suffering, and solatium. Accordingly, it is this 27th day of May 2025,

ORDERED that the court ADOPTS the Report and Recommendation by Special Master Letten. After the Court reviews the proposed damages chart provided by Plaintiffs, which calculates punitive damages in accordance with the formula used by the Court in its [196] Memorandum Opinion, the Court will issue its Order and Judgment, with a damages chart attached thereto.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE