**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TIMOTHY KARCHER, *et al.*,

        Plaintiffs,

    v.

ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Civil Action No. 16-232 (CKK)

**MEMORANDUM OPINION**
(June 3, 2026)

Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), on February 12, 2016, over 300 Plaintiffs filed this lawsuit against Defendant Islamic Republic of Iran ("Iran"). The three-count Amended Complaint in this action seeks relief with reference to United States nationals and/or United States servicemembers who were injured or killed by Iran and/or its agents in Iraq, during the period of 2004 through 2011. Such relief is sought on behalf of surviving victims, the estates of victims who were killed, and the family members of both. *See* Am. Compl., ECF No. 8, ¶¶ 1161–74.

The Court previously held a bench trial addressing Iran's liability for some of Plaintiffs' claims derived from seven "bellwether" attacks involving Iran, where six such attacks involved Iranian-manufactured explosively formed penetrators ("EFPs"). Following that bench trial, on August 26, 2019, this Court made findings of fact and conclusions of law pertaining to Iran's liability arising out of these bellwether attacks, which included a template for the future assessment of Plaintiffs' remaining claims, including those attacks involving EFPs. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019). Then, on September 9, 2019, the Court appointed Special Master Alan Balaran to administer damages proceedings for the bellwether Plaintiffs. Order and Administrative Plan, ECF No. 102.

On January 14, 2021, this Court found Iran responsible for an additional 73 EFP attacks, which implicated the claims of: (1) eight Plaintiffs who were personally injured in one of the attacks, (2) thirty-four Plaintiffs representing the estates of individuals killed in one of the attacks, and (3) two-hundred and twenty-seven (227) Plaintiffs seeking solatium damages as a family member of a victim of one of the attacks. *Karcher v. Islamic Republic of Iran*, Civil Action No. 16-232, 2021 WL 133507 (D.D.C. Jan. 14, 2021). The Court granted default judgment on liability against Iran on the claims of the eight Plaintiffs personally injured in one of the non-bellwether attacks, and the thirty-four Plaintiffs representing the estates of individuals killed by one of those attacks but did not – at that time – make any ruling regarding the damage claims of the 227 "family-member" Plaintiffs, which arose out of the seventy-three non-bellwether attacks. On January 14, 2021, the Court issued an Order broadening the scope of Special Master Balaran's appointment to include recommended findings of fact and conclusions of law regarding non-economic damages for the eight Plaintiffs injured in the non-bellwether EFP attacks. Order, ECF No. 125.

Special Master Balaran's recommended damages were largely adopted by this Court in its December 7, 2023 Memorandum Opinion, which incorporated the Plaintiff's amendments and corrections to the Special Master's Report and Recommendation. Those damages related to four Plaintiffs who were injured in attacks not involving EFPs, as well as damages for conscious pain and suffering for three estate Plaintiffs, economic damages, and solatium damages. Memorandum Opinion, ECF No. 159; Order and Judgment, ECF No. 160. Separately thereafter, Special Master Balaran developed – and this Court approved – a modified template for the award of damages in cases in which EFPs were utilized. *See generally* June 7, 2024 Memorandum Opinion, ECF No. 171 (addressing the damages in the modified Report and Recommendation, to which Plaintiffs did

2

not object, and adopting the analysis and damage calculation for the five Plaintiffs addressed therein); Order and Judgment, ECF No. 172.

Subsequently, the Court referred the remaining claims by Plaintiffs – for whom a liability determination had been made and the *Borochov* "standard" was met – and by Plaintiff family members – who were claiming a loss of solatium – for determination of damages by four additional Special Masters. *See* Order and Administrative Plan Governing Four Additional Special Masters, ECF No. 179 (indicating that the Special Master would also address Plaintiffs' statutory standing under 28 U.S.C. § 1605A(c)). The *Borochov* "standard" refers to a March 2024 decision by the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), in an FSIA case, whereby the D.C. Circuit concluded that there was no subject matter jurisdiction, pursuant to Section 1605A, where "the perpetrator did not kill anyone in the attack that injured the [Plaintiffs], [and therefore] no extrajudicial killing occurred." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1060 (D.C. Cir. 2024). Furthermore, the D.C. Circuit opined that "Section 1605A's test does not support expanding the material-support provision to cover attempted but uncompleted extrajudicial killings," *id.* at 1063.[1]

Following rolling receipt and review by the Court of multiple Reports and Recommendations submitted by those four Special Masters, this Court adopted those Reports and Recommendations in a multitude of opinions and issued Orders and Judgments on damages. *See generally* ECF Nos. 197, 205, 225, 237, 242, 245, 254, and 281 (Orders and Judgments).

Now pending before this Court is Plaintiffs' [142] Submission of Eleven Attacks Not Yet Adjudicated ("Submission"). Plaintiffs request that this Court find Iran responsible for an additional ten attacks, which implicate the claims of: (1) two Plaintiffs who were personally injured

---

[1] This ruling contrasted with the approach taken previously by judges from this District.

in one of the attacks  (2) two Plaintiffs representing the estates of individuals killed in one of the attacks, and (3) thirty-five Plaintiffs seeking solatium damages as a family member of a victim of one of the attacks.  *See* Status Report, ECF No. 141; *see also* List of the 41 Plaintiffs in Response to the Court's February 21, 2025 Minute Order ("List"), ECF No. 202.[2]  Plaintiffs' Submission initially addressed eleven attacks and forty-one Plaintiffs; however, after filing it, Plaintiffs requested that this Court hold in abeyance a liability ruling regarding the March 30, 2008 attack [which implicates claims by two Plaintiffs]. . . until further legal and factual issues resulting from the *Borochov* decision are resolved."  *See* Plaintiffs' Notice of New Authority, ECF No. 165, at 5.

Accordingly, this Memorandum Opinion addresses Iran's liability for ten attacks, which implicates claims by thirty-nine Plaintiffs.  Consistent with prior procedures in this case, once liability is established, the damage determinations for these Plaintiffs shall be handled by the appointed Special Masters.

## I. BACKGROUND

This Court incorporates by reference its prior opinions on liability.  In summarizing proceedings leading up to the present decision, the Court will reiterate extensively from those

---

[2] The two Plaintiffs who were injured are George D. White and John McCulley.  The estate claims relate to Plaintiff Estate of Steven Vincent and Plaintiff Estate of Jeffery Hartley.  Others killed in action were Robert Arsiaga, Blake Harris, Emanuel Pickett, Stephen Scott, Stuart Wolfer, Adam Marion, Mark Stone, Cody Eggleston; and Daniel Drevnick. The Plaintiffs claiming solatium damages are as follows: Tracie Arsiaga; Sylvia Macias; Gilbert Arsiaga, Jr.; George Arsiaga; Matthew Arsiaga; Angel Munoz; Robi Ann Galindo; the Estate of Jeremy Arsiaga (brother of Robert Arsiaga); Lisa Ramaci; Isabell Vincent; Charles Vincent; Anne F. Harris; Paul D. Harris; Merlese Pickett; Harry Cromity; Rachel M. Gillette; Rebekah Scott; Leonard Wolfer; Esther Wolfer; David Hartley; Pam Marion; Donnie Marion; Adrian McCann; Don Jason Stone; Angie Jackson; Kaytrina Jackson; Shilyn Jackson; Kenneth J. Drevnick; Natalia White; Kristin White (identified previously as K.W.); George J. White; Edna Luz Burgos; Stephanie McCulley; Tarron McCulley (identified previously as T.M.)**;** and Ryan McCulley (identified previously as R.M.)

opinions, with minor modifications to avoid disclosing the small amount of information that was redacted in the public version.

### A. Service and Entry of Default

Plaintiffs purported to effectuate service on Iran via diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4).  After Iran failed to respond, they sought entry of default, which was entered by the Clerk's Office.  *See* ECF Nos. 16-18.  Plaintiffs thereafter moved for default judgment, but the Court denied that motion without prejudice to permit Plaintiffs to demonstrate the grounds for proper service.  Nov. 15, 2016 Order, ECF No. 22.

Plaintiffs supplied further justification for their attempt to serve Iran under Section 1608(a)(4), while also asking the Clerk of Court to facilitate service on Iran's Minister of Foreign Affairs under Section 1608(a)(3).  *See generally* ECF Nos. 23-27.  At Plaintiff's request, the Clerk again entered a default against Iran once proof of service under Section 1608(a)(3) was returned and Iran failed to respond within the statutory time.  *See* ECF Nos. 27-30; 28 U.S.C. § 1608(c)(2), (d).  The Court determined subsequently that Plaintiffs had properly effectuated service.  Apr. 19, 2017 Mem. Op. and Order, ECF No. 31.

### B. Pretrial Proceedings

Through a series of Orders, the Court elicited Plaintiffs' views regarding facilitation of proceedings in the default setting.  *See id.* at 4; Scheduling and Procedures Order, ECF No. 32; Min. Order of May 15, 2017; Pretrial Scheduling and Procedures Order, ECF No. 39.  Based on that briefing, and discussion on the record with Plaintiffs, the Court decided to hold a three-day bench trial regarding a subset of attacks that Plaintiffs proposed as "bellwethers."  In the Court's Phase I bellwether proceedings, Plaintiffs presented evidence as to jurisdiction, liability, and at

least an aspect of damages.  *See* Min. Orders of June 18, 2018, and July 17, 2018.  After liability was established, one or more Special Masters would conduct Phase II bellwether proceedings to complete damages determinations and make reports and recommendations to the Court.  *See* Min. Orders of June 18, 2018, and July 17, 2018.  Thereafter, the Court would issue further instructions regarding non-bellwether proceedings.  *See* Min. Order of July 17, 2018.

### C. Bench Trial

The Court held a bench trial on December 3, 4, and 6, 2018.  During the three-day trial, Plaintiffs presented evidence regarding seven bellwether attacks - six attacks in Baghdad or the vicinity, which allegedly involved EFPs, and a seventh attack—on the PJCC in Karbala—which involved more conventional weapons.  Plaintiffs put on a total of 19 witnesses, consisting of 8 fact witnesses and 11 expert witnesses.  The fact witnesses consisted of the following five military servicemember Plaintiffs who were injured in the bellwether attacks: Robert Bartlett, Robert Canine, David Haines, Chris Levi, and Wesley Williamson.  The other fact witnesses were Kelli Hake, a Plaintiff and the widow of servicemember Christopher Hake, who was killed in a bellwether attack; Colonel (Ret.) Kevin Farrell, a non-Plaintiff witness of the attack that injured Mr. Bartlett; and then-First Lieutenant Rusty Mason, a non-Plaintiff witness of the attack that killed Mr. Hake.

Of the expert witnesses, seven spoke to liability issues consisting generally of Iran's role in Iraq, Iran's relationship with its Lebanese and Iraqi proxies, the weapons they used in Iraq, and the U.S. military's efforts to respond.  The liability experts were Captain (Ret.) Donald Wade Barker; Colonel (Ret.) Leo E. Bradley III; Dr. Matthew Levitt; Colonel (Ret.) Kevin Lutz; Russell McIntyre; Lieutenant General (Ret.) Michael L. Oates; and Michael P. Pregent.  Because the Court cites extensively herein to expert testimony, the Court shall reiterate its summary of some relevant

qualifications of those liability experts and identify the topics as to which the Court found them to be qualified.  *See* Fed. R. Evid. 702.[3]

<u>Liability Experts</u>

- <u>Captain (Ret.) Donald Wade Barker</u> performed counter-IED research and development at Georgia Tech after leading counter-IED units of the U.S. Army in Iraq, Afghanistan, and the United States.  Expert Rep. of Capt. (Ret.) Donald Wade Barker, PX-158 ("Barker Rep."), Ex. 1; *see also* Barker T3-6:19-10:7.[4]  The Court qualified Mr. Barker as an expert in "[improvised explosive devices ("IEDs")], EFPs and counter-IED technology."  Barker T3-10:8-12.

- <u>Colonel (Ret.) Leo E. Bradley III</u> commanded U.S. Army units in Iraq, Afghanistan, and the United States that were responsible for explosive ordnance disposal ("EOD") and/or counter-IED initiatives.  Expert Rep. of Colonial Leo E. Bradley III, U.S. Army (Retired), PX-156 ("Bradley Rep."), Ex. A; Bradley T2-7:14-9:24.  The Court found Mr. Bradley qualified to serve as an expert as to "U.S. military EOD operations and IED investigations."  Bradley T2-12:9-13.

- <u>Dr. Matthew Levitt</u> directs a counterterrorism and intelligence program at the Washington Institute for Near East Policy and previously served in related roles at the Federal Bureau of Investigation and the U.S. Departments of State and the Treasury.  Expert Rep. of Dr. Matthew Levitt, PX-154 ("Levitt Rep."), Ex. A; *see also* Levitt T1-15:5-26:5.  The Court found Dr. Levitt qualified to address "Iran's role as a state sponsor of terrorism, Iran's Islamic Revolutionary Guard Corps, or IRGC; the Islamic Revolutionary Guard Corps Qods Force, or IRGC-QF; Hezbollah; and those entities' support and training of the Special Groups in Iraq."  Levitt T1-26:6-14.

- <u>Colonel (Ret.) Kevin Lutz</u> established and commanded the U.S. military's Combined Joint Task Force Troy ("Task Force Troy") in Iraq and led other counter-IED and EOD units of the U.S. Army. Expert Rep. of Col. (Ret.) Kevin Lutz, PX-159 ("First Lutz Rep."), Ex. A; *see also* Lutz T5-6:18-15:2.  The Court found Mr. Lutz qualified to address "the use of explosive devices, including IEDs and other ordnance, by transnational terrorist organizations and specifically the tactics,

---

[3] Certain subjects that the experts discussed appeared to be "common knowledge" amongst those who study recent conflicts involving Iran and Iraq.  For example, several of the experts discussed Iranian proxies in Iraq.  However, the Court found their reports and/or testimony to be credible as to any such topics for which it cited them.

[4] Citations to testimony from the bench trial shall use the following format: "name T#-page(s):line(s)," i.e., witness name, transcript volume, and then page number(s) and line(s) thereon.

techniques and procedures used by terrorist groups in Iraq between 2003 and 2011." Lutz T5-15:4-11.

- Russell McIntyre has held intelligence roles that include but are not limited to serving with Multi-National Corps-Iraq in a counter-IED cell. Expert Rep. of Russell L. McIntyre, PX-157 ("McIntyre Rep."), at 2 & Ex. A; *see also* McIntyre T5-59:10-64:15. The Court recognized Mr. McIntyre as an expert regarding "IED threats to [U.S.] forces, specifically in Iraq between 2003 and 2011, and with an additional focus on explosively formed projectiles or penetrators." McIntyre T5-64:16-22.

- Lieutenant General (Ret.) Michael L. Oates directed the U.S. military's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") and served in several U.S. Army leadership roles in, or concerning, Iraq during the relevant period. Expert Rep. of Lt. Gen. Michael L. Oates, United States Army (Ret.), PX-153 ("Oates Rep."), at 2; *see also* Oates T1-81:2-9, 81:25-86:8. The Court recognized Mr. Oates as an expert in "tactical and strategic threats faced by US and Coalition Forces in Iraq [from] 2003 to 2008 and including the specific threat to US military forces from IEDs and other ordnance, including EFPs." Oates T1-86:15-22.

- Michael P. Pregent performed intelligence roles for the United States Central Command Intelligence Directorate, Defense Intelligence Agency, and U.S. Army and currently serves as a senior fellow at the Hudson Institute, where he focuses on, among other things, counter-Iranian policy proposals. Expert Rep. of Michael P. Pregent, PX-155 ("Pregent Rep."), at 1-2; *see also* Pregent T5-165:15-173:2. The Court found that Mr. Pregent was qualified to testify regarding "intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field." Pregent T5-173:3-7.

In addition to the nearly one hundred pre-admitted exhibits, the Court admitted twenty-five more based on the witnesses' testimony. *See generally* Ex. List, ECF No. 68. Those exhibits consisted largely of the expert reports, as well as audiovisual and photographic evidence. Demonstrative exhibits also were used at trial but were not offered into evidence.

### D. August 26, 2019 Ruling & Post-Trial Proceedings

On August 26, 2019, the Court entered an order granting default judgment on liability against Iran as to the claims of certain Plaintiffs representing individuals killed or injured in the six bellwether EFP attacks addressed during the bench trial and one bellwether attack not involving

an EFP.  *See* Aug. 26, 2019 Order, ECF No. 93.[5]  In support of its August 26, 2019 Order, the Court made extensive findings of fact based on testimony presented at the bench trial, as well as a substantial amount of evidence submitted before and after the trial.  *See* Aug. 26, 2019 Mem. Op., ECF No. 94.  A portion of the Court's August 26, 2019 Findings of Fact were specific to Iran's material support for the six individual bellwether EFP attacks at issue during bench trial.  *See id.* at 27–54 (addressing the six bellwether EFP attacks in Baghdad).  The Court, however, also made detailed findings of fact regarding "Iran's relationship with Hezbollah and other proxy groups operating in Iraq" and "the nature and use in the Iraqi theater of EFPs, as an Iranian signature weapon."  *Id.* at 12 (quotation omitted).  The Court intended these findings of fact to provide a foundation for forthcoming liability analyses pertaining to the remaining non-bellwether  attacks raised in Plaintiffs' Amended Complaint.

On August 30, 2019, the Court held a teleconference on the record, and Plaintiffs addressed the future proceedings for the non-bellwether attacks raised in the Amended Complaint.  To facilitate the Court's liability analysis for the remaining EFP attacks, Plaintiffs first submitted a sample expert report from Col. Kevin Lutz, opining on Iran's liability for one of the non-bellwether EFP attacks.  *See* Pls.' Sept. 5, 2019 Rep., ECF No. 100.  As noted above, the Court had previously found Col. Lutz qualified as an expert to address "the use of explosive devices, including IEDs and other ordnance, by transnational terrorist organizations and specifically the tactics, techniques and procedures used by terrorist groups in Iraq between 2003 and 2011."  Lutz T5-15:4-11.  Accordingly, upon review of Plaintiffs' sample expert report from Col. Lutz, the Court permitted

---

[5] As noted previously, the Court appointed Special Master Balaran to administer damages proceedings for the bellwether Plaintiffs.  *See* Sept. 9, 2019 Order, ECF No. 102.

Plaintiffs to file additional expert reports regarding the remaining non-bellwether EFP attacks alleged in the Amended Complaint. Min. Order of Nov. 15, 2019.

Thereafter, Plaintiffs submitted a consolidated expert report from Col. Lutz addressing an additional seventy-two (72) of the non-bellwether EFP attacks in the Amended Complaint. *See* Dec. 11, 2019 Consolidated Expert Rep. of Col. (Ret.) Kevin Lutz ("Lutz Rep."), ECF No. 109–1. Plaintiffs also submitted to the Court an Evidentiary Appendix under seal containing the records considered and relied upon by Col. Lutz in arriving at the opinions set forth in his consolidated expert report. *See* Dec. 11, 2019, Pls.' Submission of Lutz Rep., ECF No. 109, at 1–2. Finally, Plaintiffs also filed a stand-alone "Section 1605A(c) Appendix" to accompany the Col. Lutz's consolidated expert report. *See id.* at 2.[6]

In assessing the seventy-three non-bellwether EFP attacks, the Court relied in part on its August 26, 2019 findings of fact regarding Iran's use of EFPs in Iraq, but the Court also made new findings of fact specific to Iran's role in each of the attacks in question, including whether an EFP was in fact responsible for each attack. The Court determined that Iran was liable under the FSIA for Plaintiffs' claims arising from the seventy-three non-bellwether attacks.

---

[6] Under the public records exception to the hearsay rule, "a record or statement of a public office" is admissible if it contains "a matter observed while under a legal duty to report" or "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8). "Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record' and '[o]nce proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 n.6 (D.D.C. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017)). Upon review, the Court finds that the each of the military records included within Plaintiffs' Section 1605A(c) Appendix is admissible under the Rule 803(8) public records exception. So too are those public records referenced in Col. Lutz's expert report and cited by this Court in its Findings of Fact below. *See* Fed. R. Evid. 803(8). The Court also makes these evidentiary findings in view of the D.C. Circuit's instruction that "courts have the authority—indeed . . . the obligation—to adjust evidentiary requirements to . . . differing situations," particularly in the context of FSIA default proceedings. *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (quotations omitted).

The Court proceeds in the same manner here in addressing Plaintiffs' [142] Submission relating to the remaining ten attacks, which consists of: (1) the consolidated expert report of Col (Ret.) Kevin Lutz, attached as Exhibit A; (2) the consolidated expert report of Russell L. McIntyre, attached as Exhibit B; (3) the expert report of Col. (Ret.) Joel Rayburn, attached as Exhibit C; (4) the expert declaration of Col. (Ret.) Nichoel "Nycki" Brooks, attached as Exhibit D; (5) a sealed Evidentiary Appendix containing the records considered and relied upon by the experts in arriving at the opinions set forth in the expert reports and declaration referenced above; and (6) a sealed "Section 1605A(c) Appendix" containing a small subset of documents to establish that a "victim" in each attack was a national of the United States or a member of the armed forces, attached as Ex. E.

The Court notes that Col. Kevin Lutz and Russell McIntyre have been previously qualified as liability experts, and their qualifications have been discussed in Section I.C. above.  Referencing their expert reports, the Court now briefly summarizes the qualifications of Plaintiffs' two additional proffered liability experts, Col.(Ret.) Joel Rayburn and Col. (Ret.) Nichoel Brooks.  The Court notes also the topics on which they have expertise.

- <u>Col. (Ret.) Joel Rayburn</u> served as a U.S. Army strategic intelligence officer on multiple deployments to Iraq from 2006-2008. Rayburn Expert Report (Professional Background), Ex. C ¶2.  Col. Rayburn continued to work on Iraqi issues after his 2008 redeployment to the United States, deploying to Iraq briefly in fall 2009 and again in September-October 2015 to lead a campaign assessment team for the then-commander of Combined Joint Task Force-Operation Inherent Resolve. ¶3.  Col. Rayburn also served as director of the U.S. Army's Operation Iraqi Freedom Study Group, which assessed the Army's involvement in Iraq from 2003-2011. ¶ 4. From January 2017 through July 2018, Col. Rayburn was on the National Security Council staff as the Senior Director for Iran, Iraq, Syria, and Lebanon, where he oversaw implementation of the U.S. government's policy concerning those countries. ¶5.  From July 2018 through January 2021, he served as Deputy Assistant Secretary of State for Near Eastern affairs, where he was responsible for Levant Affairs and served as the U.S. Special Envoy for Syria, with both roles requiring him to closely follow affairs in Iraq, engage with Iraqi counterparts, and travel to Iraq for diplomatic assignments. ¶ 6.

11

- Col. (Ret.) Nichoel "Nycki" Brooks served as an Intelligence Officer for the U.S. Army for 32 years, and after retiring from the Army in 2019, he joined Deloitte U.S. as a Specialist Leader in Strategy and Analytics. Brooks Decl., Ex. D ¶ 2. During his time with the Army, he served as Executive Officer to the J-2 Senior Intelligence Officer for the Multi-National Forces-Iraq from 2003-2005; as Director of the Analytic Center for MNF-1 from 2006-2007; and as Special Advisor to Commanding General, MNF-1 from 2007 to 2009. ¶ 4. Col. Brooks was one of the U.S. Army's leading subject matter experts on Shi'a militant groups that operated in Iraq between 2003 and 2011. *Id.* In 2009, Col. Brooks served as Commander of the 310th Military Intelligence Battalion, and after a fellowship, he was promoted in 2012 to the position of Executive Director of the Defense Intelligence Agency for the Director of National Intelligence. ¶ 5. Between 2013-2015, Col. Brooks served as the Commander of the National Ground Intelligence Center, and as J-2 Director of Intelligence for the Combined Joint Special Operations Command in Afghanistan. *Id.* In 2016, after returning stateside, he joined the U.S. Army Intelligence and Security Command – which conducts intelligence, security and information operations for U.S. Army commanders and partners in the Intelligence Community – in the position of Deputy Commander. ¶ 6.

The Court finds that both Col. Rayburn and Col. Brooks are qualified to serve as liability experts in this FSIA case involving attacks that occurred in Iraq during the period of 2004 through 2011.

## II. LEGAL STANDARD

Plaintiffs seek a default judgment against Iran for claims set forth in their Amended Complaint. The entry of default judgment is governed by Federal Rule of Civil Procedure 55. Where the damages sought from a defaulting party are not for a sum certain or are not readily susceptible to computation, "the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b). But even then, "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). In ordinary civil litigation, "[t]he determination of whether a default judgment is appropriate is committed to the discretion of the trial court." *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011) (citing *Jackson v. Beech*, 636

F.2d 831, 836 (D.C. Cir. 1980)); *see also* 10A Charles Alan Wright et al., Federal Practice & Procedure Civil § 2685 (4th ed.) (same).  Because "strong policies favor resolution of disputes on their merits[,] '[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson*, 636 F.2d at 836 (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)).

A plaintiff seeking default judgment must persuade the trial court that subject-matter jurisdiction and personal jurisdiction over the defendant are satisfied.  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016) (citing *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008)). Additionally, this Court cannot enter default judgment against a foreign state under the FSIA "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."), *cert. denied*, 542 U.S. 915 (2004).  "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d at 1044, 1047 (D.C. Cir. 2014), and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp. 3d at 33.

### III. FINDINGS OF FACT

This Court's Findings of Fact in this Memorandum Opinion proceed in two principal parts. First, the Court will reiterate many of its prior factual findings from its August 26, 2019 Memorandum Opinion, which recounted in detail the evidence proffered during a three-day bench

trial in this case.  *See* Aug. 26, 2019 Mem. Op., ECF No. 94.  These findings of fact addressed

Iran's relationship with Hezbollah and other proxy groups operating in Iraq as well as the nature

and use in the Iraqi theater of EFPs, an Iranian "signature weapon."[7]

Second, the Court will address how Iran's material support for its proxies and use of

conventional weapons and EFPs resulted in injuries to George D. White and John McCulley, and

the deaths of Robert Arsiaga, Steven Vincent, Blake Harris, Emanuel Pickett, Stephen Scott, Stuart

Wolfer, Jeffery Hartley, Adam Marion, Mark Stone, Cody Eggleston, and Daniel Drevnick. In so

doing, the Court will rely upon the entirety of the record evidence in this case, but with a focus on

Plaintiffs' evidence in support of its Submission.

### A. Iran's Material Support for Hezbollah and Other Proxies in Iraq

### 1. Iranian Interests in the Region

Shortly after Ayatollah Ruhollah Khomeini came to power as Supreme Leader, he

instituted what became known as the Islamic Revolutionary Guard Corps ("IRGC") to forestall

any "backsliding in implementing [his] vision for an Islamic theocratic government" in the Islamic

Republic of Iran.  McIntyre Rep. at 4–5; *see also* Levitt T1-27:9–12.  While the Iranian armed

forces would "protect the borders of Iran," the IRGC with its "parallel" military structure was

tasked with "protect[ing] the revolution."   Levitt T1-28:3–8 (observing that IRGC has its own

army, navy, and air force).   A subsidiary of the IRGC—the Qods Force, or IRGC-QF—is

responsible for its international operations, including training Muslim groups to support the

revolution through insurgency and terrorism.  McIntyre Rep. at 6; Levitt T1-27:18–21, 33:6–16

(likening the Qods Force to "the sharp end of [a] spear" when it comes to "Iran's extraterritorial

---

[7] Because at least one of the attacks at issue in this Opinion involved the use of EFPs, the Court
will recount part of its prior analysis regarding EFPs.

activities"). That subsidiary was led by General Qasem Soleimani, now deceased, who was a direct report to the second Supreme Leader of Iran, Ayatollah Sayyid Ali Hosseini Khamenei. McIntyre Rep. at 4–5; Oates Rep. at 11.

As a result of Iran's "support for acts of international terrorism," the United States designated Iran as a state sponsor of terrorism on January 19, 1984. State Sponsors of Terrorism, U.S. Dep't of State (Dec. 21, 2020), PX-1; *see also* McIntyre Rep. at 6 (attributing designation "in large part to the actions of the IRGC and later its Qods Force"); Levitt T1-27:16–17 (observing that designation has not been discontinued). Similar terrorism-related designations of the IRGC and IRGC-QF have followed more recently: the IRGC-QF on October 25, 2007, and the IRGC on October 13, 2017. *See* U.S. Dep't of Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (Oct. 25, 2007), PX-5 ("IRGC-QF Designation"), at 1, 3 (announcing designation of IRGC-QF under Executive Order ("E.O.") 13224 for supporting terrorist organizations); McIntyre Rep. at 3 n.1, 4 n.3 (recognizing this designation of IRGC-QF as "Specially Designated Global Terrorist"); U.S. Dep't of Treasury, Treasury Designates the IRGC Under Terrorism Authority and Targets IRGC and Military Supporters Under Counter-Proliferation Authority (Oct. 13, 2017), PX-6 (announcing designation of IRGC under E.O. 13224 for supporting IRGC-QF); McIntyre Rep. at 3 n.1 (recognizing this designation of IRGC as "Specially Designated Global Terrorist"); Levitt Rep. at 6 n.4 (same).

Dating at least to the Iran-Iraq War in the 1980s, the Shi'a Muslim regime in Iran sought to undermine Saddam Hussein's largely Sunni Muslim government by supporting Shi'a political groups in Iraq. *See* McIntyre Rep. at 14; Levitt Rep. at 16. These efforts escalated after the United States' Second Iraq War, opines Dr. Matthew Levitt, a former U.S. counterterrorism intelligence analyst:

> By forcing the collapse of Saddam Hussein's regime, Operation Iraqi Freedom removed Iran's greatest enemy and longtime nemesis. The 2003 invasion therefore provided Iran with a historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region. To that end Iran employed an "all elements of national power" approach in exploiting the outcome of this seminal event. This included both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies.

Levitt Rep. at 7. The United States' post-invasion presence in Iraq threatened Iran's opportunities, however, only reinforcing "the long-held Iranian desire to push the United States out of the Gulf region." *Id.* at 8. Iran accordingly pursued "a Shia-dominated and unified Iraq" while causing the United States "continued setbacks in [its] efforts to promote democracy and stability" there. Annual Threat Assessment of the Director of National Intelligence for the Senate Select Comm. on Intelligence (Feb. 2, 2006) ("Annual Threat Assessment"), PX-16, at 12.

Meanwhile, Iran had long exerted its influence in Lebanon, as well. Beginning in the early 1980s, IRGC shaped the development and military capabilities of Lebanese Hezbollah (herein, "Hezbollah"),[8] a militant Shi'a political party that wanted to oust Israeli forces from Southern Lebanon. McIntyre Rep. at 7–8. As the relationship between IRGC and Hezbollah grew, Hezbollah reciprocated by executing terrorist missions against Israeli and American targets at Iran's request, offering Iran "reasonable deniability" after the fact. Levitt T1-30:10–19; *see also* McIntyre Rep. at 7–8; Annual Threat Assessment at 13 (describing Hezbollah as "Iran's main terrorist ally" and "capable of attacks against US interests if it feels its Iranian patron is threatened").

### 2. Iran's Network of Influence in Post-Invasion Iraq

In order to bolster its influence in Iraq, and counter American efforts there, Iran continued to sponsor Shi'a political movements—now vying for control of the post-Hussein government—

---

[8] Elsewhere the Court shall distinguish an Iraqi Shi'a militia group known as Kata'ib Hezbollah.

16

while funding and facilitating the training of Shi'a militia groups, with Hezbollah's help. *See, e.g.*, Oates Rep. at 14–17. In the political sphere, the Da'wa Party, the Supreme Council for the Islamic Revolution in Iraq ("SCIRI"), and Muqtada al-Sadr's Office of the Martyr Sadr ("OMS") filled varying niches but each benefitted from Iranian support. *See id.* The armed wings of SCIRI and OMS—the Badr Corps and Jaysh al-Mahdi ("JAM"), respectively—were likewise closely affiliated with IRGC-QF. *Id.* at 14, 17. Among the downstream effects of that Iranian support was militia infiltration of the Iraqi police and security forces, resulting in widespread corruption and "death squads" targeting at least Sunnis, if not Western officials as well. *See, e.g.*, McIntyre Rep. at 19–21; Oates Rep. at 15–16. Meanwhile, Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training. McIntyre Rep. at 26.

The fruits of Iran's soft power are perhaps best demonstrated by Michael Pregent's testimony. As a civilian intelligence officer with the Defense Intelligence Agency, Mr. Pregent was tasked with "curbing Iranian influence in the security ministries." Pregent T5-168:2–25, 169:16–24. His undercover assignment in the Iraqi prime minister's Office of the Commander in Chief gave him a unique vantage point. *Id.* at 169:24–170:2. He witnessed "the level of complicity with Iraqi ministers tied to the Shi'a Da'wa Party that went after American allies in the Sunni community and the Kurdish community and also Shi'a nationalists." *Id.* at 170:7–10. These connections benefitted Shi'a militia members, who gained access to "government vehicles, government waivers to travel during curfews," and "official ministerial paperwork and permissions" that enabled them to "develop targeting packets against opposition leaders and also Sunnis." *Id.* at 170:11–16. Iranian allies threatened American military interests in Iraq in part

17

because they had "saturat[ed] . . . the security ministries and the intelligence apparatus." *Id.* at 170:17–21.

As for the hard power, the IRGC-QF spearheaded a closely coordinated campaign to equip the Shi'a militia for proxy warfare. That campaign is well attested to in U.S. Government documents. In 2007, the Qods Force earned its Treasury Department designation under E.O. 13224 in part because it "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." IRGC-QF Designation, PX-5, at 3. The State Department found that in 2011,

> Iran was responsible for the increase of lethal attacks on U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF, in concert with Lebanese Hizballah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

U.S. Dep't of State, Country Reports on Terrorism 2011 (July 2012), PX-18, at 172.[9]

The threat from Shi'a militia continued to evolve under Iranian direction or support. After American and Iraqi forces inflicted tremendous casualties on JAM in the battle of Najaf in 2004, Mr. al-Sadr permitted the formation of JAM "Special Groups" with enhanced capabilities to attack American and Coalition forces, while the remainder of JAM would focus on anti-Sunni violence and other criminal activities. Oates Rep. at 22; McIntyre Rep. at 37. This resulted in a realignment

---

[9] The Court has no reason to believe that "Lebanese Hizballah" is not synonymous with Lebanese Hezbollah, to which the Court refers simply as Hezbollah. *See Hezbollah*, Oxford English Dictionary (2d ed. 1989) (identifying other transliterations of Arabic term for "Party of God"), *available at* https://www.oed.com/oed2/00105782 (last visited Aug. 12, 2019); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 37 n.1 (D.D.C. 2007) (discussing some transliterations), *abrogated on other grounds*, *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.C. Cir. 2015). Any other presumptive versions of that organization's name that appear in the evidence shall be treated likewise.

of leadership, where local commanders of JAM Special Groups operated with some autonomy from Mr. al-Sadr and "received their training, weapons and operational direction directly from Hezbollah and the IRGC-QF." Oates Rep. at 22-23. IRGC-QF funding and equipment for Special Groups reached an estimated $750,000 to $3 million per month by August 2007. Pregent Rep. at 12 (reporting U.S. military estimate).

Notably, Qais Khazali – who commanded one or more JAM Special Groups – traveled to Iran in 2006 and met with IRGC-QF leadership as well as Supreme Leader Ayatollah Khamenei. Declassified Detainee Document Regarding Qais Khazali, at 000324 (Aug. 13, 2007), PX-57; McIntyre T5-104:9–17; McIntyre Rep. at 25. Declassified military intelligence indicates that the Supreme Leader asked Mr. Khazali to start Asa'ib Ahl al-Haq ("AAH") or the K2 network, a further special group outside of Mr. al-Sadr's auspices and awareness. Declassified Detainee Document Regarding Qais Khazali, at 000324 (Aug. 13, 2007), PX-57. The AAH initiative demonstrated Iran's effort to foster dependence on its aid for Iraqi militia to carry out attacks on Coalition Forces. Pregent Rep. at 13. Although AAH was later deprived for some time of the leadership of Qais Khazali and his brother, Layth,[10] during their detention by U.S. forces, the group "was able to maintain a fairly high-level offensive tempo" and "operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF" from 2006 through 2011. Oates Rep. at 33; *see also* McIntyre Rep. at 39, 51 (discussing AAH's successes without the Khazalis, and identifying the release of Layth in June 2009 and Qais in January 2010);[11]

---

[10] The record suggests that Layth Khazali's first name is also transliterated "Laith." But the Court shall use Layth uniformly, for simplicity. *See supra* note 9 (discussing transliterations of Hezbollah).

[11] In his testimony, Mr. Pregent identified the release date of Layth as 2008 and Qais as 2009, but the discrepancy is immaterial. Pregent T5-180:112–14. Evidently the Khazali brothers and Mr. Daqduq had been turned over to the Iraqi government and subsequently released "at the request of Iran." Pregent T5-179:5–180:14, 181:7–10.

19

Pregent T5-223:4–13 (stating that AAH "was funded, directed, trained and equipped by the IRGC-Qods Force and Lebanese Hezbollah").

Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. Oates Rep. at 33; Oates T1-123:24–25 (calling KH a "whole-cloth creation of the IRGC"). This group would be led by Abu Mahdi al Muhandis, now deceased, who served as a senior advisor to the IRGC's former leader Qasem Soleimani with both Da'wa Party and Badr Corps credentials. Oates Rep. at 33; McIntyre Rep. at 40. Since 2007, Kata'ib Hezbollah had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq," the U.S. Department of State noted when it designated the group as a Foreign Terrorist Organization in June 2009. U.S. Dep't of State, Designation of Kata'ib Hizballah (June 26, 2009), PX-10.

In July 2008 Mr. al-Sadr announced the formation of the Promise[d] Day Brigades ("PDB"), which could be called a JAM Special Group of his own. Oates Rep. at 38; McIntyre Rep. at 46. This group too was supported by the IRGC-QF and Hezbollah, "in keeping with the IRGC's long-time policy of investing in all Shi'a factions." Oates Rep. at 38. And it was responsible for its own string of attacks on U.S. and Coalition forces. Oates Rep. at 38.

**B. Explosively Formed Penetrators as a Signature Weapon**

Plaintiffs' evidence shows that Iran supplied or bankrolled several types of weapons used by Shi'a militia groups in Iraq. *See, e.g.*, McIntyre Rep. at 41 (noting that Iran provided Kata'ib Hezbollah with a certain type of rocket launcher).

**1. <u>The Nature, Uses, and Deployment of EFPs</u>**

The Court's understanding of EFP design, construction, and detonation is aided by the report and trial testimony primarily of Wade Barker, an explosives expert. *See* Barker T3-13:3–15:7; Barker Rep. at 5–9; *see also* Lutz T5-17:8–18:19 (affirming Mr. Barker's testimony and

describing EFP video admitted as PX-60).  An EFP typically consists, in pertinent part, of a short metal pipe loaded with high-energy explosive ("HE" explosive) and capped with a concave copper disk.  Barker Rep. at 6–7 & n.13 (defining HE explosives in part as "chemical compounds or mixtures that are capable of supporting or sustaining a detonation wave").  Detonation of the EFP forces the inverted center of the disk outwards into a molten slug capable of traveling 2,000 meters per second or more.[12] *Id.*  Detonating an EFP relies on a "two-step arming and triggering process" akin to that of other explosive weapons.  Barker Rep. at 10, 12.  At least for EFPs in the Iraqi theater, the operator typically would arm the EFP using either a command wire ("CW") or remote frequency ("RF").  *Id.* at 10.

Mr. Barker confirmed at trial that making effective EFPs requires substantial technical expertise.  He acknowledged that it had "taken [him] years to even understand how" to make an EFP, and that building the demonstrative EFP exhibit for trial involved two months of work by two electrical engineers and two mechanical engineers.  Barker T3-19:2–10. Effectively deploying the EFP called for a further layer of technical know-how combined with substantial strategic planning.  Identifying precisely the right directional focus, distance from the target, and timing of the PIR-enabled weapon would require an extensive "trial and error" process.  Bradley T2-26:16–27:15.  The EFP emplacers were also adept, for example, at camouflaging the weapon to avoid tipping off U.S. forces.  EFPs could be embedded in piles of trash, trash barrels, concrete street curbing, or synthetic rocks made from foam and covered with dirt.  Barker T3-26:4–12, 45:15–21; Lutz T5-43:14–44:13 (discussing "rock" pictured in PX-65); McIntyre Rep. at 10.    The

---

[12] Mr. Barker's report states, in different places, that EFPs "typically" travel 2,000 meters per second but "up to" 5,000 meters per second.  Barker Rep. at 7.  Mr. Barker does not explain what might drive the wide variation between the typical and maximum speeds.

21

sophistication of EFP attacks also evolved in step with the U.S. military's countermeasures, as explained below.

### 2. The Sources of EFPs and the Training to Deploy Them

Due to the unique components of the EFP, the tactics through which it is effectively deployed, and the extensive expertise necessary to overcome U.S. countermeasures, Plaintiffs' experts have traced the EFPs encountered in Iraq to Iran and Hezbollah. Although Hezbollah appears to have developed the first EFPs, both Iran and Hezbollah were instrumental in their use in Iraq, beginning in 2004. *See, e.g.*, Lutz T5-20:2–21:2 (identifying earliest reported EFP use in Iraq). The evidence shows that Iran supplied EFPs that were fired in Iraq. Mr. Oates, the former director of JIEDDO, said that the U.S. Department of Defense established JIEDDO to "coordinate all of the defense activities to understand" IEDs, including EFPs, "how [U.S. institutions] might mitigate the effects from a material[s] solution or from training and furthermore to understand the intelligence components associated with the networks that are being used against Coalition Forces with these devices." Oates T1-85:18–86:8. While JIEDDO coordinated counter-IED efforts from Washington, D.C., Task Force Troy was "the operational force" on the ground in Iraq, bringing together "intelligence, explosive ordnance expertise and engineering expertise." Oates T1-95:1–9. Task Force Troy and domestic U.S. intelligence conducted extensive forensic analysis after EFP attacks, as well as when EFP components were found in caches. *See, e.g.*, Lutz T5-27:16–25; Bradley T2-43:25–44:16. When Mr. Oates was asked whether "Task Force Troy and/or JIEDDO ever reach[ed] any conclusion about the source of the EFPs being used in Iraq," he concluded unequivocally that "[t]he principal source of the materials and the completed munition, the EFP, was . . . Iran." Oates T1-95:11–18; *see also, e.g.*, Oates Rep. at 24–25 ("[O]ne of Iran's primary forms of material support to the [JAM] Special Groups was financing, manufacturing and

deploying EFPs. . . . The U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and PIR devices deployed in Iraq to Iran and its illicit supply chain."); U.S. Dep't of Defense, Measuring Stability and Security in Iraq (Mar. 2007), PX-35, at 17 (identifying Iranian origin of EFPs supplied to some Shi'a militants, who in turn have attacked Coalition forces).  At a minimum, the metal, the HE explosive, and some degree of EFP manufacturing have each been attributed to Iran.  *See* Oates T1-95:19–25 (agreeing that "the actual metal," as well as "the milling or the actual manufacture," could be traced to Iran); Lutz T5-46:12–47:18 (ascribing HE explosive that looked like American C4 to non-U.S. origin, "most likely . . . Iran through the IRGC"); *id.* at 48:5–48:15 (indicating that "large shipments of steel [were] going into Iran to a specific manufacturing plant that had the capability to cut and mill the casings").  It appears that Iran facilitated the smuggling of these components into Iraq along well-established, yet clandestine supply lines for assembly into the finished weapons.  *See* McIntyre T5-96:20–97:11 (discussing network of supply bases, weapons caches, and safe houses); Lutz T5-47:19–48:4 (describing HE explosives disguised as American equivalent to pass though "logistic rat lines").

Meanwhile, IRGC-QF and Hezbollah conducted training operations in combination of Iraq, Iran, and Lebanon for Iraqi Shi'a militant leaders in the effective use of EFPs.  *See e.g.*, U.S. Dep't of Defense, FY 2010 NDAA Conference Rep., PX-39, at 3; U.S. Dep't of State, Country Reports on Terrorism 2008 (Apr. 2009), PX-18, at 183.  The trainers offered critical assistance that, for example, enabled Shi'a militia groups to understand how to position EFPs' PIR triggers based on the likely speed of a moving target vehicle.  *See* Bradley T2-26:16–27:21 (indicating, *inter alia*, that substantial calculations were involved); Lutz T5-36:11–37:24 (discussing Hezbollah's characteristic use of PIR triggers).

As Mr. Oates testified, "the rapid capability development of the Shi'a militia in Iraq from a weapons training and tactics [perspective], the speed with which they achieved this capability and their ability to adapt led me to believe that there was external assistance provided." Oates T1-97:23–98:10 (explaining his metaphor that a turtle found atop a fence post required some outside help to get there). And Mr. Lutz more pointedly identified that assistance when it came to surmounting U.S. countermeasures:

> In my professional opinion, the Special Groups and other local Shi'a terror cells could not have deployed and implemented throughout southern Iraq the sophisticated radio-frequency technology necessary to defeat our [systems] without the IRGC's active involvement, training, equipment and support.

First Lutz Rep. at 4, 21. Moreover, the U.S. military determined that many thousands of copies of a device used to thwart U.S. countermeasure technologies had passed through Iran and thereafter into EFPs used in Iraq. Lutz T5-48:16–49:12.

Having reiterated its findings on Iran's relationship with Hezbollah and other proxy groups operating in Iraq as well as the nature and use in the Iraqi theater of EFPs, the Court turns now to the ten attacks at issue in this Opinion.

### C. Ten Attacks in Iraq

In analyzing these ten attacks, the Court will generally employ the template adopted during previous proceedings. As a threshold matter, the Court shall determine whether the victim of each attack was a United States servicemember or United States national at the time the attack occurred. Next, the Court shall summarize each attack and identify the harms inflicted on the respective Plaintiff(s) (or the decedent(s) represented by Plaintiff(s)). The Court shall trace the attack's connection to Iran, and where applicable, the Court shall identify the key elements of the attack that persuade the Court that it is an EFP strike. For ease of reference, the Court cites to the expert

reports and declaration (produced in connection with the Plaintiffs' Submission) without referencing the internal citations therein.

### 1. April 4, 2004 - Baghdad - Robert Arsiaga (discussed in Rayburn Report, Ex. C)

The record reflects that SPC [Specialist] Robert Arsiaga received a gunshot wound to the head on April 4, 2004, which resulted in his death. 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Certificate of Death Overseas, Ex. 1. Col Rayburn provided the following background for the April 4, 2004 attack which killed Robert Arsiaga. Muqtada al-Sadr ("Sadr") was the son of a popular Iraqi Shi'a cleric who preached during Sadam Hussein's rule in Iraq and was assassinated in February 1999. After the assassination, Sadr "inherited a sizable infrastructure – a network of mosques and social institutions and a vast constituency of poor Shi'a with both religious and social loyalties" to his martyred father. Rayburn Report, ECF No. 142-3, at 5. Sadr visited Iran in June 2003, shortly after the U.S. invasion of Iraq where General Abdul Reza Shahlai from the Islamic Revolutionary Guard Corps-Qods Force ("IRGCQF") served as "chief of protocol" for the visit, and Sadr's delegation was hosted by Qsem Soleimani, IRGC-QF Commander. *Id.* at 5-6. Sadr also met with Ayatollah Ali Khamenei during the visit and Sadr received assurances from General Shahlai of financial support for the Sadrist movement. *Id.* at 6.

In the spring of 2004, Sadr and his organization were viewed "as the most significant threat to the planned transfer of sovereignty to an interim Iraqi Government in June [2004]." *Id.* at 7. On March 28, 2004, after Sadr's newspaper, *Al Hawza*, published an article that was critical of the Coalition Provisional Authority, [U.S.] Ambassador L. Paul Bremer ordered the Coalition Forces to close the newspaper, and that closure prompted a protest by approximately 20,000 Sadrists. *Id.* In the meantime, Navy SEALs arrested one of Sadr's deputies, who headed the Najaf office. *Id.* These two events precipitated armed attacks throughout Iraq –by the IRGC proxy group JAM –

against the U.S. Coalition and Iraqi security forces. *Id.* This included the April 4, 2004 attack in issue.

On April 4, 2004, a four-vehicle convoy of Humvees consisting of a platoon of about 18 soldiers and an interpreter were providing security for sewage trucks in the Sadr City section of Baghdad, and on their way back to camp, they came under fire after passing the Sadr Bureau. Two of the Humvees became inoperable and the gunner in one was shot, so the platoon set up a defensive position until a rescue force could arrive. *Id.* at 8. A quick reaction force ("QRF") attempted to reach the stranded platoon but came under heavy fire and was forced to head back. Additional forces were dispatched, but a report was received that Sadr's militia had taken over the police stations in Sadr City, and the rescue convoy encountered a blockade, came under fire, and was forced to turn around. *Id.* at 9. Subsequently, a convoy of approximately eight vehicles joined the rescue mission, led by an unarmored M998 Humvee, driven by SPC Stephen Hiller, followed by a Bradley fighting vehicle, followed by a Light Medium Tactical Vehicle ("LMTV"), which did not provide protection to those in the rear of the vehicle. *Id.* One of the soldiers located in the rear of the LMTV was SPC Robert Arsiaga, who was seated immediately behind the cab of the vehicle. Following the LMTV in the convoy were several other vehicles. *Id.* at 10. The convoy took fire from rooftops on both sides of the street with rocket-propelled grenades and other explosives being detonated. As the convoy made its way through a gap in the barrier, the shooting got louder and heavier, as the convoy had "unwittingly driven straight into a three-hundred-yard-long ambush, with hundreds if not thousands of unseen enemies poised and determined to kill them." *Id.* at 10-11. While they were trying to get out of the kill zone, the lead vehicle came to a stop when the driver of the Humvee was killed; the Bradley pulled up alongside and the LMTV pulled up close behind. While stopped, the LMTV came under constant fire and several soldiers

26

in the back were hit, including SPC Arsiaga, who was shot "high on the center of his cheekbone, just below his right eye." *Id.* at 11. Of the 16 soldiers in the back of the LMTVE, one was killed, another was in critical condition and all but one of the remaining 14 were wounded from gunfire or shrapnel. *Id.*

Based on a review of official records and in the context of the political situation in Iraq (as described above), Col. Rayburn opined that "the [well-coordinated ambush] that caused the deaths of SPCs Arsiaga and Hiller and injured SPC Greenwood was conducted by Jaysh al-Mahdi. *Id.* Relying on his own expertise as well as the description in Mr. McIntyre's Expert Report, Col. Rayburn concluded also that JAM was "one of several proxy groups in Iraq that received training, weapons, financial support, and operational advice from the IRGC as well as training, financial support, technological assistance and operational advice from Lebanese Hezbollah." *Id.* The Court finds Col. Rayburn's expert analysis and opinion persuasive and concludes accordingly that Iran and its proxies bear responsibility for the April 4, 2004 attack in Baghdad, Iraq that caused SPC Robert Arsiaga's death.

### 2. August 2, 2005 – Basra- Steven Vincent (discussed in Brooks Decl., Ex. D)

In early May 2005, Steven Vincent – a United States national and freelance journalist – traveled to Basra to report on student uprisings against Iraqi Shi'a cleric Sadr. Brooks Decl., ECF No. 142-4, ¶ 34. Sadr controlled the Office of Martyr Sadr ("OMS") party, and "in response to the U.S. occupation of Iraq and with the goal of establishing [control of] an Iraqi Shi'a government," in 2003, Sadr formed its military wing, JAM. *Id.* Col. Brooks discussed in detail Iran's influence over Iraq, specifically Basra, Brooks Decl. ¶¶ 16-22, as well as the ways in which Iran supported JAM with assistance through its long-time proxy, Hezbollah. *Id.* at ¶¶ 25-28. He

notes that "almost from its inception, JAM was materially assisted by Hezbollah, at Iran's direction" and he discusses Sadr's visit to Iran in 2003.  Brooks Decl. ¶ 26.

While in Basra, Mr. Vincent reported on JAM's corruption of the local government, and in a July 9, 2005 blog post, he critiqued Sadr and commented that Sadr's picture was hanging in a local police station, and that most of Basra's police supported Sadr.  Brooks Decl. ¶¶ 35-37. Furthermore, on July 31, 2005, Mr. Vincent authored an opinion piece for *The New York Times* called "Switched Off in Basra," which described how

> Basra politics (and everyday life) is increasingly coming under the control of Shiite religious groups, from the relatively mainstream Supreme Council for the Islamic Revolution in Iraq to the bellicose followers of the rebel cleric Moktada al-Sadr.  Recruited from the same population of undereducated, underemployed men who swell these organizations' ranks, many of Basra's rank-and-file police officers maintain dual loyalties to mosque and state.

Brooks Decl. ¶¶ 38-39 (internal citation omitted).  Mr. Vincent reported that between 50-75% of Basran Iraqi police were affiliated with religious parties, and some of them were perpetrating assassinations in Basra.  *Id.* at ¶ 40.

On August 2, 2005, Mr. Vincent was abducted, and he died after receiving a perforating gunshot wound to his back.  28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E,  Certificate of Death Overseas, Ex. 2.  An investigation of Mr. Vincent's abduction and murder was conducted by the Federal Bureau of Investigation ("FBI").  *Id.* at ¶ 41.  Eyewitnesses reported that Mr. Vincent and his interpreter were at a money exchange in Basra, in a JAM-controlled area of the city, when they were confronted by four to six men armed with Glock pistols and AK rifles and forced into a white police vehicle.  *Id.*  The two were held for a few hours before being released from the vehicle and shot - Mr. Vincent died but his interpreter survived.  *Id.*  The interpreter described the men who kidnapped them as wearing police uniforms and stepping out of a police car.  *Id.* at ¶ 42.

The FBI investigation reflected that JAM claimed responsibility for the attack. *Id.* at ¶ 43 (internal citation omitted). Col. Brooks opined that "this claim is accurate based on the significant predominance of JAM forces within Basra and the likelihood that JAM was unhappy with Mr. Vincent's reporting about their illicit activities in Basra and their connections to Iran" and the fact that the "intelligence community has determined that JAM's claims of responsibility are consistently credible." Brooks Decl. ¶ 43. Col. Brooks engaged also in a discussion that rules out other responsible parties. *Id.* ¶¶ 47-50.

Col Brooks concluded that "based on [his] professional training and experience, including but not limited to his . . . expertise on Shi'a militant groups operating in Iraq between 2003 and 2011, it is [his] professional opinion that Steven Vincent was abducted and murdered by Jaysh al-Mahdi ("JAM") operatives, possibly including JAM elements that infiltrated the Basra police force." Brooks Decl. ¶ 11. Accordingly, the Court accepts Col. Brooks' expert opinion and finds sufficient evidence in the record to demonstrate that Iran and its proxies were responsible for Steven Vincent's August 2, 2005 abduction and murder in Basra.

### 3. March 15, 2007 – Baghdad- Blake Harris (discussed in Lutz Report, Ex. A)

On March 15, 2007, a four-vehicle convoy was traveling down a road in Baghdad, when the Bradley Fighting Vehicle ("Bradley") in the lead position was struck by an improvised explosive device ("IED"), which caused moderate damage. Lutz Report, ECF No. 142-1, at 4. After the Bradley stopped, soldiers from the other three vehicles in the convoy dismounted to conduct a battle damage assessment and sensitive site exploitation, and during that activity, a second IED located on the other side of the road exploded, killing four of the soldiers, including SSG [Staff Sergeant] Blake Harris, and wounding two others who died later. *See generally* 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Report of Casualty, Ex. 3 (noting that Harris was

29

killed in action).  A post-blast analysis of the scene revealed a third device, a 10-inch anti-armor IED ("AAIED") with a radio-controlled initiator, which was then [safely] detonated by the EOD [explosive ordinance disposal] unit.  *Id.* at 5.

Col. Lutz reviewed documents including SSG Harris's death investigation, three incident reports produced in response to FOIA requests, and an event storyboard in support of his conclusion that the March 15, 2007 attack that killed SSG Blake Harris was a complex attack which involved the use of multiple IEDs including an AAIED and that it is "probable that the attack was committed by an IRGC and Hezbollah directed Special Group that was likely trained by Hezbollah and/or the IRGC-QF." *Id.* at 4.  Furthermore, Col. Lutz indicated that "the explosives used in this attack can be understood as "area denial weapons' or "Anti Access/Area Denial' ("A2/AD") weapons that were part of the IRGC and Hezbollah's strategy to prevent U.S. and Iraqi forces from freely traversing Shia-dominated areas and effectively sealing off the IRGC's main operational center in Sadr City." *Id.* at 12.  Considering this, in the context of the timing and location of the attack, Col. Lutz opined that "it is highly probable that the complex attack that killed SSG Harris, which involved the use of 3 separate IEDs including an unexploded AAIED (likely an EFP) was committed by an IRGC and Hezbollah proxy group linked to JAM." *Id.* The Court finds Col. Lutz's expert analysis of the reports and his conclusion to be persuasive. Accordingly, the Court concludes that Iran and its proxies were responsible for the March 15, 2007 death of SSG Blake Harris in Baghdad.

### 4. **April 6, 2008 - Baghdad- Emanuel Pickett (discussed in McIntyre Report, Ex. B)**

On April 6, 2008, Emanuel Pickett died from blast injuries from a rocket and mortar attack. 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Certificate of Death Overseas, Ex. 5. That afternoon – without any warning alarm sounding – a single round of indirect fire impacted a

30

concrete pad in the 95th Military Police Battalion Motorpool on Forward Operating Base ("FOB"), in Baghdad.  McIntyre Report, ECF No. 142-2, at 5.  At the time of the attack, the 1st Squad, 2nd Platoon, 1132nd Military Police Company was conducting tower guard duty, and SSG Pickett, who was squad leader for 1st Squad, was in his living quarters.  *Id.*  The soldiers responded by proceeding to the nearest bunker for protection.  Three additional rounds of indirect fire landed on the FOB, one of which impacted in front of the bunker where SSG Pickett was located.  *Id.*  Emanuel Pickett was mortally wounded; he was evacuated while additional indirect fire was occurring, and he later died at the 86th Combat Hospital.  *Id.*

After review of the applicable reports and other documentation, Col. McIntyre concluded that it was "highly probable that the attack which killed SSG Pickett and injured 14 other soldiers involved the use of a 107mm Iranian rocket [Katyusha rocket] and 81 mm mortar rounds that struck FOB Rustamiyah."  *Id.* at 7.  Col. McIntrye noted that the attack occurred during a "period of increased operational tempo by IFGC-directed Special Groups directed against Coalition Forces" and coincided with "significant confrontation" between the Iraqi government and the movement headed by Sadr.  *Id.*  Col. McIntyre opined that, based on the timing of the attack and his review of the available information, "it is highly probable that the April 6, 2008 attack on FOB Rustamiyah that killed SSG Pickett was consistent with the types of attacks orchestrated by the IRGC and Hezbollah against U.S. and Coalition Forces operating in Iraq and was committed at the general direction of the IRGC by one of its Special Groups proxies using weapons provided by the IRGC and training provided by the IRGC and Hezbollah."  *Id.* at 8.  The Court accepts Col. McIntyre's expert opinion and finds Iran and its proxies liable for the death of SSG Emanuel Pickett.

31

5. **April 6, 2008 - Baghdad- Stephen Scott and Stuart Wolfer (discussed in McIntyre Report, Ex. B)**

On April 6, 2008, in Baghdad, Colonel ("COL") Stephen Scott was reportedly killed by blast and ballistic fragment injuries, 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Certificate of Death Overseas, Ex. 6,  and Major ("MAJ") Stuart Wolfer was reportedly killed by blast injuries, *id.*, Ex. E, Report of Casualty, Ex. 6.  During the afternoon of April 6, 2008, Colonel Scott and Major Wolfer were at the gym of Phoenix Base when a 107mm Iranian rocket impacted the roof of the gym.  McIntyre Report, ECF No. 142-2, at 10.  An alarm sounded at a nearby compound and an employee who heard the alarm ran into the gym to warn everyone to take cover. *Id.*  Phoenix Base's manual indirect fire alarm sounded almost simultaneously with the rocket impacting the roof of the gym.  *Id.*  The explosion sent shrapnel into the gym; both Scott and Wolfer were "nearly directly under the rocket detonation" and they received multiple severe traumatic blast injuries. *Id.*  Both were quickly evacuated to the 86th Support Hospital where both were pronounced dead. *Id.*

Col. McIntyre examined the documentary and other evidence relating to this attack, and he concluded that it was "highly probable that the attack which killed COL Scott and MAJ Wolfer and injured 19 other soldiers involved the use of a 107mm Iranian rocket that struck Phoenix base gym." *Id.* at 13.  Col. McIntyre discussed the same surrounding circumstances as with the attack that killed Emanuel Pickett; *i.e.*, "increased operational tempo by IRGC-directed Special Groups" and "significant confrontation" between the Iraqi government and the movement headed by Sadr, with attacks between March 23, 2008-March 28, 2008 involving the launching of "91 separate barrages that dropped a total of 344 rockets and mortar rounds on the Green Zone in Baghdad." *Id.* at 13-14.  Col. McIntyre opined that "it is highly probable that the April 6, 2008 attack on Phoenix Base that killed COL Scott and MAJ Wolfer was consistent with the types of attacks

32

orchestrated by the IRGC and Hezbollah against the U.S. and Coalition Forces operating in Iraq and was committed at the general direction of the IRGC by one of its Special Groups proxies using weapons provided by the IRGC and training conducted by Hezbollah instructors." *Id.* at 14. The Court accepts Col. McIntyre's opinion as well-supported by the evidence and finds Iran and its proxies liable for the deaths of Stephen Scott and Stuart A. Wolfer.

### 6. **April 8, 2008 - Kharguliah - Jeffery Hartley (discussed in Lutz Report, Ex. A)**

On April 8, 2008, in Kharguliah, SSG Jeffrey Hartley was killed by blast injuries, 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Report of Casualty, Ex. 7. On the evening of April 8, 2008, a convoy of four vehicles departed FOB Rustamiyah heading towards FOB Hammer when the lead vehicle was struck by a 2-array copper EFP, which was "concealed in a yellow burlap-sack and placed 4 feet off the south side of the road next to a dirt mound with a light pole marker." Lutz Report, ECF No. 142-1, at 19. The vehicle was approximately 20 feet away from the detonation; the EFP was likely PIR [passive infrared sensor] initiated and it penetrated the right passenger door under the window and in between the front and rear passenger door causing the door to be removed. SSG Jeffery Hartley – one of three soldiers in the vehicle – was sitting in the right front passenger seat of the vehicle, and he was killed instantly. *Id.* at 20. In connection with his review of SSG Hartley's death, Col. Lutz looked at the AR 15-6 Investigative Report, the SIGACT report, the IED Report, the JTF Troy Report the Extended Casualty Report, and the Event Storyboard. *Id.* at 20-22. Based on the available information, Col. Lutz concluded that the attack that killed SSG Jeffery Hartley "was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies [and] the attack involved a multi-array copper-lined EFP." *Id.* at 23. Furthermore, the damage to the vehicle "strongly indicate[d] that the multi-array EFP was precision manufactured and copper

lined," as well as "the likely use of HE explosives in the construction of the multi-array EFP." *Id.* Col. Lutz opined that an "IRGC-sponsored Special Group was likely involved in the assembly and emplacement of the multi-array EFP." *Id.*

The Court accepts Col. Lutz's expert opinion that Iran and its proxies were responsible for SSG Hartley's death and further that the EFP used in the April 8, 2008 attack is linked to Iran and its proxies. Accordingly, the Court finds that Iran and its proxies are liable for SSG Jeffery Hartley's death by means of a multi-array EFP.

### 7. April 28, 2008 - Baghdad - Adam L. Marion and Mark Stone (discussed in Lutz Report, Ex. A)

On April 28, 2008, Private First Class ("PFC") Adam Lee Marion and SGT Mark Stone were killed in action in Baghdad. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Reports of Casualty, Ex. 8. During the afternoon of April 28, 2008, in Baghdad, fourteen IRAMs [Improvised Rocket Assisted Munitions] were launched from a cargo truck that was used as a mobile launch platform located approximately 100 meters southwest of FOB Loyalty. Lutz Report, ECF No. 142-1, at 25. FOB Loyalty was "located in eastern Baghdad, south of Sadr City, the large Shi'a slum that was a key operations area for Iranian-sponsored Special Groups" and the weapons were confirmed to be IRAMs. *Id.* Col. Lutz described IRAMs as "rocket-launched Improvised Explosive Devices ("IEDs") made from large metal canisters (usually propane gas tanks that have been drained of their contents and filled with high explosives – up to several hundred pounds), scrap metal, and ball bearings and typically initiated by an impact type fuze. *Id.* at 24-25. The IRAMs destroyed FOB Loyalty's theater, damaged and destroyed several vehicles, and killed three U.S. soldiers including PFC Marion and SGT Stone and wounded sixteen soldiers. *Id.* at 26. At the time of the attack, PFC Marion had returned from a route clearance patrol and was standing near the rear of a Buffalo mine-protected clearance vehicle, offloading bags, when

34

one of the IRAMs landed between the Buffalo and other vehicles, causing significant damage to the Buffalo and four other vehicles. *Id.* at 27. PFC Marion was found between the left rear tires of the Buffalo and was moved to the Aid Station, where he was pronounced killed in action due to a fatal shrapnel wound to the lower extremities. *Id.* at 27, 33. SGT Stone reportedly died of a massive hemorrhage due to the enemy attack. *Id.* at 33.

Col. Lutz noted that the attack occurred during a period of "increased operational tempo by IRGC-directed Special Groups," explaining that, between February and April 2008, EFP attacks against Coalition Forces increased by 40 percent, and furthermore, there was significant confrontation between the Iraqi government and the movement headed by Sadr, with increased indirect-fire attacks at the end of March 2008. *Id.* at 35. These indirect-fire attacks "coincided with coordinated JAM Special Groups assaults against all 11 Iraqi Security Forces checkpoints around Sadr City." *Id.* Moreover, in April 2008, U.S. Forces worked with Iraqi Special Forces to launch an offensive directed at JAM and JAM Special Groups based in and around Sadr City. *Id.*

In the context of the intensified conflicts described above, and based on the reports and scene diagrams he reviewed, Col. Lutz opined that it is "highly probable that the April 28, 2008 IRAM attack on FOB Loyalty that killed PFC Marion and SGT Stone was committed at the general direction of the IRGC and Hezbollah by their Special Groups proxies using weapons provided by the IRG and training provided by the IRGC and Hezbollah." *Id.* at 35. The Court accepts Col. Lutz's well-reasoned expert conclusion and finds that Iran and its proxies are responsible for the deaths of PFC Marion and SGT Stone

### 8. October 16, 2008 - Baqubah - Cody J. Eggleston (discussed in McIntyre Report, Ex. B)

PFC Cody Eggleston died on October 24, 2008, due to the head and neck wounds he received on October 16, 2008. 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Report of

35

Casualty, Ex. 9; McIntyre Report, ECF No. 142-2, at 18.  On the afternoon of October 16, 2008, three 107mm rockets, which were identified by radar, were launched – from what was later identified as an abandoned house – against the FOB Warhorse, located in Baqubah, Iraq.  McIntyre Report ECF No. 142-2, at 15.  Mr. McIntyre noted that Baqubah, which is 31 miles northeast of Baghdad, "was a link in an IRGC directed and controlled arms smuggling route that ran from the Iraqi-Iranian border in the vicinity of the Iraqi town of Mandali . . . with the ultimate destination for arms IRGC directed and controlled and affiliated militia groups operating in the northern suburbs of Baghdad." *Id.* at 18.  One of the tasks of the 2nd Cavalry Regiments, which was stationed at FOB Warhorse, was to "interdict that movement of IRGC provided arms and munitions to Special Groups operating in Diayala Governate and their further movement south to Baghdad." *Id.* at 19.

Considering the record evidence and the "threat picture existent at the time of the attack," Mr. McIntyre opined that 107mm rockets were the weapon used to attack FOB Warhorse causing the death of PFC Eggleston, the rockets were likely supplied by the IRGC,  and one of the IRGC's proxy groups was likely responsible for the attack.  *Id.*  The Court accepts Mr. McIntyre's expert opinion and finds that Iran and its proxies are liable for the death of PFC Eggleston.

### 9. <u>July 16, 2009 - Basra - Daniel P. Drevnick (discussed in McIntyre Report, Ex. B)</u>

SPC Daniel P. Drevnick died on July 17, 2009, due to wounds resulting from blast and blast fragmentation injuries received on July 16, 2009.  28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Report of Casualty, Ex. 10.  On the evening of July 16, 2009, five 107mm rockets were launched against Contingency Operating Base ("COB") Basra, with the point of origin determined to be along the riverbank of the Quarmat'Ali River, where Improvised Rocket Launcher ("IRL") rail systems were found.  McIntyre Report, ECF No. 142-2, at 21.  One of the rockets detonated

fifteen feet from a designated smoking area within COB Basra, while another detonated near of Chevy Blazer, a third detonated upon impact with an outer perimeter wall, and the other two impact sites were found the next day. *Id.* Just prior to impact, SPC Drevnick had been in the smoking area, with three other soldiers, and when the siren went off to indicate an incoming indirect rocket attack, the soldiers moved to the Hesco barriers nearby but failed to make it there prior to the explosion. *Id.* at 21, 22. SPC Drevnick was located 6-8 feet from the point of impact; he was mortally wounded in the attack and died approximately two and one-half hours later while en route to a higher-level hospital. *Id.* Two other soldiers close to the point of impact were also killed. *Id.* at 32.

Mr. McIntyre noted that, through the period in question, Basra was a Shi'a-dominated province and city that was a significant entry point for IRGC weapons and personnel. During the early months of 2008, Hezbollah-trained JAM dominated much of that area, but Basra was also a site for significant IRGC-directed attacks against the Coalition Forces, with the Coalition Forces launching operations targeted against IRGC-sponsored and Hezbollah-trained Special Groups even a year prior to the July 16, 2009 attack. *Id.* On March 31, 2009, the British Multi-National division-Southeast ("MND-SE) departed Iraq and handed control of  operations to then-Major General Michael Oates's Multi-National Division-Center ("MND-C"), which would be later renamed MND-South. *Id.* During the first half of 2009, "Iranian-sponsored and Hezbollah-trained Special groups and Kata'ib Hezbollah in particular marshalled indirect fire teams armed with 107mm rockets in Basra to target MND-South's personnel." *Id.*

Considering the aforementioned information, and upon review of the available evidence and information about the attack, Mr. McIntyre opined that the attack that caused the death of SPC Drevnick was "orchestrated by the IRGC-QF and was likely conducted by Kata'ib Hezbollah,

37

though it could also have been conducted by one of the IRGC-QF's other Hezbollah-trained Special Group proxies they supplied with munitions to include 107mm rockets." *Id.* The Court finds Mr. McIntyre's expert opinion persuasive and concludes that Iran and its proxies were responsible for the July 16, 2009 attack that resulted in the death of SPC Drevnick.

**10. June 29, 2011 - Wasit Province - George D. White and John McCulley (addressed in Lutz Report, Ex. A)**

John McCulley and SSG George D. White were wounded in action during an attack on June 29, 2011 in Wasit Province, Iraq. 28 U.S.C. § 1605A(a)(2)(A)(ii) Appendix, Ex. E, Medical Records, Ex. 11. In the late afternoon of June 29, 2011, four IRAMs were launched from a dump truck used as a mobile launch platform against COB Shocker, located in the Wasit Province of Iraq. Lutz Report, ECF No. 142-1, at 37. In this instance, each IRAM contained about 300 pounds of an unknown bulk explosive. *Id.* at 36. Three IRAMs detonated and caused extensive damage to the tactical operations center and gym, killing three U.S. soldiers and wounding SSG George D. White, six additional soldiers, and one civilian, John McCulley - a contractor working for American Iraqi Solutions Group in Iraq. *Id.* at 36-37. The fourth IRAM penetrated the gym, but it did not detonate. *Id.* at 37-38.

Following the attack, Kata'ib Hezbollah ("KH"), an IRGC proxy group, posted a video showing multiple IRAMs being fired at COB Shocker followed by several explosives. *Id.* at 43. In his expert report, Col. Lutz indicated that he agreed with the Department of Defense's Joint improvised Explosive Device Defeat Organization's ("JIEDDO") assessment that IRAMs – at least from 2007-2011 – were a "signature weapon 'used by Iranian-backed militias that operate with the aid of Iran's Islamic Revolutionary Guards Group,'" including KH. *Id.* at 36, 43. He opined that – regarding the IRAM attack which injured SSG White and Mr. McCulley – it is "highly probable that the 240mm rockets used to perpetrate the attack were supplied by IRGC"

38

and "the attack itself was likely committed by KH at the direction of the IRGC and the (Lebanese) Hezbollah." *Id.* at 43.

The Court finds that Col.'s Lutz's expert opinion is well-supported by the record in this case, and accordingly, the Court concludes that Iran and its proxies were responsible for the June 29, 2011 attack which injured SSG White and Mr. McCulley. In sum, the Court has found Iran and its proxies liable for all ten attacks at issue.

## IV. CONCLUSIONS OF LAW

The Court's Conclusions of Law proceed in three parts. First, the Court evaluates whether it has subject-matter jurisdiction pursuant to the FSIA's terrorism exception to foreign sovereign immunity over Plaintiffs' claims arising from the ten non-bellwether attacks outlined above in the Court's Findings of Fact. Next, the Court assesses whether Plaintiffs have satisfactorily established their claims for relief under the federal cause of action associated with the FSIA's terrorism exception. Finally, the Court considers whether it has personal jurisdiction over Iran in this action. Where applicable, the Court reiterates in part some of its conclusions from its prior opinions.

### A. Subject-Matter Jurisdiction and Liability

For the reasons set forth below, the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. 1605A(a)(1). The Court also finds that Plaintiffs have successfully established their right to relief under 28 U.S.C. § 1605A(c) on some, but not all, of their individual claims. *See* Am. Compl., ECF No. 8, ¶¶ 1161–74 (addressing Counts One and

Two relating to Plaintiffs who were wounded in action and the estates of Plaintiffs who were killed in action).[13]

### 1.  Subject-Matter Jurisdiction

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)).  Pursuant to the FSIA, the Court has "original jurisdiction" over "nonjury civil action[s]" against foreign states "without regard to amount in controversy" if the claims seek "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement."  28 U.S.C. § 1330(a).  Most of these elements are clearly satisfied in this case and require little discussion.  Plaintiffs do not demand a jury trial, they assert civil causes of action and seek *in personam* relief against Defendant Islamic Republic of Iran, a foreign state.

The question of Iran's immunity is more involved.  "[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing, e.g., 28 U.S.C. § 1604).  "[E]ven if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983); *see also Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (recognizing that a court must consider, *sua sponte*, a potential defect in its subject-matter jurisdiction).  Plaintiffs

---

[13] Count Three addresses solatium claims by Plaintiffs who are family-members of those wounded or deceased.

have not identified an international agreement that would abrogate Iran's immunity, nor is the Court aware of any such agreement.

Plaintiffs, in this case, have instead relied on the FSIA's terrorism exception to foreign sovereign immunity. That exception states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). Additionally, this exception generally applies only when the defendant was a designated state sponsor of terrorism when the act happened *and* at the time the claim was filed or in the preceding six months, *id.* § 1605A(a)(2)(A)(i); the "claimant or the victim" in the case was "a national of the United States," "a member of the armed forces," or "otherwise an employee of the Government of the United States" when the act happened, *id.* § 1605A(a)(2)(A)(ii); and "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," *id.* § 1605A(a)(2)(A)(iii).

Some of these elements are clearly satisfied and require little discussion. To start, Iran has been a designated state sponsor of terrorism since 1984 and presently retains that designation. *See* U.S. Dep't of State, State Sponsors of Terrorism (Dec. 21, 2020), PX-1; Levitt T1-27:16-17. Next, each of the victims in the ten non-bellwether attacks addressed in the Court's Findings of Fact, with two exceptions, was a U.S. military servicemember at the time of their death or injury, *see* 28 U.S.C. § 1605A(a)(2)(A)(ii)(II). The two exceptions are Mr. Steven Vincent, a United States

41

national working as a journalist in Basra at the time of his death, and Mr. John McCulley, a United States national working as a civilian contractor, who, therefore, also satisfy the jurisdictional requirement set forth in 28 § 1605A(a)(2)(A)(ii)(I).  Finally, none of the injuries or killings at issue in the ten non-bellwether attacks addressed in the Court's Findings of Fact took place in Iran, but instead, each attack occurred in Iraq.  Accordingly, Plaintiffs had no obligation to afford Iran an opportunity to arbitrate.  *See* 28 § 1605A(a)(2)(A)(iii).

Next, the Court concludes that each of the victims in the ten non-bellwether attacks addressed in the Court's Findings of Fact was the victim of an attack involving an  "extrajudicial killing."  28 U.S.C. § 1605A(a)(1).  Under the FSIA, the term "extrajudicial killing" is defined consistently with Section 3 of the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. § 1605A(h)(7).  The TVPA states that:

> For the purposes of this Act, the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  The Court of Appeals recognizes "three elements" of this definition: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017). Each element is satisfied here and accordingly, the Court concludes that each of the ten non-bellwether attacks constituted an "extrajudicial killing" within the meaning of the FSIA.  28 U.S.C. § 1605A(a)(1).  Importantly, this conclusion of law applies not only to the eleven victims who were killed in action but also to the two victims addressed in the Court's Findings of Fact who were wounded in action because

42

each of the ten attacks involved an extrajudicial killing.[14]  *See* Lutz Report, ECF No. 142-1, at 37

(noting that the June 29, 2011 attack that wounded SSG George D. White and civilian contractor

John McCulley also "killed three U.S. Soldiers").  Accordingly, the *Borochov* "standard" has been

met regarding all ten attacks discussed herein.

Next, the Court concludes that Iran provided "material support or resources" for each of

these ten non-bellwether attacks.  28 U.S.C. § 1605A(a)(1).  The FSIA adopts the definition of

"material support or resources" found in 18 U.S.C. § 2339A.  28 U.S.C. § 1605A(h)(3).  That

section broadly defines "material support or resources" to consist of

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel (1 or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).  As set forth in the Court's Findings of Fact, the IRGC, along with

Hezbollah, provided expertise, financial support, and material resources to Iranian proxies in Iraq,

specifically to facilitate the use of EFPs and other types of weaponry against U.S. military

servicemembers in furtherance of Iranian strategic interests in the Iraqi theater.  Moreover, the

Court is satisfied that the IRGC is at least an agent of Iran, if not a part of the government itself,

such that individuals working for the IRGC would be officials or employees of Iran.  *Cf., e.g.*,

*Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (finding that IRGC

was governmental entity, rather than commercial agent).  Lastly, the record evidence in this case

demonstrates that each of the ten non-bellwether attacks addressed in the Court's Findings of Fact

was traceable to Iran, through the IRGC, Hezbollah, and their proxies.  For these reasons, the Court

---

[14] These two victims are: George D. White and John McCulley.

43

concludes that Iran, "by an official, employee, or agent," provided "material resources or support" for each of the ten non-bellwether attacks.

Finally, the Court concludes that Iran's material support for the ten non-bellwether attacks was the "proximate cause" of each victim's death or personal injury in those attacks. *Owens*, 864 F.3d at 794; *see also Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)) (clarifying that "jurisdictional causation" under Section 1605A(a) relies on same standard applicable to its predecessor, Section 1605(a)(7)). "Proximate cause requires 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Owens*, 864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128 (quoting *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984)) (internal quotation marks omitted)). The "two similar but distinct elements" to establish proximate cause are that 1) "the defendant's actions [were] a 'substantial factor' in the sequence of events that led to the plaintiff's injury," and 2) "the plaintiff's injury [was] 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).

Under these elements of proximate cause, there is more than a "reasonable connection" between Iran's material support for its Iraqi proxies and the deaths and injuries suffered in each of the ten non-bellwether attacks addressed in the Court's Findings of Fact. *See Kilburn*, 376 F.3d at 1128–30. Iran, through the IRGC and/or Hezbollah, furnished EFPs or the components thereof as well as more conventional weapons, facilitated training of Shi'a militia groups, and supported their effective deployment of weaponry in the Iraqi theater. And, regarding the Iranian-backed EFPs, which were specifically designed to inflict maximum and lethal damage to U.S. military vehicles and servicemembers, the record evidence also demonstrates that Iranian expertise was necessary for the sophisticated manufacturing and deployment of EFPs. For these reasons, the Court

44

concludes that Iran's "material support" proximately caused the deaths and injuries sustained in each of the ten non-bellwether attacks. *See Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005) ("It is enough, the D.C. Circuit held [in *Kilburn*], to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act." (citing *Kilburn*, 376 F.3d at 1127–30)).

Having determined that Iran provided material support through IRGC to Hezbollah and other Shi'a proxies in Iraq, and that this support was for the purpose of extrajudicial killing in each of the ten non-bellwether attacks, the Court concludes that it has subject-matter jurisdiction under the FSIA's terrorism exception over Plaintiffs' claims arising from those attacks.

## 2. **Liability**

Plaintiffs assert private causes of action against Iran under 28 U.S.C. § 1605A(c) for the personal injuries, deaths, and emotional distress caused by the ten non-bellwether attacks addressed in the Court's Findings of Fact. *See* Am. Compl., ECF No. 8, ¶¶ 1161–74. Section 1605A(c) of the FSIA provides that state sponsors of terrorism "shall be liable . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages," in suits brought by four categories of individuals, including "member[s] of the armed forces" or their legal representatives. 28 U.S.C. § 1605A(c); *see also Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1606 (2020). In other words, this section creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity. Importantly, Section 1605A(c) also creates vicarious liability "for the acts of [Iran's] officials, employees, or agents," in this case, the IRGC and its leadership, Hezbollah, and Iraqi proxies. 28 U.S.C. § 1605A(c).

Plaintiffs' § 1605A(c) claims arising from the ten non-bellwether attacks fall into three categories: the claims of (1) two U.S. soldiers and civilians injured in Iraq by terrorist acts that Iran materially supported; (2) two estates of U.S. soldiers and civilians killed in Iraq as a result of such acts; and (3) thirty-five immediate family members (or the estates of now-deceased immediate family members) of the injured and deceased U.S. soldiers and civilians.  The first two categories comprise the § 1605A(c) claims of four Plaintiffs:

> Surviving Plaintiffs (*see* Am Compl. ¶¶ 1120-1131, 1132-1144): (1) George D. White and (2) John McCulley.

> Estates of Deceased Victims (*see* Am Compl. ¶¶ 173-181, 906-912): (1) Stephen Vincent and (2) Jeffery Hartley.

Collectively, these Plaintiffs' claims derive from the deaths of members of the U.S. armed forces, proximately caused by Iran's material support for an attack in Iraq.  *See* 28 U.S.C. § 1605A(c); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 398 (D.D.C. 2015) (discussing claim by legal representative of an estate).  Given the factual and legal overlap, the Court's finding of subject-matter jurisdiction over each of these Plaintiff's claims also establishes their entitlement to relief under 28 U.S.C. § 1605A(c).  *See, e.g.*, *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 369 (D.D.C. 2020); *Allan v. Islamic Republic of Iran*, Civil Case No. 17-338 (RJL), 2019 WL 2185037, at *6 (D.D.C. May 21, 2019) ("[M]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605 A(c) [sic]."); *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (Kollar-Kotelly, J.) (discussing overlapping aspects of jurisdiction and liability).

The remaining § 1605A(c) claims at issue, however, are those of thirty-five family members, or the estates of now-deceased family members, of the U.S. soldiers and civilians injured

46

or killed in the ten non-bellwether attacks. *See* Am. Compl., ECF No. 8, ¶¶ 1171–74. These Plaintiffs seek solatium damages under an intentional infliction of emotional distress theory of liability. *See* Pls.' Tr. Br., ECF No. 43, at 20; *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 78 (D.D.C. 2010). Adhering to the common law of torts, courts in this jurisdiction have concluded that family-members may recover for emotional distress under § 1605A(c) if: "(1) they are members of a victim's immediate family," and (2) if "the defendant's conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019) (cleaned up) (citing Restatement (Second) of Torts § 46); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017). Additionally, § 1605A(c) still requires that these Plaintiffs individually demonstrate that they "are themselves U.S. nationals, members of the armed services, or government employees." *Force*, 464 F. Supp. 3d at 369.[15]

Currently, these "family-member" Plaintiffs have not yet submitted satisfactory evidence establishing their individual rights to relief under § 1605A(c). *See* Am. Compl., ECF No. 8, ¶¶ 1171–74. To start, each "family-member" Plaintiff may rely on the Findings of Fact in this Memorandum Opinion, which establish that Iran's material support proximately caused the actual or attempted extrajudicial killing of each victim in the ten non-bellwether attacks. Moreover, the Court is satisfied that these acts of terrorism were "sufficiently extreme and outrageous to demonstrate that" Iran's intent was "to inflict severe emotional harm on even those not present at the site of the act." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015).

---

[15] "For jurisdictional purposes, this fact is non-consequential, because the waiver of foreign sovereign immunity applies so long as 'the claimant *or* the victim was, at the time of the' terrorist attack, a U.S. national, member of the armed forces, or government employee." *Force*, 464 F. Supp. 3d at 369 (emphasis in original) (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)). As set forth in the Court's Findings of Fact, each *victim* in the ten non-bellwether attacks was a U.S. servicemember, or, in the cases of Mr. Steven Vincent and Mr. John McCulley, U.S. nationals.

Nonetheless, the "family-member" Plaintiffs have not yet offered evidence proving their *own* qualifying statuses within the enumerated categories of permissible claimants under § 1605A(c). *See* 28 U.S.C. § 1605A(c)(1)–(4); *Force*, 464 F. Supp. 3d at 369.  Each "family-member" Plaintiff must also provide evidence satisfying the "immediate family" requirement, which "is strictly construed in FSIA cases."  *Roth*, 78 F. Supp. 3d at 400.  Without such evidence, the Court makes no finding as to the § 1605A(c) claims of the "family-member" Plaintiffs arising from the ten non-bellwether attacks.  *See* Am. Compl., ECF No. 8, ¶¶ 1171–74; 28 U.S.C. § 1608(e).

### B. Personal Jurisdiction

Although a personal jurisdiction defense can be waived in certain circumstances, the Court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default judgment against a missing party."  *Kaplan v. Cent. Bank of Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018) (citing *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2682 (3d ed. 1998)).  "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) [and] where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  "In other words, 'under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction.'"  *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting *Price*, 294 F.3d at 95).

The Court has already concluded that it has subject-matter jurisdiction over the claims in this case.  Moreover, service has been made under Section 1608(a)(3), as described above and in the Court's [31] Memorandum Opinion and Order.  The Court incorporates the analysis in that Memorandum Opinion and Order here and accordingly concludes that the Court has personal jurisdiction over Iran.  There are no due process concerns raised by the Court's exercise of personal

48

jurisdiction over Iran because "foreign states are not 'persons' protected by the Fifth Amendment." *Price*, 294 F.3d at 96.

### V. CONCLUSION

For the reasons set forth in this Memorandum Opinion, and in an exercise of its discretion, the Court finds that Iran and its proxies were responsible for the ten attacks discussed herein, which resulted in death and injuries to U.S. servicemembers and U.S. nationals. Accordingly, the Court shall **GRANT** default judgment against Defendant Islamic Republic of Iran as to the Section 1605A(c) claims of: (1) the two Plaintiffs personally injured in one of the ten non-bellwether attacks and (2) the two Plaintiffs representing the estates of individuals killed in one of those attacks.

As noted in Section IV (A) (2) herein, the Court, however, does not make any liability ruling, currently, regarding the Section 1605A(c) claims for emotional distress by the thirty-five "family-member" Plaintiffs, arising out of the ten non-bellwether attacks. The Court has indicated that these "family-member" Plaintiffs may rely on the Findings of Fact herein, which establish that Iran's material support proximately caused the actual or attempted extrajudicial killing of each victim in the ten non-bellwether attacks; and furthermore, that these acts of terrorism were sufficiently extreme and outrageous to demonstrate that Iran intended to inflict severe emotional harm on even those not present at the site of the act. The "family-member" Plaintiffs, however, must confirm that they are members of a victim's immediate family, and that they are either U.S. nationals, members of the armed services, or government employees. As has been previously done, this information regarding the family-members should be included with the information on damages that is provided to the Special Master(s).

Furthermore, this Court makes no findings regarding the appropriate amount of damages for any of the 39 Plaintiffs and instead, the Court anticipates that a Special Master will make subsequent findings regarding the appropriate damages calculations for Plaintiffs who have established their right to relief under § 1605A(c), upon the submission of supplemental damages evidence.

An appropriate Order accompanies this Memorandum Opinion.


Dated: June 3, 2026

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE
